IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MAUREEN BRESNAHAN, | |
| Plaintiff, | Case No.: 18-cv- |
| v. | |
| CITY OF CHICAGO, a municipal corporation, | |
| Defendant. | **JURY DEMAND** |

## COMPLAINT

Plaintiff Maureen Bresnahan alleges the following against Defendant, the City of Chicago (the "City" or "Defendant"):

## I.     NATURE OF THE CLAIM

1.      This is an action brought to remedy discrimination in employment on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, and the Illinois Civil Rights Act, 740 ILCS 23/5(a)(1). Plaintiff seeks declaratory and injunctive relief and other equitable make-whole relief both to secure future protection and to redress the past deprivation of the rights secured to her under federal and state law.

2.      Plaintiff is a sworn detective of the Chicago Police Department ("CPD" or "Department"). In February 2015, after ten years as a police officer, she applied for promotion to the position of Explosives Technician I on the Bomb Squad, one of several high-profile, prestigious units in CPD's Special Functions Division.

3. A single CPD deputy chief oversees all Special Functions Divisions units. In February 2015, when Plaintiff applied for promotion to the Bomb Squad, Steve E. Georgas ("Georgas") was the deputy chief over Special Functions.

4. The number of women employed in the Special Functions Division under Georgas' command was abysmal—and it remains so today. Based upon data available in March 2016, after the City rejected Plaintiff for promotion:

A. 0 of 15 members (0%) of the Bomb Squad (title code 9158, D3 pay) were women;

B. 0 of 66 members (0%) of the Special Weapons and Tactics (SWAT) Team, a prestigious position with training opportunities and extensive overtime, were women;

C. at most 1 of 25 (4%) Marine Unit officers (title code 9168, D2 pay) was a woman, and she was detailed out to another unit. (The female commanding officer of the Marine Unit, Lt. Allison Schloss, had one other woman in training and a female officer, in a different title code, working as her Marine Unit secretary);

D. 0 of 5 (0%) Helicopter Unit officers (title code 9154) were women. (Lt. Schloss, who also commanded the Helicopter Unit, had a female officer working as her secretary, in a different title code);

E. 4 of 42 (9.5%) explosives detection canine handlers (title code 9153, D2 pay) were women.

2

5.      Since then, the numbers have not moved in the right direction. In June 2016, Georgas removed Lt. Schloss—the only woman to ever command the Marine and Helicopter Unit—from her command.[1] Based upon currently available CPD data, in March 2018:

A.  0 of 11 members (0%) of the Bomb Squad (title code 9158, D3 pay) are women;

B.  0 of 72 members (0%) of the SWAT team are women;

C.  2 of 31 (6.4%) Marine Unit officers (title code 9168, D2 pay) are women;

D.  0 of 4 (0%) Helicopter Unit officers (title code 9154) are women;

E.  6 of 44 (13.6%) explosives detection canine handlers (title code 9153, D2 pay) are women.

6.      When Plaintiff applied for the Bomb Squad, she obtained the top score, along with two male candidates, on the written MultiCraft Aptitude Test, used to evaluate each candidate's mechanical and electrical aptitude. At the end of the selection process, the City placed both of those male candidates on the Explosives Technician I promotions list but rejected Plaintiff.

7.      During the Equal Employment Opportunity Commission's (EEOC) investigation of Plaintiff's discrimination charge, the City submitted Candidate Assessment Forms for the 72 officers interviewed for the Explosives Technician I

---

[1] On March 15, 2018, Schloss filed a Title VII lawsuit against the City challenging her removal from command. *Schloss v. City of Chicago*, Case No. 18-C-1880 (N.D. Ill.) (Durkin, J.).

position, including Plaintiff. The City also submitted notes and worksheets from the

"consensus meeting," where it made final decisions on the promotions list.

8.     The Candidate Assessment Forms and consensus meeting notes

provided to the EEOC reflect that the City's interview and final decision-making

process for the Explosives Technician I position was permeated with gender bias.

The City denied Plaintiff promotion because she is a woman.

9.     The official notes from the consensus meeting record that the reason

the City rejected Plaintiff—the highest-scoring female candidate and a 10-year

Department veteran—for promotion to the Bomb Squad was that the decision

makers deemed her "Best suited for clerical, office [work]."

| | |
|---|---|
| Candidate 15 | Rec - Team player, bomb canine handler |
| Candidate 16 | DNR ~ |
| Candidate 19 | |
| Candidate 20 | Lacks trainging     DNR |
| Candidate 23 | Exp in mechanical, friendly, prepped     Rec |
| Bresnahan   Maureen | Best suited for clerical, office     DNR |
| Candidate 28 | Rec |
| Candidate 29 | Did not answer questions well     DNR |
| Candidate 30 | Interviewed well, good qualifications     Rec |
| Candidate 33 | Did not answer enough questions on scenario, not team player   DNR |
| Candidate 35 | Rec ~~RR~~ |
| Candidate 36 | Rec |

Exhibit A.

10.     Sgt. James Egan was the commanding officer of the Bomb Squad and

served as both the Hiring Manager and one of three oral interviewers. His notes

from the interview of one of the two male candidates who scored as high as Plaintiff

on the written test (identified by the City as "Candidate 53") record that the

4

candidate's current assignment was in News Affairs and that his "typical day at work" involved "coffee, news clips, [and] media inquiries." Exhibit B at 1. Likewise, Bomb Squad Officer Roland Jones recorded that the candidate identified his duties as including "get coffee/oatmeal," "compile news clips," "deal [with] media inquiries," and "write up press releases." Exhibit C at 1. Candidate 53 had not worked on the street since 2009. Exhibit B at 2. Sgt. Egan noted that he did not "know enough about [the] role of [an] Explosives Technician." *Id.* at 3. He had no military experience or relevant certifications. *Id.* at 4. As training for the Bomb Squad, Egan noted that Candidate 53 "possesses writing skills." *Id.*

11.     For good reason, the City identified the ability to make quick decisions as a criterion for promotion to the Bomb Squad. Asked in his interview to "[d]escribe a time at work when [he] handled a situation and had to make a quick decision based on information available at the moment," Candidate 53 described his arrest for domestic violence. The victim was his fiancé, as documented in Ofc. Jones' notes. Exhibit C at 5. The candidate stated that, "in hindsight, [he] would have reacted in a different direction" and had "learned from the incident." After listening to his answer, Jones gave Candidate 53 the highest rating ("[c]andidate clearly demonstrates competency") on the "quick decision" hiring criterion, and despite his history of domestic violence, recommended him for promotion to the Bomb Squad. *Id.* at 5, 7. Sgt. Egan and the third interviewer, Todd Schmitt, an FBI agent invited by the City to participate in the promotions process, were careful to downplay the candidate's arrest for domestic violence in their notes. Egan described only that the

candidate had "made [a] poor decision in [a] personal domestic issue." Exhibit B at 5. Schmitt recorded even less, noting only that he "talked about [a] federal lawsuit," "made [a] wrong decision," and "learned from [his] mistake." Exhibit D at 5.

12.     Despite Candidate 53's arrest for domestic violence and lack of relevant experience, Schmitt recommended him for the Bomb Squad, "with reservations," because he seemed "very intelligent," "easy going," and "friendly." Exhibit D at 7. Schmitt recognized similar personal attributes in Plaintiff, noting that she was "very intel" (intelligent) and "very pleasant/friendly/outgoing." Exhibit E at 7. But while recommending Candidate 53 based upon his intelligence, Schmitt did not recommend Plaintiff for promotion based upon her own intelligence. Instead, Schmitt patronized her: despite her ambition to work on the Bomb Squad, he opined that she "seem[ed] to be in a good current position." *Id.*

13.     The City does not patronize male officers the way it patronized Plaintiff, deciding that they should feel content in their current positions rather than striving for promotion to a challenging, better-paying job in a prestigious unit.

14.     The other male candidate who scored as high as Plaintiff on the MultiCraft Aptitude Test was identified as "Candidate 62" in the City's documents provided to the EEOC. Candidate 62 also had no military experience. On the only portion of the interview scored objectively—the "Department Procedures and Scenario"—Sgt. Egan awarded him 14 points and rated him "demonstrates some of the competency." Egan thought Candidate 62's description of the role of an

Explosives Technician I was "OK." He noted that the candidate was "nervous" and had "little experience" but had done his "homework."

15.     Plaintiff was better prepared for the oral interview than Candidate 62. She received 16 points on the Department Procedures and Scenario from Jones and Egan (who also noted, "Good Job!") and 19 points from Schmitt. Both Egan and Schmitt rated her "clearly demonstrates competency" on the scenario. In contrast, Candidate 62 received inferior ratings from both Egan and Schmitt.

16.     Despite Plaintiff's superior performance at the oral interview, the City rejected her for promotion while selecting Candidate 62 on the basis that he was "well prepared for [the] interview." Similarly, the City selected "Candidate 93," another male, for the promotions list on the basis that he was "well prepared" for the interview and did "very good" (sic) on the scenario. In fact, Plaintiff received higher scores on the scenario from both Schmitt and Egan than Candidate 93.

17.     The City denied Plaintiff promotion to the Bomb Squad because she is a woman.

18.     Unfortunately, Plaintiff's experience is not unique. The experience of Lt. Allison Schloss, who Georgas terminated from command because of her sex; the *complete absence* of women in the most prestigious Special Functions Division units; the scarcity of women in other Special Functions units; the City's inherently subjective interview procedures; and the unmitigated gender bias evidenced in the notes from the Bomb Squad selection process suggest that the Special Functions Division is permeated with discriminatory bias against women.

19.     After being rejected for promotion to the Bomb Squad, Plaintiff was promoted twice, first to evidence technician and later to detective. Unlike the Bomb Squad promotions process, promotions to evidence technician and to detective are based upon each candidate's performance on a written, subject matter test. The use of objective standards prevents sexist interviewers from dismissing female officers' qualifications and trampling their career aspirations.

20.     In addition to her own make-whole relief, Plaintiff seeks injunctive relief to ensure equal employment opportunities for female CPD officers seeking promotion to the Bomb Squad and other positions in the Special Functions Division.

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII) and 28 U.S.C. §§ 1331 (federal question) and 1443 (civil rights).

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 42 U.S.C. § 1367.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

## III.     PARTIES

**A.     <u>Plaintiff</u>**

24.     Plaintiff Maureen Bresnahan is a female CPD detective.

25.     Plaintiff has met all administrative prerequisites to the filing of this

lawsuit under Title VII. On May 13, 2016, she filed a charge of sex discrimination with the Equal Employment Opportunity Commission. She has filed this complaint within 90 days of her receipt of notice of her right to sue from the EEOC.

**B.    Defendant**

26.    The City is and was at all times relevant a municipal corporation organized and existing under the laws of Illinois.

27.    The City is and was at all times relevant Plaintiff's "employer" as defined by Title VII.

### IV.    FACTUAL ALLEGATIONS, INCLUDING CPD'S PATTERN AND PRACTICE OF SEX DISCRIMINATION IN THE SPECIAL FUNCTIONS DIVISION

28.    Plaintiff has been a sworn member of the Chicago Police Department since September 2005.

29.    Plaintiff has a bachelor's degree in psychology, a master's degree in education, and is a certified teacher, trainer, and Crisis Intervention Officer. In addition to many other certifications, she holds a master's level certificate in Training and Workplace Learning Executive Education from St. Xavier University.

30.    Plaintiff graduated from the Police Academy as class valedictorian. Having graduated first in her class, she was afforded the opportunity to choose her first assignment. She chose the 24th District, which encompasses the Rogers Park community, for its ethnic diversity and the wide variety of police calls.

31.    Rogers Park is one of the most ethnically diverse neighborhoods in Chicago and includes many Jewish and Muslim residents. On information and

belief, the 24th District has the highest number of bomb threats in the City, because of anti-Semitic and anti-Muslim animus. On assignment in the 24th District, Plaintiff handled a bomb threat to a residential building. In responding to that threat, she was required to evacuate the building residents and direct them to a warming bus. She followed the guidelines of the CPD Special Order on Bomb Threats.

32.     On information and belief, most other police districts in Chicago do not face the same potential, daily threats from the use of explosives as a weapon of hate as Rogers Park. Thus, as a police officer assigned to the 24th District, Plaintiff had more experience dealing with such real and potential threats than officers assigned to most other police districts in the City.

33.     From 2009 to 2016, Plaintiff was assigned to the Police Academy (Unit 124) and was detailed out to Public Safety (Unit 125) from around April 2010 to December 2014. Her job duties in these units included, in addition to others, developing curricula for training programs for Chicago police officers, the Chicago Fire Department, the Illinois State Police, and other public safety agencies. The training curricula she developed incorporated materials from the Bomb Squad and HAZMAT materials from the Illinois State Police.

34.     From 2009 to 2016, in addition to her job duties in Public Safety and at the Police Academy, Plaintiff was routinely and regularly deployed to the field. She was detailed to the field nearly every weekend from March to October for special events (e.g. the Air and Water Show, Taste of Chicago, African Arts Festival,

running events). Plaintiff was deployed all over the city to ensure public safety at these events by looking for terrorist indicators, conducting crowd control, and providing a visible deterrent against terrorism and other crime. Further, Plaintiff was also deployed to the filed for "seat belt missions," Operation Safe Passage, and Operation Protect Youth—to deter criminal activity in the city's most violent, high-crime areas.

35. Before joining CPD, Plaintiff had extensive work experience in information technology (IT), as a technology coordinator, programmer, researcher, and library associate. As a sworn member of CPD, she has also worked extensively in IT—including in project management, upgrading and maintaining the Enterprise Knowledge Platform, and troubleshooting—and was one of three officers detailed to the Chicago Fire Department to work on IT projects.

36. In February 2015, Plaintiff applied for promotion to Explosives Technician I, on the Bomb Squad.

37. Promotion to the Explosives Technician position includes a pay increase and elite training opportunities, including a six-week training course sponsored by the FBI at the Redstone Arsenal in Huntsville, Alabama.

38. The Bomb Squad is a prestigious unit in CPD's Special Functions Division.

39. The Special Functions Division also includes the SWAT Team, Marine and Helicopter Unit, Mounted Unit, Canine Unit, and several others.

40.    A single deputy chief is in charge of all Special Functions Division units.

41.    From July 2012 until on or around September 1, 2016, Steve E. Georgas was the acting deputy chief and then deputy chief over Special Functions.

42.    Women are severely underrepresented in all of the prestigious, high-profile Special Functions Division units.

43.    The City currently employs no women—zero—on the Bomb Squad.

44.    On information and belief, the City has never employed a female officer on the Bomb Squad.

45.    The City currently employs no women—zero—on the SWAT Team.

46.    On information and belief, the City has never employed a female officer on the SWAT Team.

47.    The City has employed only one female commanding officer of the Marine and Helicopter Unit: Lt. Allison Schloss. Lt. Schloss served as commanding officer of that unit from May 2014 until June 2016, when Deputy Chief Georgas removed her from command and replaced her with a man. Lt. Schloss has sued the City for sex discrimination and retaliation.

48.    In 2015, when Plaintiff applied for promotion to Explosives Technician I, she had all of the required licenses, certifications, background qualifications, and necessary experience as set forth in Employee Resource E05-20, the Application for Explosives Technician I, Title Code 9158.

49.     Plaintiff obtained the top score (39/40) of approximately 130 candidates on the written MultiCraft Aptitude test, designed to evaluate her mechanical and electrical aptitude. Only two other candidates achieved the same score.

50.     Plaintiff then passed the physical fitness test, using only half (approximately) of the allotted time.

51.     Officers employed as Explosives Technicians must maintain professional liaison with state and local bomb squads, military Explosives Ordnance Disposal (EOD) units, federal agencies, and professional associations, and provide technical support and assistance for other CPD units.

52.     On information and belief, when Plaintiff applied for promotion to Explosives Technician I, she was the only candidate who had been detailed as a professional liaison to the Chicago Fire Department and to outside law enforcement, government agencies, and private corporations on multiple major projects.

53.     Explosives Technician I officers must provide technical support and assistance for other CPD units, prepare and participate in training, compile and report technical data, and keep current with technological development so as to maintain proficiency in the use of computer hardware, software, the internet, email, personal communication devices, and similar technology.

54.     On information and belief, when Plaintiff applied for promotion to Explosives Technician I, she was the only candidate with experience administering the enterprise knowledge online system for the City of Chicago, which includes updating and maintaining the hardware and software for the system, integrating

13

the system with constantly evolving technology, providing technical support and assistance, preparing and participating in training, and compiling and reporting technical data for units within and outside of CPD.

55.  The job duties of an Explosives Technician I include familiarity with and maintenance of a library of technical data, conducting research, and staying informed of current events.

56.  On information and belief, when she applied for the position in 2015, Plaintiff was the only candidate whose previous career included working for the Chicago Public Library.

57.  In addition, Explosives Technician I officers are required to assist in the development of the CPD emergency response plan.

58.  Before applying to the Bomb Squad, Plaintiff's work experience at CPD included preparing the emergency response plan for the Chicago Police Academy.

59.  On information and belief, no other candidate for promotion to Explosives Technician I had drafted a CPD emergency response plan.

60.  On May 4, 2015, after passing the physical fitness test, Plaintiff received a notice to report for an oral interview.

61.  Employee Resource E05-20 identified the following oral interview rating criteria:

> a.  relevant non-Department experience/training, certifications, military experience, etc. Candidates should bring copies of certifications and DD214, if relevant, for consideration.
>
> b.  relevant Department experience and assignments.

      c.      willingness to accept the duties and responsibilities of an Explosives Technician I.

      d.      appearance and professionalism.

      e.      communication skills.

62.    The notice to Plaintiff to report for the oral interview also identified a candidate's knowledge of "Department orders and training materials related to response procedures for suspicious and unattended packages, Bomb Incidents, and Bomb Threats" as a rating criterion.

63.    Employee Resource E05-20 identified study materials for the oral interview, including the Department directive on Bomb Incidents, education and training bulletins, streaming videos, and Department Form CPD-23.256 (the "Bomb Threats" card).

64.    Plaintiff studied and mastered all of the Explosives Technician I study guide material before her oral interview.

65.    On May 27, 2015, Plaintiff completed the oral interview before a panel of three interviewers: Sgt. James Egan, the commanding officer of the Bomb Squad (and the Hiring Manager for the Explosives Technician I promotion); Ofc. Roland Jones of the Bomb Squad; and Todd Schmitt, an FBI agent invited by the City to participate in the Explosives Technician I selection process.

66.    At her interview, Plaintiff described her training at CPD, including her graduation as valedictorian of her Police Academy class, and her work experience at CPD, including her relevant IT experience as an enterprise knowledge system administrator and her work as a liaison to the Chicago Fire Department.

67.     The interview included a bomb threat "scenario" used "to assess the member's ability to articulate department directives into an actual situation." The scenario is the only portion of the oral interview scored objectively, with a rubric.

68.     Plaintiff excelled on the scenario. Schmitt gave her 19 points and a rating of "[c]andidate clearly demonstrates competency." Egan gave her 16 points and the same rating—"clearly demonstrates competency."

69.     Jones gave Plaintiff 16 points on the scenario and noted, "studied" and "hit many points." However, he gave her a lower subjective rating ("[c]andidate demonstrates some of the competency"), reflecting that the rating was more subjective than the numerical scoring rubric.

70.     Only one candidate, identified in the EEOC as "Candidate 152," scored higher than Plaintiff on the scenario. He received 20 points from Schmitt, 18 from Jones, and 19 from Egan. At the end of the selection process, the City ranked Candidate 152 at number 3 on the promotions list. In contrast, the City did not place Plaintiff—the second-highest scoring candidate on the only objective portion of the oral interview—in the top 30 on the rank-ordered promotions list.

71.     Despite her demonstrated capacity to apply Department directives to an actual bomb threat, the City rejected Plaintiff for promotion.

72.     At the consensus meeting, the City's decision makers, which included Sgt. Egan, the Hiring Manager, rejected Plaintiff for promotion on the basis that she was "[b]est suited for clerical, office [work]." Exhibit A.

73. The consensus meeting notes and Candidate Assessment Forms evidence that unmitigated gender bias permeated the Explosives Technician I promotions process. The City rejected Plaintiff for promotion because of her sex.

74. In rejecting Plaintiff for promotion to the Bomb Squad, the City— acting through its designated interviewers/decision makers—dismissed as irrelevant her experience and qualifications, even though her background matches the job duties of the Explosives Technician I position.

75. Rather than applying the objective criteria set forth in the City's written job application, Employee Resource E05-20, the City permitted its designated decision makers to apply their own gender-biased promotions criteria.

76. The decision makers ranked candidates based upon their own sexist stereotypes of what a member of the Bomb Squad should look like.

77. The decision makers ranked candidates based upon their own gender-biased beliefs about what background a member of the Bomb Squad should have.

78. The City's decision makers systematically favored candidates—all of them male—with military experience, whether or not their military experience was objectively relevant to the job duties of the position.

79. In substituting their own discriminatory criteria to the promotions process, the City's decision makers dismissed Plaintiff's experience and qualifications as irrelevant, even though they extensively and uniquely matched the job duties of an Explosives Technician I. For example:

A. The job application identifies, as "Duty K": "prepare and participate in explosives-related training programs authorized by the Chicago Police Department." In the position Plaintiff occupied at the time of her application, she developed training curricula for CPD.

B. The job application identifies, as "Duty O": "assist in the development of agency emergency response plans for bomb threats, improvised explosive devices, and bomb detonation crime scenes." Plaintiff participated in the preparation of the emergency response plan for the Chicago Police Academy, including the response to bomb threats.

C. The job application identifies, as "Duty L": "maintain and be familiar with the technical library of Bomb Data Center publications and other explosives-related materials." In addition, it identifies, as "Duty U": "keep current with technological development so as to maintain proficiency in the use of computer hardware, software, digital photography, the internet, e-mail, PDA's and similar technology." In the position Plaintiff occupied at the time of her Explosives Technician I application, she administered the Enterprise Knowledge Platform for CPD, which included updating and maintaining the hardware and software for the system, integrating the system with constantly evolving technology, providing technical support, and preparing and leading trainings. Plaintiff had also worked as a library associate, running an entire department at a Chicago Public Library branch.

D. The Explosives Technician I job application identifies, as "Duty P": "develop and present bomb threat awareness and safety programs for public and private organizations." Plaintiff has a master's in education degree, a teaching certification, and experience in curriculum development. In addition, CPD had detailed her on major projects as its liaison to the Chicago Fire Department, outside law enforcement agencies, and private corporations.

80. At her oral interview, Plaintiff described how she could apply her background in IT and as a librarian, and her experience as a trainer and liaison to other public safety departments to her job duties on the Bomb Squad. But the interviewers dismissed these objective qualifications as largely irrelevant.

81. In contrast, according to the consensus meeting notes, the City ranked "Candidate 35"—a male—number 6 on the promotions list because he had experience with the FBI and other "outside agencies."

82. The City selected two male candidates for the promotions list, "Candidate 53" and "Candidate 62," who lacked relevant experience but were perceived by the interviewers as "intelligent." Thus, for these male candidates, perceived "intelligence" could make up for a lack of experience. One of these candidates, Candidate 53, was assigned to News Affairs, had not worked on the street for at least six years, and admitted to battering his fiancé.

83. Plaintiff was the valedictorian of her Police Academy class, scored a 39 out of 40 (the highest score) on the MultiCraft Aptitude test, and has a master's

degree. But the City's sexist decision makers did not conclude, as they had with the male candidates, that her intelligence would make up for any lack of experience. Instead, they deemed her "best suited" for "clerical" work.

84.    On July 21, 2015, the City notified Plaintiff that she was rejected for promotion to Explosives Technician I.

85.    Eight days later, on July 29, 2015, she learned that Sgt. Egan had filed a false and malicious Internal Affairs Division (IAD) complaint against her, claiming that she had engaged in deception in obtaining an explosives license from the Illinois Department of Natural Resources (IDNR). Before he filed the IAD complaint, Egan had spoken with Linda Raufer, the explosives license coordinator at IDNR, and demanded that she invalidate Plaintiff's explosives license. Raufer refused to invalidate Plaintiff's license and told Egan that Plaintiff had followed proper procedures and had done everything "by the book" and that hundreds of CPD officers who are not on the Bomb Squad had obtained the same license.

86.    On or around July 30, Plaintiff contacted Raufer, who asked whether "they [were] still bothering [her]" about the license. On or around August 4, 2015, Raufer offered to speak to her supervisors about Egan's conduct.

87.    On or around October 2, 2015, Egan continued to abuse his office by harassing Raufer, asking her to revoke Plaintiff's explosives license, and making derogatory and defamatory statements about her.

88. On October 13, 2015, IAD concluded that Egan's complaint against Plaintiff was unfounded. The Chicago Police Department officially defines the finding of "unfounded" as when the allegation is false or not factual.

89. Egan's false and malicious complaint against Plaintiff was motivated by sex-based animus. On information and belief, Egan has never initiated an investigation into the validity of an explosives license held by any male CPD officer or tried to badger a state official into revoking any male officer's license.

90. Because of sex discrimination, Plaintiff has not been promoted to the position of Explosives Technician I, on the CPD Bomb Squad.

91. Furthermore, the City is and has been engaged in an unlawful pattern and practice of sex discrimination against female police officers applying for jobs in the Special Functions Division, in violation of Title VII.

92. Plaintiff's own experience applying for positions in the Special Functions Division evidences a pattern and practice of discrimination.

93. In 2015, before Plaintiff applied for promotion to the Bomb Squad, she applied for promotion to the Canine Unit, to be a canine handler or canine explosives detection handler (two separate promotional positions). She scored 55 out of 56 on the written promotions test and then passed the physical fitness test. Yet despite scoring 98% on the written test, after the oral interviews, Plaintiff was ranked only 22nd on the canine handler list and 24th on the canine explosives detection handler list. As a result, the City has not offered her promotion to the

Canine Unit, where women are also underrepresented relative to their representation as sworn members of the Department.

94.     On information and belief, the use of oral interviews in the application process for positions in the Special Functions Division has resulted, and continues to result, in systemic sex discrimination against female candidates.

95.     In contrast to the selection procedures used in the Special Functions Division, the City's procedures for other promotions, including to detective, sergeant, and lieutenant, incorporate measures intended to reduce discriminatory bias. Specifically, the written test scoring sheets are blinded to remove the candidates' names and other indicia of their race and sex so that racial and gender bias does not infiltrate the promotions process. Plaintiff's promotion to detective, in the first class hired after her application, demonstrates that blinded application procedures will reduce sex discrimination in promotions.

96.     The City is and has been aware that its selection procedures in the Special Functions Division result in systemic discrimination against women. In addition, it is and has been aware of the availability and efficacy of alternative procedures, including ones used for other promotions in the Department, to reduce or eliminate gender bias. Yet, despite the availability of measures to enhance equal employment opportunities for women, the City has taken no steps to replace its discriminatory promotions procedures in the Special Functions Division with neutral ones, resulting in a pattern and practice of discrimination against women.

## FIRST CLAIM FOR RELIEF
## Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*
## Sex Discrimination

97.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

98.     Through the actions described above, Defendant intentionally discriminated against Plaintiff, by rejecting her for promotion to Explosives Technician I, because her sex.

99.     On information and belief, the City is and has been engaged in an unlawful pattern and practice of sex discrimination against female police officers applying for jobs in the Special Functions Division, in violation of Title VII.

100.     As a result of Defendant's unlawful discrimination against Plaintiff, she has suffered injuries including but not limited to the loss of income, training, and promotional opportunities; damage to her reputation; and emotional distress.

## SECOND CLAIM FOR RELIEF
## Illinois Civil Rights Act, 740 ILCS 23/5

101.     Plaintiff incorporates by reference the preceding paragraphs as alleged above.

102.     Through the actions described above, Defendant subjected Plaintiff to discrimination on the basis of her sex, in violation of 740 ILCS 23/5.

103.     As a result of Defendant's violation of the Illinois Civil Rights Act, Plaintiff has suffered damages including but not limited to the loss of income, training and promotional opportunities; damage to her reputation; and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.     A declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and the Illinois Civil Rights Act, 740 ILCS 23/5;

B.     An order promoting her to the position of Explosives Technician I on the CPD Bomb Squad and ordering other necessary and appropriate relief related to that promotion, including protection from retaliation;

C.     An order that the City end its unlawful practice of sex discrimination in the Special Functions Division, including that it cease utilizing discriminatory oral interviews in candidate selection, and other necessary and appropriate injunctive relief to ensure equal employment opportunities for women;

D.     Appointment of a monitor to ensure compliance with Title VII in the selections process for positions in the Special Functions Division;

E.     An award of backpay and compensatory damages;

F.     An award of costs and reasonable attorneys' fees and expenses as provided for in 42 U.S.C. § 2000e-5(k) and 740 ILCS 23/5;

G.     An order awarding Plaintiff pre-judgment and post-judgment interest; and

H.     All other legal and equitable relief the Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury on all claims and issues that may be tried to a jury.

Dated:  March 18, 2018            Respectfully submitted,


                                 /s Marni Willenson
                                 Marni Willenson
                                 marni@willensonlaw.com
                                 Samantha Kronk
                                 skronk@willensonlaw.com
                                 Willenson Law, LLC
                                 542 S. Dearborn Street, Suite 610
                                 Chicago, IL  60605
                                 (312) 508-5380
                                 (312) 508-5382 (Fax)

                                 Attorneys for Plaintiff