# Exhibit E

**Plaintiff's Deposition Designations**

**Bookmark**

Ron Dornecker .......... Tab A

Roland Jones .......... Tab B

Linda Raufer .......... Tab C

Todd Schmitt .......... Tab D

# Tab A

# Deposition Designations

# Ron Dornecker

Maureen Bresnahan v. City of Chicago – No. 18CV1972

# Deposition Designation Chart — Ron Dorneker

Witness: Ron Dorneker; Deposition Date: October 15, 2021

| Designation | Objection / Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation / Concise Basis |
|---|---|---|---|---|
| The City objects to any designated testimony from Ron Dornecker because it is irrelevant, prejudicial, confusing, and subject to a pending motion in limine. The City further objects that Plaintiff has not demonstrated the deponent is unavailable under Rule 32. | | | | |
| Tr. 4:1-6:3 | | | | |
| Tr. 6:11–9:24 | | | | |
| Tr. 12:8–12 | Foundation. Witness testified he was uncomfortable answering these questions because he did not remember. Relevance – testing rounds for fire department divers is irrelevant, confusing, and prejudicial. | | | |
| Tr. 13:3–14:5 | Relevance – gender composition of fire department divers is irrelevant, confusing, and prejudicial. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

# Deposition Designation Chart — Ron Dorneker

Witness: Ron Dorneker; Deposition Date: October 15, 2021

| Designation | Objection / Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation / Concise Basis |
|---|---|---|---|---|
| Tr. 14:19–15:6 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 16:24–19:15 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 20:17–23 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 21:5–22:6 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 22:19–23:25 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

# Deposition Designation Chart — Ron Dorneker

Witness: Ron Dorneker; Deposition Date: October 15, 2021

| Designation | Objection / Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation / Concise Basis |
|---|---|---|---|---|
| Tr. 24:23–25:9 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 26:2–25 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 27:12–15 | Relevance –fire department diver testing is irrelevant, confusing, and prejudicial. | 27:16-28:4 | | |
| Tr. 29:25–30:18 | Relevance – fire department diver equipment is irrelevant, confusing, and prejudicial. | | | |
| Tr. 31:13–33:14 | Relevance – fire department opinion on diver equipment is irrelevant, confusing, and prejudicial. Speculation. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

# Deposition Designation Chart — Ron Dorneker

Witness: Ron Dorneker; Deposition Date: October 15, 2021

| Designation | Objection / Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation / Concise Basis |
|---|---|---|---|---|
| Tr. 35:7–10 | Relevance – fire department treatment of medical conditions is irrelevant, confusing, and prejudicial. | 34:18-20, 34:24-35:6 | | |
| Tr. 37:8–17 | Relevance – testing fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 37:5–38:2 | Relevance – training fire department diver applicants is irrelevant, confusing, and prejudicial. | | | |
| Tr. 44:7-45:9 | Relevance – deponent's vague awareness of Schloss is irrelevant. | | | |
| Tr. 45:21-46:13 | Relevance – deponent's vague awareness of Georgas and Schloss is irrelevant. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

# Deposition Designation Chart — Ron Dorneker

Witness: Ron Dorneker; Deposition Date: October 15, 2021

| Designation | Objection / Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation / Concise Basis |
|---|---|---|---|---|
| Tr. 53:20–54:2 | Relevance – training and testing fire department divers is irrelevant, confusing, and prejudicial. | | | |
| Tr. 56:16–57:10 | Relevance – training and testing fire department divers is irrelevant, confusing, and prejudicial. | | | |
| Tr. 63:3–64:11 | Relevance – training and testing fire department divers is irrelevant, confusing, and prejudicial. | | | |
| Tr. 65:9–23 | Relevance – fire department diver operations are irrelevant, confusing, and prejudicial. | | | |
| Tr. 67:20-71:2 | Relevance – fire department application and training standards are irrelevant, confusing, and prejudicial. | | | |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-cv-1880; 19-cv-1257

ALLISON SCHLOSS/MELISSA TAPIA, )
)
Plaintiffs, )
)
vs. )
)
CITY OF CHICAGO, et al. )
)
Defendants )
________________________________)

DEPOSITION OF
RON DORNECKER

Taken on Behalf of the Defendants

DATE TAKEN: October 15, 2021
TIME: 10:08 AM - 11:56 AM
PLACE: VIA ZOOM

MAGNA LEGAL SERVICES
(866) 624-6221
www.magnaLS.com

APPEARANCES:
FOR PLAINTIFFS ALLISON SCHLOSS and MELISSA TAPIA:
CYNTHIA H. HYNDMAN, ESQ.
ROBINSON CURLEY P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
chyndman@robinsoncurley.com

FOR PLAINTIFFS ALLISON SCHLOSS and MELISSA TAPIA:
MARNIE WILLENSON, ESQ.
WILLENSON LAW
542 South Dearborn Street, #610
Chicago, Illinois 60605

FOR DEFENDANTS EXCEPT SGT. BELTRAN:
ALEXIUS CRUZ O'MALLEY, ESQ.
MICHAEL BEST & FRIEDRICH
444 W. Lake Street, Suite 3200
Chicago, Illinois 60606
acomalley@michaelbest.com

FOR DEFENDANT EDUARDO BELTRAN:
JESSICA DURKIN, ESQ.
Assistant Corporation Counsel for the City of Chicago
2 North LaSalle Street, Suite 640
Chicago, Illinois 60602
Jessica.durkin@cityofchicago.org



INDEX
EXAMINATION


Witness Name Page
RON DORNECKER
BY MS. HYNDMAN ................................ 4
BY MS. O'MALLEY ............................... 59


(No exhibits were marked at this time.)



P r o c e e d i n g s

Deposition taken before Michele Anzivino, Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

\- - -

Thereupon,

RON DORNECKER,

having been duly sworn or affirmed, was examined and testified as follows:

THE WITNESS: Yes.

DIRECT EXAMINATION BY MS. HYNDMAN:

Q. Good morning. My name is Cynthia Hyndman. I'm one of the attorneys representing Allison Schloss and Melissa Tapia in their lawsuits against the City of Chicago arising from their work as police officers in the Chicago Police Department.
What is your highest level of education after high school?
A. I have a college degree.
Q. Where did you get that degree from?
A. University of Illinois.
Q. What was your area of study?
A. Criminal justice.
Q. Mr. Dornecker, do you have any certifications in diving?



A. Yes, I do.
Q. What certifications do you hold?
A. I'm an open water scuba instructor. I'm also a public safety diving instructor.
Q. When did you become a public safety instructor?
A. I don't remember the exact date.
Q. How many years have you worked as a safety diving instructor?
A. Over 20.
Q. Where did you receive that certification?
A. Through Emergency Response Diving International.
Q. Is that public safety diving instruction certification something that needs to be renewed from time to time?
A. Yes.
Q. How often does it need to be renewed?
A. Yearly.
Q. Through ERDI?
A. Yes.
Q. What is the process for renewing the certification through ERDI as a public safety diving instructor?
A. So I mean it's obviously an insurance,



MAGNA LEGAL SERVICES

Page 6

liability insurance. You have to prove that, and also you have to prove that you've conducted a certain amount of instructional sessions and diving each year.
Q. Is there a fee for renewing the certification?
A. There is.
Q. Do you have any idea how much it is or do you remember how much it is?
A. I don't. It varies depending on the certification level.
Q. Were you formerly employed by the Chicago Fire Department?
A. I was.
Q. How long were you employed by the Chicago Fire Department?
A. From 1988 November through November of 2018.
Q. What was your highest rank at the fire department?
A. I was a career service rank battalion chief, and appointed as a exempt rank deputy district chief.
Q. During your career with the Chicago Fire Department, did you have any responsibilities with the fire department's air/sea rescue team?
A. Yes, I did.
Q. Is that the proper name for the group?

Page 7

A. That's one of the groups.
Q. What is the air/sea rescue team?
A. The air/sea rescue team is a division under the special operations unit within the Chicago Fire Department that provides an emergency response to any water rescue or any water-related incident within the boundaries of the City of Chicago or wherever we provide mutual aid.
Q. How long did you work as part of the air/sea rescue team?
A. Exact dates I don't know. Probably close to 20 years.
Q. When you were deputy district chief, did you have responsibility for that team?
A. I did.
Q. What were your responsibilities with respect to the team when you were district chief?
A. I mean, they were numerous. Everything from day-to-day operations to purchasing, procurement, grant writings, setting up contracts, all the trainings, certifications, writing the standards, creating standards, and responding to any and all incidents that they went on.
Q. How many divers did you have on the air/sea rescue team at the time you ended your work with them?

Page 8

A. So when you -- there's a difference. So I was tasked with not only overseeing air rescue, but I also oversaw all the divers within the Chicago Fire Department. So within air/sea there was approximately 32 divers or 32 personnel. The Chicago Fire Department was probably closer to 140 divers.
Q. So other divers that work worked for the fire department, where were they assigned?
A. They were strategically located throughout the City of Chicago on what we call squad companies, Squad 1, 2, 5 and 7.
Q. So you had responsibility for all the divers who worked for the fire department?
A. My title as a deputy district chief was deputy district chief of marine and dive operations for the Chicago Fire Department. So I oversaw all the dive and any water-related issues, programs, purchases, training.
Q. Were the -- did the air/sea rescue team have boats?
A. We did.
Q. How many boats did the team have?
A. Well, air/sea rescue had one boat. The Chicago Fire Department also had a larger boat that was -- didn't not fall under my command, did not have

Page 9

divers on it.
Q. So there was one boat that had divers for the Chicago Fire Department?
A. Yes, ma'am.
Q. And then one more boat that the fire department had; is that correct?
A. Correct.
Q. Did the air/sea rescue team have all shifts covered on a 24-hour basis?
A. Yes.
Q. Where was the air/sea rescue team headquartered?
A. On Forman Drive. Their base of operation, air/sea rescue was based out of Forman Drive. Our was stationed at the Chicago Marine Safety Station.
Q. Where was the Chicago Marine Safety Station?
A. You know, I can't give you an exact -- quite honestly, I don't remember the address. It's been three years, but I don't remember. Off of -- I don't remember. I don't remember the address.
Q. Okay. Can you tell me approximately where -- was it on the lakefront?
A. Yeah. It was where the Chicago river meets the lake.
And just for a matter a point here, when my

Page 10

wife, if she ends up back on this conference call I'm going to have to move outside, okay? So we're as good sitting here until she gets on her call. When she's on her call I'm going to have to move.
Q. Okay. I appreciate that. Thank you very much.
A. Happy wife, happy life.
Q. Right. Exactly.
Where -- where did you office when you were the deputy district chief for marine dive operations?
A. I -- mine was 259 NorthColumbus out of Engine 13's quarters.
Q. Did the Forman Drive building where the air/sea rescue team was headquartered, was this a shared space with the Chicago Police Department marine unit?
A. Not with the marine unit. I believe it was their helicopter division. So that was our divers flew out of that hell port out of fifth street. I think -- I don't believe they had any marine unit. I don't know that. I think it was just helicopter people as far as I knew.
Q. Did the Chicago Fire Department have any people working out of the space where the marine unit was headquartered, the Chicago Police Department marine

Page 11

unit was headquartered?
A. Yes. We moved into the Chicago Marine Safety Station. That's where we housed our personnel.
Q. When did you move into there?
A. I don't remember that date.
Q. Did the marine unit have their boats stationed there, as well?
A. Yeah. That was the Chicago Marine Safety Station. So everybody did. Coast Guard. That was for public safety agencies that were assigned out of that unit or out of that station.
Q. Were you involved in recruiting personnel to become divers for the Chicago Fire Department?
A. I was involved in the testing processes, not -- I wouldn't say it was the recruiting process.
Q. Was the testing process the same for divers in the air/sea rescue team as it was for divers that were housed elsewhere throughout the fire department?
A. No. It was different.
Q. Let's talk first then about the testing process for the divers on the air/sea rescue team. What was the application process to become a diver on the air/sea rescue team?
A. I would be uncomfortable trying to remember that. I mean, I really don't remember all those

Page 12

details. And that's something I think you could get that would give an exact answer. I'm not comfo -- I don't remember is going to be my answer there.
Q. Do you remember if there was some sort of a written test at all?
A. No. There was no written test. I mean -- no, no. I mean there -- no.
Q. Was there some kind of physical fitness test involved in -- to become a diver as part of the air/sea rescue team?
A. Yes. And that was -- fell under the public safety diving standards that they had to comply with.
Q. Do you remember any parts of that public safety diving test that was administered for people trying to become divers on the air/sea rescue team?
A. I don't remember that. But again, the fire department has all that information documented.
Q. Were both firefighters and paramedics eligible to become divers for the air/sea rescue team?
A. The short answer is yes. The long answer is the paramedics had to be cross-trained. So they had to also be a firefighter. So at the time I was in charge there were no single-role paramedics on air/sea rescue. Any paramedic that was part of the air/sea rescue or the dive program had also gone through the Chicago Fire

Page 13

Department Fire Academy and crossed over as a firefighter and retained their paramedic status.
Q. Of the 32 divers that were on the air/sea rescue team around the time that you ended your work with that team, how many of them were women?
A. I'm trying to -- I don't remember if we had women on air/sea rescue at that point. I know a couple had just transferred out and had been promoted.
Q. At any point in time while you had responsibility for the air/sea rescue team did you have women divers?
A. Yes, I did.
Q. Over the course of 20 -- of the 20 years or so that -- that you were responsible for the air/sea rescue team, can you tell me how many -- approximately how many women divers you had on that team?
A. I don't know that. I don't remember.
Q. Of the 140 divers assigned to the Chicago Fire Department, can you approximate how many of those were women?
A. I don't -- again, I don't remember that. It was a -- I mean there was a turnover there with promotions and people moving from, you know, unit to unit. I don't remember the number.
Q. Is it there to say there were more than 10



MAGNA LEGAL SERVICES

women divers for the Chicago Fire Department out of the 140 that were driving for the department?
A. During my career?
Q. Yes.
A. Yes.
Q. Did you have to be below a certain rank in order to become a diver for the air/sea rescue team?
A. Originally, yes. But then it was changed because we needed lieutenants and captains to fill positions on our fast boat.
Q. Was the fast boat the boat that was assigned to the air/sea rescue team?
A. Yes, ma'am.
Q. So were the lieutenants and captains that were assigned to the air/sea rescue team, were they all trained as divers?
A. Yes, ma'am.
Q. You said that you were -- strike that.
Do you have any experience either one the fire department or outside the fire department with training of applicants?
A. I do.
Q. What experience do you have with training of applicants?
A. I'm currently employed by Vision Quest



Coaching which is out of Highland Park, Illinois. I'm an Ironman Triathlon University graduate, and I coach several athletes in swimming, biking, running and endurance sports.
Q. Do you coach women as well as men?
A. Yes, I do.
Q. How long have you been doing the Triathlon training?
A. As an individual or as a coach?
Q. As a coach.
A. 1995.
Q. How long have you been training as an individual?
A. 1984.
Q. You mentioned that you had instances where you had divers that promoted out of the air/sea rescue team. Can you describe what those circumstances would be where someone would promote out of the air/sea rescue team?
MS. O'MALLEY: Object to form, O'Malley.
BY MS. HYNDMAN:
Q. You can go ahead and answer.
A. Within the unit there's budgeted positions, right? So if you're a firefighter and you choose to take, say, an engineer exam or promotional exam to a



lieutenant position and you're promoted to that position and the budgeted position that you're assigned to is only a firefighter rank, then you have to take that position and move out of the unit.
Q. And so that would happen from time-to-time with your divers?
A. Quite often.
Q. Did you ever have circumstances where your divers would promote out and then come back into the unit as a lieutenant or captain?
A. Yes.
Q. During the time you were responsible for the air/sea rescue team, did you ever have any women in the position of lieutenant or captain?
A. No, not -- I'm thinking. No, not within -- no, not while I was there.
Q. At some point after you were there, are you aware of any women lieutenants or captains on the team?
A. I -- you know what?
MS. O'MALLEY: Object to form.
BY MS. HYNDMAN:
Q. You can answer.
A. I don't know that.
Q. You said that you were responsible for training of all Chicago Fire Department's divers. Did



you personally conduct that training?
A. I did.
Q. Were you assisted by anyone?
A. I conducted the training. And what we allowed the officers to do on a daily basis was -- was to conduct a company drill -- which means that they were not responsible for the actual instruction. It was their job to just then go take them out after they were certified to practice those skills.
Q. Were there any other licensed public safety diving instructors in the fire department during the time that you were the deputy district chief?
A. Not while I was on -- not while I was in charge.
Q. Did you maintain your licensing as a public safety diving instructor the entire time that you were deputy district chief for marine and dive operations?
A. I did.
Q. While you were conducting training for divers, did you train air/sea rescue team divers and other fire department divers together, or was that a separate training?
A. Initially they all came through the same training program, and then they went to their specific unit of assignment and that training was designed to be



MAGNA LEGAL SERVICES

Page 18

-- to meet the needs of that specific unit or team.
Q. So let's talk first about the training for the air/sea rescue team. Well, strike that. So wait. Let me -- let me make sure that I understand.
There was training together for the air/sea rescue divers and the fire department divers, and then they would split off and they'd have additional training? Is that -- do I understand that correctly?
A. Yes.
Q. So let's talk first then about the joint training.
How long did that training program last?
A. Initial training for a driver was one 40-hour week which we call endorsement training.
Q. In order to become a diver for the fire department either as a air/sea rescue team driver or a fire department diver, were they required to have any diving certifications prior to training?
A. A basic open water scuba certification.
Q. That was a requirement?
A. Yes.
Q. What was involved in the initial 40-hour week training?
A. I mean, it was a very complex intense week. I mean, again I'm -- I -- to give you a snapshot

Page 19

wouldn't be fair. You know, that's all documented. I mean, it was a -- it was a -- it was a pretty intense week for them for 40 hours. I don't remember is my -- is what I'm saying. I don't remember all the details or all the training. It was quite a bit.
Q. Was this something -- so you documented everything that these divers would go through in the training in that first 40-hour week?
A. Yes.
Q. Did it follow a curriculum of some kind?
A. We used Emergency Response Diving International as a standard.
Q. Did you streamline it or modify it for fire department purposes?
A. Yes, we did.
Q. Where did that training take place?
A. Well, originally it took place at our -- the swimming pool that we were able to use at 1450 North Larrabee.
Q. Was that the high school pool?
THE REPORTER: Sorry. 1450 North what?
THE WITNESS: Larrabee. Larrabee.
A. And former. It's, yeah, the old near North Metro High School.
Q. How long did you conduct training at the pool

Page 20

of 1450 North Larrabee?
A. I don't remember the dates.
Q. But at some point that pool was no longer available for your use, correct?
A. That pool was there I believe until the end of my tenure. Yeah, I was -- I still had -- I believe I still had control of that pool. We used it until the end of my -- my time.
Q. So through November of 2018?
A. I think so. I'm pretty certain.
Q. After this 40-hour week, what was the next step in the training for -- strike that.
Was the 40-hour week the only time that the -- the fire -- fire department divers and the air/sea rescue divers trained together?
A. No.
Q. What was the next step in the training after this 40-hour week for the joint training for the fire department and air/sea rescue divers?
A. So, I mean, that training got them their certifications and basic skill level to then be able to conduct open water dive training. And that was with air/sea rescue done on an everyday basis.
Q. How many open water dives would the air/sea rescue team divers participate in?

Page 21

A. I mean if -- I don't understand the question.
Q. Yeah, let me -- let me -- let me rephrase that or let me first ask you some preliminary questions.
Once the 40-hour training was done, you said that got them to their certifications. At that point, were the trainees considered part of the air/sea rescue team?
A. No. I mean yes. So they were -- yes. Yes.
Q. But they continued to do some training with open water dives; is that correct?
A. Correct.
Q. Were there a certain number of open water dives that the trainees needed to complete in order to move on to some next step of certification or some next step with respect to being on the air/sea rescue team?
A. I mean it -- that's kind of a -- within the diving world that's kind of, you know, a gray area. Where they -- you know, some divers require more training than others to get comfortable. They could all perform the skills, but everybody did -- basically did the same amount of training. Some divers just dove a little more than others just to get their comfort level's where they needed to be.
Q. Was there a period of time that you conducted



MAGNA LEGAL SERVICES

Page 22

these open water dives for the divers on the air/sea rescue team and the fire department?
A. We dove seven days a week. The only thing that limited us was lightning. Otherwise, we were in the water diving every day as a training dive. And again not with everyone, but whoever was on duty.
Q. What certification did the divers have at the end of the 40-hour week that you described that took place at the pool?
A. I don't remember all of them. It was a -- emergency response diver level one, full face mask, a dry suit. I don't remember all of them, but again that's documented within the Chicago Fire Department. I believe there were seven or eight they -- they -- they were able be to obtain at the end of an entire year because we -- of course we had to wait for winter to conduct did the ice diving and the cold weather operation dives.
Q. Once the week of training, intense training in the pool was completed and you went out to the open water dives, were both air/sea rescue team divers and firefighter divers participating in those open water dives?
A. When on duty, yes.
Q. Was there separate specific training that you

Page 23

conducted for the air/sea rescue team in addition to this intensive week of training and then the open water dives?
A. Yes.
Q. What training did the air/sea rescue team receive in addition to that?
A. So air/sea rescue unit divers would potentially be assigned to our helicopter or to our fast boat. So they needed additional training to learn about helicopter operations and dive operations off the helicopter, which were different than what we did with the divers that were on the squads. And the same thought would go for the people on the boat. They would have to learn boat operation and they'd need learn to execute a dive off a which was different than a helicopter and different than the squads.
Q. Were all members of the air/sea rescue team trained in both helicopter operations and air/sea rescue operations?
A. Not immediately. But as the time allowed, yes.
Q. So everybody was cross trained on doing helicopter dives and boat dives, everybody in the air/sea rescue?
A. Yes.

Page 24

Q. What additional training was there for divers that were assigned to the squads?
A. Can you repeat that question, please?
Q. What additional training was there that was conducted for the divers that were assigned not to the air/sea rescue team but to -- but to the other squads?
A. I mean specific to their location, you know, that could be a possibility. For example Squad 7, at O'Hare Airport did a lot of mutual aid outside the city of Chicago. So it was -- the training -- because remember, when you talk about training it's not only dive training. It could be anything from familiarization. So now Squad 7 could respond out the City of Chicago, or you have, you know, Squad 5 down working at 95th and the river where they're diving around tug boats learning how to dive, you know, in and around something like that.
So it was more -- it was -- it was nothing -- I mean it was a different dynamic of the training, right?
Q. Yeah.
A. But there was not a certification for that.
Q. Did you conduct the training for -- the additional training for the divers who were assigned to the various squads?

Page 25

A. I did.
Q. What training did you conduct for them? Was it primarily dive training for --
A. Yes. So they did everything from open water dive training, and they would also do surface ice rescue training.
Q. Did you do the training for the river dives for them, as well, those squads?
A. I did.
Q. Going back to some questioning I had earlier about whether there were any women lieutenants and captains assigned to the air rescue team, I failed to ask you whether there were any women lieutenants or captains who were divers that were assigned to any of the squads that you were aware of.
A. That were officers? That were lieutenants and captains?
Q. Yes.
A. I don't know that.
Q. How often would you have a training class beginning their intensive 40-hour week initial training with the fire department?
A. That was only done after we conducted our interviews and members of the Chicago Fire Department were then assigned to one of the teams that required



MAGNA LEGAL SERVICES

dive training.
Q. So after that, so after interviews are conducted and -- and people make it past an interview and they are assigned to one of the dive teams there would be this training, right? How often was there a selection process or an interview process to get together a new group of divers?
A. That was -- that would be based on what we call vacancies. Within the Chicago Fire Department, the bargaining unit, they have to post vacancies four times a year within a calendar year. So the potential could be four classes a year. That could be more or less based on the number of people that might be coming into the unit because we limited the amount of divers that would come for one 40-hour week.
Q. How many divers would you have in a class for that 40-hour week?
A. It could -- it could range from 6 to maybe 12 on the high end.
Q. And you could have a class of 6 to 12 divers potentially four times a year, is that right, depending on vacancies?
A. It could be. It could also be, you know, there could have been six or seven class a year based on the vacancies.



Q. Was there a typical year at any point where you could say typically I would have four classes a year or I would have five classes a year?
A. That number is so random based on people wanting to transfer because -- and then promotions. So, you know, transfers occur because of promotions and transfers.
Q. And so then vacancies would open on the team that somebody transferred out of or got promoted out of?
A. Correct.
Q. Did the divers -- the existing divers for the fire department have to go through regular physical fitness testing?
A. No.
Q. So there wasn't an annual retesting requirement for the divers?
A. No. It was not an annual. It was a -- we evaluated our divers every day they went into the water. So divers would routinely be in the water a couple times a year. It was not a -- a one test that we ran. We continually, every day, did daily evaluation of every diver that was on duty.
Q. Did the divers regularly swim to stay in shape? Were there requirements for them to swim a



certain amount a week?
A. I could not mandate requirements because of our union, but I was able to implement dive -- swim training.
Q. And that was something that was voluntary for divers?
A. When they were on it was just -- it as endurance training. Physical fitness training to boost their endurance so that they could be, you know, a better diver, a more efficient diver, and more comfortable in the water.
Q. Would that swim training take place in the pool or was that open water training?
A. Both.
Q. Both? You said that you did open water diving seven days a week when people are on duty. So that was all the existing divers for the fire department would be diving on a regular basis?
A. More air/sea rescue and the fast boat than the squad companies. The squad companies would typically have one day a week where they would -- you know, the -- the company captain on a -- on an apparatus gets to put together kind of a work schedule and a drill schedule. And remember, the squad companies aren't only tasked with diving but they're



also technical rescue experts in everything from confined space to, you know, elevator operations to high rise to HazMat. So the disciplines that they're -- they're expected to be experts in was -- that was numerous. So we couldn't take up seven days a week of their time for just dive training.
Q. What is the regular tour of duty for the divers?
A. 24 hours on duty, 48 hours off duty. Every fifth duty day is what they call a daily day where they're off duty. And there's three shifts within the fire department.
Q. So that true for the divers. Is that the same as other firefighters, same tours of duty?
A. For every firefighter assigned within the fire suppression and rescue unit.
Q. Was that just a specific unit of the fire department?
A. That's sworn firefighters. Paramedics were on a different schedule, and then there were different bureaus within the fire department that could have different work schedules, as well. But all the divers fell within the bureau of fire suppression and rescue, and that was their schedule.
Q. Were the divers on the air/sea rescue team



MAGNA LEGAL SERVICES

Page 30

outfitted with dry suits by the fire department?
A. Yes.
Q. Did each diver have their own dry suit?
A. No.
Q. Were there various sizes of dry suits available to the divers?
A. Yes.
Q. Did you make attempts to have dry suits that fit the firefighters who were assigned as divers to the air/sea rescue team?
A. Yeah. We did the best we could with the budget we had.
Q. Did you have -- you did have some women divers over the course of team that you were responsible for the air/sea rescue team, correct?
A. Yes.
Q. Did you have dry suits that fit women divers?
A. Yes.
Q. What other equipment did the fire department provide to the divers on the air/sea rescue team?
A. So no one was given their own set of equipment. We shared all our equipment within the entire dive program. So, you know, it was -- there was quite a bit. It was a large list of equipment from full face mask, tanks, buoyancy compensators, fins,

Page 31

weight belts. So that's -- that was all shared within the entire department.
Q. Was there -- was there any equipment that the divers on the air/sea rescue team were expected to provide for themselves, purchase for themselves or for provide for themselves?
A. No.
Q. I'm sorry.
A. It was not allowed.
Q. So a diver couldn't come with their own dry suit and use their own dry suit?
A. At no time.
Q. You said you made attempts to have the dry suits fit to the extent you could within the budget that you had. Why is it important for a dry suit to fit a diver?
A. Safety and comfort.
Q. And what's the safety issues around having a properly fitted dry suit?
A. I mean -- everything from your mobility in the water to the seals on the dry suit need to fit you so you're protected from contaminants and you're basically enclosed in that suit. So I mean there's numerous issues but, you know, generally speaking if the suit doesn't fit it's -- could be cumbersome to

Page 32

work with. And it can't be too tight. That could be a liability to the diver.
Q. Are there safety issues around having a dry suit that's too large for a diving?
A. Yes.
Q. What would be the safety issues presented by dry suit that's too large?
A. I mean, a dry suit that doesn't fit properly might not allow you to sick the right way you need to kick. It might vent air through the suit. It could cause a free flow of air from your full face mask into your hood. You know, so the blow-by could be an issue into the suit which can cause -- you know, if you're at any depth that can cause a buoyancy problem, and a buoyancy problem can go into an uncontrolled ascent. An uncontrolled ascent can cause a lung over-expansion injury and that can cause a hospital visit or death.
Q. So if a diver has a dry suit that's too big, there is a risk that there could be an uncontrolled ascent?
A. That is one possibility.
Q. Would you agree if a dry suit is too big, as long as the seals are tight it's not an issue for safety?
MS. O'MALLEY: Object to form. Calls for

Page 33

speculation.
A. I would have to see the suit.
Q. You can answer, Mr. Dornecker.
A. I would have to see the suit on the individual to make that determination. That's not something -- there's not a blanket statement there that I can make. You know, I can't just say -- I would have to see how the suit fits. Because there's things you condition put in a suit that enable a suit that could potentially be too large that could help assist the diver to be able to wear that suit. That's why the suits are made in such -- you know, zero through five sizes. They're not like specific like a 31 waist unless you customize the suit.
Q. At any time -- strike that.
When you were the district chief responsible for marina dive operations, were the firefighters who interviewed and -- and wanted become divers required to go through medical testing of any kind?
A. They were. Not in the beginning.
Q. But later on at some point?
A. Later on at some point in my career I implemented a medical testing procedure through our medical diving through the fire department.
Q. Why did you implement that medical testing


MAGNA LEGAL SERVICES

Page 34

procedure?
A. Not to preclude the divers from being able to join the team, but to help identify potential problems that might cause an accident or injury later on in the diving.
Q. Did you ever at any time while you were the deputy district chief for marina dive operations have divers working for you who had asthma?
A. You know, that was a HIPAA issue. I was never privy to any of the information, given related divers' medical conditions. I actually, once the test was created, turned all of that over to our medical division and our medical division conducted all the testing. All we would be able to be told was whether a diver was medically fit to dive or they had a, you know -- they would just say he's put out on medical and can't dive.
Q. Were you aware whether or not people with asthma could pass the medical testing to be declared fit for diving?
MS. O'MALLEY: Object to form.
BY MS. HYNDMAN:
Q. You can answer.
A. Again, that -- that was a liability that we never incurred or I never incurred. And within my

Page 35

position that was not my job to make that determination. That was a questionnaire they were given, a standard they had to pass through medical, and medical made that determination whether any medical condition would allow them or preclude them from diving.
Q. Did you ever have any divers self-identify to you and say I have asthma, I need to take certain precautions?
A. Never. Never.
Q. As a public safety diving instructor, do you receive any instruction as to medical conditions that could pose a safety risk for divers?
A. Yes.
Q. As part of your public safety diving instruction training, what medical risks are you aware of that could pose safety risks to divers?
A. Ask that question one more time, please.
Q. In your training as a public safety diving instructor, what medical conditions were you trained to identify that could possibly pose safety risks for divers?
MS. O'MALLEY: Object to form. Foundation.
A. And you are going to tell me to answer it? You can answer. The attorneys allowed to make

Page 36

objections for the record.
MS. O'MALLEY: I'm not objecting to you, sir. I'm objecting to the form of the question. You are able to answer.
A. Okay. Thanks. Again, as a public safety diving instructor, much like within the Chicago Fire Department, those standards were identified on a questionnaire that the diver would have to answer. As a public safety diving instructor, if someone checked the box of having any of those medical conditions, I was not trained to determine whether that person was fit or not fit. That person in a -- in the outside world outside the Chicago Fire Department, and I've also conducted training there, would then have to prove with a note from a medical professional, their doctor, that their doctor signs off on that medical condition to allow me to conduct the training.
Q. So it was not ever your decision or determination as to whether or not somebody was medically fit to be a diver --
A. It was --
Q. -- for the Chicago Fire Department?
A. No. And -- okay. You said medically fit.
Q. Medically fit, yeah.
A. Okay.

Page 37

Q. You made determinations whether they were physically fit, correct?
A. Yes. Capable of doing the job. But medical didn't -- that fell under our medical division.
Q. Going back, I recall that when I was asking you about the physical test to become divers you said you didn't remember all the aspects of it.
Was there any part of the physical testing for fire department divers or air/sea rescue team divers to be able to get themselves out of the deep end of a swimming pool with dive equipment on?
A. Using a ladder, yes.
Q. Was there any form of testing for them to be able to get out of the swimming pool not using the ladder and just by boosting themselves out of the pool onto the pool deck?
A. No.
Q. Did you design the physical fitness testing for the divers that they had to go through to become divers for the fire department or on the air/sea rescue team?
A. We used the guidelines within Emergency Response Diving International, and any additional training we sought that was -- that exceeded those standards we were allowed to implement. So there


MAGNA LEGAL SERVICES

weren't many, but there was a few that I believe we -- we did have to implement for their training.
Q. Did you ever participate in physical fitness testing for police officers who were trying to become divers with the police department's marine unit?
A. No.
Q. Did you ever observe physical fitness testing conducted by members of the police department's marine unit for people who were trying to become divers on the marine unit?
A. No.
Q. Your one week intensive training, did that ever occur at the same time that the police department marine unit was training people to become marine unit divers?
A. Yes.
Q. And under those circumstances, would you then just share the pool?
A. Yeah.
Q. And during the time you would both be sharing the pool, did you have an opportunity to observe the training being conducted by the police department's marine unit?
A. When you conducted the training for the fire department I was pretty dialed in and focused at what



-- the task I had at hand. So I was -- you know, 40 years of lifeguard training teaches you your eyes are your most valuable asset. I watched my people. That's who I cared about.
Q. Sure. Did you -- who conducted those trainings on the times when you were sharing the pool with the police department marine unit?
MS. O'MALLEY: Object to form and foundation.
A. I wouldn't know.
Q. Do you know Sergeant Robert Fitzsimmons?
A. Yes.
Q. Did you ever observe Sergeant Fitzsimmons conduct training for marine unit divers?
A. No.
Q. Were you aware that he conducted training for marine unit divers?
A. I knew he was one of the instructors.
Q. How did you know he was one of the instructors?
A. Just day-to-day walking by knowing who was unlocking the pool.
Q. Did you share responsibilities with Sergeant Fitzsimmons for maintenance of the pool?
A. Yes.
Q. How would you divide up those



responsibilities?
A. We had a job to do. We just got it done.
Q. So it was whoever was available to do it would do it?
A. Yes.
Q. Did you ever have any conflicts with Sergeant Fitzsimmons in connection with maintenance of the pool?
A. I don't remember.
Q. Do you know Sergeant Eduardo Beltran?
A. I do.
Q. Did you ever observe Sergeant Beltran conducting training for police department divers?
A. When you use the word "observe", did I ever see that he was doing training? Yes. Did I pay attention and watch what he did? No.
Q. Did you ever train together, cross-train fire department, police department divers?
A. I don't believe we ever did.
Q. Did you ever have any discussions with anyone in the marine unit about sharing responsibilities for training of divers?
A. I don't remember if I did.
Q. Did anybody in the Chicago Police Department marine unit ever approach you to discuss how you conducted training for your fire department divers?



A. They may have. It's been a long time. I don't remember that.
Q. What about the conditions like at the pool at 1450 Larrabee?
A. I mean, was it a 25-meter six-lane swimming pool? Yeah. It was a dilapidated building, but if you compared that to what most departments around the world have, that was a gem. There weren't many training facilities in the world like that.
Q. Were there separate locker rooms available for women who were training as divers?
A. The marine unit created those. The police did.
Q. Did the firefighters use them, as well?
A. No. We weren't allowed to.
Q. What facilities did the firefighters use for locker rooms?
A. There was one locker room that was -- there was an office that had a bathroom and our female firefighters would use that as their private area.
Q. Were you aware whether that was the same bathroom that the women marine unit divers would use when they were training?
A. Yeah. I don't know what they did for that.
Q. Do you have any idea how long the training



MAGNA LEGAL SERVICES

Page 42

course was for the Chicago Police Department marine unit divers?
A. I have no idea.
Q. Did you ever have any discussion with any of the instructors for that diving institute how -- what training they did?
A. I did not.
Q. Did you ever conduct any open water dives along with members of the Chicago Police Department marine unit?
A. I did not. None that I remember.
Q. Do you have any knowledge as to whether or not the instructors for the Chicago Police Department marine unit were licensed public safety diving instructors?
A. I would have no way of knowing that.
Q. From time-to-time would there be occasions when the marine unit and the air/sea rescue team would respond to the same call?
A. Yes.
Q. And on those occasions, would marine unit divers and Chicago Fire -- air/sea rescue team divers be diving at the same time?
A. Yes.
Q. Was there any kind of agreement or

Page 43

understanding between the fire department and the police department as to what responsibilities each would have in responding to a call in the open water either on the lake or the river?
A. I mean, the short answer is no. The -- one thing that we do did recognize were crime scenes. When we designated or recognized something as a crime scene we would make sure that we still operated in a rescue mode. But at times when it was not a rescue, for example, maybe a decomposed body, we implemented a -- I don't believe it was a general order but a memo, a department memo that designated decomposing bodies is in the water as a crime scene, at which part the fire department dive team would not remove the body from the water unless there was a potential to lose the body. We would just cordon off the area and let the police marine unit come in and make that removal for purposes of recovering evidence.
Q. So is it fair to say that the police department was responsible for recovery and the fire department typically was involved only in rescue operations?
A. Well, partly. The police department was also responsible for rescue.
Q. I didn't make that clear. I'm sorry. I

Page 44

didn't mean to say that the fire department was solely responsible for rescue. But when it came to recovery, typically the police department was responsible for recovery operations; is that fair?
A. Unless the circumstances I just described came into play.
Q. Right. Over the course of the 20 years or so that you were responsible as the deputy district chief for the marine dive operations, did you come to know various commanding officers of the police department's marine unit?
A. I did.
Q. Did you know Lieutenant Allison Schloss?
A. I did.
Q. How do you know Lieutenant Schloss?
A. She was the commanding officer of the Chicago Police marine unit and helicopter division.
Q. Did you know her prior to the time she became the commanding officer of the marine unit?
A. No.
Q. Did you have opportunity to work together?
A. We attended meetings together.
Q. Did you ever work on any details with her or work with her at all?
A. I mean, two different departments. Did we

Page 45

work together? Yes. We were at the scene together.
Q. So there were times when you were at the scene with her responding to a call?
A. Yes.
Q. Can you approximate how many times that happened?
A. No. I've gone on over 8,000 water rescue calls.
Q. That's a lot.
Did you have an opportunity to form an opinion as to Lieutenant Schloss's competence as a commanding officer of the marine unit?
A. No. I didn't care.
Q. What other commanding officers in the marine helicopter unit did you work with over the years?
A. I couldn't remember them all by name, but I guess you could look up. I don't remember the year I took over. I believe it was around 2004 until 2018. So whoever would have been the commanding officers during that time, there was several of them.
Q. Did you ever work with Steve Georgas when he was commanding officer of the marine unit?
A. I did.
Q. Did you ever have an opportunity to form an opinion as to Steve Georgas's competence as a



MAGNA LEGAL SERVICES

Page 46

commanding officer of the marine unit?
A. They paid me to work with everybody, not form opinions.
Q. Did you have a good working relationship with commanding Schloss when she was the commanding officer of the marine unit?
A. I had a working relationship with all the commanding officers.
Q. Was your working relationship with Lieutenant Schloss different than your working relationship with any of the other commanding officers of the marine unit?
A. No.
Q. Dr. Dornecker, were you aware of a drowning incident that occurred in Lake Michigan over Memorial Day Weekend in 2016? So it would have been I believe May 28th or 29th of 2016.
A. I don't remember that.
Q. Do you remember a drowning incident that occurred just prior to the time that Lieutenant Schloss was removed as the commanding officer of the marine unit?
A. I don't know. I mean, I don't remember. That's been -- that's off my radar.
Q. About five years ago.

Page 47

Did you ever have any conversations with -- strike that.
Did you know Sergeant Carl Hajdu of the marine unit?
A. I did.
Q. Did you ever have any conversation was Sergeant Hajdu relating to the removal of Lieutenant Schloss as commanding officer of the marine unit?
A. I may have. Again, it's been so long I don't remember.
Q. Did you ever talk to Steve Georgas about the removal of Lieutenant Schloss as commanding officer of the marine unit?
A. Same. I -- I may have. I don't remember. I have no recollection of that.
Q. You said you know Sergeant Eduardo Beltran. How did you know Sergeant Beltran?
A. He was a lifeguard with me and then went on the marine unit.
Q. When were you and he lifeguards together?
A. I don't remember the dates. Probably '90s, early 2000s.
Q. How long did you work with him as a lifeguard?
A. Late, early '90s to early 2000s I believe.

Page 48

Q. So 5 to 10 years or so?
A. Could have been, yeah. I don't remember the dates.
Q. Were you working as lifeguards for the Chicago Parks District?
A. Yes, we were.
Q. Were you personal friends with Sergeant Beltran?
A. We were friends.
Q. Did you have an opportunity to form an opinion of him as a lifeguard when you were working as a lifeguard?
A. Again, that wasn't my job. They paid me to work with all the lifeguards, not form opinions.
Q. Were you ever Eduardo Beltran's supervisor when you both worked as lifeguards?
A. I was.
Q. For how long were you a supervisor?
A. I don't remember. I was -- when he first came on our team I believe I was a captain and he was a lifeguard, and he quickly rose up to be a captain as well.
Q. So you've known Eduardo Beltran since sometime in the '90s or 2000s.
Are you aware of Eduardo Beltran's reputation

Page 49

for truthfulness and honesty?
A. I'm not.
Q. There was an incident that took place with a member of the fire department dive team by the name of Juan Bucio in 2018; is that correct?
A. Yes.
Q. And that was an incident where Juan Bucio lost his life, right?
A. Yes, ma'am.
Q. Were you present on that occasion?
A. Yes, I was.
Q. Did the marine unit respond to that incident with Juan Bucio, as well?
A. Yes, ma'am.
Q. Who from the marine unit responded to that call?
A. I don't remember.
Q. Do you remember that Sergeant Beltran was driving one of the boats on that occasion?
MS. O'MALLEY: Objection. Form and foundation.
BY MS. HYNDMAN:
Q. You can answer.
A. I know he was there. I don't know that he was driving. I don't remember.


MAGNA LEGAL SERVICES

Page 50

Q. Did you ever have any conversations with Sergeant Beltran about the Bucio incident?
A. I don't remember.
Q. Did you ever read any statements that Sergeant Beltran made about the incident and what occurred that day?
A. I was never shown those.
Q. Did you provide a statement to anyone in connection with what happened on that occasion?
A. I did.
Q. Who did you provide statements to?
A. It seemed like thousands of people. Everybody from OSHA to police detectives to my safety division. It was a lot.
Q. Can you describe to me what happened that led to Juan losing his life on that date?
MS. O'MALLEY: Object to form and foundation.
A. I mean.
Q. You can answer.
A. I'll tell you that Juan was a friend of mine, and out of respect for Juan I would tell you that I don't remember enough to even give him the due dignity that he deserves in answering that question. Everything is written down in my statements that I made through NIOSH and through the police detective and the

Page 51

Chicago Fire Safety Division. And because that's so serious, I don't know if I could ask but I would ask that you review that because I'm not comfortable at this point, three, four years later, trying to remember what happened that day.
Q. Let me just quickly show you a document that I believe is the statement that -- one of the statements you made just to have you identify it if I could. I could put this up on the screen if you just give me a second.
So this is part of an exhibit that we have marked as Plaintiff's Exhibit 461. This is titled employee statement and interview. It as got your name, deputy district chief, and it's handwritten. And there's a signature at the bottom and it continues for two pages.
Is that your signature at the bottom, Mr. Dornecker?
A. That is.
Q. Is that your handwriting in the narrative of the description of the events?
A. Yes. From what I can see on the screenshot, yes.
Q. Okay. Do you recall which entity you gave this statement to?

Page 52

A. No. What form is this written on? That would be helpful?
Q. It's part of -- it's part of a document that was provided to us by the police department in this -- in these cases. And it's a large document, 275 pages, and it includes -- it says OSHA Illinois Department of Labor report, and it appears that your statement might be part of that folder.
Does that refresh your recollection at all?
A. No.
Q. Is this a statement you gave to OSHA?
A. I wouldn't know unless it says on the document who I wrote that to. I don't know if that's OSHA or our safety division. I don't know who I wrote to.
Q. At the bottom of this page very faint it looks like it says "Illinois OSHA". Do you see that right there?
A. Yeah. Again I mean, you can see the document better than I can. If it says "OSHA" on it then it might be the OSHA statement. I don't know.
Q. But looking at it, you don't remember which one it is?
A. I don't remember.
Q. But this is your handwriting, and that is

Page 53

your signature at the bottom?
A. Yes.
Q. And it's fair to say that every statement that you gave relating to this incident was true and accurate, correct?
A. Of course, yes.
Q. I'm going to take just a quick little break here. I want to go back over my notes and see if I have any more questions for you. Other attorneys representing the city and Sergeant Beltran may have questions for you, I don't know. But we'll be back quickly. Let's just take a quick break.
(Brief recess taken.)
BY MS. HYNDMAN:
Q. Mr. Dornecker, was the bidding for vacancies on either the air/sea rescue team or as a diver for the fire department, was that bidding by seniority for those vacancies?
A. Yes.
Q. I asked you about whether or not it was a part of any physical testing or -- or training that you did for the divers to be able to get out of the pool with equipment on by, you know, hoisting themselves out of the pool.
Did you ever evaluate divers at any time on


MAGNA LEGAL SERVICES

Page 54

that ability or that task?
A. No.
Q. You said that when were doing open water dives with your divers after they complete their week of intensive training that some divers dive more than others depending on, you know, on their needs.
Can you explain why it is that some divers would dive more than others in those open water dives?
A. I mean, it could be a variety of reasons. I mean, some people aren't as comfortable in the water. Some people may have never encountered what we call black water, water with true limited visibility. In open water scuba diving if you are in Hawaii and can't see 300 feet ahead of you it's a bad day. But for the Chicago Fire Department you could be diving in complete zero blackout conditions where everything is done by feel, and you don't see anything. So, you know, for some divers to get comfortable with that, it's based on their background and experience.
So it's just -- again they all met a standard. It was just to get everybody to be as comfortable as possible so they could be as safe as possible.
Q. So if you had a diver with difficulty the first time or even a couple times they did it, did you

Page 55

remove them from team or from the training?
A. Well, they needed to meet our standard first.
Q. So the standard was met when they met their 40 hours of training, right?
A. Correct.
Q. So once they met that and they were out doing open water diving, did you ever have occasion to remove someone from your team or remove a diver from being a diver because of the difficulties they had with open water dives?
A. So yes, I had the ability to stop someone from diving based on their performance evaluation.
Q. And were there occasions that you had to do that?
A. Yes.
Q. How many times roughly over the course of your years with training divers did you have to do that?
A. I wouldn't know that number. I don't remember.
Q. Did you ever have an occasion to remove someone from diving after they had two attempts of a dive and had difficulty with a dive?
A. You know, that's -- I don't understand that question.

Page 56

Q. So that -- did you ever have a diver who the first two times they attempted to dive and had difficulty with it, did you ever remove them from your dive team based on their difficulties the first two times doing any particular dive when they were still new in training?
A. The criteria we used was, you know, we -- it was based on safety. So it depends on what you mean when you say if they had difficulty. I mean, if it was a life safety issue where they did something that was going to compromise their safety or the safety of another diver, that would be a different type of remediation or a different type of tactic we'd use to assist the diver or let them self-identify that this may not be for them.
Q. Going back to the, you know, ability to get out of the pool with equipment on and hoisting themselves out of the pool, why didn't you ever do any kind of testing or evaluation of that for your divers?
A. It wasn't part our program.
Q. Is it part of the criteria that you use to evaluate people to become divers for the fire department that they have upper body strength?
A. I mean, we didn't specifically test for upper body strength. Nor did we test for any body strength.

Page 57

Q. Did you evaluate divers based on upper body strength?
A. In the sense of they had to be able to lift their equipment. I mean and I guess the answer would be they had to meet the guidelines that were established within our program that we laid out, and in that program there would be -- you know, there was not a specific you had to lift so much or you had to perform tasks. Tasks relevant to the day-to-day operations to become a public safety diver.
Q. Do you have an opinion as to how much upper body strength matters compared to other physical abilities that any particular person would have to be a good diver?
MS. O'MALLEY: Object to form.
A. I can answer now?
Q. Yeah.
A. My opinion, I mean -- I mean it requires some upper body strength. I don't know -- it's -- it's too vague of a question.
Q. Okay. That's fair.
So the kinds of tasks that your divers would perform that would require upper body strength would be being able to lift their equipment, carrying their scuba tanks. What other tasks would they have to


MAGNA LEGAL SERVICES

perform that would require upper body strength?
A. Well, I mean remember that my firefighters that were divers were also firefighters within the Chicago Fire Department which required them to perform duties within the fire suppression and rescue model. So their need of dragging somebody out of a fire, carrying somebody out of a fire, lifting a ladder, carrying hose, you know, their --
Q. But they'd already met those standards to become firefighters in the first place; is that right?
A. Originally. But -- and within the fire department you had to perform your duties. If you couldn't perform your duties that were related to upper body strength then that would be addressed.
Q. Did anybody from the Chicago Police Department marine unit ever come to you with a request to borrow smaller dry suits that would fit women divers?
A. They may have. I don't remember specifically.
Q. I asked you some questions about Carl Hajdu and conversations you may have had with him about Lieutenant Schloss.
Did Carl Hajdu ever tell you that Steve Georgas had called him in after a drowning incident



that he and Lieutenant Schloss were on the scene for, and Deputy Chief Georgas told Hajdu that if he was willing to go along with what Georgas wanted he would get off with a slap on the wrist but if he wasn't willing to go along with it he would get a black mark?
MS. O'MALLEY: Objection.
A. I don't remember.
Q. You don't remember that conversation?
A. No.
Q. Is that your answer?
A. Yes, correct.
Q. Okay.
MS. DURKIN: I don't have any questions.
(Brief recess taken.)
EXAMINATION BY MS. O'MALLEY:
Q. I'm Alex O'Malley. I represent the City and a number of the individual defendants in these lawsuits. I appreciate you making the time for us today. I just have some follow-up questions, and I just want to make sure we have things covered.
Do you know the nature of the lawsuit that was brought by Lieutenant Schloss?
A. I do not.
Q. Are you familiar with the nature -- go ahead.
A. No. I didn't know if you heard me.



Q. I did.
Are you familiar with the nature of the lawsuit brought by Melissa Tapia?
A. I do not.
Q. Have you spoken with counsel, either Cindy Hyndman or Marnie Willenson, prior to your deposition today?
A. I know Marnie from Vision Quest.
Q. Okay. Great. If that in you are Triathlon duties?
A. Yes, ma'am.
Q. Okay. I know Marnie has told us a lot about her triathlons.
Did you guys discuss your deposition today, you and Marnie?
A. No. I was aware of it.
Q. Did you speak with Cindy Hyndman about your deposition?
A. No. Today I did.
Q. Anyone else from their law firm?
A. No. Someone from the city called. I don't remember the conversation. It was nothing that made an impression or left a memory.
Q. So each of the plaintiffs has disclosed you as a witness in these cases. Were you aware of that?



A. No.
Q. I just want to go over the knowledge that they indicated you have with respect to these lawsuits. I want to share a document with you.
Are you able to see my screen here that's showing Allison Schloss's supplemental response to the MIDP?
A. Yeah.
Q. Plaintiffs disclosed you as having knowledge of many facts alleged in the plaintiff's complaint. Are you familiar with any of the allegations in plaintiff's complaint? Have you ever seen her complaint?
A. No.
Q. Are you aware that there were allegations brought against Allison Schloss of sexual harassment within the marine unit?
A. No.
Q. Do you have any knowledge of Lieutenant Schloss's job performance?
A. No.
Q. Do you have any knowledge of Deputy Chief Georgas's purported discriminatory treatment of Lieutenant Schloss in the marine unit?
A. I don't.



MAGNA LEGAL SERVICES

Page 62

Q. Are you aware of any conduct of Sergeant Beltran on the night of fire department diver Juan Bucio's death aside from what you've already testified to today?
A. No.
Q. Do you have any reason to believe that Sergeant Beltran did anything that would contribute to or cause diver Juan Bucio's death?
A. No.
Q. All right. I'm going to show you plaintiff Tapia's mandatory initial disclosures.
It states here you have knowledge of many facts alleged in the plaintiff's complaint. Do you know Melissa Tapia?
A. I don't know if I know her. I know a Tapia on the fire department. I don't know. I don't believe I know her.
Q. I'm assuming then that you haven't seen her complaint?
A. No.
Q. I'll represent to you that she was a candidate for the Chicago Police Department marine unit who went through the training detail in 2018.
Were you at all involved in the training in 2018 for the marine unit for the Chicago Police

Page 63

Department?
A. Not at all.
Q. We've gone over the fire department air/sea rescue unit training procedures.
You said you are in charge of the testing. Does that differ from the training that's involved at the fire department for your divers?
A. Okay. I was in charge first of all. I'm not anymore.
Q. Right.
A. When -- the testing and the training, the testing and the training, yes, I was in charge of both, the testing and the training.
Q. Now, the testing is -- does that occur only when new candidates are being brought in or is that an ongoing process? Can you tell us a little bit more about that?
A. So I mean, the testing occurred on a day-to-day basis, right? So, you know, testing was -- I couldn't use the word "testing" because all of -- all of you should know that with your legal backgrounds of the Union wouldn't allow me to call things tests. They had to be evaluations. So once the divers completed their testing to get their certification, they were then given day-to-day evaluations on their diving.

Page 64

Q. Okay. And now the training, is that what -- the 40 hours of initial training for candidates, was that the primary training that you conducted for the divers?
A. I conduct all the training for the divers. I would say that that training was called -- we called it our endorsement week, where the divers were then endorsed by the Chicago Fire Department to be used as a public safety department. The training then continued through the course of -- you know, forever during their career. These were perishable skills.
Q. And when you were conducting the training for the divers, particularly in that first 40-hour week, would you say that the training was cumulative? Are you building on skills each time if that makes sense?
A. Yes, it was.
Q. Does that --
A. Sure, of course. Day one we slowly integrated all the equipment onto the diver for them to complete the open water test -- or not test but tasks on the final day or two days of the program. So yes, there was a -- we built up that training program.
Q. And was the training different for male trainees versus female trainees at all?
A. No. It was all the same.

Page 65

Q. Is that also true for the testing or evaluations? Are they the same whether they are male or female?
A. Except for the medical exam.
Q. And you stated earlier that you are not responsible for or involved with the medical exam; is that right?
A. Correct.
Q. I have -- excuse my ignorance but I have information that you had 140 divers on the dive team approximately, but only one boat. How do the divers conduct their dives typically? Is it from shore or --
A. I mean we jumped out of helicopters. We came by land, by air, and by sea.
Q. Okay.
A. So we staffed a helicopter every day, which we operated with two pilots and two divers, and they could respond 24 hours a day seven days a week weather permitting. We seasonally staffed a what we called fast boat 688 which was from April 1st through I believe it was the last day in November. And then our year-round capability was our dive truck 687 with the squad companies.
So there was, you know, a couple different groups within the marine and dive operations within the



MAGNA LEGAL SERVICES

fire department.
Q. And have you utilized or are you familiar with the seven or so boats that the police department marine unit has?
A. I've seen them. I've been on them.
Q. But did your department or the divers have access to those boats or utilize them in their rescue mission?
A. We used them once when our one boat, as you described, was broken. We did borrow one of their boats once. Once that I remember.
Q. Okay. Is part of your dive training for your divers boat handling at all or --
A. Yes.
Q. Okay. And is that included in the first 40 hours in --
A. No. That's not dive training. That falls under our boat operations. So that's -- that was -- you know our first year that we had our fast boat in service, we were fortunate that three of our applicants were licensed Coast Guard rated captains. So that's who conducted our driving on the boat.
Q. Are the pilots who fly the helicopters, are they also divers or certified divers?
A. Some are.



Q. But that's not a requirement?
A. It is not. That's a separate job description. But if you were a diver you could potentially be utilized in a different position and be used on a helicopter, on the fast boat, or on the dive truck based on needs, manpower needs which again was a -- that's a contractual agreement that was -- you know our union outlined that in our bargaining agreement.
Q. And your union agreement differs for the fire department from the police department union agreement?
A. I'm sure. I don't know, but I would -- I would take a guess and say yes.
Q. It's not the same union agreement as far as you know?
A. No, no.
Q. Would you say that recreational diving differs from public safety diving?
A. Yes.
Q. Do you know why the fire center requires the basic scuba certification to apply for a dive position on the fire department?
A. It was -- original -- yeah, I do. Originally you didn't have to come in with any scuba certifications to be assigned to these units, and the



fire department provided the recreational instruction to get you that level of training, and that's all they did.
When I took over as the chief of marine and dive operations, I went out and became a public safety diving instructor and stopped there. Because we were using recreational divers with recreational training to conduct public safety dive training. And remember, public safety diving is relatively -- it's still pretty new in the public safety world, right? It really is.
So what we decided was for them to be able to prove that they had a recreational certification and allow us to then conduct the public safety dive training for them. That initial training that they had to come in with to prove that they had showed that they had the ability to at least swim a bit and have some comfort level in the water under recreational standards and under recreational conditions which are so different from public safety diving.
Q. Okay. Now, I think you stated earlier that you utilized the ERDI standards as a guideline, but you're able to institute additional qualifications or training or testing that you think is necessary for the fire department. Is that a fair statement?
A. Yes. So you have to meet their standard, but



you can exceed their standard as long as you -- with -- within meeting that standard. And this is all about liability so the group gets it, you can increase that training. For example, if the ERDI swim training program guideline stated that you had to be able to swim 500 meters, we could extend that and say 1000 meters and that was within our rights. But there were certain standards -- you had to meet the standard within your -- you exceeding it.
Q. Okay. So who -- you said that was within your rights as the chief or as the person running the program within the city or who conferred those rights as you say to you; do you know?
A. So here's what happens. So remember, public safety diving -- so it's very difficult to certify a public safety dive diver. For example, I live in Florida. So a public safety diver in Florida has to dive in much different conditions than we dive in in Chicago, right? We don't deal with surf. We don't deal with salt water which is a buoyancy issue. They don't deal with really cold water, and cold water in recreational diving is water below 70. We typically are diving in water that's 50 degrees. Hypothermia, exposure concerns.
So within that Emergency Response Diving



MAGNA LEGAL SERVICES

Page 70

International standard we are able to evaluate the needs of the program that we need to put in place to make us a safe and successful public safety program. So when we talk about who was able to do that, that was just a matter of looking at our needs within the City of Chicago, what our responses were which changed a bit quite a bit in the last 20 to 25 years and -- even the shoreline topography which caused us to create a different method of removing or putting divers in the water.

So those are the tweaks we had to make to the program to get our divers to be able to dive. So it wasn't -- it was more training than it was -- we weren't rewriting the rules or guidelines. We were adding specific training which was specific to our needs within the City of Chicago. And that was approved by the -- I mean, our dive program obviously was negotiated with the union to be recognized by the City of Chicago as endorsed divers.

So the City of Chicago looked at our program, the Chicago Fire Department looked at our program, the safety division within the Chicago Fire Department looked at our program, and we also brought in Emergency Response Diving International to look at our program to make sure that we were successfully meeting the

Page 71

guidelines and the safety requirements they instituted in their program.

MS. O'MALLEY: No further questions from me. Thank you. I appreciate your time.

MS. HYNDMAN: Mr. Dornecker, thank you very much.

THE WITNESS: You're welcome.

(Thereupon, the deposition was concluded at 11:56 a.m.)

* * * * * *

Page 72

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, Michele Anzivino, Court Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of RON DORNECKER, that a review of the transcript was not requested; and that the foregoing transcript, pages 1 through 72, is a true and correct record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 15th day of October, 2021.

______________________________
MICHELE ANZIVINO, Court Reporter
Notary Public - State of Florida
My Commission Expires: 02/23/2023
My Commission No.: GG-304081



MAGNA LEGAL SERVICES

# Tab B

# Deposition Designations

# Roland Jones

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| The City objects to the designation of any of Jones' testimony because he is expected to appear at trial. | | | | |
| Tr. 5:1-18 | | | | |
| Tr. 5:21-6:14 | | | | |
| Tr. 7:2-9:8 | | | | |
| Tr. 10:24-11:7 | | | | |
| Tr. 12:4-7 | | | | |
| Tr. 13:3-11 | | | | |
| Tr. 13:20-14:1 | | | | |
| Tr. 14:12-16:23 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 17:8-16 | | | | |
| Tr. 18:8-21 | | | | |
| Tr. 19:14-16 | | | | |
| Tr. 19:24-20:9 | | | | |
| Tr. 20:21-21:2 | | | | |
| Tr. 21:17-23:9 | | | | |
| Tr. 24:4-18 | | | | |
| Tr. 25:9-15 | | | | |
| Tr. 25:21-23 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 26:21-27:7 | | | | |
| Tr. 27:21-28:4 | | | | |
| Tr. 29:5-9 | | | | |
| Tr. 30:4-19 | | | | |
| Tr. 32:2-5 | | | | |
| Tr. 32:15-16 | | | | |
| Tr. 33:4-17 | | | | |
| Tr. 36:15-23 | | | | |
| Tr. 37:14-20 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 38:13-15 | | | | |
| Tr. 38:23-39:21 | | | | |
| Tr. 39:24-40:10 | | | | |
| Tr. 41:20-42:10 | | | | |
| Tr. 43:11-44:10 | | | | |
| Tr. 44:23-45:2 | | | | |
| Tr. 45:19-46:4 | | | | |
| Tr. 46:7-23 | | | | |
| Tr. 47:6-24-48:6 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 48:11-50:10 | | | | |
| Tr. 50:13-51:20 | | | | |
| Tr. 52:11-18 | | | | |
| Tr. 53:15-54:6 | | | | |
| Tr. 55:11-23 | Foundation | | | |
| Tr. 56:14-15 | | | | |
| Tr. 57:2-10 | | | | |
| Tr. 57:16-23 | | | | |
| Tr. 58:22-59:7 | Foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 59:10-12 | Foundation | | | |
| Tr. 59:15-19 | Foundation | | | |
| Tr. 59:22-60:17 | Foundation | | | |
| Tr. 60:20-23 | Foundation | | | |
| Tr. 61:2-9 | Foundation | | | |
| Tr. 62:6-8 | | | | |
| Tr. 63:1-23 | Relevance, confusion, prejudice – witness is repeatedly saying he does not understand the questions designated | | | |
| Tr. 64:3-21 | Relevance, confusion, prejudice – witness is repeatedly saying he does not understand the questions designated | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 65:9-17 | | | | |
| Tr. 66:7-67:17 | | | | |
| Tr. 68:10-19 | Foundation | | | |
| Tr. 68:23-70:2 | Foundation | | | |
| Tr. 70:5-15 | Foundation | | | |
| Tr. 70:19-22 | Foundation | | | |
| Tr. 71:5-8 | | | | |
| Tr. 71:13-19 | | | | |
| Tr. 72:5-73:18 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 74:4-75:15 | Foundation | | | |
| Tr. 75:18-76:4 | Foundation | | | |
| Tr. 76:11-15 | | | | |
| Tr. 77:10-13 | | | | |
| Tr. 77:19-78:3 | | | | |
| Tr. 79:5-8 | Foundation | | | |
| Tr. 79:11-18 | Foundation | | | |
| Tr. 80:2-9 | Incomplete (but to the extent 79:19-23 is added, foundation).<br>Foundation | | | |
| Tr. 80:13-18 | Foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 81:21-82:6 | | | | |
| Tr. 82:12-83:8 | Foundation | | | |
| Tr. 83:11-15 | Foundation | | | |
| Tr. 84:1-85:21 | Incomplete (85:21) | | | |
| Tr. 86:1-6 | | | | |
| Tr. 86:14-21 | 86:19-87:2: Relevance, confusion, prejudice – witness is explaining he does not understand the question | | | |
| Tr. 86:24-87:2 | 86:19-87:2: Relevance, confusion, prejudice – witness is explaining he does not understand the question | | | |
| Tr. 87:4-9 | Relevance, confusion | | | |
| Tr. 87:19-88:13 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 90:17-19 | Foundation | | | |
| Tr. 90:23-91:2 | Foundation | | | |
| Tr. 92:21-93:5 | | | | |
| Tr. 93:13-94:15 | | | | |
| Tr. 94:18-20 | Foundation; relevance, confusion, prejudice – witness is explaining he does not understand the question | | | |
| Tr. 95:2-7 | Foundation; relevance, confusion, prejudice – witness is explaining he does not understand the question | | | |
| Tr. 95:11-18 | Foundation; relevance, confusion, prejudice – witness is explaining he does not understand the question | | | |
| Tr. 96:17-18 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 97:6-8 | | | | |
| Tr. 97:10-98:17 | | | | |
| Tr. 98:19-99:5 | Hearsay | | | |
| Tr. 99:8-100:24 | Hearsay | | | |
| Tr. 101:24-102:9 | Hearsay | | | |
| Tr. 102:22-103:18 | Hearsay | | | |
| Tr. 103:21-23 | Hearsay | | | |
| Tr. 104:2-10 | | | | |
| Tr. 104:14-105:3 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 105:8-11 | | | | |
| Tr. 105:14-107:4 | | | | |
| Tr.107:13-20 | | | | |
| Tr. 107:23-108:8 | | | | |
| Tr. 108:17-109:2 | | | | |
| Tr. 110:23-111:6 | | | | |
| Tr. 112:18-21 | Relevance, prejudice, asked and answered | | | |
| Tr. 113:2-6 | Relevance, prejudice, asked and answered | | | |
| Tr.113:11-114:7 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 114:10-17 | Argumentative | | | |
| Tr. 114:22-115:10 | | | | |
| Tr. 116:20-24 | | | | |
| Tr. 117:11-118:6 | Foundation | | | |
| Tr. 118:10-13 | Foundation | | | |
| Tr. 118:21-119:15 | 118:21-119:7 counsel is testifying<br>119:13-15 foundation | | | |
| Tr. 119:17-18 | | | | |
| Tr. 120:2-8 | 120:5-8 counsel is testifying | | | |
| Tr. 120:12-121:7 | 120:12-17 counsel is testifying | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 121:10-15 | Foundation, speculation | | | |
| Tr. 121:19-22 | Foundation, speculation | | | |
| Tr. 122:2-16 | Foundation, speculation | | | |
| Tr. 123:1-2 | Foundation, speculation | | | |
| Tr. 123:4-6 | Foundation, speculation | | | |
| Tr. 123:22-124:20 | Foundation, speculation | | | |
| Tr. 124:23-125:2 | Foundation, speculation | | | |
| Tr. 125:5-9 | Foundation, speculation | | | |
| Tr. 126:23-127:7 | Argumentative, foundation, speculation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 127:19:23 | | | | |
| Tr. 128:2-129:18 | Hearsay | | | |
| Tr. 130:4-5 | | 130:6-19 | | |
| Tr. 130:20-131:13 | | | | |
| Tr. 132:8-21 | Relevance, prejudice, subject to pending MIL | | | |
| Tr. 133:1-3 | Relevance, prejudice, subject to pending MIL | | | |
| Tr. 133:8-10 | Relevance, prejudice, subject to pending MIL, foundation | | | |
| Tr. 133:13-14 | Relevance, prejudice, subject to pending MIL | | | |
| Tr. 135:6-22 | 135:21-22 Mischaracterizes testimony | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 136:1-14 | | | | |
| Tr. 136:18-22 | | | | |
| Tr. 137:2-138:1 | Foundation – witness is stating he has no familiarity with the subject of the questions | | | |
| Tr. 139:5-140:3 | Asked and answered | | | |
| Tr. 140:6-10 | Asked and answered | | | |
| Tr. 140:13-19 | Asked and answered, argumentative | | | |
| Tr. 140:5-16 | Asked and answered | | | |
| Tr. 140:22-141:1 | Asked and answered | | | |
| Tr. 141:19-23 | Asked and answered | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 148:6-9 | Foundation | | | |
| Tr. 148:12-15 | Foundation | | | |
| Tr. 148:18-149:9 | Foundation | | | |
| Tr. 149:12-16 | Foundation | | | |
| Tr. 149:20-150:3 | | | | |
| Tr. 152:2-4 | | | | |
| Tr. 152:10-154:22 | | | | |
| Tr. 155:6-18 | | 155:19-21, 156:3-14 | | |
| Tr. 156:23-158:4 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| 158:21;159:10 | Foundation; incomplete | | | |
| Tr. 159:18-20 | | | | |
| Tr. 159:24 | | | | |
| Tr. 160:24-162:7 | | | | |
| Tr. 163:21-164:23 | Foundation, counsel is testifying | | | |
| Tr.165:24-166:22 | | | | |
| Tr.173:22-174:9 | Foundation | | | |
| Tr. 174:13-175:1 | Foundation | | | |
| Tr.175:4-15 | Foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Roland Jones**

Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 175:18-176:6 | Foundation, counsel is testifying | | | |
| Tr. 177:3-5 | | | | |
| Tr. 177:8 | | | | |
| Tr. 177:18-22 | | | | |
| Tr. 182:19-184:8 | Foundation | | | |
| Tr. 184:12-185:10 | Foundation | | | |
| Tr. 185:13-18 | Foundation | | | |
| Tr. 186:6-188:12 | | | | |
| Tr. 190:13-15 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 190:19-24 | Mischaracterizes testimony, leading, foundation | | | |
| Tr. 191:3-5 | | | | |
| Tr. 192:23-193:1 | | | | |
| Tr. 193:5-194:7 | | | | |
| Tr.194:10;195:8 | Prejudicial, confusion | 195:9-18 | | |
| Tr. 196:2-12 | | | | |
| Tr. 197:2-8 | Foundation | | | |
| Tr. 198:13-24 | | | | |
| Tr. 199:3-21 | Foundation, speculation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 201:19-202:5 | | | | |
| Tr. 202:10-203:9 | Incomplete, vague and ambiguous | | | |
| Tr. 203:13-15 | | | | |
| Tr. 210:9-211:13 | | | | |
| Tr. 211:17-21 | | | | |
| Tr. 211:24-212:2 | | | | |
| Tr. 212:6-15 | Argumentative, leading | | | |
| Tr. 212:18-21 | Argumentative, leading | | | |
| Tr. 212:24 | Argumentative, leading | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 222:12-224:7 | Foundation, speculation | | | |
| Tr. 124:10-15 | Foundation, speculation | | | |
| Tr. 224:18-21 | Foundation, speculation | | | |
| Tr. 232:18-233:16 | | | | |
| Tr. 234:20-236:20 | Relevance, hearsay, foundation, speculation, argumentative | | | |
| Tr. 239:21-240:8 | Relevance, prejudice, confusion, subject to pending MIL | | | |
| Tr. 240:19-241:14 | Relevance, prejudice, confusion, subject to pending MIL | | | |
| Tr. 245:4-5 | | | | |
| Tr. 245:8-11 | Incomplete, does not include any witness testimony or answer to the designated question | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Roland Jones**
Witness: Roland Jones; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 247: 24-248:2 | | | | |
| Tr. 254:1-5 | Asked and answered | | | |
| Tr. 254:24-255:9 | Foundation, relevance, prejudice, confusion | | | |
| Tr. 255:16-23 | Foundation, relevance, prejudice, confusion | | | |
| Tr: 258:22-259:9 | Foundation, relevance, prejudice, confusion | | | |
| Tr. 264:12-23 | Relevance, prejudice, confusion, subject to pending MIL | | | |

Confidential



IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAUREEN BRESNAHAN, )
Plaintiff, )
)
-vs- ) No. 18 CV 1972
)
CITY OF CHICAGO, a municipal )
Corporation, and SGT. JAMES )
EAGAN, in his individual )
capacity, )
Defendants. )

Remote, videotaped deposition of ROLAND JONES, called by the plaintiff for remote examination, pursuant to notice and pursuant to the Rules of Civil Procedure for the United States District Courts, taken before Marcie A. Haw, CSR in and for the County of Cook and State of Illinois, on 8-24-21, at 9:30 a.m. at 300 South Wacker Drive, Suite 1700, Chicago, Illinois.

There were present at the taking of this deposition the following counsel:

ROBINSON CURLEY by
MR. C. PHILIP CURLEY
300 South Wacker Drive, Suite 1700
Chicago, Illinois 60606
Phone: (312) 663-3100
E-mail: pcurley@robinsoncurley.com

Appeared remotely on behalf of the Plaintiff;

MICHAEL BEST & FIEDRICH by
MR. CHRISTOPHER R. PARKER
444 West Lake Street, Suite 3200
Chicago, Illinois 60606
Phone: (312) 222-0800
E-mail: crparker@michaelbest.com

Appeared remotely on behalf of the Defendants.

VIDEOGRAPHER: Luke Kennin
Magna Legal Services



I N D E X



| WITNESS | PAGE |
|---|---|
| Roland Jones | |
| Examination by Mr. Curley | 6 |
| Examination by Mr. Parker | 268 |



E X H I B I T S



| | PAGE |
|---|---|
| Deposition Exhibit No. 36 | 51 |
| Deposition Exhibit No. 45 | 56 |
| Deposition Exhibit No. 43 | 64 |
| Deposition Exhibit No. 78 | 70 |
| Deposition Exhibit No. 33 | 96 |
| Deposition Exhibit No. 40 | 118 |
| Deposition Exhibit No. 41 | 119 |
| Deposition Exhibit No. 125 | 139 |
| Deposition Exhibit No. 250 | 142 |
| Deposition Exhibit No. 249 | 144 |
| Deposition Exhibit No. 260 | 145 |
| Deposition Exhibit No. 85 | 174 |
| Deposition Exhibit No. 102 | 184 |
| Deposition Exhibit No. 255 | 198 |
| Deposition Exhibit No. 38 | 211 |
| Deposition Exhibit No. 118 | 215 |





E X H I B I T S
C O N T I N U E D



| | PAGE |
|---|---|
| Deposition Exhibit No. 257 | 218 |
| Deposition Exhibit No. 258 | 220 |
| Deposition Exhibit No. 52 | 225 |
| Deposition Exhibit No. 246 | 226 |
| Deposition Exhibit No. 135 | 229 |
| Deposition Exhibit No. 247 | 229 |
| Deposition Exhibit No. 137 | 232 |
| Deposition Exhibit No. 72 | 232 |
| Deposition Exhibit No. 251 | 234 |
| Deposition Exhibit No. 101 | 237 |
| Deposition Exhibit No. 259 | 240 |
| Deposition Exhibit No. 146 | 242 |
| Deposition Exhibit No. 256 | 244 |
| Deposition Exhibit No. 261 | 245 |



* * * * *



THE VIDEOGRAPHER: We're now on the video record. This begins Tape No. 1 of the deposition of Roland Jones, in the matter of Maureen Bresnahan versus the City of Chicago et al, in the United States District Court for the Northern District of Illinois, Eastern Division; Case No. 18 CV 1972.

Today is August 24th, 2021, and the time is 9:22 a.m. This deposition is being taken remotely via Zoom at the request of Robinson Curley. The Videographer is Luke Kennin of Magna Legal Services and the court reporter is Marcie Haw of Magna Legal Services.

Counsel and all parties present, state their appearances and whom they represent.

MR. CURLEY: Good morning. My name is Philip Curley. I represent the plaintiff.

MR. PARKER: Good morning. My name is Christopher Parker. I represent both defendants in this matter, and I'm also representing the witness today.

THE VIDEOGRAPHER: Okay. Will the reporter please --

MR. JONES: My -- my name is Roland Jones, former employee of the Chicago Police Department.

THE VIDEOGRAPHER: Okay. Thank you. Will you please swear in the witness.



MAGNA LEGAL SERVICES

ROLAND JONES,
called as a witness herein, having been first duly sworn, was examined remotely upon oral interrogatories and testified as follows:

EXAMINATION

BY MR. CURLEY:
Q. Good morning. Could you please tell us your full name and spell your last name for the record.
A. Roland Joseph Jones, J-o-n-e-s, Junior.
Q. Are you represented by counsel here today?
A. Yes.
Q. Who is representing you?
A. Chris Parker.
Q. What is your current home address?
MR. PARKER: Hey, Phil, sorry to interrupt you. Do we wanna just get on the record that we agree to conduct this by Zoom and that parties, you know, agree that the attestation and the swearing in was done by -- you know, in different states, but the parties agree that that is sufficient for the purposes of this deposition?
MR. CURLEY: Sure. Thank you. So agreed.
MR. PARKER: Thank you. Okay. Sorry. Go ahead.
BY MR. CURLEY:
Q. Mr. Jones, could you tell us your current home



address, please?
A. I'm currently residing at 82 Setter Circle, Apartment 302, and that's in Fredericksburg, Virginia 22406.
Q. What town in Virginia is that?
A. I'm sorry. Fredericksburg.
Q. Fredericksburg. Got it. How long have you lived there?
A. About approximately two-and-a-half years.
Q. Where did you live prior to that?
A. In Chicago.
Q. What was your most recent address in Chicago?
A. 1033 East 46th Street, Unit 303, Chicago, Illinois 60653.
Q. And how long did you live there?
A. Approximately 14, 15, years. I still have a residence there. My family lives there.
Q. Got it. Do you live there as well?
A. My family lives there, and I live here for work.
Q. Are you married?
A. Yes.
Q. How long have you been married?
A. 19 years.



Q. And what's your spouse's name?
A. Janine Jones.
Q. Do you have any children?
A. Yes.
Q. How many and what ages?
A. One, 17.
Q. By whom are you currently employed?
A. The FBI.
Q. That's Federal Bureau of Investigation?
A. That's correct.
Q. And what is your position there?
A. I'm a bomb technician.
Q. Are you a special agent?
A. No.
Q. When did you start with the FBI?
A. December of 2018.
Q. And have you served as a bomb technician with the FBI since December 2018?
A. Yes.
Q. Can you tell me the -- tell us the difference between a special agent bomb technician and a bomb technician of the FBI?
A. I'm not a special agent.
Q. Are your duties and responsibilities the same



as a special agent bomb technician?
A. No, I don't believe they are.
Q. Okay. Can you tell us then what your duties and responsibilities are as a bomb technician for the FBI?
A. I'm not sure if I can. I would have to have that cleared with my security division to go into further detail, and my legal Department of Justice.
MR. PARKER: Yeah, and just for the record, because Mr. Jones is, I think -- you know, there's security reasons why he probably can't disclose his current duties, but, you know, if we -- if we need to Phil, we're not gonna, you know, object to giving you that information off the record. I just -- I don't think he wants to put it on the record for a deposition. So we would object to that line of questioning, pending some sort of agreement that we can disclose. Sorry. Excuse me.
BY MR. CURLEY:
Q. Is your position as bomb technician described anywhere in any public documents?
A. Oh, you know, I don't know. My specific position, I don't know.
MR. CURLEY: Well, it's a little problematic, Chris,



MAGNA LEGAL SERVICES

because -- unless there's an agreement that Mr. Jones, if requested, would testify live at trial, this sort of breaks up this -- this -- this testimony for trial purposes.
MR. PARKER: Yeah. I mean, is it relevant, though, what he's currently doing, in terms of -- I mean, he is a bomb technician. He probably has the same skills as a Chicago Bomb Technician, similar to that. I just don't think the specific seems -- I don't think Roland -- and we don't want him to answer anything he's not comfortable answering from a security standpoint, assignments, those type of things.
MR. CURLEY: Either do I.
MR. PARKER: Yeah.
MR. CURLEY: Sure.
MR. PARKER: I -- I know that. And I'm not trying -- I think we're just trying to get to a solution here so --
MR. CURLEY: I'm not asking -- and I won't ask about any particular assignments, but let me -- let me ask you this, Mr. Jones, and see if we're comfortable with answering this.
BY MR. CURLEY:
Q. Are the skills and knowledge you employed and



used as a bomb technician at the Chicago Bomb Squad, the same as you are using as a bomb technician at the FBI, in general?
A. In general, sure.
Q. Okay. Why have you -- strike that.
Have you sought to become a FBI special agent?
A. No.
Q. Why not?
A. Why have I not sought to become a special agent with the FBI?
Q. Yeah.
A. You mean recently or my -- during my entire life.
Q. Recently, when you -- when you changed employment to the FBI?
A. Well, that wasn't the job position that was offered to me, was special agent. And I don't think I'm qualified to be a special agent just by age.
Q. Okay. Who offered you the job as bomb technician with the FBI?
A. A supervisor from the unit that I'm currently in right now. I'm not sure how much detail I can go into that. I definitely want to cooperate, but I'm not sure how much I'm authorized to say.



Q. And that -- that individual is in Virginia or the D.C. area?
A. Yes.
Q. Okay. Why did you leave the Chicago Bomb Squad to join the FBI?
A. I was at retirement age, and this was a good opportunity to continue with another career.
Q. Were you first recruited for the position or did you seek it out?
A. I was recruited.
Q. By the same individual in -- you referred to a moment ago in the Virginia/D.C. area?
A. Uh-huh, yes.
Q. Did -- do you know a -- a Todd Schmitt?
A. Yes, I do.
Q. He's the -- the chief of the FBI Bomb Squad here in Chicago, correct?
A. Yes, he's a supervisor, a special agent bomb tech with Chicago.
Q. Did he assist you at all in obtaining your current position with the FBI?
A. No.
Q. Did he submit a letter of recommendation or -- or call anyone or make any contacts on your behalf,



to your knowledge?
A. To my knowledge, no.
Q. Okay. Can you please describe for us your educational background, starting with perhaps where you went to high school and the year that you graduated?
A. I -- I went to high school at Saint Louis University High School, which is in Saint Louis, Missouri. I graduated in 1982, went to Saint Louis University, also in Saint Louis, graduated with a Bachelor's in 1987. Then I went to the University of Southern California, graduated with a Master's in 1990.
Q. What was your Bachelor's Degree in at Saint Louis University?
A. Geo physics.
Q. I'm sorry. I didn't hear that?
A. Geo physics.
Q. Thank you. What was your Master's degree in at USC?
A. Occupational safety and health.
Q. Did you receive any bomb or explosive-related training while at Saint Louis University?
A. No.
Q. Did you receive any bomb or explosive-related training while at the University of Southern California?



MAGNA LEGAL SERVICES

A. No.
Q. Okay. Can you tell us your first full-time employment after Saint Louis University? After you graduated from Saint Louis University?
A. After I graduated from Saint Louis University, I assisted my mother in California for starting up a restaurant business, while going to school at USC.
Q. Did you have any other employment while -- or before you obtained your Master's?
A. I think I worked for -- I worked for a painting company, painting houses for a little bit, part-time.
Q. What was your first full-time employment position after you obtained your Master's from USC?
A. I was an environmental consultant with a consulting company called High Genetics.
Q. What did you do for them?
A. It was a environmental consulting company. So we would conduct, I guess, environmental surveys related to property transfers.
Q. When did you -- when did you start there?
A. 1990.
Q. And did you start in an entry-level position?
A. Yes.
Q. How long did you remain at -- at that job?



A. Until 1994.
Q. Did you receive any bomb or explosive-related training or instructions while at that job at -- is it High Genetics?
A. Yes.
Q. Did you obtain --
A. No.
Q. -- any bomb or explosive training while at High Genetics?
A. No.
Q. Did you change employment in 1994?
A. Yes.
Q. Where -- what was your next job?
A. With the Chicago Police Department.
Q. By the way, where was High Genetics? Where were you living at that time?
A. Chicago.
Q. How did you decide to apply to the Chicago Police Department?
A. Why -- are you asking me why I decided to or how --
Q. Yes, yes.
A. -- I decided -- I just felt like it was an interesting job.



Q. And what was interesting about it to you?
A. I guess police work's team, like it would be more interesting, more dramatic. Perhaps I have more experience doing things that were -- that were interesting.
Q. Okay. Can you describe for us the application process you went through when you applied for a position at the Chicago Police Department?
A. That was a long time ago, so.
Q. Just do the best you can remember.
A. I recall having to take a test, and then filling out, obviously, an application, going through background checks, medical evaluation.
Q. So there was a written examination?
A. Yes.
Q. And -- and was there also an oral interview?
A. No. Aside from being -- aside from something connected with my background investigation, where a background investigator would come and talk to me.
Q. Other than that there was no oral interview?
A. No.
Q. Did you attend the police academy?
A. Yes.
Q. Do you remember how many were in that class at



the police academy, roughly?
A. No.
Q. Were members in that class ranked in any way?
A. The entire class ranked from one to however many; is that what you're asking?
Q. Yes.
A. No, I -- I don't recall that happening.
Q. Did you receive any special awards or recognition for your work at the police academy?
A. No.
Q. What was your first assignment when you graduated?
A. Assigned to the 23rd District, which is on the north -- North side of Chicago. 23rd District no longer exists. I believe it's now been absorbed by the 19th District.
Q. And were you -- did you choose that assignment or were you just assigned to work in the 23rd District?
A. I was just assigned.
Q. Okay. And did you begin your work there as an entry-level patrol officer?
A. Yes.
Q. How long did you remain as a patrol officer in the 23rd District?



MAGNA LEGAL SERVICES

Confidential



A. Less than a year.
Q. Can you give us an idea, in general, of your duties and responsibilities as a patrol officer in the 23rd District?
A. Well, by that time I was on probation in the office, so my duties were to patrol the District and learn under a field-training officer.
Q. How long were you a probationary officer?
A. Six months from the academy. So it's six months in the academy, and then six months from the academy.
Q. Did you receive any bomb or explosive-related training or instruction while at the police academy?
A. No.
Q. Did you receive any bomb or explosive-related training while you served for six months afterwards as a probationary patrol officer?
A. No.
Q. What was your next position after your work in the 23rd District?
A. I went to the 17th District.
Q. Did you ask to be transferred or were you just transferred?
A. I was just transferred.



Q. And where is the 17th District?
A. Northwest side of Chicago.
Q. Did you serve as a patrol officer in the 17th District?
A. Yes.
Q. For how long?
A. Approximately a year. Most of that time was on a tactical team in the 17th District.
Q. What do you mean by tactical team?
A. A plain-clothes patrol officer.
Q. Did you receive any bomb or explosive-related training while you served in the 17th District?
A. No.
Q. What was your next position with the Chicago Police Department after your time in the 17th District?
A. The 11th District.
Q. Did you ask to be reassigned or were you just given a new assignment?
A. No, I asked to be reassigned.
Q. Why did you ask to be reassigned?
A. It's a very interesting district. It's a district of high crime. I felt like I could learn and experience more things there.
Q. What was your first position in the 11th



District?
A. Patrol officer.
Q. When did you serve as a patrol officer in the 11th District?
A. Approximately three years.
Q. Did you receive any bomb or explosive-related training or instructions while you served as a patrol officer in the 11th District?
A. No.
Q. And -- and during your -- your first, approximately, it looks like four to five years after you graduated the police academy and you served as a patrol officer, can you give us a general description of what your duties and responsibilities were?
A. In general, patrol the streets, answer -- answer calls off the service. Try to be proactive and seek out criminal activities and prevent crime. Respond to incidents of a -- of an emergency nature. Assist other officers, fill out police reports, make arrests.
Q. What year are we up to when you left the 11th District?
A. 1999.
Q. And what was your next position at the Chicago



Police Department in 1999?
A. A unit called Special Operations Section.
Q. I'm sorry. I didn't hear the -- the first part of that?
A. Special Operations Section.
Q. Oh, I thought you said something before that.
And did you ask to be reassigned to the Special Operations Section, or were you just assigned?
A. It was a unit which you apply for.
Q. What was the Special Operations Section?
A. It was basically a street-crimes unit, comprised of several hundred officers divided into teams. The unit worked on -- in ten-person teams, led by a supervisor. And the -- the major mission was just to go into the high-crime areas of Chicago and -- and address street crimes.
Q. Were you still serving as a patrol officer while in the Special Operations Section?
A. Yes.
Q. How long did you remain in the Special Operations Section?
A. Until 2002, so that would be roughly three years.
Q. Three years. Did you receive any bomb or



MAGNA LEGAL SERVICES

explosive-related training or instruction while serving with the Special Operations Section?
A. No.
Q. What was your next assignment after 2002?
A. At that point I was appointed to detective, so I went to the Area 1 Detective Division.
Q. Where is Area 1?
A. At 51st Street and Wentworth.
Q. Now, you mentioned that you had applied for the assignment with the Special Operations Section, correct?
A. Yes.
Q. Can you describe for us what that application process involved?
A. I don't recall specifically. I know there was an interview involved. There might have been an application or a resume, but I don't recall that specifically. I'm pretty sure there was something along those lines. Some paperwork I had to fill out, but I don't recall specifically.
Q. Was there a written examination of any kind?
A. No, not at that time.
Q. Okay. And when you applied for the detective position, can you describe for us the application process involved with that?



A. It's a test.
Q. A written test?
A. Yes.
Q. Anything else?
A. No.
Q. Why did you decide to apply for the detective position?
A. I felt that that was a position I wanted to attain.
Q. You consider that a promotion?
A. I considered it, yes. But, technically, it's not a promotion because it does not have supervisory duties in the police department. But it's an increase in pay and also it is a different type of job. It's an investigative job.
Q. And you considered it a promotion?
A. Yes, in my --
MR. PARKER: Object to -- object to asked and answered. Go ahead.
MR. CURLEY: Mr. Parker, might make --
MR. PARKER: You can answer.
MR. CURLEY: -- objections from time to time for the record, but unless he instructs you not to, Mr. Jones, you should go ahead and answer the question.



THE WITNESS: All right.
BY THE WITNESS:
A. So --
Q. And the question, just to be clear, is that you considered the detective position to be a promotion?
A. I would consider it as a next -- next evolution in my career.
Q. Certainly an advancement in your career?
A. Yes.
Q. Did you consider the assignment in Special Operations Section to be an advancement in your career as well?
A. Yes.
Q. How long did you serve as a detective in Area 1?
A. Until 20 -- 2006.
Q. So about four years?
A. Yes.
Q. Can you describe for the -- for the jury just, in general, what the duties and responsibilities were as a detective?
MR. PARKER: Object to form. Go ahead.
THE WITNESS: I'm sorry. I didn't hear that.
MR. PARKER: Sorry. Object to form. You can go



ahead and...
THE WITNESS: All right.
BY THE WITNESS:
A. The duties of a detective would be to follow up on crimes that were reported by patrol officers. Also to follow up on in-custody apprehensions where a possible felony has been committed. Also, to attain or possibly find out who offenders were and effect their arrest.
Q. Did you obtain a different assignment in 2006?
A. Yes. At that point I went to the bomb squad, which at that time was known as bomb and arson.
Q. Did you receive any explosive or bomb-related training or instructing while you served as a detective in Area 1?
A. No.
Q. Did you have to apply for a position with the -- I'm just gonna call it the bomb squad if that's okay with you, rather than bomb and arson, if that's all right?
A. That's fine.
Q. Did you have to apply for a position of the bomb squad in 2006?
A. Yes.
Q. Can you describe that application process,



MAGNA LEGAL SERVICES

please?
A. The application was done in 2005, late of 2005. It involved, at that time, an interview and a physical test, along with an application, you know, submitting a resume.
Q. What year did you graduate from the police academy?
A. 1994.
Q. So between 1994 and 2006, did you receive any bomb or explosive-related training or instruction as a member of the Chicago Police Department?
A. No, no formal training.
Q. During those -- well, did you receive informal training?
A. Well, I may have -- I may have received maybe some awareness training maybe at roll call. I don't recall.
Q. Nothing you can recall anyway?
A. Yeah, but nothing specific to being on a bomb squad, if that's what you're asking.
Q. Well, I'm not asking that. I'm asking what I asked, which was whether you had received any bomb or explosive-related training or instruction, and it sounds like the answer is no?



A. Not that I recall, no.
Q. Okay. And during those years, from 1994 to 2005, did you, as a patrol officer or detective, respond to any bomb-related incidents?
A. No, aside from a fireworks confiscation, which requires, at that time, bomb and arson to respond. I don't recall any specific bomb incidents.
Q. Was there any written examination when you applied for the bomb squad in 2005?
A. No.
Q. And when you applied in 2005, was there -- to your knowledge, was there just a single opening on the bomb squad or were you one of a number of positions that were filled?
A. I was one of a number of positions.
Q. Okay. Who was the commander of the bomb squad at that time?
A. It was Mike Goharski (phonetic).
Q. Could you spell that for the Court if you can?
A. I'd have to look it up in my phone.
Q. Okay. Why did you decide to apply for the bomb squad?
A. It seemed like a good evolution of my career. I thought it'd be an interesting position, higher pay,



and another specialized unit.
Q. Did you consider that to be advancement in your career?
A. Yes.
Q. Once you were accepted into the bomb squad, did you have to undergo any special training or obtain licenses or certifications?
A. Yes.
Q. Can you describe that for the jury, please.
A. I had to attend the FBI Hazardous Devices School, which is located in Huntsville, Alabama on Redstone Arsenal Army Base for six weeks.
Q. Was there any other training that you were required to take?
A. Well, after that basic course, there are several follow-up courses that I would be required to take to -- to learn skills and techniques.
Q. Well, before you actually started to work as a bomb squad member, did you also have to obtain an explosive license from the Illinois Department of Natural Resources?
A. I don't recall if I had to do that.
Q. Have you, at any time, ever held an explosive license from the IDNR?



A. Yes.
Q. When did you first obtain the license, to your recollection?
A. I -- I can't recall when that was.
Q. And before you actually began work as a member of the bomb squad, did you have to undergo any HAZMAT training through the Chicago Fire Department or any other instruction?
A. Yes.
Q. Can you tell us about that.
A. I don't recall what that involved. That was a long time ago. There's been a lot of training since then, so.
Q. Right. I'm just trying to focus on what you had to accomplish or complete before you began serving as a bomb squad member. And it sounds like the FBI HDS school, some HAZMAT training, and you don't recall if you needed the explosive license from the IDNR; right?
A. I know that I didn't need it before I went, I know that.
Q. Okay.
A. I know that I got it after I was on the bomb squad.
Q. Okay. But you do recall you had to attend



MAGNA LEGAL SERVICES

the -- and complete the FBI HDS school and obtain the HAZMAT training?
A. Yes.
Q. Okay. And then were you also -- after you completed all of -- of that training, was there also a probationary period after you joined the bomb squad, before you became a fully-certified bomb technician?
A. Yes.
Q. And how long was that?
A. I don't recall how many months that was.
Q. When you -- taking all that into account then, when did you actually start in your position as a member of the bomb squad and as a certified bomb technician?
A. By my account, I started as soon as I came back from Hazardous Devices school in Huntsville, Alabama. As soon as I came back to Chicago, I was operating as a bomb technician.
Q. And so that would be 2006?
A. Yes.
Q. Okay. Thank you. When did you retire from the Chicago Bomb Squad?
A. January of 2019.
Q. But why did you retire?
A. Because I obtained a job with the FBI.



Q. So you obtained that job first before -- before you resigned from the bomb squad?
A. Yes.
Q. Have you ever served in the United States military?
A. No.
Q. Were you eligible to serve in the military but chose not to do so?
A. Yes.
MR. PARKER: Object to form.
THE COURT REPORTER: Object -- I'm sorry. What was the objection?
MR. PARKER: Object to form.
THE COURT REPORTER: Okay.
MR. CURLEY: Your microphone hasn't gotten any better, Chris?
MR. PARKER: No? Okay. Next break I'll call in.
MR. CURLEY: Okay.
BY MR. CURLEY:
Q. Why didn't you join the military?
A. Just wasn't a decision I made. I decided not to join the military.
Q. No particular reason?
A. It just wasn't -- It just wasn't something I



wanted to do in my -- in my life at that time.
Q. Going back for a moment to the FBI Hazardous Device School in Huntsville, Alabama. In connection with the Chicago Bomb Squad, the police department decides who they want to send to the HDS school, correct?
A. You have to repeat that question. I'm not sure if I quite understood that.
MR. CURLEY: Could you read that back, please, Ms. Reporter.
(Record read back as requested.)
BY MR. CURLEY:
Q. In other words, the FBI doesn't decide -- or strike that.
Just answer the pending question first.
A. Yes, that would be a decision made by the Chicago Police Department.
Q. And then those Chicago Police Department candidates must comply with whatever FBI requirements it has, correct?
A. I suppose so.
Q. And those physical requirements and weight and other requirements, correct?
A. Yes.
Q. Does the FBI, to your knowledge, have any



requirements for bomb technician candidates, other than completing the HDS training?
A. No, not to my knowledge.
Q. Are you currently a FBI Certified Bomb Technician?
A. Yes.
Q. And have you obtained your recertification every three years after you first received it in 2006?
A. Yes.
Q. Do you currently hold an explosive license with the Illinois Department of Natural Resources?
A. No.
Q. Do you know when that license lapsed?
A. No.
Q. Was it recently or quite a while ago? Do you have any idea?
A. No, I don't know.
Q. Okay. Do you hold any other certifications or licenses in connection with your work as a bomb technician?
A. Are you talking about, like, maybe state certifications or what --
Q. Any -- any -- any certifications or licenses of any kind that are related to your work as a bomb



MAGNA LEGAL SERVICES

Page 34

technician, whether it be state or federal.
A. No, not that I can think of.
Q. Do you belong to any professional law enforcement associations?
A. Yes.
Q. Which ones?
A. IBTA International Arson -- it's IBTA. It's the International Bomb Technicians and Arson Investigators Association. And I may not have all that correct.
Q. Any others?
A. No, no other associations.
Q. Have you, in the past, belonged to any other professional law enforcement associations?
A. No. I mean, aside from the Fraternal Order of Police, no.
Q. Fraternal Order of Police is a union, correct?
A. Yes.
Q. And you were a member of the Fraternal Order of Police throughout the entire time at the police department, correct?
A. Yes.
Q. Did you ever hold any union positions?
A. No.

Page 35

Q. Did you ever run for any union office?
A. No.
Q. Have you, over your career, received any professional law enforcement awards or citations?
A. Yes.
Q. Can you describe those for the jury.
A. A life-saving award. I've had what's called honorable mentions for work done as a police officer. I don't remember what they were for or how many.
Q. Anything else?
A. Not that I can recall.
Q. What was the life-saving award?
A. I, myself and my partner saved a woman from drowning in Lake Michigan.
Q. When was that?
A. Sometime late '90s or -- yeah, sometime in the late '90s between '99 -- between '96 and '99.
Q. Before you became a member of the bomb squad you mean?
A. Yes.
Q. Okay. And you referred to honorable mentions. What are those -- in general, what do those signify?
A. I guess you could describe them as official at-a-boys, if I want to use that term. You know,

Page 36

something where you're just recognized for having done something significant; a significant arrest, a significant response to an incident.
Q. Do you have a record of the awards and citations you've received over the years?
A. Do I have a personal record? No.
Q. Did you receive any law enforcement awards or citations during the time you served on the Chicago Bomb Squad?
A. I may have gotten some honorable mentions. I don't recall. That's -- I think I did.
Q. Any other professional law enforcement awards or citations that you received?
A. Not that I can recall.
Q. Do you know a James Eagan who works at the Chicago Police Department?
A. Yes.
Q. Who is Mr. Eagan?
A. He was my commanding officer at the Chicago Police Bomb Squad.
Q. Was he the bomb squad commander while you served on the -- on the bomb squad?
A. Yes.
Q. Was he the commander during the entire time you

Page 37

served on the bomb squad?
A. No.
Q. Your first commander was Mike -- what was his last name?
A. Goharski.
Q. Goharski. How long did he serve as your commanding officer?
A. I really don't recall. It was a few years, but I don't recall.
Q. And then after Mr. Goharski, Mr. Eagan took over as the bomb squad commander; is that right?
A. I feel like there was somebody before him, another sergeant.
Q. Well, can you tell us -- can you give us your -- your best recollection of when Mr. Eagan became -- became the bomb squad commander?
A. No, I can't.
Q. Did you have a work relationship with Mr. Eagan at the bomb squad?
A. Yes, I did.
Q. And did you have that work relationship with him the entire time, from 2006 to your retirement in 2019?
A. No, I didn't have a work relationship with him



MAGNA LEGAL SERVICES

before he became the bomb squad commander, but I had a relationship with him when he became the bomb squad commander.
Q. Wasn't there a time when Mr. Eagan was on the bomb squad but did not serve as commander?
A. Yes. I -- I vaguely recall that he may have been an assistant to the commander, but I can't give you any specifics on that.
Q. In any event, from at least the time that Mr. Eagan became commander of the bomb squad, you had a would work relationship with him; is that right?
A. Yes.
Q. How would you characterize that relationship, excellent, poor or somewhere in between?
A. Excellent.
Q. Can you describe the nature and extent of that work relationship?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. As far as relationship, he was my commanding officer. We got along. I'm not sure how much further I can describe that.
Q. Were you subordinate to Mr. Eagan during the time he served as bomb squad commander?



A. Yes.
Q. And did you report directly to Mr. Eagan during the time he served as the bomb squad commander?
A. Yes.
Q. Did you report to anyone else directly during that time?
A. No.
Q. How many times a month did you see Mr. Eagan in his role as bomb squad commander in the course of your work at the squad -- at the bomb squad? Was it daily, weekly, monthly?
A. It was daily, unless I was assigned to -- we have an office in the -- at the airport, so unless I was assigned to that on that particular day, it was almost a daily basis.
Q. Did you have an office, physical office, when you were on the bomb squad?
A. I did not have my own personal office. We have a technician's room.
Q. And where is that?
A. It was located at our unit at Homan Square.
Q. And did you have a desk in that room.
A. No.
Q. And can you tell us how that room was -- was



set up then for the bomb technician?
A. More like a work room, large table, about waist high, high chairs around it. Along the walls were tables and cabinets, computers, tools, supplies.
Q. And is that where you reported for work as it were each day?
A. Yes.
Q. And Mr. Eagan, as Bomb Squad Commander, also reported to work there each day; correct?
A. He had an adjoining office.
Q. All right. Did Mr. Eagan have more experience than you as a bomb technician?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. I became a bomb technician prior to him becoming a bomb technician.
Q. You consider yourself to be more experienced as a bomb technician than Mr. Eagan?
A. Well, that's kind of a loaded question because I have more time as a bomb technician. But also, a bomb technician, you know, it's based on what you've seen and what you do, so if he had an overall view of the bomb squad. So I'm -- I'm not sure if I would characterize that as -- I don't know if I would characterize myself as



saying I have more experience than he does, but I've been a bomb tech -- I was a bomb tech before he was. Does that help?
Q. Yes, I think that answers the question. I appreciate your -- your answer.
Did you believe that Mr. Eagan, given his position as bomb squad commander, had a better idea than you of what to look for in a bomb technician candidate?
A. I'm sorry. I could barely hear you on that one. Could you repeat that one more time.
Q. Yeah. Did you believe that Mr. Eagan, given his position as bomb squad commander, had a better idea than you of what to look for in a bomb technician candidate?
A. Oh. Well, I think he had a pretty good idea since how he has to manage bomb technicians. Which I did not have to manage bomb technicians. So, once again, I'm not sure if I can answer that question. His role and my role were different.
Q. Did you consider Mr. Eagan to be a personal friend?
A. Yes.
Q. And did you, from time to time, have social engagements together with Mr. Eagan, outside of the



MAGNA LEGAL SERVICES

office?
A. Yes.
Q. I've already mentioned the name Todd Schmitt. He is an FBI Special Agent Bomb Technician here in Chicago; correct?
A. Yes.
Q. Did you have a work relationship with Mr. Schmitt when you were on the Chicago Police Department Bomb Squad?
A. Yes.
Q. How long did that --
MR. PARKER: Sorry to interrupt you, Phil. I'm wondering just if we could maybe -- it sounds like you're getting into questions about Todd Schmitt. I'm wondering if we can just -- it's been about an hour, take a five-minute break. I'll call in, establish a better sound. I also need to take a bathroom break. So, Mr. Jones, if you need to too, please feel free.
THE WITNESS: Okay.
MR. CURLEY: We can break at any time, so that's fine. It's -- according to my clock, it's 10:15 -- 10:14. You want to come back, what, 10:20, 10:25?
MR. PARKER: Thank you. Thank you. Yep. That should be sufficient. Thank you everybody. Thank you.



Bye-bye.
THE VIDEOGRAPHER: Going off the record 10:15 a.m.
(Short break taken.)
THE VIDEOGRAPHER: Back on the record, 10:22 a.m.
BY MR. CURLEY:
Q. Mr. Jones, I think my last question before we took a short break was whether you had had a working relationship with Mr. Schmitt while you were on the bomb squad?
A. Yes, I did.
Q. How long was that work relationship with Mr. Schmitt?
A. I believe I met him just after I got onto the bomb squad; should be in 2006, maybe 2007.
Q. Could you describe for the jury, in -- in general, what the nature of that relationship -- work relationship was with Mr. Schmitt during that time?
A. Well, Special Agent Smith -- Schmitt, as being a special agent bomb tech, his duties are to coordinate with the state and local bomb squads around his region are his area of responsibility. So he would provide or interact with the local bomb squads; therefore, Chicago Bomb Squad, since we were a major bomb squad in that region. He would provide training with us. He would



train with us, and mostly just interact with us.
Q. How would you characterize your relationship with Mr. Schmitt; excellent, poor or somewhere in between?
A. Excellent.
Q. Did Mr. Schmitt, based on your own observations, work in the field as a bomb technician or his responsibilities more in the nature administrative and training?
A. I'd say both.
Q. Based on your observations, can you assign a percentage of time he was actually in the field, operating as a bomb technician and percent of time he devoted to administrative and training functions?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I wouldn't know.
Q. Did Mr. Schmitt have more experience as you as a bomb technician?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I don't know.
Q. You served with Mr. Schmitt and Mr. Eagan on the interview panel for the 2015 bomb squad hiring



process, correct?
A. Correct.
Q. Did you believe that Mr. Schmitt, given his position as Chief of the FBI Chicago Bomb Squad, had a better idea than you of what to look for in a bomb technician candidate?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. No, I wouldn't know that.
Q. In -- in other words, in -- in your judgment, you had just as good an idea as Mr. Schmitt did of what to look for in a bomb technician candidate; is that right?
A. Well, I think we were looking at it from different perspectives, which is often, you know, from somebody working in the bomb squad and, you know, from somebody without the -- outside the bomb squad. So those are two different perspectives.
Q. Okay. Do you know why Mr. Schmitt was part of the interview panel, given he was, as you put it, outside the bomb squad?
A. I think that was to give somebody from outside the bomb squad, who knows the job and is the subject matter expert, but outside of the police department, to



MAGNA LEGAL SERVICES

participate in this interview process.
Q. Did you consider Mr. Schmitt to be more of a subject-matter expert, as you put it, than -- than you were?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I don't consider him to be more or less of a subject-matter expert than I.
Q. Do you know what vetting process, if any, Mr. Schmitt had to go through to serve on the interview panel?
A. No, I don't know.
Q. Do you know how it came to be that Mr. Schmitt was asked to serve on the interview panel?
A. No, I don't know.
Q. How did you come to serve on the interview panel?
A. Sergeant Eagan asked me to.
Q. Did he tell you why he wanted you to serve on the panel?
A. Yes, he felt like I was a pretty good bomb squad technician, and I had fair amount of experience with the bomb squad.
Q. How many times a month would you say you



communicated with Mr. Schmitt, either in person or by telephone or by e-mail?
A. That's hard to say. Sometimes it would be a few times a month, and sometimes it may be once or less a month, so it was sporadic. It's hard to say.
Q. Okay. Do you consider Mr. Schmitt to be a personal friend?
A. Yes.
Q. Did you, from time to time, have social engagements together with Mr. Schmitt?
A. Yes. Those would usually be if he was invited to a social engagement with the bomb squad.
Q. How often was he invited to a bomb squad social engagement?
A. Oh, I -- I don't know.
Q. And what did you have in mind when you referred to bomb squad social engagements? What type of engagements?
A. Let's say if somebody was retiring from bomb squad. That's what comes to mind most the time. Every now and then, if somebody had a barbecue on the bomb squad, he might have been invited. I don't recall. But what comes to mind mostly is just, like -- like a retirement party for somebody.



Q. Did you participate in the 2015 hiring process for Explosive Technician 1 position on the Chicago Bomb Squad?
A. Yes.
Q. What was your role?
A. I was part of the interview panel.
Q. Did you --
A. And --
Q. I'm sorry.
A. Go on.
Q. I was just gonna ask you if you had any other role?
A. There was other aspects to the application process. The physical fitness and agility test, which I was one of the people who assisted in that.
Q. Anything else?
A. I think that was about it.
Q. What were the qualities you were looking for when considering the candidate for the bomb tech position?
A. We were looking for somebody who could operate under pressure, operate under stress, learn the technical aspects of the job, physically do the job. Who would be willing to go down to Huntsville, Alabama for six weeks



and learn, not only the basic course, but any additional courses that we required to become a good bomb technician.
Somebody could take -- operate in -- in an emergency sit -- situation, high stress, high pressure, and then execute courses of action that would -- that was to, you know, become a successful outcome.
Q. Was intelligence something that you looked for?
A. Yes.
Q. Was electrical and mechanical aptitude something that you looked for?
A. Yeah, that would be helpful, yes.
Q. Was quick decision making something that you looked for?
A. Both quick decision making, coupled with, also, the ability to take in as much information and make the correct decision.
Q. Quick -- correct decision making is something you look for?
A. Yes. Yes.
Q. Was knowledge of the Chicago Police Department directives and bulletins, applicable to bomb and explosive-related incidents, something that you looked for?



MAGNA LEGAL SERVICES

MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. We -- we presented I guess study material, so I guess we were looking for people who -- how well did they study that study material.
Q. And that study material included the Chicago Police Department directives and bulletins, correct?
A. That's correct.
Q. Was nervousness on the part of a bomb technician candidate something you look to avoid?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. No. I think that -- I'm speaking for myself. I understand that applying for a job is a nervous experience. So I would look -- I try to look beyond what I would consider acceptable nervousness in a candidate, because not everybody interviews -- some people interview better and some people interview and can show just nervousness. So I was trying to -- it wasn't a -- it wasn't a -- a disqualifier is what I'm trying to say.
Q. Is it fair to say that once you're in the field with another bomb technician, that you would prefer that other bomb technician to be calm and collected and not nervous?



A. Yes.
Q. Other than in 2015, have you ever participated in any other Chicago Bomb Squad, Bomb Technician hiring process?
A. No.
Q. Did you attend an interview and consensus meeting training session in advance of the 2015 hiring process?
A. Yes.
Q. Were you required to follow the hiring procedures discussed during that training?
A. Yes.
Q. Was that the first training you had received on interview and consensus meetings?
A. Yes.
Q. Have you, since then, attended any other such training sessions?
A. No.
MR. CURLEY: I'd ask that Plaintiff's Exhibit 36 be placed on the screen for our use.
(Exhibit 36 placed on the screen.)

BY MR. CURLEY:
Q. Now, Mr. Jones, this is a little more



complicated than if we were meeting in person, since we have the exhibits on screen. I'm going to show you several exhibits today.
You're certainly free to ask us to scroll through the exhibit or any exhibit and look at them in their entirety. I will, I think for all -- almost all exhibits, direct yourself -- direct us to a particular page or pages. But I did want you to be aware that you're certainly free to ask to look at the entirety of any exhibit if you would like to.
But let me ask you, first of all, this Exhibit 36, can you identify this as the training materials of the 2015 interview and consensus meeting training that you attended?
A. No, I can't identify that as that.
Q. Does it look familiar to you at all?
A. I don't recall. I mean, I don't -- I don't recall. I'm sure --
MR. PARKER: Sorry. Just for the record, this is Counsel, Chris Parker. We would just assert that any documents shown to this witness that were previously marked confidential or for attorneys' eyes only, remain as such by agreement, for purposes of this deposition, pursuant to the protective order.



MR. CURLEY: Certainly.
BY MR. CURLEY:
Q. Were you given any (inaudible) materials --
THE COURT REPORTER: I'm sorry.
BY MR. CURLEY:
Q. -- hiring procedures for the bomb tech position?
THE COURT REPORTER: Coun -- Counsel, can you start that question over? I think --
MR. CURLEY: Certainly.
THE COURT REPORTER: -- someone coughed and it blocked out your question.
MR. CURLEY: Sure.
BY MR. CURLEY:
Q. Have you given any -- were you given any -- given any documents or other materials on the required hiring procedures for the bomb tech position?
A. I don't recall, but I assume I was.
Q. Why do you assume you were?
A. Usually when you go to training, people give you things to take with you.
Q. But you don't recall that happening specifically in connection with this training, correct?
A. Are you asking me do I recall receiving this



MAGNA LEGAL SERVICES

document that's in front of me? Is that what you're asking?
Q. Well, this document or any our document relating to the hiring procedures?
A. I don't recall specifically receiving documentation, but I would not be surprised if I did.
Q. Okay. Can you give us your best recollection of what transpired at the interview and consensus meeting training session that you attended?
A. You would like my best recollection of what transpired during that consensus meeting? The -- the training, is that what you're referring to?
Q. Yes, the training, sir.
A. Well, it was a class on interview -- what to do and what not to do during an interview process for job applicants.
Q. Do you recall anything else about the meeting? About the training session I should say?
A. Well, I think it went into the philosophies of -- of how the Chicago Police Department or City of Chicago tries to hire people without bias, how to ask questions. How not to -- any questions not to ask.
You know, the stuff that seemed fairly obvious. You know, you go in -- delve into somebody's religious



backgrounds, sexual orientation, you know, stuff like that. I think these were all reminders that -- that these were -- were places where we shouldn't go to.
Q. Was there a PowerPoint presentation or any other kind of presentation like that?
A. Yes.
Q. What do you recall about that, if anything?
A. I don't recall much more than what I just said.
Q. How long did the training session last?
A. I don't recall. A day, but I don't recall.
Q. If I told you it was a couple hours, does that sound about right?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. I don't recall if it was the whole day or if it was just the morning or a couple hours.
Q. Okay. But you do recall attending that session, correct?
A. Yes.
Q. Are you familiar with the document entitled, City of Chicago Police Department Hiring Plan for Sworn Titles?
A. No.
MR. CURLEY: I'd ask please that Plaintiff's Exhibit



45 be put up on the screen.
(Exhibit 45 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail with a rath -- with a rather lengthy attachment. And if you go to the second page of this exhibit, we'll see that there is a table of contents and the title of the document is City of Chicago Police Department Hiring Plan for Sworn Titles.
Are you familiar with this document at all?
A. No.
Q. Was this document discussed at the interview and consensus meeting training session?
A. I do not recall.
MR. CURLEY: We can put that one aside then and go back to Exhibit 36 if we could.
(Exhibit 36 placed on the screen.)
BY MR. CURLEY:
Q. Most of the exhibits I'll be showing you have individual page numbers, that lawyers refer to as Bates numbers, that are placed there by the party producing the documents. So, for instance, this and most of them will have designations in the -- usually in the lower right B-R-E-S -- D-E-F, and then a unique number for each page, and that indicates that the document was produced by the



defendants in this case.
So the first page of this exhibit is page 2302. And I'd ask that we turn to the second page of this exhibit, titled, "Objectives."
And the first bullet point provides that you understand the interview process from intake session to consensus meeting.
Do you recall that being discussed at the training session?
A. No, I do not recall specifically.
Q. Did you understand the hiring process from the intake session to the consensus meeting?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. I'm sure I understood it at the time.
Q. What is an intake session?
A. I don't recall.
Q. Did you attend the intake session for the 2015 bomb technician hiring?
A. I just stated that I don't recall what the intake session is, so I don't -- I'm not sure if I can answer that question. I'm afraid I don't know the definition of intake session.
Q. Did you obtain -- did you attend, I should say,



MAGNA LEGAL SERVICES

any meetings relating to the hiring process, before the interviews?
A. I'm certain I did.
Q. Well, do you recall any meetings?
A. No.
Q. Was there any discussion at any meetings that you participated in related to the hiring process, about whether or not the oral interviews should be kept as part of the process?
A. I don't recall that conversation.
Q. Did you believe that the oral interviews should be kept as part of the process?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I don't recall objecting to it.
Q. Right, but were you in favor of keeping the oral interviews as part of the process?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. I guess based on my recollection, since I did not object to it, I'm sure I was for it.
Q. Were you in any meetings where there was a discussion about changing the scoring for the interviews that were part of the 2015 hiring process?



A. I don't recall that.
Q. If you could turn to page 2304 in Exhibit 36, Plaintiff Exhibit 36. That refers to the hiring manager in the lower right; do you see that?
A. Yes.
Q. Mr. Eagan was the hiring manager for the bomb tech position, correct?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I believe that's correct.
Q. Mr. Eagan, as hiring manager, was responsible for the hiring process; correct?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. My understanding as the bomb squad commander, yes, he had the -- he was responsible for the hiring process.
Q. And Mr. Eagan was also the ultimate decision-maker, correct?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. Yes, I guess I -- I believe that.
Q. If you could turn to page 2308, please. This flow chart shows the hiring procedure from the intake



prep through the consensus meeting; do you see that?
A. Yes.
Q. Does this flow chart look at all familiar to you as something that was put up on the screen during the training session?
A. I can't recall.
Q. Do you see the entry interview in bold lettering, right in the middle of the page?
A. Yes.
Q. And -- and to the left, do you see the entry, quote, "individually evaluate candidate against hiring criteria only." With -- end quote; with the word "only" in all capital letters. Do you see that?
A. Yes.
Q. Was it a violation of the hiring procedures to evaluate candidates based on factors outside the hiring criteria?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I don't know.
Q. The hiring procedures are in place in order to, among other things, protect against unlawful discrimination in the hiring process; correct?
MR. PARKER: Object to form, foundation. Go ahead.



BY THE WITNESS:
A. I would assume so.
Q. Including discrimination based on the candidates race; is that correct?
A. Yes.
Q. And the candidates color, correct?
A. Yes.
Q. And the candidates sex, correct?
A. Yes.
Q. Did you agree that if the hiring procedures were not followed, unlawful discrimination of the types we just discussed would be more likely?
MR. PARKER: Object to form, foundation; calls for speculation. Go ahead.
BY THE WITNESS:
A. Please repeat the question one more time.
Q. Sure. Did you agree that if the hiring procedures were not followed, unlawful discrimination, of the types we just referred to, would be more likely?
MR. PARKER: Object to form, foundation; calls for speculation. Go ahead.
BY THE WITNESS:
A. I guess I can answer that. My answer would be that during the process, we felt it's important to follow

those procedures that you just outlined to avoid any sort of discrimination. So we felt that that was important. At least I felt that was important, and that's how I interpreted the follow attachment and James Eagan -- I felt that they felt the same way.
Q. Your understanding was that the hiring procedures were in place to protect against unlawful discrimination, correct?
A. Did you just ask me the same question again?
Q. Would you like me to repeat the question?
A. I --
MR. PARKER: I'll object to asked and answered. Go ahead.
MR. CURLEY: Can you read back the pending question, please, Ms. Reporter.
(Record read back as requested.)
BY THE WITNESS:
A. Yes.
Q. What were the hiring criteria for the 2015 bomb technician hiring?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. What was the hiring criteria? Is that what you're asking me?



Q. Yes. You'll see in that bubble, if you will, on the flow chart that we looked at a moment ago, it's individually evaluate candidate against hiring criteria only.
My question is, what were the hiring criteria for the 2015 bomb technician hiring?
A. I'm afraid I don't know how to answer that.
Q. At the time, did you know what the hiring criteria were for the bomb technician hiring?
A. Are you referring to the physical and -- are you referring to the interview part -- part -- portion --
Q. Yes.
A. -- I -- I'm trying to answer it, but I don't exactly know how to answer that.
Q. That's fair. I am referring -- I am referring to the interview portion, which is what --
A. Uh-huh.
Q. -- part of the flow chart pertains to.
A. Uh-huh.
Q. And my question is, in the context of the interviews, what were the hiring criteria for the bomb tech position, if you know?
A. I don't know.
Q. Okay.



A. I don't know. I don't know how to answer that question.
Q. Did you know the hiring criteria back in 20 thousand -- in 2015?
A. I thought we were referring to 2015?
Q. Right. And I'm asking you to put yourself back in time to 2015. And at that time, you believe you knew what the hiring criteria were?
A. Once again, I'm not trying to be difficult. I really don't know how to answer that question. I mean, we were -- it's an interview process. The candidates present themselves to us, and they present -- they answer our questions, and they attempt to present qualities and qualifications that they feel would make them valid candidates for this job; almost like any other interview process, I imagine.
Q. Do you know if the hiring criteria for the bomb tech position were written down anywhere?
A. No, I don't recall.
MR. CURLEY: Will you please put Plaintiff's Exhibit 43 on the screen for the witness.
(Exhibit 43 placed on the screen.)
MR. CURLEY: And why don't we make it a little bit larger so that the witness can see it, and -- and it's



not all that long. Maybe scroll through it so that the witness can appreciate the full document and contents.
THE WITNESS: Could you slow down for just a little bit? Thank you.
(Brief pause.)
MR. CURLEY: Why don't we go back to the top if we could.
BY MR. CURLEY:
Q. And my question to you, Mr. Jones, is whether you can identify this exhibit?
A. Yes.
Q. What is it?
A. It is the -- the application for explosive technicians. It's an employee resource document.
Q. And this is the document that was in place for the 2015 bomb technician hiring process, correct?
A. Correct.
Q. Did you review this document in preparation for today's deposition?
A. No.
Q. So when was the last time you -- you saw it, do you think?
A. 2015.
Q. Okay. Did you review any documents in

preparation for the deposition today?
A. I reviewed my notes for Ms. Bresnahan.
Q. On the candidate assessment form?
A. Yes.
Q. Did you review anything else?
A. No.
Q. Okay. Did you review Plaintiff's Exhibit 43, prior to your serving on the interview panel and conducting the interviews?
A. Is that what I'm looking at right now, the application for explosive technician comma code?
Q. Yes, sir.
A. Yes.
Q. Do you know if the 2015 bomb technician hiring criteria are identified in this exhibit?
A. Well, as we scrolled through this, I believe they were.
Q. Right.
MR. CURLEY: So let me, if I may, scroll down to page 2875, under Roman VI, Capital H, Oral Interview. Right. Thank you.
BY MR. CURLEY:
Q. Are the entries under 2A through E, are those the hiring criteria for the 2015 bomb technician?



A. Yes.
Q. And did you weigh those five hiring criteria equally in your role as an interviewer and member of the panel?
A. Yes.
Q. Were there any other hiring criteria that you're aware of, other than these?
A. Any -- any -- any -- any documentation, is that what you're referring to?
Q. Any other hiring criteria other than these five, that you're aware of?
A. I don't know. I mean -- yes, I guess those would be the -- the hiring criteria, and no other criteria that was explicitly expressed to us.
Q. Was any particular experience outside the Chicago Police Department required for bomb technicians?
A. No, it was not required.
Q. Was any particular experience within the Chicago Police Department required for bomb technicians?
A. Nothing that was required, no.
Q. Did you believe that a larger and more diverse set of skills and experience among members of the bomb squad was a good thing?
MR. PARKER: Object to form. Go ahead.



BY THE WITNESS:
A. Yes.
Q. Did any particular service experience, within the Chicago Police Department, disqualify a bomb technician candidate?
A. Did a particular service or experience disqualify somebody? Is that what you're asking me?
Q. Yes, sir.
A. Not that I recall.
Q. And referring again to the exhibit on the screen, Plaintiff's Exhibit 43. Are the duties of the bomb technician listed under Roman Numeral II on page 1?
A. Yes.
Q. And it carries over to page 2, if you want to take a look at those as well.
Item B, as in boy, recites that one of the duties of the bomb technician would be the ability to perform all field functions. That's in -- in quotes, "field functions." What are field functions?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. I do not recall specifically what that meant.
Q. What were the field functions of a bomb squad technician?



A. Oh, all right. So I guess in that context, the ability to operate out on the street, physically, obviously, wear the bomb suit, be able to get in those positions that -- that a bomb tech would have to get into.
All field function; I'm gonna assume that meant, like, you know, the ability to see and read, you know, you know, function out in the street, be able-bodied. I'm gonna assume that that's what that meant.
Q. That was your understanding?
A. Yeah. It's a fairly vague bullet point. Or I should say broad bullet point, not vague bullet point.
Q. Are those field functions -- strike that.
Were those field functions also referred to as the operational duties of a bomb technician?
A. I don't know. I don't see that anywhere.
Q. Well, did you refer to them as operational duties to -- in order to distinguish them from administrative duties or duties in the office?
A. I don't recall making that distinction.
Q. Okay. This exhibit, Plaintiff's Exhibit 43, sets out the required FBI HDS school training. The Illinois Department of Natural Resources Explosive



MAGNA LEGAL SERVICES

Licenses -- or License, and the HAZMAT training; is that correct?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. I don't see what you're referring to. Is that scroll down further -- further down in the document?
Q. Well, subject to check, because this is -- well, I'll -- I'll -- I'll do it if you'd like.
Subject to check, I will -- I can tell you that those requirements are listed and included in this exhibit, Plaintiff's Exhibit 43, the FBI HDS training. The explosive license from IDNR and the HAZMAT training.
Other than that, are you aware of any other training or a certification a license requirements for a bomb technician in 2015?
MR. PARKER: Objection to form, foundation. Go ahead.
BY THE WITNESS:
A. No, I don't recall any others.
Q. Okay.
MR. CURLEY: I'm going to ask Plaintiff's Exhibit 78 be placed on the screen for the witness.
(Exhibit 78 placed on the screen.)
MR. CURLEY: And I apologize for the -- the size of



the font here. This is how it was produced to us in the case. And I think we're -- we're able to blow that up if -- if need be, at your request.
BY MR. CURLEY:
Q. But let me just start by saying that this is an e-mail from Jim Eagan to you and Mr. Schmitt. This is the top e-mail on the page, dated May 22nd, 2015. And attached to it is a blank candidate assessment form.
MR. CURLEY: Perhaps you can scroll down to the assessment form attachment.
(Brief pause.)
BY MR. CURLEY:
Q. Did you have any role in drafting or preparing the candidate assessment form?
A. Yes.
Q. What was your role?
A. I reviewed some of the questions. I had suggestions on how some of the questions should be phrased and some suggestions on the questions.
Q. Do you recall any of the suggestions that you made with the candidate assessment form?
A. If we scroll down to this --
MR. CURLEY: Slow enough for the witness to be able to look at it would be great. Most of the pages are



blank.
THE WITNESS: Can we scroll back to the top, please.
BY THE WITNESS:
A. All right. And your questions was, once again?
Q. Simply, what suggestions did you make in connection with the candidate assessment form?
A. All right. So I do recall suggesting the first question; tell us what unit you're in and what your typical work day is, as a good opening question. And maybe just to get a feel for how they felt about their work and, you know, and their motivations.
As far as the other questions, I don't have any specific recollections as to input. I know that, you know, we went back and forth as to, you know, what would look nice or what would be a good format for the questions, but I can't tell you anything more specific than that.
Q. And you say we went back and forth. Who was -- who was the "we?"
A. I'm pretty sure it was James Eagan and possibly one of the -- well, I'm not actually certain, but I'm sure human resources people were -- were involved.
Q. And were there in-person meetings with you and Mr. Eagan and the human resources folks, relating to the



candidate assessment form?
A. I don't recall specifically.
Q. So that may have been over the phone or just the e-mail?
A. There were times when Sergeant Eagan and I were in the same room, and then we might have spoke over the phone to somebody else or there might have been in-person meetings. I don't recall specifically.
Q. Okay. And have you told us everything that you recall about your role in the preparation and drafting of the candidate assessment form?
A. To the best of my recollection.
Q. Did you prepare in any other ways for the interview -- interviews, I should say, other than attending the interview and consensus meeting training session, and having some input on the candidate assessment form?
A. No.
Q. Now, I want to ask you some questions about -- about the candidate assessment form. And because this particular document was produced by the defendants electronically, the individual pages don't have those page numbers I referred to before.
So I'm gonna just refer to the pages by the



MAGNA LEGAL SERVICES

page number of the document itself. And I'm sure that the person who's helping me out here on the exhibits will be able to handle that.
But the candidate assessment form actually begins on the third page of this exhibit, correct? It says page 1 of 8 at the top?
A. I'm looking at page 1 of 8 at the top.
Q. And that's -- that's the -- that's the -- the first page of the candidate assessment form; correct?
A. That appears to be true, yes.
Q. And if you go to the next page, the three rating options appear on the bottom of that page, and the other pages that follow through page 6; do you see those -- those three boxes?
A. Yes.
Q. And those pages give the interviewer the option of checking one of three boxes. Either a, quote, "Candidate does not demonstrate the competency." End quote.
A. Uh-huh.
Q. Quote, "Candidate demonstrates some of the competency." End quote. Or, quote, "Candidate clearly demonstrates competency." End quote. Do you see that?
A. Yes.



Q. What was your understanding of competency as that word is used here in the candidate assessment form?
A. That their answers to the question have some relevation -- or rel -- relevance to whether they should be hired or not hired or whether they make a good candidate to bomb squad.
Q. What was your understanding of what the option, quote, "Candidate does not demonstrate competency." End quote, meant?
A. My understanding was that the answers that the candidate gave were not satisfactory to come to the level where they should be hired, for that particular question.
Q. Did the fact that a candidate might not demonstrate competency in one area, mean the candidate was unqualified for the bomb tech position?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. I don't recall if I thought that at the time.
Q. A -- a candidate with the --
A. I'm -- I'm not trying to be vague. I'm just saying that -- I'm not saying that it was as black and white as that.
Q. Right. So --
A. At the time.



Q. Right. So a candidate might not demonstrate competency in one area, but could still be qualified for the bomb tech position overall; correct?
A. That's possible.
Q. A candidate with the proper training, motivation and enthusiasm could acquire the needed competency, correct?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I don't know.
Q. Everyone who made the final eligibility list, was still required to complete the FBI training program at the Hazardous Device school before they could become a certified bomb technician, correct?
A. Correct.
Q. A candidate that lacked street experience could still complete the FBI training and obtain the other required certifications and licenses and become a bomb technician if they were intelligent enough, correct?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. You're asking me who can complete the FBI Hazardous Device school course; is that what you're asking me?



Q. No. Let me -- let me ask again. A candidate who may have lacked street experience could still complete the FBI training and obtain the other required certifications and licenses, and become a certified bomb squad technician if they were intelligent enough; correct?
MR. PARKER: Object to form, foundation.
BY THE WITNESS:
A. I really can't honestly speculate on that.
Q. Did the FBI, to your knowledge, require prior bomb or explosive-related experience to attend the SDH training?
A. No. Not in my experience, no.
Q. In your experience, did the Illinois Department of Natural Resources require bomb -- prior bomb or explosive-related experience in order to obtain the explosives license?
A. That I do not know.
Q. In your experience, was prior bomb or explosive-related experience required for the HAZMAT certification?
A. No.
Q. Can you tell us what your understanding was of what, quote, "Candidate demonstrates some of the



MAGNA LEGAL SERVICES

competency." End quote, meant?
A. It was a medium. It was in between, "clearly demonstrates" and "does not demonstrate."
Q. Were candidates with that rating still required to go through the FBI training and obtain the other certifications and licenses before becoming a certified bomb technician?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. You're asking me if a candidate who demonstrates some competency can go on to the hazardous device school. I don't know how to answer that, unless they were already hired as -- within the bomb squad. So I'm not -- I'm not exactly sure how to answer that question or -- or how the question was presented to me.
Q. Let me -- let me try to rephrase it.
Were candidates who made the final eligibility list but had a rating on some of these criteria of "candidate demonstrates some of the competency." Were they still required to go through the FBI training and obtain the other certifications and licenses before they became a certified bomb technician?
A. So to answer that question, if somebody was in that middle box on one of these forms, and they



were -- they scored high enough that -- within the interview process that they were put on the list of -- of recommended hirers, then, yes, they would be going to the Hazardous Device School.
Q. Right. Everyone who made the eligibility list was required to go to the HDS school, regardless of how they might have been rated on these individual criteria; correct?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. Yes. I'm going to -- I'm gonna answer yes, because they were on the eligibility list. I don't know where all those checkmarks occurred for the people who were on the eligibility list. I'd have to be -- I'd have to look through my notes or "the" notes in the end, but everybody who was on the eligibility list had to go to the -- it's called HDS. That's short for the Hazardous Device School.
Q. Did the interview and consensus meeting training that you attended, include any training on how you should rate the candidates on pages 2 through 6 of the candidate assessment form?
MR. PARKER: Object to foundation. Go ahead.



BY THE WITNESS:
A. 2 through 6.
Q. Those are the pages with the three boxes we've been talking about.
A. Oh, sure. All right. I don't recall specific training to that. I'm not saying that there wasn't. I just don't recall what that was.
Q. Was there any training at all on how you should rate the candidates?
MR. PARKER: Objection; asked and answered, foundation. Go ahead.
BY THE WITNESS:
A. Yes, I recall there was some training. I don't recall specifically what that training was.
Q. Where did you receive that training?
A. I don't recall.
(Long pause.)
A. I answered. I said I don't recall.
Q. Oh, okay. Thank you. I missed that.
Were the interviewers free to decide on their own how to rate the candidates on pages 2 through 6?
A. Yes.
Q. And they could consider whatever factors they saw fit when deciding how to rate the candidates,



correct?
A. No.
Q. Were the interviewers required to write down on the candidate assessment form all of the factors they considered?
A. Well, we wrote down -- I'm speaking for myself. I wrote down notes to remind myself of the interview, and in those notes would be factors as to why I thought the person was eligible or not eligible. When you asked were they -- were the interviewers able to use any criteria, I think we discussed that there are certain criteria in the -- in the training that we were given that, you know, you can't use. I think you discussed those also, sex, race, gender. You know, obviously those are -- those are issues we are not going to use or factors we're not going to use.
Q. Right. You learned at the training session that those factors were not supposed to be considered, correct?
A. Yes.
Q. Did you discuss, in general, how to rate candidates, with Mr. Eagan?
A. No, I don't recall having that discussion.
Q. Did you discuss, in general, how to rate the



MAGNA LEGAL SERVICES

candidates, with Mr. Schmitt?
A. No, I don't recall having that discussion either.
Q. Were there any numeric or other objective standards that you used to guide your ratings on pages 2 through 6?
A. Can you just repeat the question one more time?
MR. CURLEY: Sure. Can you read it back, please, Ms. Reporter.
(Record read back as requested.)
BY THE WITNESS:
A. Not that I recall.
MR. CURLEY: Now, if we could turn to page 7 of the blank candidate assessment form, that says in the upper, left, overall candidate rating. There we go. Thank you.
BY MR. CURLEY:
Q. There's a different set of three options at the bottom of that page, correct? And they are, quote, "Do not recommend candidate for hire." End quote. Quote, "Recommend with some reservations." End quote. And, quote, "Recommend candidate for hire." End quote; do you see that?
A. Yes, I do.
Q. Was there a required number of boxes that had



to be checked in a certain way, on pages 2 through 6, for a candidate to be rated, "Recommend candidate for hire?"
A. I do not recall there being a specific number or way those boxes should be checked.
Q. Did the interview and consensus meeting training that you attended, include any training on how you should rate the candidates on the overall candidate rating?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. I don't recall any specific conversation to that effect.
Q. Did you discuss, in general, with Mr. Eagan, how to rate the candidate on the overall candidate rating?
MR. PARKER: Objection; asked and answered. Go ahead.
MR. CURLEY: Actually, I asked that question with regard to the ratings on pages 2 through 6.
BY MR. CURLEY:
Q. And I'm asking you now to focus on the overall candidate rating page. And my question is, did you discuss, in general, with Mr. Eagan, how to rate the candidates on the overall candidate rating?



A. No. I think our instructions were to rate them, and then we'll talk about it at the consensus meeting.
Q. Did you discuss, in general, with Mr. Schmitt, how to rate the candidates on the overall candidate rating?
A. No.
Q. Prior to the interviews, did you discuss with Mr. Eagan or Mr. Schmitt, the qualities that you were looking for or that the panel should be looking for, in the bomb technician candidates?
A. I don't recall -- I don't recall any specific conversation to that effect.
Q. So just to be clear, you went into the interviews cold, as it were, without any discussion ahead of time with either Mr. Eagan or Mr. Schmitt on the process; is that correct?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. No. I said I don't recall a specific conversation to that effect. All three of us are bomb technicians, involved with the Chicago Police Department Bomb Squad, and invested with the Chicago -- invested into the Chicago Police Bomb Squad.



I don't recall us sitting down saying we want this or we want that. I think we knew each other enough to know there's certain qualities that, you know, when we see them we'd, you know, we'd recognize them.
So to characterize us as going in cold, with no forethought of what we want to see, I don't think that's accurate.
Q. Fair enough. That wasn't the intent of my question. It was a -- a bad question. Let me -- let me rephrase it.
Did you have any discussion at all, with Mr. Eagan or Mr. Schmitt, about the interview process before it started?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. The only discussion I recall is how the interview possibly was gonna go, such as, who was going to speak, who was going to ask the questions, who was going to make the introductions, where we would be sitting; matters such as that.
Q. Did that discussion take place at the start of the interview process, before the very first interview or was it -- was it before that?
A. I don't recall that.



MAGNA LEGAL SERVICES

Q. Okay. Going back to the overall candidate rating, were there any numeric or other objective standards to guide the interviewers on how to rate the candidates on the overall candidate rating?
A. There was no numerical standards that we applied -- or at least I applied, to that overall rating.
Q. Were there other objective standards that you applied?
A. Are you referring to me, personally?
Q. Yes.
A. I basically used that last page as just a summary of the -- the previous pages, and my overall characterization of how the interview went.
Q. The fact that one interviewer chose the option, quote, "Do not recommend for hire." End quote, after the interview, did not mean the candidate could no longer be considered by the panel; did it?
A. That's correct.
Q. And the fact that one interviewer chose the option, "Do not recommend for hire," after the interview, did not mean the candidate was incompetent; did it?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. I don't know how to answer that. I think my



previous answer was a little bit more accurate. It did not disqualify somebody.
Q. Okay.
MR. CURLEY: We could turn to page 4 of the blank candidate assessment form. One page before that. Hello?
THE WITNESS: Are you talking to me?
MR. CURLEY: No. I'm talking -- there you go. Yes, that one. Thank you. Thank you.
BY MR. CURLEY:
Q. Here on -- so the right of definition it says, relative department and non-department training. I assume that's a typo and it should be relevant; was that your understanding?
A. I don't know.
MR. PARKER: Object to -- yeah. Object to foundation. Go ahead.
MR. CURLEY: Okay.
BY MR. CURLEY:
Q. And then under interview questions, it says describe any training, certifications, military experience or education you possess relevant to the position of Explosives Technician 1.
What was your understanding of what relevant to the position of Explosive Technician 1 meant?



A. Well, somebody may have come into this application process that may have had experience that would be -- have to be considered, you know? If somebody came in as a bomb technician from prior military experience or from a prior law enforcement agency. We would want to know that or at least that is something that they, the applicant, would be given a chance to express.
There's also bomb awareness trainings that are within the police department, that this question would give that applicant an opportunity to express that they took that type of training and -- and they could discuss it.
Q. Right. So relevant to the position of Explosives Technician 1, meant bomb or explosive-related experience; correct?
A. No, not necessarily. I mean, you know, that was up to the candidate to decide what they would like to present, if they had something that they could present.
Q. Well, sure, because you're asking the candidate the question. But in -- in your mind, as the interviewer, what you're looking for was a prior experience they had, relevant experience, in the -- specifically in connection with bomb or



explosive-related experience; correct?
MR. PARKER: Objection; asked and answered, form, foundation. Go ahead.
BY THE WITNESS:
A. No. I mean, in -- in -- in answer to your statement that you just made, no, I wasn't -- I was not looking for that. It was an opportunity for the candidate to provide any sort of training certification or experience or education that they thought might help them get this job, and also that they thought would be relevant to this position.
Q. Right. Again, as an interviewer, did you consider prior bomb or explosives-related experience to be relevant to the position of Explosives Technician 1?
A. So for me, to be clear, it's not -- it was not required because there are very few bomb technicians out there. But if somebody was a bomb technician or had prior experience in this field, it would be in the candidate's best interest to express that.
Q. If the candidate did not have, as you put it, prior experience in this field, that was not a factor that you'd consider, correct?
A. No, it wasn't --
MR. PARKER: Objection; form. Go ahead.



MAGNA LEGAL SERVICES

BY THE WITNESS:
A. It's not something I would expect because we're -- our pool of applicants are police officers and detectives.
Q. So -- so is what you're saying, you wouldn't expect most applicants to have prior experience in the field?
A. Not specific bomb experience, no, but they may have --
Q. They --
MR. PARKER: Let him finish. Go ahead.
BY THE WITNESS:
A. But an applicant might have some experience that that applicant felt would assist them in getting this job, and had some relevance to bomb squad operations or explosive technician operations.
Q. Did this interview question seek to find out whether the candidate had prior experience in the bomb or explosives field?
MR. PARKER: Objection; asked and answered, form, foundation. Go ahead.
BY THE WITNESS:
A. All right. So as I -- this was an opportunity for the candidate to give any certifications or training



or experience that they had that -- that they felt would assist them in getting this job.
Q. And I -- and I'm trying to focus on your role as interviewer.
A. Uh-huh.
Q. The most relevant experience would be prior experience in the field, correct?
A. Yeah.
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Yes, that would be pretty relevant.
Q. What other experience would be relevant?
MR. PARKER: Objection; form, foundation.
BY THE WITNESS:
A. Well, that was a pretty open -- I'm saying -- not your question. I'm saying the interview question is left open for the candidate to interpret it. So those K9 explosive handlers, they know -- they know explosives as a subject matter. I already mentioned military experience possibly. Some may have taken classes or training in bomb squad operations.
I know the Department used to send people to a terrorist awareness class, regarding explosives, in New Mexico. So this would be an opportunity for somebody who



went to that training to state that.
Q. Okay.
A. So this question was to give the candidates the opportunity to showcase anything that they thought might get them this job.
Q. You -- you referred in your answer to military experience possibly; what did you mean by that?
A. Exactly how I said it. If somebody had military experience as a bomb technician, that -- that would be a factor that we may consider.
Q. If they had military experience, but not as a bomb technician, was that relevant to the bomb technician position?
A. No, it wasn't. But, once again, this was an opportunity for them to explain how whatever military experience that they had, might place them as a better candidate for this job. It was not required, not looked at. It's simply an opportunity for the bomb squad -- for the candidate to try to express how they will fit into this job better.
MR. CURLEY: If you could turn -- if you could scroll down to the last page of this exhibit.
BY MR. CURLEY:
Q. This is the text for -- the introduction for



each interview. And it starts with, all panel members will be introduced; and then a following statement was to be given to each candidate.
Was that done for the -- each interview in the bomb technician hiring process?
A. Give me one minute to read through this.
Q. Sure. Please.
MR. CURLEY: Maybe make it a little larger.
THE WITNESS: Yes, that would help.
MR. CURLEY: Thank you.
(Brief pause.)
BY THE WITNESS:
A. Yes, I recall that being -- that statement being given to each candidate.
Q. All right. In -- in item one, in the second sentence, it says each candidate will be asked the same questions, but panel members may ask specific follow-up questions of each candidate.
Did you ever ask any follow-up questions of any candidate?
A. Yes.
Q. Did Mr. Eagan ever ask follow-up questions?
A. Yes.
Q. Did Mr. Schmitt?



MAGNA LEGAL SERVICES

A. Yes.
Q. Were those questions written down?
A. I don't recall. Someone -- someone may have written them down in their own notes. It depends upon the individual interviewer.
Q. Was anyone of the three of you assigned the responsibility to write down all the questions?
A. Not that I recall.
Q. Was anyone from human resources assigned the responsibility of writing down follow-up questions?
A. Not that I recall. And when I say "not that I recall," what I'm saying is that I do not recall. I don't know if there's a distinction there. I don't recall if anybody was writing down those questions from human resources, the follow-up questions.
Q. Right.
A. Okay.
Q. Okay. Was whether or not a candidate held a good current position with the police department part of the hiring criteria?
MR. PARKER: Object to foundation. Go ahead.
MR. CURLEY: And you can take the exhibit off the screen if you'd like. I think we're done with that, for now anyway.



BY THE WITNESS:
A. Can you explain that question a little bit more?
Q. Sure. Well, we looked at the hiring criteria remember in Exhibit 43. Was whether or not a candidate held a good current position with the police department part of the 2015 bomb technician hiring criteria?
MR. PARKER: Object to form and foundation. Go ahead.
BY THE WITNESS:
A. Your definition of a good position, I'm not exactly sure about that. I'm going to say no. In my case was, no, it was not a criteria.
Q. At least in your case, did being in a good current position with the police department disqualify a candidate?
A. Being in a good -- being in a good position disqualify a candidate? No.
MR. CURLEY: I'd like to turn now to the candidate assessment forms for Maureen Bresnahan. If anyone needs to take a short break, this might be a good time because I'll probably spend quite a bit of time on this document. Or I'm certainly prepared to --
THE COURT REPORTER: I could use a quick break,



please, for the restroom.
MR. CURLEY: Sure.
MR. PARKER: Yeah. Let's take a quick break.
MR. CURLEY: It's 11:47. Let's come back at 11:55. Does that work for you, Mr. Jones?
THE WITNESS: Sure.
MR. CURLEY: And we're definitely gonna go, I think, through lunch. So -- and I think we'll need a break, at least for the reporter, for -- for lunch. Maybe a short break. So I'm ready, willing and able to do that, whenever it makes sense for others.
THE VIDEOGRAPHER: All right. We're going off the record --
MR. CURLEY: We'll be back --
THE VIDEOGRAPHER: All right. Going off 11:47.
(Short break taken.)
MR. CURLEY: Could we please put the Plaintiff's Exhibit 33 up on the screen for the -- for the witness.
(Exhibit 33 placed on the screen.)
BY MR. CURLEY;
Q. Mr. Jones, you had told us earlier that you did look at your own candidate assessment form notes for Maureen Bresnahan, correct, to prepare for the deposition; correct?



A. Yes.
Q. Okay. Did you also look at the candidate assessment forms completed by Mr. Eagan and Mr. Schmitt?
A. No.
Q. Okay. And Plaintiff's Exhibit 33 --
MR. CURLEY: Perhaps you can scroll through these quickly since you looked at them recently. Pages 412, the first page, through 419.
BY MR. CURLEY:
Q. I'm going to ask you, first of all, for you to confirm for us that those are your notes on the candidate assessment form for Maureen Bresnahan?
A. Yes.
Q. Is this the entire candidate assessment form that you completed for Maureen?
A. It appears to, yes.
Q. Nothing appears to you to be missing, correct?
A. No.
Q. Did you take any other notes during Maureen's an interview?
A. No.
Q. Had you met Maureen Bresnahan before the interview?
A. No.



MAGNA LEGAL SERVICES

Q. Did you meet her during the physical agility test?
A. Yes, I'm -- I'm certain I did.
Q. Okay. But do you have any recollection of -- of her from that physical agility test or any conversations you might have had with her?
A. No.
Q. Does Plaintiff's Exhibit 33 contain all of the notes you took during the Maureen Bresnahan interview?
A. Yes.
Q. Were the oral interviews of the candidates videotaped, recorded or transcribed, to your knowledge?
A. To my knowledge, no.
Q. Do you know why not?
A. No.
MR. CURLEY: And if you could scroll up to the first page of the exhibit, page 412.
BY MR. CURLEY:
Q. With the exception of the name Maureen Bresnahan, is all of the handwriting on this page yours?
A. Yes.
Q. And same for the following pages, 413 through 419, other than the name Maureen Bresnahan, written at the top, is all of the other handwriting on those pages



yours?
A. Yes.
Q. Did Maureen say during your interview that she was unable, unwilling or uninterested in performing the field functions of the bomb technician position?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. No, I don't recall her making that statement.
Q. Did you take the notes, or I should say make the notes, on pages 412 through 419, on Exhibit 33, during the course of Maureen's interview?
A. Are you asking me, like, was I writing while she was talking?
Q. Right.
A. I don't recall, because sometimes I would like to wait. I generally -- I generally like to wait for a pause in the action, because I don't want to be writing while people are talking because it makes people nervous. So I may have written a few things with breaks in the action. So I don't know if that answers your question, but, yes, most likely I probably wrote the -- wrote those during the interview, but I try to make a wait effort to listen to all the answers.
Q. Sure. Sure. Did you make any changes to the



notes or add any notes after the interview was over?
A. No.
Q. And you made your notes as accurate as possible; is that -- that fair to say?
A. It's fair to say.
Q. Did Maureen say in her interview that she only wanted to be in charge of something called the bunker?
A. I don't recall.
Q. You don't recall her saying that?
A. Yeah, I don't recall her saying that.
Q. Do you have an understanding of what the bunker is in the context of the bomb squad?
A. Yes.
Q. What is that understanding?
A. That's where we keep explosives. It's a location, South side of Chicago. It's a secured location where we hold explosives that we would use for training and operations, along with recovered explosives and recovered explosive military ordinance.
Q. Did Maureen say at her interview that she only wanted to be in charge of maintenance of equipment?
A. Are you asking me if she said she only wanted to be in charge of maintenance equipment? I don't recall those specific words.



Q. You don't recall her saying that, do you?
MR. PARKER: Objection; asked and answered. Go ahead.
BY THE WITNESS:
A. I'd have to look at some of my notes. If I'd noted it, I don't recall.
Q. If -- if she had said that you would have made a note of it, correct?
MR. PARKER: Objection; foundation, form. Go ahead.
BY THE WITNESS:
A. I don't know. I mean, if she would have said it and I didn't catch it, I would not -- I would not put it in or I might not have given it a -- a weight. I don't know. I don't know. I can't -- I -- I -- I don't know the answer to that question.
Q. Okay. Fair enough. In any event, you don't recall her saying during the interview that she only wanted to be in charge of the maintenance of equipment; correct?
MR. PARKER: Objection; asked and answered.
BY THE WITNESS:
A. I don't recall whether I heard that or I did not hear that.
Q. Did Maureen say at her interview that she only



MAGNA LEGAL SERVICES

wanted to be in charge of training?
A. I'm gonna have to look at my notes, because I might have said something about training. I don't know.
Q. So why don't -- why don't you take a look at your notes, if you'd be so kind.
A. Yeah.
Q. To see if you noted either that she said she wanted to be in charge of training, or she only wanted to be in charge in the maintenance of equipment.
MR. CURLEY: And if we could just we scroll through those. Maybe make them a little bit bigger for the witness.
MR. PARKER: And I'll object to form, foundation, asked and answered.
BY MR. CURLEY:
Q. And you'll let us know, Mr. Jones, if we're scrolling too fast?
A. Yeah. No, that's fine. That's a good speed.
(Long pause.)
A. Okay. No, I don't recall whether she said that or she didn't say that.
Q. Did you see anything in your notes indicating that she said she wanted -- only wanted to be in charge of the maintenance of equipment?



A. No, I did not, but I will preface that, like, just because something is or is not in my notes, I mean, you know, I'm writing notes as fast as I can and trying to get an overall view of the candidate, but I'm not dictating everything she says.
Q. I understand that, sir. I'm just asking you?
A. Yeah.
Q. -- a question whether there's --
A. Okay.
Q. -- that you --
A. No.
Q. -- just saw in your notes, that indicated that she only wanted to be in charge of the maintenance of equipment?
A. I did not -- no, those are not in my notes.
Q. And did you see anything in your notes indicating that Maureen said at her interview that she only wanted to be in charge of training?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. No.
Q. Who actually asked Maureen the questions during your interview?
MR. PARKER: Objection; foundation. Go ahead.



BY THE WITNESS:
A. All the question in this form were asked by Sergeant Eagan, as I recall.
Q. He asked all the questions for all the candidates?
A. I'm -- based on my recollection, yes. He was the one who asked the questions --
Q. Did he -- I'm sorry. I thought you were done.
A. I'm pretty sure that's how it went.
Q. Okay. Did you ask any follow-up questions of Maureen during the interview?
MR. PARKER: Object to foundation.
BY THE WITNESS:
A. I may have but I don't recall.
Q. Is there anything that would refresh your recollection?
A. I don't know.
Q. Is there anything that -- in your notes that we've just gone through that indicated to you that you did ask any follow-up questions of Maureen?
A. Oh, I can't tell in my notes whether I asked those questions or on the basis of those notes on somebody else's -- somebody else asking the questions.
Q. And just so we're clear; when I refer to



follow-up questions, I mean questions other than those on the candidate assessment form.
A. Yes.
Q. Right.
A. If we just scroll up a little bit, I may be able to answer that; but, honestly, I'm not gonna be able to recall whether I specifically asked a question.
Q. All right. So as we look through these, my question to you is simply going to be whether there are any -- any follow-up questions that you wrote down on the candidate assessment form?
A. Uh-huh.
(Long pause.)
A. No, I don't see any follow-up questions written down in these notes.
Q. If a candidate gave an incomplete answer to a question, were you allowed to ask a follow-up questions?
A. Yes, I believe I was.
Q. Did Mr. Eagan or Mr. Schmitt ask Maureen any follow-up questions?
A. I don't recall.
Q. Were you allowed to ask a follow-up question if a candidate said something that needed clarification or explanation?



MAGNA LEGAL SERVICES

Confidential

Page 106

A. Yes.
Q. Was anyone, other than you, Mr. Eagan and Mr. Schmitt present at Maureen's interview?
A. Yes.
Q. Was there a representative from human resources there?
A. Yes.
Q. Does the name Lisa Gariota ring a bell? Was she present?
A. I don't recall if she was present for Maureen Bresnahan's interview, but, yes, that name rings a bell.
Q. Okay. But you do recall there was one human resources representative at Maureen's interview; correct?
A. Yes.
Q. Anyone else, other than the three interviewers and the human resources person?
A. Not to my recollection. I don't know if there was one or two human resources people. I don't recall.
Q. Do you know of any notes of Maureen's interview, other than those that are included in the candidate assessment forms that have been marked as Plaintiff's Exhibit 33?
A. No, I do not know.
Q. Did you complete the ratings on pages 413

Page 107

through 417 after each question?
A. Are you referring to the three boxes at the bottom?
Q. Yes, sir.
A. Yes.
Q. So -- so for instance, on page 413, four, one, three, Maureen was asked the question, she gave an answer. You made notes and then you checked the box "Candidate demonstrates some of the competency," before you moved on to the second question; correct?
A. I don't recall exactly when I would have checked that box.
Q. Okay. You did not rate Maureen as, quote, "Candidate does not demonstrate the competency," end quote, for any of the five hiring criteria on pages 413 through 417; correct?
A. I'm not looking through all the pages, but if we scroll down, I'm pretty sure I did not check that box.
Q. Was the interview already over when you completed Maureen's overall candidate rating on page 418?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A. All right. So just to be clear, are you saying that the interview is concluded, and then are you asking

Page 108

me do I write that last -- write in that last page; is that what you're asking?
Q. Yes. And wrote the last page and checked the box, "Recommend with some reservations?"
A. Yes.
Q. So she had already left the interview room when you completed the overall candidate rating, correct?
A. Yes.
Q. Did you discuss Maureen's interview with Mr. Eagan and Mr. Schmitt, before you filled out your overall candidate rating?
A. No.
Q. Was there any discussion amongst the three of you after the conclusion of Maureen's interview and before the next interview started?
A. No.
Q. What reservations were you referring to on page 418 when you checked that box?
A. Which page? Oh, the very last page, is that what you're referring to?
Q. Yes, sir.
A. I guess my characterization of the -- of the overall interview was that she was okay. She wasn't particularly -- her answers were not particularly

Page 109

impressive. So I said "Recommend with some reservation." It's top middle of the road.
Q. And did you consider limited and street experience as a reservation?
A. Oh, I see. So, I guess when some candidates don't have -- no, I -- I -- I didn't consider that a reservation. I don't require street experience for this job. It's just that the candidates who have told or explained their experiences out on the street, doing something which required acting under pressure or under stress or in a moment of danger, you know, almost all the experiences that police officers have on the street on a daily basis, particularly in the areas of high crime. If an officer talks about that, that might be an opportunity for that officer to express those qualifications that that officer might think would be something we were looking for.
So -- so, you know, street experience is just another means of -- of demonstrating qualities that that officer might feel would be something we're looking for. So that's -- that's probably the way I wrote that down is because she didn't talk about or really have much street experience, so she couldn't draw upon those types of experiences to -- to showcase her abilities in that


MAGNA LEGAL SERVICES

manner. So that's -- that's obviously a note I wrote to myself.
Q. But that -- I -- I think you said, that that did not disqualify her from consideration for the bomb tech position, correct?
A. No --
MR. PARKER: Objection to form. Go ahead. Sorry.
BY THE WITNESS:
A. So when you say do things disqualify you from the bomb tech position, I'm not sure if I'd use that terminology. I did not think of that terminology. I was never looking at a candidate thinking whatever they said disqualified them. So it was a lot less about disqualification, and more about -- in this interview process, what can I, as a candidate, bring to the table to these interviewers sitting across from me that will express that I have those qualifications that they're looking for?
So that's -- it's not -- it's less -- it's not so much qualification. It's more like, what can I bring to the table that -- that is going to impress these -- these interviewers; does that make sense?
Q. Sure. Well, do you recall any -- a specific reservations you had about Maureen?



A. Well, you know, I wrote in my notes that she seemed very -- I wrote in my notes heavily weighted toward IT issues. She seemed to have talked a lot about IT, her -- her experience as a librarian. The characteristics she tried to convey, wasn't what we were looking for as a bomb technician.
Q. Any other specific reservation?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. I'm sure there were other reservations, but I can't -- I can't recall them. I might have to look through some of the other -- of the notes. Can I look through some of the -- some of the other pages.
Q. Sure.
A. I mean --
Q. Start at 412 and go down to 419.
A. Yeah. So I'm looking at IT computer stuff, a lot of IT computer stuff in both of those pages. You know, she's -- she wrote as her history --
THE WITNESS: Slow down just a little bit, please. All right.
BY THE WITNESS:
A. Programing and research.
THE WITNESS: Could you go up or down?



(Brief pause.)
By THE WITNESS:
A. So in my notes, I guess all my notes were just kind of luke warm. Usually when I thought a candidate was impressive, I was a little more specific, and I went into much greater detail as to the things that they said that -- that -- that I felt that they presented themselves in the qualifications or the qualities for this job.
So in the end, I scored her in the med -- as a medium; "Recommend with reservations." I wasn't enthusiastic about her responses enough to make her in the far left or far right category, which is "Recommend candidate for hire."
Q. Right. We'll -- we'll get to some of your more -- some of your specific notes in a -- in a little bit as well.
And as we went through your notes here again, you refer to the -- to IT. Other than her appearing to you to be heavily weighted towards IT issues, did you have any other specific reservations?
MR. PARKER: Objection; just asked and answered. Go ahead.



BY THE WITNESS:
A. Yeah. I mean, I think I just spent 60 seconds answering that.
Q. Well, I don't think you referred to anything other than IT. I just want to make sure that that was the specific reservation that you had?
A. Well --
MR. PARKER: Objection; foundation, form. Go ahead. Asked and answered.
BY THE WITNESS:
A. We discussed the limited street experience. And as I said, that's not a disqualifier. But what we're looking for in a candidate is if they can provide any opportunity to discuss how they operate in an environment where they have to make life-and-death decisions, put themselves in danger, willingly put themselves in danger, operate under stress and pressure and calmly.
So that's where -- once again, street experience is not necessary, but it -- it's a good way for somebody who has no other bomb squad experience to at least draw upon, and express to them, like, how they could fit in this job. So that's another example.
And -- and I'm going to have to look through the notes one more time. Overall, I mean, she --



MAGNA LEGAL SERVICES

she -- she seemed to focus a lot on -- on being a librarian, and -- and also on her IT issues, that's -- apparently I wrote that down, thinking that she really -- that's what she was expressing a lot, you know. And she thought she could bring her IT skills, I guess, to the job. I wrote that down. So once again, I mean, you're asking me for my overall assessment --
Q. Actually --
A. -- that -- that was it.
Q. Right. I -- my question was not overall assessment, which we -- which you have described. I just -- I'm asking and I'm entitled to know, what specific reservations you had, and you've identified I think two now, the IT-related issue and limited street experience. I just want to get a -- a catalog of what these specific reservations you have are. Are there any other in addition to those two?
A. So --
MR. PARKER: Objection -- Objection; foundation. Go ahead.
BY THE WITNESS:
A. So you have three boxes down at the bottom of the page. And I have to choose among one of those three boxes. So, you know, I'm not -- it's not asking me to



check all the boxes of reservations versus non reservations. I simply have to chose among those three boxes. One is "Do not hire." You know, I mean, she -- like I said, her -- her interview process was okay. So, you know, there was nothing that she said that I thought was -- was a complete red flag if -- you know.
And then there's the other side, which is definitely recommend this person for hire. And she -- the overall interview just did not lead me to that box. So I'm left with the middle box.
Q. Which says "Recommend with some reservations." And you've told us two reservations. I will give you one last chance to identify any other specific reservation, if you had any?
A. So --
MR. PARKER: Objection; asked -- objection; asked and answered, form, foundation. Go ahead.
BY THE WITNESS:
A. So if that box said, "Recommend with some reservation," the noun reservation, with no "S" at the end, would the question still stand? I'm -- I'm not trying to be argumentative, but I just -- that's the way I interpreted it, was reservation. Reservations/reservation. I don't really have -- I don't



differentiate between those two words; one's a plural, one's a singular. But one can have reservation about something.
So, you know, you're trying to make me say something and I don't really have it -- I'm not sure how else to answer that, aside from how I already did, you know. I didn't recommend her for hire, and I didn't put her on the far left category. I put her right in the middle.
Q. And -- and just to be clear, to you and to others, I'm not trying to get you to say anything.
A. Uh-huh. Okay. I'm sorry. I didn't mean -- I didn't mean to say that, but --
MR. PARKER: All right.
BY THE WITNESS:
A. Probably if you're asking --
MR. PARKER: Is there a -- are you done? Is there a pending question? Let's go.
BY MR. CURLEY:
Q. At the consensus meeting, you did change your rating for Maureen to DNR or do not recommend; do you remember that?
A. I don't recall it, but probably -- that may have been the case.



Q. Okay.
A. Oh, I think because we were required to put them in one or two categories at that point.
Q. Why did you change your rating at the consensus meeting to not recommend Maureen?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Because she didn't -- because as I recall, she would not have fit into the recommend category, so that leaves the do-not-recommend category.
Q. Do you recall any discussion about Maureen at the consensus meeting?
A. I recall there was discussion.
Q. Right. Do you recall the substance of any of the discussion about Maureen at the consensus meeting?
A. No, not specifically. She was one of many candidates who fell in that middle category, where we had to immediately make a decision.
Q. Do you know Rebecca Zamora?
A. Is she one of the HR people?
Q. Yes, she was.
A. Okay. Yes.
Q. All right. And was Ms. Zamora at the bomb technician consensus meeting on June 5th?

A. I don't recall.
Q. Was her -- well, was the human resource representative's role at that consensus meeting, to memorialize how and why the decisions were made at the consensus meeting?
A. Yes.
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Yes.
MR. CURLEY: If we could we pull up on the screen please -- well, first of all, let's go with Plaintiff's Exhibit 40. Could you make that a little bit bigger.
(Exhibit 40 placed on the screen.)
BY MR. CURLEY:
Q. This is the explosive technician HR consensus meeting worksheet, produced to us in this case by the defendants. And have you ever seen this document before?
A. I do not believe I have seen this document before.
Q. Okay. And just to explain how -- what the testimony is -- has been how it reads. There's the candidate's last and first name. Then the names of the three interviewers; Eagan, yourself and Schmitt. And



then the consensus meeting column, which is a result of the consensus meeting, and the rank on the eligibility list, and the writing or the initials, the letters in black, are the ratings that were provided by the interviewers for each candidate after the interview. And then the letters in red are the ratings that were provided at the consensus meeting.
So if -- just to confirm, if you look at Maureen Bresnahan, you had, as we saw on the candidate assessment form, rated Maureen as WR, recommend with reservations; correct?
A. Yes.
Q. And that was changed to DNR or do not recommend, right?
A. Yes.
MR. PARKER: Object to form, foundation. Go ahead.
MR. CURLEY: Now can we pull up Plaintiff's Exhibit 41, please. Maybe make that a bit -- a tad larger.
(Exhibit 41 placed on the screen.)
BY MR. CURLEY:
Q. This was also produced by the defendants in this case, and is another human resource's consensus worksheet, 2015. Have you ever seen this document before?



A. I do not believe I have.
Q. Do you recognize the handwriting on Plaintiff's Exhibit 41?
A. No.
Q. Ms. Zamora, who was with the human resources division, has testified that it's her handwriting. And then on the last page she signed and dated the worksheet, June 5th, 2015.
MR. CURLEY: If you could scroll down and show the witness all three pages.
BY MR. CURLEY:
Q. The testimony about this exhibit is that, again, it's another human resource's consensus worksheet, and that each of the candidates that were discussed at the consensus meeting appear on the left; last name, first name and then there are notes that were taken by Ms. Zamora.
On the first page of -- of this exhibit, next to Maureen Bresnahan, it says best suited for clerical, comma, office, DNR; do you see that?
A. Yes.
Q. Does that refresh your recollection at all about the discussion of Maureen at the consensus meeting?
A. No.



Q. Did you say, at the consensus meeting, that Maureen was best suited for a clerical or office position?
A. I don't recall making that statement.
Q. Did Mr. Eagan, at the consensus meeting, say that Maureen was best suited for a clerical or office position?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I don't recall if anybody made that statement. I'm not saying somebody didn't, but I don't recall that.
Q. Let me just try and close the loop there then. Did Mr. Schmitt, at the consensus meeting, say that Maureen was best suited for a clerical or office position?
A. I don't know --
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I don't recall.
Q. Do you have any reason to believe that Ms. Zamora simply made up her notes about the discussion of Maureen?
MR. PARKER: Objection; form, foundation, calls for speculation.



MAGNA LEGAL SERVICES

BY THE WITNESS:
A. No, I don't have any reason to speculate that.
Q. Lisa Gariota, another human resource representative, was also at the consensus meeting. Do you recall that there were two representatives?
A. No, I don't recall that.
Q. Well, she testified about Plaintiff's Exhibit 41, under oath, at her deposition, as follows at page 135: Quote, Question: "Under Maureen Bresnahan it says best suited for clerical office. Do you see that? Answer: Yes. Question: Do you remember somebody making that comment at the consensus meeting? Answer: Yes, but I do not know specifically which panel member said that." End quote.
Do you have any reason to believe that Lisa Gariota did not testify truthfully?
MR. PARKER: Objection; form, foundation. Testimony speaks for itself, calls for speculation. Give me a break. You're asking him to testify to what somebody else testified to? Come on. This is ridiculous, Phil.
BY MR. CURLEY:
Q. Do you have any reason to believe that Lisa Gariota did not testify truthfully at her deposition?



A. No, I don't believe --
MR. PARKER: Objection. Same objection.
BY MR. CURLEY:
Q. Whether or not a candidate might, in someone's view, be best suited for clerical or office position, was not part of the hiring criteria; was it?
A. I'm sorry. You have to repeat that one more time.
Q. Sure. Whether or not someone believed the candidate was best suited for a clerical or office position, was not part of the hire criteria; was it?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. All right. I'm sorry. I'm trying to process your question here. Are you asking me does that -- does that disqualify somebody or does it qualify somebody?
Q. No, I'm sim -- I'm simply asking whether --
MR. CURLEY: Ms. Reporter, could you read the question back.
(Record read back as requested.)
BY THE WITNESS:
A. I will say no, that's not part of the hiring criteria.
MR. CURLEY: Can we put Plaintiff's Exhibit 33 back



up on the screen, please, and turn to page four, one, nine.
BY MR. CURLEY:
Q. I -- I just want to confirm that that's your signature on page 419, and that you signed your candidate assessment form for Maureen on May 27th, 2015; correct?
A. That's correct.
Q. And did you sign the form after the interview was over and after you had already completed the previous pages, 412 through 418?
A. Yes.
Q. Now, I want to direct you to the candidate assessment form of Mr. Schmitt, which starts on page 428 and goes through 435. Let's start with his overall candidate rating for Maureen. Do you see that on page 434?
A. Yes.
Q. The first line Mr. Schmitt wrote about Maureen that she was, quote, "Very pleasant/friendly/outgoing." Is that consistent with your own recollection of Maureen?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I think I wrote that on my evaluation, too. I believe I did.



Q. Very pleasant was a positive factor in favor of Maureen; is that correct?
MR. PARKER: Objection; form, foundation.
BY THE WITNESS:
A. Yes, it's meant to be positive.
Q. And -- and friendly was also a positive factor, correct?
A. Yes.
Q. And outgoing was also a positive factor, right?
MR. PARKER: Objection; form, foundation. You know, I'll just object to this whole line of questioning, to the extent you're asking him about what Todd Schmitt rated her as. So as opposed to keep objecting to each of these questions about somebody else's candidate assessment form, if we can just have a rolling objection; form, foundation, calls for speculation.
MR. CURLEY: That -- that's fine, but I'm not asking the questions about what Mr. Schmitt said. I'm asking questions --
MR. PARKER: You just literally went through very pleasant, friendly and outgoing that are listed on Todd Schmitt's form as whether those were positive factors listed from -- from Todd Schmitt's form. So you're clearly trying to get him to testify to what somebody



MAGNA LEGAL SERVICES

else wrote -- notes. So, you know, this is just getting ridiculous here.
You've already test -- you've already deposed Todd Schmitt. He can testify to what he wrote. Mr. Jones is here to testify to what he recalls and what he wrote into his form.
I'm gonna have a rolling objection to these questions.
MR. CURLEY: That's fine.
BY MR. CURLEY:
Q. Very pleasant, friendly and outgoing, all indicate the ability to work as part of a team; do you agree with that?
A. Pleasant and friendly, yes. I don't -- I don't recall if I wrote outgoing. So, you know, I don't know. I mean, I'm not -- I'm -- I'm not gonna make a -- a -- a declaration on that because I'm sure there are people who are shy and not outgoing and make excellent team members. So I -- I can't attest to that.
And that's something that Todd Schmitt wrote. I don't remember if -- I don't remember if I wrote outgoing.
Q. Well, actually, my -- my very first question was whether his comments were consistent with your



recollection, and you answered as you answered. But in any event, I'll stick with very pleasant and friendly. Very pleasant and friendly indicate the ability to work as a part of a team, correct?
A. I'm thinking about that right now. I generally like people who are pleasant and friendly so that works for me.
Q. And -- and pleasant and friendly also speaks to Maureen's communication skills, correct?
A. Well, that's what Todd Schmitt wrote, and I think I wrote something along the lines that she was pleasant.
Q. Well, regardless of who wrote what, pleasant and friendly speak to Maureen's communication skills, correct?
A. No. They speak to somebody being pleasant and friendly.
Q. Fair enough. If that's the way you look at it. Are good communication skills and teamwork important for bomb squad members?
A. I would value that.
Q. Did you find Maureen to be intelligent, based on her interview?
MR. PARKER: Object to foundation. Go ahead.



BY THE WITNESS:
A. Yeah, she -- I think I wrote down that she was -- she appeared to be intelligent.
Q. And you noted on page 413 that she was the valedictorian of her police academy class, correct?
A. She noted that. I wrote it down.
Q. Right. You noted it, she said it; correct?
A. She said it, I noted it. Sometimes I write things just to remind me of -- just because that's something that they said, so I might need that. I mean, I might need that information.
Q. Right. That's a note that you took?
A. Yep.
Q. Okay. You know how one becomes valedictorian of your -- of the police academy class?
A. I -- I'm going to surmise that by doing well on all the academy tests. I was not, so I don't know specifically.
Q. Was being valedictorian a positive factor in Maureen's favor?
A. I'm going to say it was neither positive nor negative in the -- in the context of this job application.
Q. And why didn't you consider it a positive



factor?
A. Well, I'm not sure -- what -- what I said is I didn't view it as a positive or a negative. She was valedictorian. I don't hold that against -- I did not hold that against her, but one could come in -- into the police department as a high school valedictorian or a -- or a Harvard grad student. That may or may not make them a good police officer. So, you know, I just took it at face value. So I --
Q. Right.
A. -- I'm not -- I'm not-- so I -- I -- I -- I wrote it down and that was -- I just wrote it down as a note that that might be a positive factor.
Q. Well, she -- she didn't say that she was a valedictorian of her high school class or college class. She said she was the valedictorian of her police academy class; correct?
A. Yes. So the point --
MR. PARKER: Objection to -- ahead.
THE WITNESS: Yes.
MR. PARKER: Sorry go ahead.
THE COURT REPORTER: Was there an objection? I'm sorry.
MR. PARKER: Yeah, sorry. Object to form and



MAGNA LEGAL SERVICES

foundation. Go ahead.

BY THE WITNESS:
A. I simply wrote it down to refer to it later, I suppose.
Q. But is your testimony that you did not write it down as a positive factor; is that correct?
A. No that's not my testimony. I wrote it down just as the things I wrote down on notes on her interview. I wasn't necessarily assigning a value to every single note. No. I have notes on there. You know, I have children, librarian. I did not assign a particular value to that. That's to remind me what things that she said.
So, you know, that differentiated her from maybe the next person. And 24th District val -- I'm sorry. Valedictorian of her class, that's something she noted. I'm not saying it's a negative. I -- I'm not sure how much weight I gave that at the time.
Q. You noted on page 415 that Maureen had a B.S. in Psychology?
A. Uh-huh.
Q. An MA in Education and was also pursuing an M.B.A.; correct?



A. Yes.
Q. Did you consider those to be a positive factor?
A. Positive or negative, I was -- these are the answers to her question -- to the question.
Q. I -- I understand that. Once you wrote down the answer, did you consider her answer to be a positive or a negative factor or no factor at all?
A. I don't recall assigning weight to it in both positive or a negative way. You know, I -- I didn't think that having that -- having that education was a negative, and I don't think I had reviewed it as a positive. I was simply writing down the answers to her question.
Q. You also made a note, if I read it correctly, talent development. What -- what does that refer to?
THE WITNESS: Could you scroll up please -- or scroll down. Oh, oh, I -- no, I'm sorry.
MR. CURLEY: Well, it's right there. Yeah.
THE WITNESS: Yeah.
BY THE WITNESS:
A. I'm gonna guess -- oh, I'm sorry. I really can't recall, so I will speculate that that might have been something that she said.
Q. Do you have any other recollection about that



note?
A. Talent development?
Q. Yes.
A. Like I said, I can't imagine myself just writing that down unless she had mentioned it. Like, maybe that was what she was trying to do or pursue as a study.
Q. You also noted on this page 415, that Maureen was getting her explosive license with DNR?
A. Uh-huh.
Q. Do you see that?
A. Yes.
Q. Did you see any problem with Maureen getting her explosive license with the Illinois Department of Natural Resources?
A. I didn't assign any significance to that, aside from the fact that she note -- she noted it, so I noted it.
Q. Right. But did you see any difficulty or problem with the fact that she was in the process of getting her explosives license?
MR. PARKER: Objection; asked and answered, form. Go ahead.
BY THE WITNESS:



A. I don't recall if I had any follow-up questions to that or if I just simply accepted it at face value. And I don't recall thinking about it beyond that.
Q. Did you criticize Maureen at her interview for getting her explosives license?
A. No, I don't -- I didn't criticize anybody at the interview. That would be bad form.
Q. That's the explosives license from the IDNR that all bomb technicians are required to obtain, correct?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Yes, we were required to obtain that once we become bomb technician, was my understanding.
Q. You couldn't become a bomb technician until you get that explosive license, right?
A. No, I got my explosive license after I became a bomb technician.
Q. Okay. Do you know if that's the case today that -- strike that. Never mind.
You made reference to Maureen's remarks during her interview about IT. Do you recall that?
(Long pause.)
Q. I'm sorry. I didn't hear your answer if you



MAGNA LEGAL SERVICES

gave one.
THE COURT REPORTER: I think he's frozen, Counsel.
MR. PARKER: Yeah, it looks like he dropped off.
THE VIDEOGRAPHER: Should we go off really quickly?
MR. PARKER: Yeah, why don't we go off really quick. Hopefully he'll connect back in.
THE VIDEOGRAPHER: Off the record 12:52 p.m.
(Lunch break taken.)
THE VIDEOGRAPHER: Back on the record 1:30 p.m.
BY MR. CURLEY:
Q. Mr. Jones, as we already discussed, you noted in your candidate assessment form that Maureen was limited in street experience; do you remember that?
A. I remember noting it. Or she did not note it, I should say.
Q. Right.
THE COURT REPORTER: Hold on one second. Hold on. We're not -- the witness is not in the video shot.
THE WITNESS: Yeah. You know what, I'm -- I'm trying to secure my phone a little bit better, okay? Stand by.
(Brief pause.)
THE WITNESS: All right. Is that a little bit better?



THE VIDEOGRAPHER: That's much better. Thank you.

BY MR. CURLEY:
Q. All right. Let's -- let me ask that question again then.
As we've already discussed, you wrote down on your candidate assessment form for Maureen, that she was limited in street experience; do you recall that?
A. Yes.
Q. But you did note on page 413, if we need to turn to it, that Maureen did have two-and-a-half years experience in the 24th District as -- as a patrol officer; do you recall that?
A. Yes, if that's what I wrote down. And I'm looking at it, yes.
Q. Okay. Did you ask Maureen any follow-up questions about her street experience in the 24th District or elsewhere?
A. I don't recall if I asked her specifically about street experience.
Q. Why didn't you if you felt that was a concern?
A. No --
MR. PARKER: Objection; form, foundation. Go ahead
BY THE WITNESS:



A. No. I wrote it because it's not a concern. I think as I explained before, is it's just one method that a police officer can use to exemplify the traits that he or she exhibits during, you know, high-stress environments where quick decisions have to be made. Although police officers have used some of their street experience in these interviews to their advantage when they had to discuss certain times when they had to make quick decisions or they had to do something quickly or dangerously or under high pressure or under stressful circumstances.
Q. Did you tell Maureen, during her interview, that you felt she was limited in street experience?
A. No, that's --
MR. PARKER: That's been asked and answered. Go ahead.
BY THE WITNESS:
A. No, that's not something I would have thought to do during an interview.
Q. Did you have any role in selecting the electrical and mechanical aptitude test that was given to the bomb technician candidates?
MR. CURLEY: And we -- we can take down Exhibit 33 from the screen.



BY THE WITNESS:
A. Are you talking about the written test?
Q. Yes, sir.
A. That they took in the academy initially?
Q. No, I'm talking about the -- oh. I -- I don't know where the test was given, but I'm referring to the written electrical and mechanical aptitude test that was given to the bomb technician candidates.
And my question is did you have any role in selecting that test?
A. All right. I'm assuming you're referring to a written test that everyone took?
Q. Yes.
A. No, I didn't -- I had no role in that.
Q. Okay. Did you have any personal familiarity or experience with that electrical or mechanical aptitude test, given to the bomb technician candidates?
A. No.
Q. Did you have any reason to believe that the test was not a reliable indicator of electrical and mechanical aptitude?
A. I have not seen the test. By design, I did not see the test. I did not take the test. So I just trust that that was a test used to test people's mechanical and



MAGNA LEGAL SERVICES

electrical aptitude.
Q. Right. My -- my question was a little more specific than that.
Did you have any reason to believe that the test was not a reliable indicator of mechanical and electrical aptitude?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. What I'm saying is that since I had not had any firsthand experience with the test, I had no experience, no personal experience to have an opinion on it.
Q. So -- so you had no reason to believe it was not a reliable indicator, correct?
MR. PARKER: Objection; form, foundation, asked and answered. Go ahead.
BY THE WITNESS:
A. I'm sorry. Can you hear me? I -- I can't see you.
MR. PARKER: Yes, we can hear you.
THE WITNESS: All right.
BY THE WITNESS:
A. Once again, I was informed that the test was to be given. It was a standardized test that I had no part in looking at, by design. And -- and I had not seen or



taken the test, by decide. So I had -- I have no reason to think that it wouldn't work, but I have no reason to think that it would. I have no opinion on it. It was -- it was something that was part of the process.
Q. Did you know, during the hiring process, how the individual candidates scored on the written aptitude test?
A. No.
MR. CURLEY: Let me ask that Exhibit 125 be put up on the screen. Plaintiff's Exhibit 125. That's Bates numbered B-R-E-S dash D-E-F 9759 and 60.
(Exhibit 125 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail from Kristoff (phonetic) Bielfeldt, dated April 27, 2015, to you and several others; do you see that?
A. Yeah. Once again, I'm reading it on my -- on my phone.
Q. So did you receive this e-mail?
A. I must have received the e-mail because my name's on there as a recipient.
Q. The attachment shows the top 75 candidates, and each individual candidate's score on the aptitude test; do you see that?



A. Okay.
Q. And -- and you saw those individual's scores when you read the e-mail and the attachment, correct?
MR. PARKER: Objection; foundation, form. Go ahead.
BY THE WITNESS:
A. I have no recollection of looking at individual scores, or noting individual scores or what people scored.
Q. Well, was it your practice at the time to read e-mails and attachments that you received?
MR. PARKER: Objection; form. Go ahead.
BY THE WITNESS:
A. Well, yes, it is my practice to read attachments. And I'm telling you, I had no recollection of -- of reading people's scores and what they scored --
Q. So did you know --
A. -- so --
Q. So did you see that Maureen's score was 39 out of 40, one question away from a perfect score?
MR. PARKER: Objection; foundation.
BY THE WITNESS:
A. Well, I'm looking at it now --
MR. PARKER: Go ahead.
BY MR. CURLEY:



Q. Did you see it at the time in 2015?
MR. PARKER: Objection; asked and answered.

BY THE WITNESS:
A. No, I have no recollection of seeing this.
Q. Do you agree that a candidate who scores a 39 or a 40 on the aptitude test, has a better electrical and mechanical aptitude than a candidate who scores a 32 or 33?
A. I don't know.
Q. This attachment shows that -- or reflects that Maureen had the highest score on the test, along with Jose Estrada and James Fumo, F-u-m all -- all who scored a 39 out of 40. Did the fact that those candidates had the highest score on the aptitude test, was that a positive factor in their favor?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. Once again, I didn't -- I have no recollection of seeing these scores or knowing them when they had the interviews. So, it would -- so, therefore, the positivity of that would not have been known to me at the time.
Q. Okay. So you did not -- you did not take into



MAGNA LEGAL SERVICES

account the individual candidate's score on the written aptitude test; correct?
A. That is correct. I was under the impression that it was, like, we just took the people who passed -- passed a certain score. Like, who ranked the top -- I can't remember. Possibly 25 -- oh, I'm sorry. 75 candidates.
MR. CURLEY: Could you pull up and put on the -- you can close this exhibit and please pull up exhibit -- Plaintiff's Exhibit 250. This is Bates numbered B-R-E-S dash D-E-F 9755 and 56.
(Exhibit 250 placed on the screen.)
BY MR. CURLEY:
Q. And this is an e-mail. The top e-mail in the chain is from Bielfeldt to you; do you see that?
A. Yes.
Q. Dated April 27th, 2015. Did you receive this e-mail?
A. I don't have a recollection of it. I mean, I'm looking at the e-mail. I'm seeing -- I'm seeing the to -- to myself. I have no recollection of this e-mail or those attachments.
Q. You do recall, don't you -- I think you already told us that you had a role in scheduling the physical



agility tests for the candidates?
A. Well, I don't know if I had a role in scheduling it, but I had a role in administering it.
Q. And the attachment to this exhibit also includes the test scores of the individual candidates; do you see that?
A. Yes.
Q. And is it your testimony that you do not recall reviewing those test scores when you received this e-mail?
A. Yes.
Q. This e-mail, Exhibit 250, was sent to you by Kris Beilfeldt B-e-i-l-f-e-i -- f-e-l-d-t. Who is he?
A. I -- I'm trying to recall. He was a sergeant, within -- I don't recall -- he might have been a sergeant within Special Functions.
Q. Was he a member of the bomb squad?
A. No.
Q. Did he have a senior rank to you?
A. Yes.
Q. Were the bomb squad tech candidates notified of their scores on the aptitude test?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:



A. I do not know.
MR. CURLEY: Would you please put up Plaintiff's Exhibit 249.
(Exhibit 249 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail from you to James Eagan, dated April 24th, 2015. And you forward, as an attachment to this e-mail to Mr. Eagan, a form that was used by the canine handler and explosive detection canine handler candidates, for a separate hiring process; do you see that?
A. Yes.
Q. And this attachment was used at a template to notify the bomb tech candidates of their individual test scores, correct?
A. I don't know -- I don't know that. I mean, I don't know if it was meant to -- as a template to report their individual test scores or whether they passed in the top 75. So I don't know that.
Q. Okay. But you were aware at the same time that the bomb technician hiring process was underway, that there was a separate hiring process for the canine handler and explosive detection canine handlers; correct?
A. I don't recall that being the case. It may



have, but I don't recall that.
MR. CURLEY: Will you please put Exhibit 260 up on the screen.
(Exhibit 260 placed on the screen.)
BY MR. CURLEY:
Q. This is a single-page document Bates numbered B-R-E-S dash D-E-F 9779. And this is an e-mail from the bomb squad to Maureen Bresnahan; do you see that?
A. Yes, I do.
Q. Were you responsible for sending out this e-mail?
A. No.
Q. And this e-mail advised Maureen of her score on the written aptitude test, correct, if you look at the bottom?
A. All right. Yes.
Q. And didn't the candidate have to bring this e-mail to the physical agility test?
A. I don't recall that -- oh, actually I don't know that, because the physical agility test, my portion of it, was the execution of it. So when people came in to process, they weren't coming to me to show up to the test.
Q. They checked in somewhere else first and



MAGNA LEGAL SERVICES

then --
A. Yeah.
Q. -- were directed to you? Okay.
A. Yeah.
Q. Are you aware that there were several candidates who applied for the bomb squad and the canine handler in explosive detection canine handler position at the same time, in 2015?
A. No.
Q. Did you know that Maureen applied for all of those positions?
A. No.
Q. Do you know how Maureen finished in the 2015 canine handler and explosive detection canine handler hiring process?
A. I heard later on, possibly, that she became a canine handler, but I don't -- I -- I think I was told that by somebody. I don't recall.
MR. CURLEY: We can take this exhibit off the screen now if you'd like.
BY MR. CURLEY:
Q. Who told you that?
A. I don't recall.
Q. And do you know when you were told that? Were



you still at the bomb squad, for instance?
A. Nope. Don't recall that either.
Q. So it wouldn't surprise you to learn that Maureen was recommended for hire by that canine panel and placed on the eligibility list, correct?
MR. PARKER: Objection; form, foundations. Go ahead.
BY THE WITNESS:
A. Are you saying it wouldn't surprise me?
Q. Right. You've heard of that before.
A. Are you asking if I'm surprised or not surprised? Because I have no opinion on that. I'm neither surprised or not surprised I guess.
Q. You heard before today that Maureen was recommended for hire by that panel and placed on the eligibility list, correct?
A. No. All I heard was that she has -- has been or maybe still is a canine handler.
Q. Okay. Do you have any explanation for why Maureen was recommended for hire and placed on the eligibility list for canine handler and explosive detention canine handler, but not for bomb technician?
A. No.
MR. PARKER: Objection; foundation. Go ahead. I



don't know if they got your answer. Sorry.
BY THE WITNESS:
A. My answer was no.
MR. PARKER: Thank you.
BY MR. CURLEY:
Q. Let's go back to the bomb technician written aptitude test. Was the fact that Maureen had scored the highest on the aptitude test, discussed at the consensus meeting?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Not that I recall.
Q. The only other two candidates who scored as highly as Maureen on the aptitude test, Jose Estrada and James Fumo, both made the eligibility list; correct?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I don't know that. You'd have to run through the eligibility list and confirm that. So I don't know -- I don't recall if that's true or not true.
MR. CURLEY: All right. Let's pull up on the screen, please, Exhibit 40, four, zero.
BY MR. CURLEY:
Q. And if we scroll down alphabetically first, to



Jose Estrada, you see that Mr. Estrada made the eligibility list and was ranked 20; correct?
A. Yes, I see that.
Q. And Mr. Fumo also made the eligibility list -- list, and was ranked 21; do you see that?
A. Yes.
Q. But Maureen did not make the eligibility list despite having the highest score on the aptitude test, did she?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Are you asking me something that I'm reading right now?
Q. Just asking you to confirm that Maureen did not make the eligibility list, despite having the highest score on the aptitude test?
A. I am --
MR. PARKER: Same objection.
BY THE WITNESS:
A. I am reading that she did not make the eligibility list, right here on your list.
Q. Did you know Maureen before the 2015 bomb tech hiring process?
A. No, I did not.



MAGNA LEGAL SERVICES

Q. Did you know any of the other top 75 candidates for bomb technician?
A. Yes, I knew some of them.
MR. CURLEY: Can you scroll us down through Plaintiff's Exhibit 40.
BY MR. CURLEY:
Q. And tell me which of the candidates you knew before the hiring process.
A. You want me to point out the names.
Q. Yes. Just read the names -- last names into -- into the record would be great.
A. All right. And when I say I know them, there's various degrees of knowing them because I've been in several units, okay?
Q. Sure.
A. I believe I knew Kevin Butler, because that name sounded familiar.
THE WITNESS: All right. Slow down a little bit.
BY THE WITNESS:
A. Josh Diaz, I knew of him.
THE WITNESS: Scroll down a little bit more. Stop.
BY THE WITNESS:
A. Joseph Ferenzi, I knew him. Frank Gaber, I knew him.



THE WITNESS: Scroll down a little bit more. Scroll down a little bit more. Okay. Stop right there.
BY THE WITNESS:
A. Daniel McDonough, I may have known him.
THE WITNESS: Okay you can stop right there.
BY THE WITNESS:
A. Adam Paulsen, I knew him. Bruce Phipps, that's a name I knew. Nick Spencer, that's a name I knew. Bill Sweeny I knew. Is that it?
Q. Yes, the last name is Winn (phonetic).
A. Yeah, those are the names of people I remember at least knowing them or knowing -- having had maybe some interaction with them. Like, perhaps I -- I met them. So I knew them in various fashion.
Q. Did you encourage any candidates to apply for the bomb tech position?
A. No.
Q. Did Mr. Eagan tell you whether he knew Maureen before the bomb tech hiring process?
A. I don't recall if he told me he knew her or not -- or did not know her.
Q. All right. Did Mr. Eagan tell you whether he knew any of the other candidates?
A. No, we never had that -- we never had that



conversation of what candidates he knew or did not know.
MR. CURLEY: I will ask Plaintiff's Exhibit 78 be put back up on the screen. That's the -- includes the blank candidate assessment form.
THE WITNESS: Hello, you -- you still there?
MR. CURLEY: Yes, sir.
THE WITNESS: Okay.
MR. PARKER: Yeah.
BY MR. CURLEY:
Q. And, again, just for context, this -- the blank assessment form, candidate assessment form, is attached by Mr. Eagan, in an e-mail to you and to Mr. Schmitt, dated May 22nd, 2015; do you see that?
A. I'm looking at the e-mail, yes.
Q. Okay.
MR. CURLEY: If we scroll down to Bates numbered pages near the end, B-R-E-S dash D-E-F 10010 and 111. It's all the way at the end. There we go. Thank you.
BY MR. CURLEY:
Q. Those pages refer to a scenario, part one and part 2, that were a part of the oral interviews; correct?
A. Yes.
Q. In that scenario -- or actually there are two scenarios, required a candidate to articulate how they



would handle a bomb-related incident, such as a bomb threat or a suspicious package; correct?
A. Yes.
Q. And do these two pages describe the details of the two scenarios and the questions that each candidate was asked?
A. Yes. On the scenario part one and a little bit of scenario part two.
Q. I'm sorry. What about scenario --
A. Yes, I'm looking at both scenarios.
Q. Okay. And the candidates were given just a matter of minutes to respond to the scenarios; correct?
A. They had two minutes to responded to Scenario No. 1, and three minutes to respond to Scenario No. 2.
Q. And the interviewers gave numeric scores to each candidate, based on their answers; right?
A. No, I don't recall it like that.
Q. How do you recall it?
A. I'd have to look at my notes again.
Q. All right. Well, before we get to your notes, at the bottom of page 10010 --
A. Oh, yes, I see. All right. Yeah. So, I think -- yes, we did. We -- we ticked off like how many they got -- how many of those bullet points did they get.



MAGNA LEGAL SERVICES

Q. And then you rated them on their answer, based on that numeric scale; correct?
A. Based on that and also -- I think, also how well they articulated what they were doing or what they were -- what they would do in that scenario. So I think it was both the combination of -- at least in my mind, a combination of A, how many bullet points did they get? How well did they establish those bullet points? And how did they articulate them?
Q. Is that procedure, as you have described it, set out on pages 10010 and 10011?
A. What are those pages? I'm not sure --
Q. The one right -- the ones right on the screen.
A. Oh, okay. You're asking me how did I -- how did I score their --
Q. No. What I'm asking is if those pages break out, as -- as you did in your answer a moment ago --
A. Uh-huh.
Q. -- with respect to the candidate, how many bullet points they got, how well they got them and how they articulated them?
A. Yes.
Q. And where is that set out on these two pages?
MR. PARKER: Objection; form, foundation.



BY THE WITNESS:
A. Well, what I just said isn't specifically outlined in those two pages.
Q. Okay. So now let's look at your notes as you referred to.
MR. CURLEY: So you can put up Exhibit 33. And if you turn to page 417.
BY MR. CURLEY:
Q. First of all, do you agree with the statement about the scenario at the top of page 417, that it's purpose was, quote, "To assess the member's ability to articulate department directives into an actual situation?"
A. Yes.
Q. Was the scenario designed to assess a candidate's ability to think critically and react quickly in a matter of minutes?
A. I would say so, yes.
Q. Do you agree that the scenario was one of the more important parts of the interview?
A. No, I wouldn't agree with that.
Q. Why not?
A. Why would I agree with it or why would I not agree with it? I -- you're making a statement and --



Q. Why would --
A. -- I'm not sure if I agree with that.
Q. Right. I'm asking, why would you not agree that the scenario was one of the most -- more important parts of the interview?
A. Because that was -- well, because that requires you to have studied and memorized those bullet points. And that's basically if you were able to study and memorize those bullet points, you did well.
I'm not sure if that translates into the -- the other qualifications that we were looking into for a bomb tech. So what you're asking me, is that the most important thing, and I'm saying I don't think it was the most important thing.
Q. I asked you if it was one of the more important parts. But in any event, why was the scenario even included in the interview?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. As I recall, and I'm gonna surmise that it was included to give people something to study, and it had to do with the general orders of the police department.
Q. Do you agree that how a person performs in an actual bomb-related situation is important?



A. Yes.
Q. And you noted with respect to Maureen on page 417 -- well, you wrote the word "studied," then you wrote the words, "hit many points."
A. Yes.
Q. What do -- what do those mean?
A. Exactly what I said. It seemed like she studied and she hit many points.
Q. Were those positive factors in your mind?
A. Yes.
Q. And you wrote down the -- well, let me ask you. There's -- under part one and part two, you wrote a series of numbers; what are those?
A. So as the candidates were hitting all the bullet points, I found it was easier to assign numbers to those bullet points, so that way I could check off what they said and what they didn't say.
Q. So are you telling me that these are the bullet points for which you gave the candidate credit?
A. Yes.
Q. And then under part one, nine, the number nine you wrote something; what is that?
A. Got UCR -- UCR is the code for, you know, every -- every police incident has a code that you would



MAGNA LEGAL SERVICES

put in the report. It's a numerical code, called a UCR. So maybe I wrote that down, saying that she remembered the UCR code, or maybe that was one of the bullet points. I don't recall.
Q. And then to the right of that, there's -- under the -- under the other set of numbers, there's other handwriting. Could you first read those into the record and tell me what they refer to.
A. HAZMAT considerations, fire lines -- fire lanes, the canine for unattended. So maybe she, in her scenario, called for a canine for unattended bags. Fire lanes, I don't recall, but maybe it was something that she mentioned. And maybe she mentioned hazardous material considerations. So those are probably notes I wrote down of stuff that she might have mentioned.
Q. So were those bullet points that she mentioned, in addition to the -- to the numbered points above?
A. I don't recall if there were additions, but it's something I noted.
Q. Okay. And then at the bottom of this page, you noted that candidate demonstrates some of the competency; do you see that?
A. Yes.



Q. We can take a look if you'd like, but I will represent to you that Mr. Schmitt and Mr. Eagan also, both of them rated Maureen on this scenario as candidate clearly demonstrates competency.
A. Okay.
Q. And that Mr. Schmitt scored Maureen at 19 on the -- on the scenario. Now, since a numeric scale was used for this scenario, would it have been appropriate to use a numeric scale for the other hiring criteria?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. I don't know.
Q. But the other four criteria were not rated on any sort of a numerical scale, right?
A. I think that would be difficult, but I wasn't -- I wasn't part of that decision-making process.
Q. Okay. Was Maureen's high score on the scenario a positive factor in her favor?
A. I think it was --
MR. PARKER: Object to form. Sorry. Object to form. Go ahead.
BY THE WITNESS:
A. I think she did well.



Q. And was that a positive factor in her favor?
A. Yes.
Q. And I'll represent to you that only one candidate who made the eligibility list scored higher than the score of 19 that Mr. Schmitt gave Maureen on the scenario; will you accept that subject to check?
MR. PARKER: Check -- object to form, foundation. Go ahead.
BY THE WITNESS:
A. If you say so. I will accept that. I'm not -- I don't know who you're referring to.
Q. Well, you do recall that Maureen did not make the eligibility list despite her score on the scenario; correct?
A. That is correct.
Q. Did you have discussions with anyone at all after the interviews and before the consensus meeting, about any candidate for the bomb tech position?
A. No.
Q. Were you given any notes, records or other documents to look at after the interviews and before the consensus meeting?
A. No.
Q. I think we've confirmed that the consensus



meeting was June 5th, 2015. What time of day did that meeting start?
A. I don't recall.
Q. Do you recall if it was morning or afternoon?
A. Since I worked days at that time, I'm going to guess it was days, but I -- I -- that's just a guess. I don't -- I don't -- I don't recall when they -- when the meeting was scheduled.
Q. Okay. Did -- did you meet with Mr. Schmitt and Mr. Eagan that day, before the meeting started?
A. Before the meeting started?
Q. Yes.
A. I don't recall.
Q. You don't recall one way or the other?
A. Well, if it was -- if the meeting was started early in the morning, then we would have just showed up at the -- I don't recall us having a formal meeting, if that's what you're asking, no.
Q. Did you have any --
A. Or having -- or having any discussion.
Q. Did you have an in-formal meeting with Mr. Schmitt or Eagan before the consensus meeting started?
A. When I said meeting, I meant formal or informal



MAGNA LEGAL SERVICES

is what I meant.
Q. Okay. I just brought it up because you said formal.
A. I'm sorry. I mean, as -- as opposed to us all showing up to the lobby and taking the elevator up, that's not what I consider a meeting. But, no, no meeting, formal or informal, that I can recall.
Q. Was the consensus meeting videotaped, recorded or transcribed, to your knowledge?
A. I don't know.
Q. Did you have copies of the candidate assessment forms that had been filled out during the interviews at the consensus meeting?
A. I think we did. I think I did. I can't see how we could have conducted a consensus meeting without those notes, our own notes I meant.
Q. Who gave them to you?
A. HR.
Q. And they gave them -- they had taken the notes at the end of each individual candidate interview; correct?
A. That's correct.
Q. And then is it your testimony that at the start of the consensus meeting, those candidate assessment



forms were returned to you?
A. Yes.
Q. And did you get them all in one batch at the beginning of the -- of the consensus meeting, or were you given them as each candidate was discussed?
A. I don't recall that, how they were given to us.
Q. Did you receive the copies of the candidate assessment forms filled out by Mr. Schmitt and Mr. Eagan?
A. I don't recall if I received their forms.
Q. You don't recall one way or the other?
A. No. I -- my recollection is that we were all given our forms that we filled out, but I'm not entirely sure about that. I don't recall being handed other people's forms.
Q. Okay. Were you given anything else, any other documents at the start of the meeting?
A. I don't recall.
MR. CURLEY: Can you put, please, Exhibit 40 back up on the screen. Thank you.
BY MR. CURLEY:
Q. Were you have given a copy of this consensus meeting worksheet, filled out only with the black letters; in other words, the results for each of the three of you for the individual interviews?



A. I don't recall that specifically.
Q. So, in other words, for Mr. Aldrich, when he was discussed, at the start of that discussion did you know that Mr. Eagan had recommended him with reservations, you had recommended him for hire, and Mr. Schmitt had recommended with reservations?
A. Yes, because when we went through each candidate, that would have to be resolved.
Q. Okay. So as each candidate came up, you learned how Mr. Eagan and Mr. Schmitt rated that candidate after the interviews?
A. Yes.
Q. Did you take any notes during the consensus meeting?
A. Not that I recall. I don't recall taking any notes.
Q. We've seen Ms. Zamora's notes before. Those were marked as Exhibit -- I think it was Exhibit 41. Did you see anyone else take notes during the consensus meeting?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. No.
Q. I want to ask you some questions now about how



the consensus meeting was conducted. Did anyone leave the meeting?
A. Not that I recall.
Q. Was there some sort of general discussion amongst the panel members and the human resources' representatives before the candidates were discussed?
A. We were given instructions on how to proceed with the consensus meeting.
Q. Who gave you those instructions?
A. I don't recall.
Q. Was it Mr. Eagan as hiring manager?
MR. PARKER: Objection; asked and answered. Go ahead.
BY THE WITNESS:
A. I don't recall who --
Q. What were these --
A. -- who specifically gave us the instruction for the consensus meeting.
Q. What instructions were you given?
A. I don't recall that either. That we had to come to a consensus. That, I recall.
Q. Do you recall anything else?
A. No.
Q. Were each of the bomb technician candidates



MAGNA LEGAL SERVICES

that had been interviewed, discussed at the consensus meeting?
A. Yes.
Q. Were they discussed in some particular order or was it random?
A. I don't recall how the order came about.
Q. You've already told us that you cannot remember the specifics of the discussion of Maureen at the consensus meeting; correct?
A. Yes.
Q. Do you remember the discussion of the consensus meeting about any of the individual candidates?
A. No.
Q. Do you remember why, at the consensus meeting, you recommended for hire any of the individual candidates?
A. Why I recommended for hire? Based on my notes and discussions with the other two panel members.
Q. Right. I'm just asking whether you recall, as to any specific candidate, why you recommended that candidate for hire?
A. No.
MR. CURLEY: Let's look at, if we can, Plaintiff's Exhibit 41 again. Ms. Zamora's notes. And I'm going to



ask to scroll through those.
BY MR. CURLEY:
Q. And have you take a look at the notes. And my question is going to be whether you recall making any of the comments on Plaintiff's Exhibit 41 yourself?
MR. PARKER: I'll object to foundation. Go ahead.
BY THE WITNESS:
A. No.
Q. Have you had a chance to look at all of the notes on Plaintiff's Exhibit 41?
A. Yeah. I'm looking at the comments, and then the recommend, do not recommend notation at the end.
Q. Right. My question is whether you recall making any of the comments on Plaintiff's Exhibit 41 yourself?
A. No.
MR. PARKER: I'll object to foundation. Go ahead. Sorry.
BY MR. CURLEY:
Q. Does Plaintiff's Exhibit 41 refresh your rellec -- refresh your recollection about anything that was discussed about any individual candidate of the consensus meeting?
A. No.



Q. Does Plaintiff's Exhibit 41 refresh your recollection about why, at the consensus meeting, you recommended for hire any of the individual candidates?
A. No.
MR. CURLEY: Can we put, please, Plaintiff's Exhibit 40 back up on the screen.
BY MR. CURLEY:
Q. And, Mr. Jones, I'd like to ask you to -- I'd like to ask you some questions about the eight candidates that you had rated as "recommended with some reservations," based on their interviews, but who you later rated as "recommended for hire," after the consensus meeting.
A. Uh-huh.
Q. And subject to check, I'll tell you that there were eight such candidates.
A. Okay.
Q. So the first candidate was William Carlson, and do you see that after the interview you recommended Mr. Carlson with reservations?
A. Yes.
Q. And at the consensus meeting you changed to recommend for hire?
A. Yes.



Q. Do you recall anything about the discussion of William Carlson at the consensus meeting?
A. No.
Q. Do you recall why you changed William Carlson from "Recommend with some reservations," to "Recommend candidate for hire?"
A. Not -- not specifically.
Q. Is there anything you are aware of that would refresh your recollection as to why you changed William Carlson from "Recommend with some reservations," to "Recommend candidate for hire?"
A. Not that I know of.
Q. The next candidate you changed from "Recommended with some reservation," to "Recommend candidate for hire," is John Dahlberg, D-a-h-l-b-e-r-g; do you see that?
A. Yes.
Q. Do you recall anything about the discussion of John Dahlberg at the consensus meeting?
A. No.
Q. Do you recall why you changed John Dahlberg from "Recommend with some reservations," to "Recommend candidate for hire?"
A. No.



MAGNA LEGAL SERVICES

Q. Is there anything you are aware of that would refresh your recollection of why you changed from "Recommend with some reservations," to "Recommend candidate for hire?"
A. No.
Q. The next candidate you changed from "Recommend with some reservations," to "Recommend candidate for hire," is James Fumo; you see that?
A. Yes.
Q. Do you recall anything about the discussion of James Fumo at the consensus meeting?
A. No.
Q. Do you recall why you changed James Fumo from "Recommend with some reservations," to "Recommend candidate for hire?"
A. No.
Q. Is there anything you're aware of that would refresh your recollection, why you changed James Fumo to "Recommend candidate for hire?"
A. No.
Q. The fourth candidate you changed to "Recommend candidate for hire." Is Timothy Granville; you see that?
A. Yes.
Q. Do you recall anything about the discussion of



Timothy Granville at the consensus meeting?
A. No.
Q. Do you recall why you changed Timothy Granville to "Recommend candidate for hire?"
A. No.
Q. Is there anything you are aware of that would refresh your recollection why you changed Timothy Granville to "Recommend candidate for hire?"
A. No.
Q. The fifth candidate you changed from "Recommend with some reservations," to "Recommend candidate for hire," is Matthew Koegler, K-o-e-g-l-e-r; do you see that?
A. Yes.
Q. Do you recall anything about the discussion of Matthew Koegler at the consensus meeting?
A. No.
Q. Do you recall why you changed Matthew Koegler to "Recommend candidate for hire?"
A. No.
Q. Is there anything you are aware of that would refresh your recollection why you changed Matthew Koegler to "Recommend candidate for hire?"
A. No.



Q. The sixth candidate you changed from "Recommend with some reservations," to "Recommend candidate for hire," is Roberto Lopez; do you see that?
A. Yes.
Q. Do you recall anything about discussion of Roberto Lopez at the consensus meeting?
A. No.
Q. Do you recall why you changed Roberto Lopez to "Recommend candidate for hire?"
A. No.
Q. Is there anything you are aware of that would refresh your recollection why you changed Roberto Lopez to "Recommend candidate for hire?"
A. No.
MR. CURLEY: If we could go to the next page of the exhibit.
BY MR. PARKER:
Q. The seventh candidate you changed from "Recommend with some reservations," to "Recommend candidate for hire," is Robert Murphy; do you see that?
A. Yes.
Q. Do you recall anything about discussion of Robert Murphy at the consensus meeting?
A. No.



Q. Do you recall why you changed Robert Murphy to "Recommended candidate for hire?"
A. No.
Q. Is there anything you are aware of that would refresh your recollection why you changed Robert Murphy to "Recommend candidate for hire?"
A. No.
Q. The eighth candidate that you changed from "Recommend with some reservations," to "Recommend candidate for hire," is Peter Toledo; do you see that?
A. Yes.
Q. Do you recall anything about the discussion of Peter Toledo at the consensus meeting?
A. No.
Q. Do you recall why you changed Peter Toledo to "Recommend candidate for hire?"
A. No.
Q. Is there anything you're aware of that would refresh your recollection why you changed Peter Toledo to "Recommend candidate for hire?"
A. No.
MR. CURLEY: We can take this exhibit down for now, if you'd be so kind. And I'm going to ask you to place on the screen, Plaintiff's Exhibit 85. This has been



MAGNA LEGAL SERVICES

Confidential



Bates numbered B-R-E-S dash D-E-F 10548 and 9.
(Exhibit 85 placed on the screen.)
BY MR. CURLEY:
Q. And this is the final eligibility list for the bomb technician position, produced in this case by defendant's attorneys. I want to go back to James Fumo.
After the consensus meeting he was recommended and made the final eligibility list, correct; do you see that?
MR. PARKER: I'll just object to foundation for these questions. Go ahead.
BY THE WITNESS:
A. Yes, I'm looking at his name right now.
Q. And he was recommended and made the eligibility list, correct?
A. Correct.
Q. After his interview, James Fumo is rated by you and Mr. Eagan as recommended with some reservations; correct? That's also reflected on this exhibit. You see, for instance, for James Fumo, the column Eagan slash org?
A. Yes. Are you asking me if I see that?
Q. Yes. And I'd indicate so Mr. Eagan had -- had rated James Fumo as "Recommend with reservations," after



the interview; correct?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Correct.
Q. And you also recommended James Fumo, after the interview, with some reservations; right?
A. As I'm looking down, yes.
Q. But Mr. Schmitt rated him as, do not recommend candidate for hire, after the interview; do you see that?
A. I don't see it. I think it's further down the screen, but okay. Oh, all right. Now I see it. Yes. Yes.
Q. Okay. Thank you. Now, those ratings are the same overall candidate ratings by each of the three of you for Maureen, correct?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I'd have to see her name, but if that's what you're saying, okay.
Q. Well, you -- I'll represent to you and we saw it earlier on Plaintiff's Exhibit 33, that you and Mr. Eagan had recommended Maureen with reservations, and that Mr. Schmitt had not recommended.
A. Okay.



Q. And that's -- that's the same way it broke down between the three of you for Mr. Fumo, correct?
A. Yes.
Q. But at the consensus meeting, James Fumo was recommended and made the eligibility list, correct?
A. Yes.
MR. PARKER: Object to foundation. But that's fine, go ahead.
BY MR. CURLEY:
Q. Why was James Fumo recommended and put on the eligibility list at the consensus meeting and Maureen was not?
MR. PARKER: Objection; asked and answered. Go ahead.
BY THE WITNESS:
A. I'm going to surmise that had to do with the discussion of these consensus meeting, going over the individual notes of both Candidate Fumo and Candidate -- at the time.
So based -- based on what we recall at that time, and his notes, a discussion among the three of us resulted in him being recommended.
Q. But you don't recall that discussion, correct?
A. No, I'm just telling you how I believe it



worked, because that's how I believe it worked. But, no, I don't have any specifics on that conversation.
Q. Did Mr. Schmitt, at the consensus meeting, say why he changed his "Do not recommend" rating for James Fumo to "Recommend candidate for hire?"
MR. PARKER: Objection --
BY THE WITNESS:
A. I don't recall.
MR. PARKER: Yeah. Objection; foundation. He just said he doesn't recall.
MR. CURLEY: Can you read back the answer, please, Ms. Reporter.
(Record read back as requested.)
MR. CURLEY: Thank you. Sometimes the three of us talk at the same time and I know it's very hard for you, Ms. Reporter, but it's hard for us, too.
BY MR. CURLEY:
Q. Did you and Mr. Eagan convince Mr. Schmitt to change his "Do not recommend" rating for James Fumo?
MR. PARKER: Objection; foundation.
BY THE WITNESS:
A. I do not recall.
Q. I have the candidate assessment forms for James Fumo, and I'm happy to show them to you, Mr. Jones, if



MAGNA LEGAL SERVICES

Page 178

you'd like to see them. But I'll represent to you that you rated James Fumo as, demonstrates some of the competency for the scenario. Will you accept that subject to check?
A. Sure.
Q. I mean, I'm happy to throw them up on the screen if you want to take the time?
A. Well, I'd like to see what I wrote.
Q. Sure.
A. I mean, if you're gonna ask me questions regarding what I wrote, I guess I'd have to look at them, right?
Q. I'm asking about the ratings, but that's certainly fair.
MR. CURLEY: Can you pull up Plaintiff's 52, please. And turn to page 1780, which is about halfway into the document. You're ahead of me.
BY MR. CURLEY:
Q. You rated James Fumo as "Demonstrates some the competency for the scenario;" correct?
A. Yes. Can I look at all the pages, because this interview process was -- you know, it was a -- a collective process. It was -- it was an overall characterization, so.

Page 179

Q. You can look at anything -- at anything you want. I'm only gonna ask you questions about the scenario, but you're certainly free --
A. Oh.
Q. -- to look at whatever you want.
A. Okay.
Q. Mr. Eagan, on page 995, rated James Fumo as "Demonstrates some of the competency," for his responses to the scenario as well; do you see that?
A. Yes.
Q. And Mr. Schmitt also rated James Fumo, at page 2092, near the end, only as "Demonstrates some of the competency," for his responses to the scenario; do you see that?
A. Yes.
Q. Comparing those ratings with Maureen, who as we've -- as we have seen, received two clearly demonstrates competency ratings, to "none" for James Fumo on the scenario. Do you agree that the panel rated Maureen higher on the scenario than Mr. Fumo?
MR. PARKER: Objection; form foundation. Go ahead.
BY THE WITNESS:
A. I don't know. I mean, that -- that's an honest question -- I -- I - I -- an honest answer. I don't -- I

Page 180

don't know. You're -- you're asking me to compare -- let's see. And I don't know which -- I don't know which page I'm looking at. Am I looking at Todd Schmitd's page or am I looking Jim Egan's page?
Q. This right now, 2092, is Todd Schmitt's page.
A. Okay. And --
Q. And so my question is -- my question is the three of you rated Mr. Fumo the same on the scenario, which is "Demonstrates some of the competency."
A. Sure.
Q. And I'm -- and I'm comparing that to the ratings that Maureen received on the scenario, which were two, clearly demonstrates competency, and one demonstrates some competency.
My question simply is --
A. Okay.
Q. -- whether you agree that the panel rated Maureen higher on the scenario than Mr. Fumo?
MR. PARKER: Same objection. Go ahead.
BY THE WITNESS:
A. Well, it -- it appears to be -- and I'm going by memory here, that two people rated her the same, and two other people -- and one other person rated her higher; is that -- is that correct?

Page 181

Q. Two -- two folks, Mr. Schmitt and Mr. Eagan, rated Maureen as "Clearly demonstrates competency" on the scenario.
A. Okay.
Q. And Mr. Fumo received no ratings of "Clearly demonstrates competency." So my --
A. Okay.
Q. -- question simply is, do you agree that the panel rated Maureen higher on the scenario than it did Mr. Fumo?
A. On that particular page, you're -- yes. What you're saying is two people scored her -- scored him -- I'm sorry. Scored her, "Clearly demonstrates competency," and one person scored, in the middle check box, for her; is that right?
Q. Yes, sir.
A. Yes. And he got -- all of his scores were in the middle box. Is that what you're saying?
Q. Yes, sir.
A. Okay. So that would put her ahead of him.
Q. Okay.
A. And now for that page, right?
Q. Just for the scenario.
A. Just for the scenario. Okay.



MAGNA LEGAL SERVICES

Q. And as we have also seen, Maureen and Mr. Fumo had the same score on the written aptitude test, a 39 of -- a 39 out of 40; correct?
A. Okay. I did not know that at the time, but okay.
Q. All right.
MR. CURLEY: And then let's -- let's go back, if we could, to Plaintiff's Exhibit 41. And in particular, on the second page, the notes with respect to James Fumo.
BY MR. CURLEY:
Q. Those notes say, quote, "Lacks experience, but intelligent." End quote. And there's a recommendation for hire; do you see that?
A. Yes.
Q. First of all, does that refresh your recollection at all about the discussion of James Fumo at the consensus meeting?
A. No, it does not.
Q. After discussions at the consensus meeting, it was decided that although James Fumo lacked experience, he was intelligent and the panel rated him as "Recommended candidate for hire;" correct?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:



A. Yes, according to the document that you showed earlier.
Q. And that included Mr. Schmitt, who had earlier rated James Fumo as "Do not recommend candidate for hire;" right?
MR. PARKER: Objection; form, foundation.
BY THE WITNESS:
A. Yes.
Q. I'd like to ask you questions now about another candidate, Jose Estrada.
MR. CURLEY: Can we please put Plaintiff's Exhibit 85 back up on the screen.
BY MR. CURLEY:
Q. And if you look at Estrada, he's about two-thirds of the way down.
After the consensus meeting he was recommended for hire and made the eligibility list; correct?
A. Yes.
Q. Do you remember anything about the discussion of Jose Estrada at the consensus meeting?
A. No.
Q. And according to this exhibit, Plaintiff's Exhibit 85, after his interview, Jose Estrada was rated by Mr. Eagan and Mr. Schmitt as "Recommend with some



reservations;" do you see that?
A. Yes.
Q. And you rated Mr. Estrada, after the interview, as "Recommend candidate for hire;" correct?
A. Correct.
Q. Why was Jose Estrada rated "Recommend for hire" and put on the eligibility list at the consensus meeting?
A. I don't recall.
MR. PARKER: Objection; foundation. Go ahead. Sorry. Could you answer again, Roland?
THE WITNESS: Yes. I don't recall.
MR. CURLEY: Could you please put Exhibit 102 up on the screen.
(Exhibit 102 placed on the screen.)
BY MR. CURLEY:
Q. These are the candidate assessment forms produced by the Defendants for Jose Estrada. And if you turn -- or rather look at page 13035, you rated Jose Estrada as demonstrates some of the competency for the scenario; correct?
A. Correct.
Q. Again, for these series of questions, I'm gonna focus only on the scenario.
On page 12184, Mr. Eagan rated Jose Estrada as



"Demonstrates some of the competency," for his responses to the scenario as well; correct?
A. Correct.
Q. And on page 2084, Mr. Schmitt also rated Jose Estrada as just "Demonstrates some competency" for his responses to the scenario; correct?
A. Correct.
Q. Now, comparing those ratings with Maureen, which we just discussed, do you agree that Maureen was rated higher on the scenario than Jose Estrada?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. Okay. If we're gonna base it just on this particular page, in the three assessment -- three assessors, yes.
Q. Right. Let -- I'm limiting it just to the scenario, just to be clear.
A. Okay.
Q. And as we saw, Maureen and Jose Estrada also had the same score on their written aptitude test of 39 out of 40, correct?
A. All right. If you say so.
Q. I do.
A. Okay.

Q. I can go back to the exhibits that we looked at earlier --
A. No.
Q. Okay.
A. No.
Q. Let's look at Mr. Estrada's then current position with the Chicago Police Department, and his job duties at the time he applied for the bomb tech position. So I'm on page --
MR. CURLEY: Exhibit, I should say, 102. And it would be the very first page of that exhibit.
BY MR. CURLEY:
Q. Those are your notes about what Jose Estrada told you about his current position at the police department and his typical day at work --
A. Yes.
Q. -- correct? His current unit was the Office of News Affairs; do you see that?
A. Yep.
Q. Can you read for us into the record, your notes about Jose Estrada's typical day at work, starting under Office of News Affairs?
A. Sure. So we would ask them, initially, like, what was a typical day? And everybody had their various



styles of how they would describe their day. You know, some were more serious, some were more lighter.
So basically, according to my notes, I'm gonna recall that he would say, okay, he got some coffee and some oatmeal. He'd start his day off getting some coffee and oatmeal. Once he got himself settled, he'd go to work. He was buy most days. Compile news clips, dealt with the media inquiries, wrote up press releases, set up the media availability, press conferences and prep people for conferences, command staff conferences. That was just a quote. He must have said our job is to make sure to keep yours. So I felt like that was a -- that was a neat description of his day. That was it.
Q. Did you consider those duties, as Mr. Estrada described them, as being administrative in nature?
MR. PARKER: Objection; foundation, form. Go ahead.
BY THE WITNESS:
A. Yeah, they appear to be administrative in nature.
MR. CURLEY: Now if we can go back again -- I'm sorry to be skipping around a little bit. If we can go back again to Plaintiff's Exhibit 41, one of the consensus meeting worksheets.
BY MR. CURLEY:



Q. And we looked a moment ago at Mr. Fumo's -- the notes for Mr. Fumo, which we saw read, quote, "Lack experience -- "Lacks experience, but intelligent." The notes next to Jose Estrada PX 41, are very similar. Quote, "Lacks experience/training but has the intelligence to learn." End quote. Do you see that for Mr. Estrada?
A. Yes.
Q. And at the consensus meeting, Jose Estrada was recommended for hire by the panel, including you, and made the eligibility list, correct?
A. Yes.
MR. PARKER: Objection; foundation. Go ahead.
BY MR. CURLEY:
Q. Same as Mr. Fumo, right?
A. Correct.
Q. We discussed earlier today your note about Maureen, that she had limited street experience; do you remember that?
A. Yes.
Q. And you also testified earlier today that Maureen was very intelligent; do you recall that?
A. Yes.
Q. It was decided at the consensus meeting that



despite their lack of experience, Mr. Fumo and Mr. Estrada would be recommended for hire because of their intelligence. Do you remember seeing that on -- on Plaintiff's Exhibit 41?
MR. PARKER: Objection; foundation, form. Go ahead.

BY THE WITNESS:
A. No. I -- those are the notes that you're reading, written by one of the HR people. But I've already told you that I don't recall the specific conversation for each particular -- of those candidates in the consensus meeting. So I'm not sure if I can say that or not.
Q. Well, it was decided at the consensus meeting that Mr. Fumo and Mr. Estrada would be recommended for hire and placed on the eligibility list; correct?
A. Yes.
Q. And it was noted at the consensus meeting that Mr. Fumo and Mr. Estrada lacked experience; correct?
MR. PARKER: Objection; form, foundation.
BY THE WITNESS:
A. It's in the notes, as you can see -- as I can see in front of me. I don't recall the specific conversation though.



MAGNA LEGAL SERVICES

Q. Okay.
A. So I -- I --
Q. And it's also in the notes that Mr. Fumo and Mr. Estrada were intelligence [sic]; correct?
MR. PARKER: Objection; form, foundation. Go ahead.

BY THE WITNESS:
A. In the notes written by HR, yes.
Q. But at the consensus meeting, unlike Mr. Fumo and Mr. Estrada, Maureen was not recommended for hire and did not make the eligibility list; correct?
A. That is correct.
Q. Do you remember why Maureen was rated differently than Jose Estrada and James Fumo at the consensus meeting?
MR. PARKER: Objection; asked and answered. Go ahead.
BY THE WITNESS:
A. No.
Q. According to Plaintiff's Exhibit 41, it was decided at the consensus meeting that Maureen, who like Mr. Estrada, Mr. Fumo, may have lacked experience but was intelligent, was best suited for a clerical or office position; correct?



MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. I don't recall that conversation. It's in the notes that you read in front of you. I don't recall specifics of that conversation.
Q. Why didn't you conclude that despite any lack of experience, Maureen would be recommended for hire and put on the eligibility list because of her intelligence?
MR. PARKER: Objection; form, foundation, calls for speculation. Go ahead.
BY THE WITNESS:
A. You're asking me why, based on her intelligence, she should not have been put on the list? I -- I'm --
Q. Yeah. Let me -- let me rephrase the question. Maybe it was a bad question.
Why did you conclude -- Let me try again.
Why -- why didn't you conclude that despite any lack of experience, Maureen would be recommended for hire and put on the eligibility list because of her intelligence?
A. You're asking why did --
MR. PARKER: Object -- hold on. Hold on. Objection; form, foundation, asked and answered, calls



for speculation. Go ahead.
BY THE WITNESS:
A. In the end, her -- I guess based on the consensus discussion, I'm going to assume that her interview simply was not impressive enough to warrant recommendation.
Q. Why wasn't Jose Estrada best suited for a clerical or office position given his administrative duties at the Office of News Affairs?
MR. PARKER: Objection; form, foundation, calls for speculation. Go ahead.
BY THE WITNESS:
A. Are you asking why he wasn't -- he -- he should not be a clerical -- he should not be in a clerical position -- are you asking me why he should not be in a clerical position?
Q. Right. Why wasn't --
A. I never --
Q. -- he --
A. -- said he should or shouldn't be.
THE COURT REPORTER: Whoa.
BY MR. CURLEY:
Q. Okay. Did you think Mr. Estrada was best suited for a clerical or office position, given his



administrative duties at the Office of News Affairs?
MR. PARKER: Objection; form, foundation, calls for speculation. Go ahead.
BY THE WITNESS:
A. I honestly gave that no thought.
Q. Okay. Have you now told us everything you can recall about the discussion of Maureen Bresnahan, at the consensus meeting?
A. Yes.
Q. Are you aware of anything that could refresh your recollection about that discussion, beyond which you have testified to today?
A. Not aware of anything.
Q. Have you now told us everything you can recall about the discussion of James Fumo at the consensus meeting?
A. Yes, I have told you everything that I can recall.
Q. Are you aware of anything that could refresh your recollection about that discussion, beyond which you have already testified to today?
A. I'm not aware of anything.
Q. Have you told us everything you can recall about the discussion of Jose Estrada at the consensus



MAGNA LEGAL SERVICES

meeting?
A. I've told you everything I can recall about the discussion at the consensus meeting with Jose Estrada.
Q. Are you aware of anything that could refresh your recollection about that discussion beyond what you have testified to today?
A. No, I'm not aware of anything.
Q. I did want to follow up on one thing on Mr. Estrada.
MR. CURLEY: So if we could put Exhibit 102 back up on the screen, please; page 13034.
BY MR. CURLEY:
Q. Those are your notes about what Mr. Estrada said in connection with Hiring Criteria No. 4, correct?
A. Yes.
Q. Can you, first, without -- explain to them -- just read into the record your handwritten notes and then I'm gonna ask you what they mean.
A. So as I'm reading --
Q. I -- I really -- just -- just to make the record clear, I would like you to just read, verbatim, your notes --
A. Oh, sure.
Q. -- into the record, and then give us your



recollection of what they mean.
A. Okay. I have written: Incident, underlined. With fiance as victim, candidate arrest and that -- that Delta refers to offender, that's my shorthand.
Q. Uh-huh.
A. Was sued as a result, in hindsight would have reacted in a different direction; learned from the incident.
Q. And do you have any recollection about what those notes meant?
A. I have very little recollection right now of what they meant. It appears that he arrested somebody. The incident -- in hindsight he should have -- he would have react in a different manner, and he learned from that incident. That's -- you know, I'm sure he probably said more in his -- in his account of what happened, and I just simply wrote down those few words to -- to document it.
Q. In -- in any even, just to be sure, at least as best you can recall, Mr. Estrada was not referring to any incident in which he was involved personally? It was his involvement as a police officer, correct?
A. I do not recall any more -- I -- I don't recall.



Q. Okay. Fair enough.
MR. CURLEY: Plaintiff's Exhibit 41. If we could go back to that for just a moment.
BY MR. CURLEY:
Q. Do you see the references on a couple of places, to, quote, "Team player," end quote; and in particular I -- well, I direct you to Timothy Baron (phonetic) and Daniel Colvenson (phonetic)?
A. Yes, Timothy Baron and Daniel Colvenson.
Q. Is "Team player," in quotes, is that a term you used while at the Chicago Police Department?
A. No.
Q. Have you heard officers at the Chicago Police Department use the term, quote, "Team player," end quote?
A. I do not recall that term being used. It's a fairly common term, but I don't recall any specific -- I don't associate anything with that term, nor do I refer -- nor do I recall it being thrown around at this consensus meeting.
Q. Is, quote, "Team player," end quote; is that, to your knowledge, some sort of a -- used as some sort of a code at the department?
A. No.
MR. PARKER: Objection; form, foundation.



BY MR. CURLEY:
Q. Do you -- do you have any understanding of what the term, quote, "Team player," end quote, means in the context of the police department?
MR. PARKER: Objection; form, foundation. Go ahead.

BY THE WITNESS:
A. No.
Q. Okay.
MR. CURLEY: I'm going to be moving on. This might be a good time to take a ten-minute break. We've been going for an hour and a half, I think.
MR. PARKER: That's fine. How are we looking, Phil? Can you give an estimate or no?
MR. CURLEY: I think we're looking pretty good.
MR. PARKER: Okay.
THE VIDEOGRAPHER: Going off the record 2:59 p.m.
(Short break taken.)
THE VIDEOGRAPHER: Going back on the record 3:09 p.m.
BY MR. CURLEY:
Q. Mr. Jones, are you familiar with the acronym EOD, in the context of your work as a bomb technician?
A. Yes.



MAGNA LEGAL SERVICES

Q. What does that mean?
A. Explosive Ordinance Disposable. It's a military term.
Q. Did you consider having military EOD experience to be a positive factor in rating bomb technician candidates?
A. It definitely would have been something to consider.
Q. Did you consider having military experience, other than EOD experience, a factor in your rating of the bomb technician candidates?
A. No.
MR. CURLEY: Can I ask, please, that Plaintiff's Exhibit 255 be put up on the screen.
(Exhibit 255 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail dated November 29th, 2018, from Eduardo Vasquez, to a number of recipients, including you, which looked to me to be mostly members of the bomb squad. It's Bates numbered B-R-E-S dash D-E-F 16067 and 8. Who's Eduardo Vasquez?
A. He's a member of the bomb squad.
Q. And did you receive a copy of this e-mail on November 29th, 2018, and the attachment?



A. Yes.
Q. And --
A. Yes.
Q. I'm -- I'm sorry. That attachment is a list of Chicago Police Department Bomb Squad members from 1979 through 2018; correct?
A. That's correct.
Q. And subject to check, I reviewed those names, and out of the 61 bomb technicians listed, just 3 or 4.9 percent are women. Do you have any reason to disagree with that?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. No.
Q. And the three that I've identified are Irene Jones, Cynthia Zelitzky Z-e-l-i-t-z-k-y and Julie Cotter (phonetic). Can you just take a moment and go over the -- the names, and tell me if any of the other names are women?
A. I think that those are the only women on this list.
Q. Do you know why this list starts in 1979?
A. No.
Q. Julie Cotter, one of the women on the list, was



part of the 2015 bomb tech hiring process, correct?
A. That's correct.
Q. In fact, there are nine bomb techs on the attachment from the 2015 hiring process, starting on the second page of the attachment, with Josh Diaz down to Tyson Colvin (phonetic), correct?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. Yes.
Q. And so subtracting those 9 from the 61 total number of bomb techs on this list, leaves 52, if you'll accept my math. And Julie Cotter, being a 2015 bomb tech, if you were to subtract her from the three women, that leaves two; correct?
A. Yes.
MR. PARKER: Objection; form. Go ahead.
BY MR. CURLEY:
Q. So before the 2015 hiring process and since 1979, according to this list, only two women had served on the bomb squad out of 52 or just 3.8 percent. Do you have any reason to disagree with those numbers?
A. No.
MR. PARKER: Objection; form, foundation. Go ahead.



BY THE WITNESS:
A. No.
Q. Are you aware that the approximate percentage of women holding sworn positions in the Chicago Police Department is about 25 percent?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. No, I did not know that.
Q. Do you know, from your own personal knowledge, at the time, the 2015 hiring process, there were zero women on the bomb squad?
A. That sounds about right. I know that the other female bomb tech that you mentioned, might have retired before then. So, yes, it's possible.
Q. Well, you were on the bomb squad --
MR. CURLEY: You can take that exhibit off the screen.
BY MR. CURLEY:
Q. You were on the bomb squad in 2015, correct?
A. Yes.
Q. Do you recall any women being on the bomb squad at that time?
A. I'm trying to think of when --
MR. PARKER: Object to asked and answered. Go



MAGNA LEGAL SERVICES

ahead.
BY THE WITNESS:
A. I'm trying to think of when the last woman had retired, and I think it was before 2015. So I'm gonna say yes, there were no women on the bomb squad in 2015.
Q. And -- and I guess that's a matter of record in -- in any event, correct?
A. Sure.
Q. Okay.
MR. CURLEY: Now, I'd like to go back to Plaintiff's Exhibit 85, and the consensus meeting; 85 being the final eligibility list.
BY MR. CURLEY:
Q. Can you tell us what you recall about how the candidates were ranked on the eligibility list?
A. I think we had to simply take everybody who we thought we could recommend, look at -- look at their -- look at our notes, our evaluations of their interview, and simply place them in a ranking order.
Q. All right. And -- and what -- well, did Mr. Eagan decide how the candidates were ranked on the eligibility list?
A. No, not that I recall, if he decided.
Q. Did he have the final say on how the candidates



were ranked?
A. Yes, he was the hiring manager, so he would have the final say.
Q. Did you have any role in the ranking of the candidates?
A. Yes.
Q. Were any numeric scores or other objective factors used in -- in ranking the candidates on the eligibility list?
MR. PARKER: I'll object to form. Go ahead.
BY THE WITNESS:
A. I don't recall if that was the case.
Q. Were the candidates ranked subjectively?
A. My understanding is, yes, they were ranked subjectively, based on our interviews of them.
Q. Do you know why, for example, Roberto Lopez, if we can look at him, why he was ranked 22 and not 14?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. Well, I do know that people -- no, I don't know why he was ranked for me to -- between 22 or 14. I do recall that our emphasis was on the top half of that list. Because, in general, with de facto list, candidate lists, they don't go down very far in terms of hiring.



It takes a long time to hire a lot of bomb techs.
Q. Do you know why Roberto Lopez wasn't ranked, for instance, No. 7?
A. No, I don't recall why -- I don't recall why he wasn't ranked No. 7.
Q. Do you have any recollection at all about how any individual candidates were ranked from the final eligibility list?
A. There was discussions among all the candidates, and the ranking came from who, based on their performance in the interviews, was most desirable in that order.
Q. My question is, if you have any recollection about how any individual candidate was ranked in a particular spot?
A. Well, I thought I just answered that.
Q. Well, you -- you -- respectfully, I'm not sure that it is -- let me try and rephrase the question.
Do you know why any particular candidate was ranked at the number reflected on Plaintiff's Exhibit 85?
A. Well, we looked at their -- the notes from our interviews and our recollection of how well they performed during those interviews, and we placed them in the order that we would like to see them hired.
Q. Joshua Diaz was the top-ranked candidate on the



eligibility list; do you see that?
A. Yes.
Q. Why was he given the top ranking?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. Our impressions of him were very high. He gave a very good interview.
Q. Was the fact that --
A. He.
Q. -- he was -- I'm sorry. I thought you were done.
A. I was gonna say, he stated his case very well. Just as the person below him and the person below that person and the person below that person. They all stated their case as to why they should be hired impressively.
Q. Was the fact that he was an explosive detection K9 handler a positive factor in Mr. Diaz being ranked No. 1?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I'm sure it was one of several factors. Based on that but also how he presented himself and -- and the way he handled the questions.
Q. So that wasn't --



MAGNA LEGAL SERVICES

Confidential



A. -- it was -- it was -- it was a positive factor, but it is all put together in a collaborative effort, I guess. You know, it's -- it's -- it's like you take all those factors and put them together -- or I should say, the candidate takes all his factors and puts them together, and that's what propels the person higher up the list.
Q. Did you consider membership in other units, in the Special Functions Division, a positive factor in the 2015 bomb squad hiring process?
A. No, because I believe some of those candidates who did well, did not come from specialized units.
THE WITNESS: Could you excuse me for like ten seconds? I need to get at power cord for this phone.
MR. CURLEY: Of course.
THE WITNESS: Stand by.
(Brief pause.)
THE WITNESS: All right. Can you see me?
MR. PARKER: Yes, and we can hear you.
BY THE WITNESS:
A. All right. I guess just to reiterate what I just said is coming from a specialized unit or not coming from a specialized unit, did not either disqualify or guarantee you success in this process.



Q. Right. I understand that, but if you were a member of, what you call, a specialized unit, is that a reference to a unit in the Special Functions Division?
A. No. No. I'm using that term meaning that a unit outside of a -- a beat officer. So that could be narcotics. That could be a Detective Division. That could be a task force. It doesn't have to be specialized -- a special operations or special functions.
Q. All right. So I'd like for you to focus on, if you can, the other units in the Special Functions Division.
And so my question to you is whether or not you considered membership in other units in the Special Functions Division, a positive factor in the bomb tech hiring progress?
A. By itself, no.
Q. Well, I didn't ask by itself. I asked you if it was a positive factor?
A. Okay. So --
Q. So if somebody --
A. Yeah.
MR. PARKER: Objection; form, asked and answered. Go ahead.
BY THE WITNESS:



A. All right. The reason why I said -- I made that comment was that if somebody is in a specialized unit, but they do a very bad job at the interview or they don't have good qualifications, then it's not a positive attribute. It doesn't -- it doesn't help them. It would not help them.
So what I'm saying is, it -- it all has to be -- everything has to be taken in conjunction, whereas a person who is not in a specialized unit, a patrol officer, let's say, but performs very, very well in all the tests and the -- and the interview, that person -- being whether that person was or was not in a specialized unit, didn't factor in.
Q. All right. So you -- you referred again to specialized units and I really do want to focus on units in the Special --
A. Oh.
Q. -- Functions Division.
A. Okay.
Q. So I'm gonna ask the question again. I'm sure it will be objected to as asked and answered. It's definitely been asked. I'm not sure it was answered.
So my -- my question is did you consider membership in other units in the Special Functions



Division, a positive factor in the hiring process?
MR. PARKER: Objection; asked and answered.
BY THE WITNESS:
A. No, not by itself. No.
Q. Are you aware of any candidates in the top 75 that made it to the interview process, that were members of other units in the Special Functions Division, who did not make it to the eligibility list?
A. Okay. So just to be clear, people who were -- who were interviewed were within Special Functions but did not make it to the eligibility list; is that what you're saying?
Q. Yes, sir.
A. Yes, there were -- I'm sure that there -- in fact, I know that there were people who did not make it to the eligibility list.
Q. So can you look at Exhibit 40 and tell me who those were?
A. I can't tell you specifically, but I -- as for an example, I know that there were SWAT -- people who were in SWAT who applied. That would be within Special Functions, and they did not get into the eligibility group. So that -- that I can recall.
Q. In any event, I supposed that's also a matter



MAGNA LEGAL SERVICES

of record, correct?
A. I suppose so.
Q. Okay.
A. And that's just one example. I'm sure there are others, but I would -- I would not be able to look down that list of names and tell you who was or was not in a special function group.
Q. Thank you. Now, do you see on --
MR. CURLEY: If we can go back to Plaintiff's Exhibit 85, please. That's the final eligibility list.
BY MR. CURLEY:
Q. There -- while there are 30 candidates listed, they are ranked 1 through 29, with one candidate, James Winn, slotted in at 4.5 --
A. Yes.
Q. -- do you see -- Can you explain how that came about?
A. Yes. As I recall, he was in Afghanistan, deployed with the military. So he could not participate in the interviews during the two weeks the interviews were taking place, but he was eligible to have an interview.
So at that point, he was the last person, as I recall, to be interviewed. We had already ranked people



through our consensus meeting, I think. I'm pretty sure that my recollection is we already ranked people. He showed up at his interview. He did very, very, very well, so we slotted him in there.
Q. So James Winn was added to the eligibility list and ranked 4.5, after the consensus meeting was held on June 5th, the eligibility list was determined and other candidates ranked; is that your recollection?
A. I think so. I'm pretty sure that's a matter of record, but I believe that we had to have -- we could not wait for him to come back to work on the consensus list, but he still had to have his interview. So that is my recollection of how that occurred.
Q. Okay. I think the e-mails and such bear that out.
A. Okay.
MR. CURLEY: Could you please put up on the screen, Exhibit -- Plaintiff's Exhibit 38. This has been identified as the initial eligibility list and ranking determined at the consensus meeting on June 5th, twenty thousand -- 2015.
(Exhibit 38 placed on the screen.)
BY MR. CURLEY:
Q. And do you see that McNichols is ranked No. 4



on this initial eligibility list?
A. Yes, I see that.
MR. PARKER: And I'll object to foundation. Go ahead. But -- sorry. Answer to stand.
BY MR. CURLEY:
Q. McNichols is a male, correct?
A. Yes.
Q. Next ranked on Plaintiff's Exhibit 38, is Cotter at No. 5; correct?
A. Correct.
Q. And Cotter is female, correct?
A. Correct.
Q. So when James Winn was slotted in at 4.5, he was placed ahead of the first woman on the eligibility list; correct?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. 4.5., yes. It would be between McNichols and Cotter.
Q. So he was slotted in ahead of the first woman on the eligibility list, correct?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. Yes.



Q. But why was James Winn slotted in ahead of Julie Cotter, rather than bumping someone else?
A. You mean as opposed to behind Julie Cotter?
Q. Yeah, as opposed to bumping, let's say, a male?
MR. PARKER: Objection; form, foundation. He bumped a lot of males that were below Julie Cotter, but go ahead.
BY THE WITNESS:
A. Yeah. I don't know how to answer that. I mean, Julie Cotter being a female, James Winn being a male, I don't remember that factoring in.
Q. Who decided to place James Winn at 4.5? Was that Mr. Eagan?
A. I don't recall exactly where the 4.5 versus 5.5 or 3.5 came in.
Q. My question simply is, if you know, why James Winn was slotted in ahead of Julie Cotter at 4.5?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. I don't recall why he was slotted in. I don't think it would be in reference to Julie Cotter.
Q. If -- if James Winn had slotted in at 5.5, Julie Cotter would not have been bumped, correct?
MR. PARKER: Objection; form, foundation. Go ahead.



MAGNA LEGAL SERVICES

BY THE WITNESS:
A. Well, I don't think she was bumped. If -- regardless, whether he went in before or after, we knew we were gonna hire past -- well past Julie Cotter, whether she was No. 5 or No. 6. We knew she was gonna get hired just by simply the math of how -- how we hire people.
Q. Well, if -- if Mr. Winn had been slotted in at 5.5, he would have been placed ahead of Colvin; correct?
A. Yes --
MR. PARKER: Objection; form, foundation.
BY MR. CURLEY:
Q. Is Colvin male or female?
A. Colvin is male.
Q. Now, there were only two current vacancies at the bomb squad, when the 2015 hiring process got under way; correct?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I don't recall exactly how many positions were open. I do know that we knew that a lot of people were at -- nearing retirement age, so we were expecting to hire several people.
Q. I think we lost part of that answer.



A. Oh. What was the last --
MR. PARKER: I heard it. I thought I heard it all.
MR. CURLEY: Can you read back the answer, Ms. Reporter.
(Record read back as requested.)

MR. CURLEY: Thank you.
BY MR. CURLEY:
Q. Did you -- did you -- is that your answer? Did you finish your answer, Mr. Jones?
A. Yes.
Q. Okay. Great.
MR. CURLEY: Please put up Plaintiffs 118 on screen. You can make it a little larger.
(Exhibit 118 placed on the screen.)
BY MR. CURLEY:
Q. This is a -- I think -- I think it's called a to-from. Bates No. B-R-E-S dash D-E-F 5925 to 5926; from Sergeant James A. Eagan to Eugene E. Williams.
And in the first paragraph, second sentence, Mr. Eagan wrote: The selection process will be administered to fill two current vacancies and future anticipated vacancies on the bomb squad due to retirements.



Does that refresh your recollection that at the time of the 2015 bomb technician hiring process, there were two current vacancies on the bomb squad?
A. Yes.
MR. PARKER: Objection; form -- form, foundation. Go ahead.
BY MR. CURLEY:
Q. I think you answered that yes; is that correct?
A. Yes.
Q. And you also knew that only six persons had been hired off the 2007 bomb technician hiring list; correct?
MR. PARKER: Objection; foundation.
BY THE WITNESS:
A. Well, I know that now as I'm reading it.
Q. Okay. And Mr. Eagan certainly knew that because he wrote it in his memo, correct?
MR. PARKER: Objection; foundation.
THE COURT REPORTER: What was the objection? I'm sorry.
MR. PARKER: Foundation. He's asking him to testify to what Jim Eagan said. Sorry.
BY MR. CURLEY:
Q. At the time of the 2015 hiring process, was the



authorized staffing level for bomb technicians 18?
MR. PARKER: Objection; foundation.
BY THE WITNESS:
A. I do not recall.
Q. Did the staffing level change from year to year, based on the budget for a particular year?
A. Yes.
Q. And was that a calendar-year budget or some intermediate point in the year?
A. The staffing level was dictated by budgeting, but also by grants. We had explosive technicians who were hired under what's called Transit Grants, and also under the airport budget.
So I can't give you a definitive answer as -- as to exactly what the current -- the exact number was. Whether -- whether it was 18 or 21 bomb techs.
Q. Okay. Focussing -- my question just went to the Chicago Police Department Bomb Squad budget. Was that a budget based on the calendar year?
A. Oh, I don't know.
Q. Okay.
A. That wasn't my -- that wasn't part of my duties to know that.
MR. CURLEY: Can you please put up Plaintiff's



MAGNA LEGAL SERVICES

Exhibit 257.
(Exhibit 257 placed on the screen.)
BY MR. CURLEY:
Q. This is Bates Numbered B-R-E-S dash D-E-F 6454 through 6489. It's a rather lengthy document. I'm only gonna ask you questions about the first page, but if you'd like, we can scroll through more of it for you to get the context.
A. Yeah, could you scroll through this? I don't recall what this was. All right.
THE WITNESS: Well, you're scrolling a little fast.
BY THE WITNESS:
A. How many pages are there?
Q. Quite a few.
A. All right.
Q. Let me just -- my question's on the first page, and then if you think you need to look at others --
A. Sure.
Q. -- this way we can do that. This -- this document is titled Blank Questionnaire Bomb Squad September 2014 and bomb squad. And you are listed as a secondary point of contact; do you see that?
A. Yes.
Q. And under the questions, the third question



down is how many HDS Certified Bomb Techs does a unit have, and the answer was 16; correct?
A. Yes.
Q. And a couple questions below: How many texts below the authorized staffing level is a unit? And it says two, correct?
A. Correct.
Q. Do you have any reason to believe that data is incorrect?
A. At that time, no.
Q. Okay. So this indicates, does it not, that the authorized staffing level for bomb squad bomb techs was 18, correct?
A. Correct.
MR. PARKER: Objection; foundation, form. In 2014.
MR. CURLEY: True.
BY MR. CURLEY:
Q. And it also reflects that at the time of this document, there were two current vacancies for bomb techs in the bomb squad; right?
A. Correct.
Q. Now, later in 2016, you know whether the number of bomb tech vacancies had grown?
A. I don't recall.



MR. CURLEY: Can you please put Exhibit 258 up on the screen.
(Exhibit 258 placed on the screen.)
BY MR. CURLEY:
Q. This is a -- an e-mail from Mr. Eagan to a Kevin Tindall and there's a reference in the second e-mail in the chain, to the following names who have been -- who are retired from the bomb squad: Joe O'Carroll (phonetic), Louis Ford, Melvin Hargret (phonetic) and Chris Strahlman (phonetic); do you see that?
A. Yes.
Q. Are you aware of any other vacancies on the bomb squad, as of the date of this e-mail, other than these four?
A. No, I'm not aware of anything like that. I don't recall.
Q. Do you have any reason to dispute the number and names of the bomb techs identified by Mr. Eagan?
A. As retirees? No, I don't any reason to dispute that.
Q. And do you have any reason to dispute the roster of active members of the bomb squad?
MR. PARKER: Object to foundation. Go ahead.



BY THE WITNESS:
A. I have no reason to dispute that.
Q. I mean, Mr. Eagan was the Bomb Squad Commander at this time; correct?
A. Yes.
Q. There's included in the -- in the list of names, a gentleman -- a sergeant and a gentleman by the name of Rob -- I'm sure I'll mispronounce this. Jurczkykowski, J-u-r-c-z-k-y-k-o-w-s-k-i. What was his role in the bomb squad?
A. At that time, he was -- if his name's on there at that date, then he would have been an assistance supervisor.
Q. Assistant to Mr. Eagan?
A. Yes. Mr. Eagan being -- Sergeant Eagan being the Commander and Rob Jurczkykowski being a supervisor.
Q. Was Mr. Jurczkykowski a Certified Bomb Technician?
A. Yes.
Q. Did he serve in the field at all or was he -- his position strictly administrative?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. He was a operational bomb tech, but he was the



MAGNA LEGAL SERVICES

supervisor of us.
Q. Did he count towards the authorized staffing level of bomb technicians?
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. I don't know.
Q. Were any of the -- the bomb techs listed here, on the bomb squad in 2016 from the 2015 eligibility list?
A. All right. So the list I'm looking at is starting with Chris Evanoff (phonetic) is that what you're -- is that what we're looking at?
Q. We're looking at 258, and the first name is James Eagan and then it goes -- yeah, right.
A. And Chris Evanoff?
Q. Right.
A. So you're asking me out of any of those people from the 2015 list; is that right?
Q. Yes. Were there any members of the bomb -- of the bomb squad --
A. No.
Q. -- as of the date of this e-mail, that were hired as a result of the 2015 hiring process?
A. No. And this e-mail is dated 2016; is that correct?



Q. That's correct.
A. Yeah, no.
Q. And there were four retirees as Mr. Eagan noted, correct?
A. Yeah, I didn't see that -- that list. But I'm sure you're correct.
Q. O'Carroll, Ford, Hargret and Strahlman; we went over those a moment ago. So --
A. O'Carroll, Ford and Strahlman and -- and -- and in this e-mail it's saying that they retired that year or will retire that year; is that what you're saying?
Q. Yes.
A. Okay.
Q. It's just -- there's the four of them, correct?
MR. PARKER: Object; found --
BY THE WITNESS:
A. According to that list --
MR. PARKER: Go ahead.
BY MR. CURLEY:
Q. So if there were another retirement in 2016, beyond those four, James Winn would get the next spot, having been slotted in at number four-and-a-half, ahead of Julie Cotter; correct?
MR. PARKER: Objection; foundation, go ahead.



BY THE WITNESS:
A. All right. So you're asking me if somebody else had retired -- if a fifth person retired in 2016, would James Winn have been hired in 2016; is that what you're asking me?
Q. Yes, as -- as a ranked number 4.5, ahead of Julie Cotter?
MR. PARKER: Objection; foundation.
BY THE WITNESS:
A. I can't answer that because -- just because an opening -- a spot opens up, does not directly mean that somebody's gonna fill that slot on that day or anytime soon.
Q. Well, Mr. Winn would have been next in line after the candidate who was ranked number four, correct?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. He'd be next in line when the bomb squad was going to bring in another candidate to fill the vacancy, and provide that nobody on that list declined or moved on or was promoted.
Q. You know, I meant to cover something with respect to James Fumo and I forgot, so I apologize. I want to go back to his candidate assessment form.



MR. CURLEY: Which is Plaintiff's Exhibit 52.
(Exhibit 52 placed on the screen.)
BY MR. CURLEY:
Q. And on page -- well, first of all, do you recall that James Fumo's father was a police officer, a Chicago --
A. No.
Q. -- Police Officer?
A. No.
Q. Do you recall that he had tried to get on the bomb squad?
A. No.
MR. CURLEY: Can you please scroll down to page 2089, which is one of the pages of Mr. Schmitz notes.
BY MR. CURLEY:
Q. And do you see on the right, he wrote down father P period, oh, dash, tried to get on bomb SQ dash interested.
Does that refresh your recollection whether Mr. -- James Fumo's father was a Chicago Police Officer?
A. No.
Q. If James Fumo was the son of a Chicago Police Officer, would he have been referred to within the department as a legacy?



MAGNA LEGAL SERVICES

A. No. That's not -- that's not something I'm familiar with.
Q. You've never heard the term legacy --
A. No.
Q. -- used at the Chicago Police Department to indicate a relative of a -- of another police officer?
A. I've never used -- I've never heard the term legacy in that context.
Q. Okay.
MR. CURLEY: Would you please put up Exhibit 246 on the screen for Mr. Jones.
(Exhibit 246 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail, Bates numbered -- an attachment Bates numbered B-R-E-S dash D-E-F 4288. The last page is actually cut off on my copy. I think it's maybe 4294. But in any event, this is an e-mail from Mr. Eagan to, among others, yourself. And it says: Guys, I've selected you to be members of the job task analysis subcommittee for the upcoming Explosives Tech 1 selection process.
Do you see that?
A. Yes.
Q. What was the job task analysis subcommittee?



A. I don't recall.
Q. Do you recall serving on that subcommittee?
A. Not specifically.
Q. Is this the first time that you learned about a upcoming explosive -- explosives tech selection process?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. I don't recall this e-mail.
Q. Did you -- did you know --
A. I'm not saying that I didn't get it. I just don't recall it.
Q. Did you know in December of 2013 that there was going to be an upcoming bomb tech selection process?
A. I do after reading this e-mail. I don't know if I knew that beforehand.
Q. In -- in the e-mail, Mr. Eagan asks for suggestions with respect to the job task analysis attachment to his e-mail. And then he also notes later on that Roland, which I believe is the reference to you. I understand you're on furlough, and if you don't have a chance to look at this, no big deal.
Did you look at the attachment and offer any suggestions?



A. I don't recall if I did.
Q. Do you know the purpose of the job task analysis?
A. I don't recall. I mean, I think it seems self-explanatory.
Q. In what ways is it self-explanatory?
A. It's an analysis of the job tasks for upcoming bomb technicians.
Q. And the attachment identifies certain tasks to be performed, and then it rates each task based on frequency and criticality. And those are all summarized on the last page of the exhibit.
MR. CURLEY: If you can scroll down to that.
BY MR. CURLEY:
Q. Did you disagree with any of the tasks to be performed here or their frequency or criticality ratings that were given?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. I don't recall.
Q. If you had would you have told Mr. Eagan?
A. Yes.
Q. And do you recall telling him about such disagreements?



A. No.
MR. CURLEY: Can you please put up on the screen Exhibit 135.
(Exhibit 135 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail chain, that has attached to it a document titled FBI Data Bomb Data Center Special Technicians Bulletin, 2013-1. A guide For Selecting Bomb Squad Personnel.
MR. CURLEY: Can you scroll to the second page of the exhibit, please.
BY MR. CURLEY:
Q. Are you familiar with this --
MR. CURLEY: Whoa, stop. Stop. Stop. Go back to the cover page, please.
BY MR. CURLEY:
Q. Are you familiar with this document at all?
A. I'm not familiar with it right now, but I'm -- I would guess I've seen it before.
Q. Do you know whether the -- this guide was followed in connection with the 2015 Chicago Bomb Squad hiring process?
A. I do not know that.
MR. CURLEY: Can you please put Exhibit 247 up on



MAGNA LEGAL SERVICES

the screen.
(Exhibit 247 placed on the screen.)
BY MR. CURLEY:
Q. It's Bates numbered B-R-E-S dash D-E-F 4410 through 17. And this is an e-mail from the top chain -- e-mail in the chain is from you, to Mr. Eagan. And attached is a draft application for Explosives Technician 1.
First of all, do you recall seeing a reference in an earlier exhibit today about an intake session for the hiring process?
A. Yes, we discussed that earlier.
Q. Right. Does this e-mail refresh your recollection at all as to whether you attended the intake session?
A. No.
Q. So you still have no recollection of -- of -- of attending the intake session or what might have been discussed at it; correct?
A. That's correct.
Q. When did you learn that Mr. Schmitt was gonna serve on the panel with you and Mr. Eagan?
A. I don't recall when I learned that.
Q. Was it right before the interviews or was it



quite a ways before? Do you have any -- can you place any context at any time?
A. No.
Q. Did Mr. Eagan consult with you about whether Mr. Schmitt should be asked to serve on the panel?
A. I don't recall him consulting with me. I think he said that was a decision he had made. I don't remember if he consulted with me regarding it. He's the commanding officer.
Q. Did -- did he tell you why he decided to have Mr. Schmitt serve on the panel?
A. No, I don't recall the specifics of why. I probably -- when he told me, I probably guessed as to why. I don't remember if he told me specifically.
Q. Did you have any objection to Mr. Schmitt serving on the panel?
A. No.
Q. Are you aware of any background check or other investigation that the City of Chicago or the Chicago Police Department did of Mr. Schmitt before he served on the panel?
A. No.
MR. CURLEY: Can you please pull up on the screen Exhibit 137.



(Exhibit 137 placed on the screen.)
BY MR. CURLEY:
Q. This is a chain of e-mails Bates numbered B-R-E-S dash D-E-F 8848. I will ask you to review the e-mails in this chain.
MR. CURLEY: If we can scroll through them slowly.
BY MR. CURLEY:
Q. And my question to you is whether or not the meeting that's referred here at 11:30 on March 31st, involved in any way, the 2015 bomb tech hiring process?
A. I do not know.
Q. Did you have any discussions with Mr. Schmitt about the hiring process before the interviews?
A. No, I don't recall having any specific discussions. I know he had to go through consensus training, that sort of thing. But beyond that, I don't think we had any discussion.
MR. CURLEY: Could you please put on the screen Plaintiff's Exhibit 72.
(Exhibit 72 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail from James A Eagan, to Rose Sprinkle, and others, including you; dated April 8, 2015. Do you see that?



A. Yes.
Q. And it attaches a copy of interview questions for the bomb tech selection process, and it refers to the questions being discussed at our last meeting. Do you see that?
A. Yes.
Q. Do you recall a meeting with Mr. Eagan, including any of the other persons on this e-mail, about the interview questions for the bomb tech selection process?
A. I don't recall specifically the meeting.
Q. Did you attend a number of meetings about the interview questions for the bomb tech process?
A. I attended meetings and also there was discussions in Jim Egan's office. I can't come up with a number of how many meetings there were.
Q. Has this e-mail refreshed your recollection about whether you attended the intake session or any discussions at the intake session?
A. No, it does not.
Q. Okay.
A. And I may have -- may have attended the intake session meeting, and maybe it was called something else. I don't know.

Q. The last page of this Exhibit is referred to by Mr. Eagan as additional questions that Roland Jones and I came up with for consideration.
Did you personally come up with any of these questions?
A. No, I don't recall if I personally came up with the questions or did not come up with the questions. I'm sure they all came from discussions between Sergeant Eagan and myself.
Q. You mentioned earlier today that you recall, perhaps, having some input on the very first question on the candidate assessment form, which was, quote, "Tell us what unit you are in and what is your typical day at work." Do you remember that testimony?
A. Yes.
Q. The -- the first question here is that what you were referring to?
A. No.
Q. Okay.
MR. CURLEY: Could you please put Plaintiff's Exhibit 251 up on the screen.
(Exhibit 251 placed on the screen.)
BY MR. CURLEY:
Q. Now, this is an e-mail chain marked as



B-R-E-S dash D-E-F 9797 through 9798; between you and Mr. Schmitt and Mr. Egan. Do you see that?
A. Yes.
Q. And in the middle of the -- from the first page, Todd Schmitt e-mailed you that -- this was after the consensus meeting training, that he can't talk to you guys until the consensus phase.
What was your understanding of what he meant when he said that?
A. I'm looking. I'm just trying to scroll down to where you want me to.
(Brief pause.)
A. Okay. And what was your question?
Q. When Mr. Schmitt wrote, I can't talk anymore to you guys, until the -- he wrote sensus, I'm assuming he meant consensus phase.
What was your understanding of what he meant by that?
A. My interpretation of that was that he was just simply joking that he can't talk to us about anything; socially, on the phone.
Q. Okay.
A. I don't -- I didn't take him to be serious in that. I think he was just taking it to a, you know,



extrapolating that to another level.
Q. Was he making light of the process, in your judgment?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. No, I don't think he was making light of the process.
Q. And in the top e-mail, Mr. Schmitt wrote to you and Mr. Eagan: What bar's back room will the interviews be held in?
Did you get the sense that Mr. Schmitt was talking the hiring process seriously?
A. I did.
Q. And what was your understanding of what he meant when he said: What bar's back room will the interviews be held?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A. My understanding was that he was attempting humor.
Q. Did you and Mr. Eagan and Mr. Schmitt meet from time to time at bars?
A. No.
Q. Do you know if Mr. Schmitt or Mr. Eagan met



from time to time in bars?
A. I don't know that.
Q. Did you come to learn at some point that Mr. Egan filed a CR naming Maureen Bresnahan?
A. I learned that.
MR. CURLEY: Could you please put on the screen Plaintiff's Exhibit 101.
(Exhibit 101 placed on the screen.)
BY MR. CURLEY:
Q. This is a memo that Mr. Eagan wrote to store -- Steve Georgas, Deputy Chief Special Functions Division. And in it, Mr. Eagan sets out the facts and circumstances that led -- that led to his CR against Maureen.
Have you ever seen this document before?
A. No, I don't recall seeing this document.
Q. Did -- I take it then, then Mr. Eagan did not show you a copy of this memorandum before he sent it, correct?
A. That's correct.
Q. Did -- did he consult with you before he filed the CR against Maureen?
A. No.
Q. Did he tell you after he filed the CR that he



MAGNA LEGAL SERVICES

had filed it?
A. I recall him mentioning the CR. I didn't get too involved in the details of it.
Q. Did he tell you why he filed the CR?
A. He mentioned something about the Illinois Department of Natural Resources Explosives License, and discussions with his supervisor.
Q. His supervisor being who?
A. I'm assuming the chain of command goes up to Steve Georgas.
Q. Right. Did Mr. Eagan tell you that he was directed by Deputy Chief Georgas to file the CR?
MR. PARKER: Objection; foundation. Go ahead, Roland.
BY THE WITNESS:
A. I don't recall him getting into a whole lot of detail regarding this -- this CR complaint.
Q. Have you told us everything you recall about Mr. Eagan's filing of the CR against Maureen?
A. Yes.
Q. Did you later learn that Maureen had filed a CR against Mr. Eagan in August of 2015?
A. I recall that, yes.
Q. And --



MR. CURLEY: Take that exhibit down off the screen if you'd like. We're done with that.
BY MR. CURLEY:
Q. And do you recall learning that Maureen also filed a complaint with the Equal Employment Opportunity Commission against the Chicago Police Department in May '16?
THE COURT REPORTER: I'm sorry. What was the date?
MR. CURLEY: In May of 2016.
THE COURT REPORTER: Thank you.
BY THE WITNESS:
A. That sounds familiar, but I don't recall the exact details of when I heard that or how I heard that. It sounds like that sounds right.
Q. Did you learn that the Internal Affairs of the Chicago Police Department determined that Mr. Eagan's CR against Maureen was unfounded?
A. No, I did not know that.
Q. You never heard that before today?
A. I don't recall hearing that before today.
Q. Do you recall being interviewed by the Bureau of Internal Affairs of the Chicago Police Department in connection with Mr. Eagan and Maureen?
A. Yes.



MR. CURLEY: I'm going to ask you, please, to put on the screen Plaintiff's Exhibit 259.
(Exhibit 259 placed on the screen.)
BY MR. CURLEY:
Q. This is Bates number B-R-E-S dash D-E F 3122 through 3136. Do you recognize this as your signed witness statement to the Bureau of Internal Affairs?
A. Yes.
Q. And on the first page, it -- it indicates near the bottom that you were represented by counsel at this interview, Elizabeth Flemming; correct?
A. Yes.
Q. Was she provided by the Fraternal Order of Police?
A. Yes.
Q. Why did you ask that you be accompanied by a counsel at your interview?
A. That's standard procedure.
Q. On the next page, near the top, you answered to the question: Are you ready to give your statement at this time? You answered, quote, "Yes, however this statement is not being given voluntarily but under duress. I am only giving this statement at this time because I know that if I -- because I know that I will



lose my job if I refuse a direct order being given to me." End quote.
Who gave you the direct order to give this statement?
A. Sergeant Pettis is the sergeant in -- from the Bureau of Internal Affairs.
Q. And why did you not want to give this statement voluntarily?
A. That's standard preamble whenever police officers give a statement to Internal Affairs.
Q. Why is that a standard preamble?
A. Because we don't have the right to refuse to give that statement; or I should say we have the right, but then we would lose our jobs.
Q. On the last page of this exhibit, you were asked by Sergeant Pettis, quote, "Did Sergeant Eagan acquire the CR complaint against Officer Bresnahan to eliminate her from consideration for the explosive technician process?" End quote. And you answered: I do not know.
Was that answered truthful at the time you gave it?
A. Yes, I can't testify to whether Sergeant Eagan wanted to eliminate her for consideration or not. So I



MAGNA LEGAL SERVICES

Confidential



did not know or I do not know.
Q. And that answer is -- is truthful today, correct?
A. Yes.
MR. CURLEY: You can take that exhibit down. Could you please put up Plaintiff's Exhibit 146.
(Exhibit 146 placed on the screen.)
BY MR. CURLEY:
Q. This is an e-mail from Mr. Eagan on March 21, 2018, to you and to Todd Schmitt. And he attached a complaint that was filed by Maureen Bresnahan in federal court here in Chicago, against the City of Chicago; do you see that?
A. Yes.
Q. Did Mr. Eagan tell you why he was sending you this complaint?
A. No, I don't recall.
Q. Did you read the complaint after you received it from Mr. Eagan?
A. I don't recall.
Q. Did you ever have any discussions with Mr. Eagan about the complaint filed by him in federal court -- I'm sorry. About the complaint filed by Maureen Bresnahan in federal court, against the City of Chicago?



A. Well, he mentioned that there was a suit against him, and it was based on her not getting hired, and that's pretty much the extent of the conversation as I recall. We didn't go into a whole lot of conversation regarding it.
Q. Did you have any other conversations from March 21, 2018 until today, about Maureen's complaint against the City of Chicago?
A. Nothing beyond what I just said, which is that an active complaint is still going on.
Q. And over the -- over the three years since the complaint was filed, you had no further discussions with Mr. Eagan about the complaint, beyond what you've told us today; is that right?
A. Yes.
Q. Okay. How many times would you say that you have seen Mr. Eagan between March 2018 and today? Hundreds?
A. Oh, I don't know. I mean, I worked with the bomb squad until December of 2018. And then after that I left Chicago, moved to Virginia. So I don't -- I can't quantify how many times I've seen him.
Q. Did you ever discuss Maureen's complaint against the City of Chicago with Todd Schmitt?



A. No, I don't recall. If I did it would just be nothing beyond that there was a lawsuit or complaint.
Q. Have you now told us everything you recall about any discussions you had with either Mr. Eagan or Mr. Schmitt about Maureen's complaint against the City of Chicago?
A. Yes.
Q. Are you aware of anything that would refresh your recollection about any further discussions?
A. No.
MR. CURLEY: Could you please put on the screen Plaintiff's Exhibit 256.
(Exhibit 256 placed on the screen.)
BY MR. CURLEY:
Q. It's a one-page e-mail chain Bates numbered B-R-E-S dash D-E-F 16298. At the top, the e-mail chain is from James A. Eagan to Linda Ralpher (phonetic) at the Illinois Department of National Resources. And Mr. Eagan wrote: No problem. By the way, Roland Jones retired from our department, and I don't know if he'll be renewing his license.
So this merely confirms that, certainly by this time, you had left the Chicago Bomb Squad, correct?
A. Correct.



Q. And did you renew your explosive license with the IDNR?
A. No.
MR. CURLEY: Could you please put on the screen Plaintiff's Exhibit 261.
(Exhibit 261 placed on the screen.)
BY MR. CURLEY:
Q. This is a document Bates numbered B-R-E-S dash D-E-F 10080 through 10107. Do you recognize this document as the Bomb Technician Application File for Maureen Bresnahan?
MR. PARKER: Object to foundation. Go ahead.
MR. CURLEY: So I think we should scroll through it so Mr. Jones can get a sense of the document.
BY MR. CURLEY:
Q. Not necessarily, unless you want to read every word, Mr. Jones. I'm gonna direct your attention to certain parts of it, but just maybe more quickly to get an idea of what the file is.
A. Okay.
(Long pause.)
THE COURT REPORTER: Counsel, could I take this time to run to the restroom?
MR. CURLEY: Sure.



MAGNA LEGAL SERVICES

THE COURT REPORTER: Is that okay?
MR. PARKER: Of course.
THE COURT REPORTER: Sorry.
MR. PARKER: Of Course.
THE VIDEOGRAPHER: Going off the record 4:26 p.m.
(Short break taken.)
THE VIDEOGRAPHER: Back on the record 4:29 p.m.
BY MR. CURLEY:
Q. Mr. Jones, my question to you is whether you recognize this as the bomb technician application file for Maureen Bresnahan?
A. No, I don't recall that.
Q. Did you review the application files for the bomb tech candidate as part of your work on the interview panel?
A. No, I don't recall doing that.
Q. Why not?
A. My task was to be on the interview panel.
Q. Didn't you want to know as much as you could about each of the candidates?
MR. PARKER: Objection; form. Go ahead.
BY THE WITNESS:
A. My objective at that point was to have them all come in, present themselves in the interview format that



they were given, half hour, and proceed from there.
Q. So far -- so as far as you were concerned, the entire application process came down to a -- a 30-minute interview for each candidate?
MR. PARKER: Objection; form, foundation. Go ahead.

BY THE WITNESS:
A. My understanding was they had to pass the writ -- the written, the physical, and then -- and then do the interview. I believe that they could have brought or submitted a resume. I can't remember but I think that they were allowed to submit a resume during their interview.
Q. But once they scored high enough on the written aptitude test and passed the physical agility test, as far as you were concerned, the application process came down to that 30-minute interview; correct?
A. Yeah --
MR. PARKER: Object to form.
BY THE WITNESS:
A. Yes, that was the only way I had to differentiate those after they had passed the physical and the aptitude.
Q. And to the best of your recollection, you never



looked at Maureen Bresnahan's application file, correct?
A. Correct.
Q. So let's take a look, at least some of it now. The second page and third page of the Exhibit 10081 and 82. That is the recommendation letter from Chicago Police Department, Sergeant Christopher Gunnel, G-u-n-n-e-l. Do you know Sergeant Gunnel?
A. No.
Q. He was Maureen's direct report in 2015, correct?
A. I'm sorry --
MR. PARKER: Object to foundation.
BY THE WITNESS:
A. You were asking me who he was?
Q. Let me rephrase the question. Do you see in the third paragraph that he wrote in his letter recommendation, she reported to me as the administrative sergeant supervising the E-learning group.
Is it your understanding, based on that, Sergeant Gunnel was Maureen's direct report?
MR. PARKER: Object to foundation.
BY THE WITNESS:
A. I will take that at face value, yes.
Q. By the way, do members of the bomb -- bomb



squad take any training or other learning via an E-learning process?
A. Not specifically for bomb squad, but all police officers have to involve -- be involved in E-learning.
Q. In the fourth paragraph of his letter of recommendation, Sergeant Gunnel wrote that, quote, "Officer Bresnahan is one of the most reliable officers that I have ever worked with, and that she consistently does more than what she is required to do to complete a task, takes tremendous pride in her work and accurately and efficiently addresses complex problems through resolution." End quote.
Do you consider those qualities to be positive factors in favor of a bomb technician candidate?
MR. PARKER: Objection; form, foundation.
BY THE WITNESS:
A. Yes. You're asking me why I did not see this. Is that where we're going with this is why I did not see this letter of recommendation?
Q. No, I'm ask -- I just asked you --
A. Okay.
Q. -- a question about something and -- and you answered it, so that's -- that's fine.
A. Because I did not -- because I think one of the



MAGNA LEGAL SERVICES

portions of this application process was that there was not supposed to be any outside influence, you know, supervisor pushing into the bomb squad. So I'm pretty sure that's probably why I didn't see any letters like this from her -- with regards to her or any other candidate.
Q. Well, do you know then why letters of recommendation were solicited?
A. No.
MR. PARKER: Objection; foundation. Go ahead.
BY THE WITNESS:
A. No.
Q. Page 10083 is a letter from Mark Hannan, H-a-n-n-a-n, a former board member of an organization called Concerns of Police Survivors, and known by the acronym COPS C-O-P-S. Do you know that organization?
A. No.
Q. Are you aware that it raises money and awareness for the families of fallen police officers?
A. No.
MR. PARKER: Object to foundation. Go ahead.
BY MR. CURLEY:
Q. Did you know that Maureen did volunteer work for that organization?



A. I did not know the organization existed, so, no, I didn't know that.
Q. I think you've already answered this, but is it fair to say that you did not see these letters of recommendation in Maureen's application file during the bomb tech hiring process?
MR. PARKER: Objection; asked and --
THE COURT REPORTER: I'm sorry?
BY THE WITNESS:
A. Yes, I have no recollection of seeing these letters.
Q. Turning to page 10088 and 89. These are certificates of completion from the Illinois State Police for a HAZMAT awareness refresher courses. That is relevant to the duties of a bomb technician, correct?
MR. PARKER: Object to form, foundation.
BY THE WITNESS:
A. Yes.
Q. Did you review these in Maureen's application file during the bomb tech hiring process, or is this the first time you've seen them?
A. She may have brought them with her as part of her resume. I don't recall if anybody was allowed to present us with -- with certificates or certifications at



the time of the interview. Aside from a DD214.
THE COURT REPORTER: I'm sorry. I missed that last part. Aside from what?
BY THE WITNESS:
A. A DD214, which is a military form, certifying that you were in the military and you were discharged on -- you know, discharged legally. So I don't remember -- I think I recall that -- that candidates could not present us with forms at the time of the interview. That -- I have a recollection of that.
Q. Right --
A. So -- so -- so to answer your question, I don't recall seeing this.
Q. Okay.
MR. CURLEY: Let's turn to page 10091.
BY MR. CURLEY:
Q. This is a City of Chicago Special Services Award for Maureen, in recognition of her leadership and diligence during the 2012 NATO Summit here in Chicago. That is relevant to the duties of the bomb technician, correct?
MR. PARKER: Object to form, foundation.
BY THE WITNESS:
A. I'm looking at that form. I -- I -- I can't



recall, but I think we all got those forms. Like, you know, I mean, all -- the entire police department served during the 2012 NATO Summit. So often times, you know, certificates of appreciation are sent out to everybody. So I don't -- I can't -- I can't tell you -- and in answer your question, I can't tell you if you this was anything special for her, or this might have been something that was just sent out, you know, department wide.
Q. Right.
A. I don't recall. I might -- I may very well have one in my drawer somewhere.
Q. All right. So I'm gonna have to move to strike as non-responsive. My question was whether --
A. Oh, I'm sorry. I mean --
Q. -- was whether this was relevant to the duties of a bomb technician?
A. Oh, I thought I was answering that.
MR. PARKER: Objection; asked and answered, form, foundation. Go ahead.
BY MR. CURLEY:
Q. Mr. Jones?
A. Yes, I thought I was answering that in context. So -- so my -- so my response then would be I don't know.



MAGNA LEGAL SERVICES

Page 254

Q. Did -- did you review this in Maureen's application file during the bomb tech hiring process, or is this the first time you've seen it?
A. Pretty sure this is the first time I saw it -- I have seen this.
Q. The next page, 10092, is another certificate of completion from the Illinois State Police for HAZMAT refresher course. Again, that is relevant to the duties of a bomb technician, correct?
A. Yes.
Q. Did you review this in Maureen's application file during the bomb tech hiring process, or is this the first time you've seen it?
A. I don't remember reviewing anybody's certificates, any candidate's certificates, whether they brought them to the interview process. I definitely did not review anything before the interview process. So if they brought something during the interview, like a binder worth of things, I can't remember if we, the interviewers on the panel, were allowed to read through them or not.
So my question is, I don't recall seeing this and I'm not even sure if I could have seen this.
Q. Page 10095 is a certificate given to Maureen by

Page 255

the Chicago Police Department Superintendent for completion of a speaker series on Initial Law Enforcement Response to Suicide Bombing Attack.
A. Uh-huh.
Q. That is relevant to the duties of a bomb technician; isn't it?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. Yes.
Q. To the best of your knowledge, is this the first time you've seen this?
A. Yes, to the best of my knowledge this is the first time I've seen this. It looks like a certificate where you attended a seminar of either one, two, multiple days.
Q. Page 10098. This is a certificate given to Maureen by the Chicago Police Department Superintendent?
A. Uh-huh.
Q. -- for a completion of a speaker series on WMB Radiological and Nuclear Awareness. That is relevant to the duties of a bomb technician; isn't it?
A. Yes --
MR. PARKER: Objection; form, foundation. Go ahead.

Page 256

BY MR. CURLEY:
Q. I believe you answered yes, Mr. Jones; is that right?
A. Yes. Once again, I'm not sure of the context of these. I mean --
Q. Mr. Jones --
A. Oh.
Q. -- this will go a lot quicker if you --
MR. PARKER: Let him answer the question. He's answering your question.
MR. CURLEY: No, he's not --
MR. PARKER: You can't ask a question and then cut him off.
MR. CURLEY: He's not answering my question. I asked him if it was relevant to the duties of a bomb technician and he said yes. I would like to move on now with my next question.
MR. PARKER: He's explaining why he thinks it may or may not be. You need to let him finish his -- finish your answer, Mr. Jones.
BY THE WITNESS:
A. So what happens is, people will come into, let's say, the police academy or they might come into the headquarters and they'll give a -- a speaker -- you know,

Page 257

this is -- they'll give a speech or -- or a talk. It says right here in the -- in the certificates, speaker series.
Often times speakers were brought in to headquarters. There's a multi media room, and officers were able to attend or have the time to attend or work there, were always invited. So these things occurred throughout the time -- throughout the year. So going to one of these talks does not necessarily equate into training for the bomb squad. So I'm just trying to put this into context that I would be looking at if this was presented to me.
MR. CURLEY: I'll move to strike everything after the answer "yes."
BY MR. CURLEY:
Q. Plaintiffs -- or I should say page 1099, is a certificate given to Maureen by the Chicago Police Department Superintendent for completion of the speaker series of Terrorist Indicators for Law Enforcement. Is that relevant to the duties of a bomb squad technician?
MR. PARKER: Wait. Hold on. Objection; form, foundation. Go ahead, Mr. Jones.
BY THE WITNESS:
A. Once again, I'm gonna have to refer to what I



MAGNA LEGAL SERVICES

Confidential



previously said, is this is a speaker series. I'm looking at the date. It's a one-day speaker series. Superintendent, his name goes on everything. So is that relevant to a bomb squad duties? Yes. Those -- that subject matter is relevant to bomb squad duties. Can anybody attend these things? It's a speaker series. It does not equate into training.
Q. Right. Mr. Jones, I'm not asking if it equates into training. I'm asking if it's relevant and you said yes. Thank you.
MR. PARKER: He's explaining why it's not relevant. What do you -- how is that not responsive to your question?
MR. CURLEY: My motion stands.
MR. PARKER: Well, fine. I would object to your motion.
MR. CURLEY: You have the right to cross-examination, Chris, and you can do that if you choose.
MR. PARKER: It's a deposition. It's a deposition. There's no cross-examination.
MR. CURLEY: All right. All right. Please turn to page 10100.
BY MR. CURLEY:



Q. That is a certificate given to Maureen by the Chicago Police dependent Super -- Chicago Police Department Superintendent for completion of the speaker series on Hostage Incidents and Negotiations. Is that relevant to the duties of a bomb technician?
MR. PARKER: Object to form, foundation. Go ahead, Mr. Jones.
BY THE WITNESS:
A. Yes.
MR. CURLEY: Page 10101. The next page.
BY MR. CURLEY:
Q. Is a certificate given to Maureen by Chicago Police Superintendent for successful completion of the speaker series on School Violence Threat Assessment. Is that relevant to the duties of a bomb technician?
A. Not sure about --
MR. PARKER: Object to --
BY THE WITNESS:
A. -- that one.
MR. PARKER: -- form -- Sorry. Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I mean, if -- if basically you're wanting me to read the last line of this speaker series certificate,



and the last line says, School Violence Threat Assessment; yes, I suppose it could be if that school violence threat assessment involved possible IEDs, you know, placed by students, so, sure.
MR. CURLEY: Page 10102 --

BY MR. CURLEY:
Q. -- is a certificate of training given to Maureen by the National White Collar Crime Center, for successful completion of instruction in Cyber Investigation Secure Techniques for On-Site Preview. Is that relevant to the duties of a bomb tech?
MR. PARKER: Object to form, foundation.
BY THE WITNESS:
A. I don't see how that would be directly pertinent to bomb squad operations.
Q. Do the -- or does the bomb squad, I should say, ever get involved in cyber investigations in connection with explosive devices?
A. I'm looking at National White Collar Crime Center. No, I -- I've not experienced that.
Q. Okay.
MR. CURLEY: Page 10103 --
BY MR. CURLEY:



Q. -- is a certificate of training given to Maureen by the National White Collar Crime Center for Successful Completion of Instruction in Identifying and Seizing Electronic Evidence. Is that relevant to the duties of a bomb technician?
A. I don't --
MR. PARKER: Object to form, foundation. Sorry. Go ahead.
BY THE WITNESS:
A. No, I don't see that direct correlation to bomb squad operations.
Q. One of the job duties of bomb technicians is to identify and -- and seize evidence; correct?
A. Well, predominantly evidence in regards to device -- explosive devices, you know, be it bits and pieces of -- of an IED.
Q. And would that include identifying and seizing electronic evidence related to IEDs or other explosive devices?
A. When it comes to seizing electronic devices, generally that would be --
Q. I'm sorry. It's electronic evidence.
A. Electronic evidence? In general, from my experience, we would rely upon the technical -- technical



MAGNA LEGAL SERVICES

division of the police department because they were actually pretty good at preserving and, you know, making sure they can recover electronic evidence within electronic devices. So that's not something that was a skill set of bomb technicians as my experience.
Q. Okay.
MR. CURLEY: Page 10104 --
BY MR. CURLEY:
Q. -- is a certificate given to Maureen by the State of Illinois for successful completion of a course in Crisis Intervention Team Training. Is that relevant to the duties of a bomb technician?
MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. All right. My recollection is that the CITT or CIT training, was for when police officers encounter people of mentally unstable, you know, in a full-on mental crisis. So there's just the officers and how they handle that. That's not really in the purview of bomb squad technicians.
Q. Well, certainly, in your experience, you've encountered individuals in connection with your bomb squad duties that are mentally unstable; correct?
A. Yes, but I think that the context of this was



for, like, police officers who respond to a person having a mental crisis and acting violently. Not without -- not bomb related. You know, like --
Q. Why are you saying it's not bomb related? What on this piece of paper --
A. No, I'm saying --
Q. -- means not bomb related?
MR. PARKER: Objection; form.
BY THE WITNESS:
A. I'm giving you my experience as a Chicago Police Officer. So what I'm saying is that this training was for police officers to respond to mentally-disturbed individuals who may harm themselves or harm others. You asked me does this have a direct correlation with bomb squad operations and you're asking me for my opinion, and I'm saying I don't see the direct correlation with the duties of a bomb squad technician in responding to an IED or a suspicious device.
Q. Mr. Jones, I did not use the word "direct correlation," or the phrase, at any time today. My question simply has been and has consistently been, whether this is relevant to the duties of a bomb technician. Can you answer that yes or no?
A. No.



MR. PARKER: No. Objection; asked and answered, form, foundation. He's already answered the question.
BY MR. CURLEY:
Q. Mr. Jones?
MR. PARKER: You can answer.

BY THE WITNESS:
A. I said no.
Q. Okay.
MR. CURLEY: Page 10106 --
BY MR. CURLEY:
Q. -- is a copy of a letter dated June 2, 2015, from Lieutenant Steve Sesso (phonetic) of the Chicago Police Department, to the Illinois Department of National Resources, requesting a waiver of the fee for Maureen's explosives license; do you see that?
A. Yes.
Q. And this letter is dated before the consensus meeting held on June 5th of 2015; correct?
A. Okay. Yes.
Q. And it's on Chicago Police Department letterhead, correct?
A. Yes.
Q. Maureen submitted this letter for her



application file, correct?
MR. PARKER: Objection; form -- form, foundation, calls for speculation.
BY THE WITNESS:
A. I don't know.
Q. Do you have any other idea of how it got into -- into the file if Maureen did not submit it?
MR. PARKER: Objection; form, foundation, calls for speculation.
BY THE WITNESS:
A. I don't recall reviewing her file so your question is, again -- what was your question? I'm sorry.
Q. Is -- is there any other way it would have gotten into the file other than Maureen's -- Maureen submitting it?
A. I have no idea. I don't -- I don't -- I don't -- I -- I didn't deal with her file.
Q. Okay.
MR. CURLEY: Page 10107 --
BY MR. CURLEY:
Q. -- is an enrollment form for a Hazardous Materials Operations Course by the University of Illinois Fire Service Institute. That is relevant for the duties of a bomb technician, correct?



MAGNA LEGAL SERVICES

Page 266

MR. PARKER: Object to form, foundation. Go ahead.
BY THE WITNESS:
A. I'm not familiar with that fire services training. I'm looking at it saying it has material operations, so -- but, I mean, I'm not familiar with that type of training so I'm not sure I can answer that. I don't know if that's arson training.
Q. Okay.
A. Or HAZMAT responder training. I -- I don't know.
Q. Okay. The first page of Exhibit 261 is the letter that was sent to Maureen, scheduling her interview; correct?
A. Yes.
Q. This letter was supposed to tell her what to expect at the interview and what to prepare for, correct?
A. Yes.
Q. And she is told that she'll be rated in several areas, the bullet points there, which we have discussed today; correct?
A. Correct.
Q. Maureen told in this letter that she would no longer be eligible for bomb technician candidate if she applied for an IDNR Explosives License?

Page 267

MR. PARKER: Objection; form, foundation.
BY THE WITNESS:
A. If it's not in the letter, than the answer would be no. I'm -- I'm reading the letter right now, and I'm pretty sure that that's -- I don't see it in there.
Q. Was Maureen told in this letter that she would be rated on whether she had a good, current position with the department?
MR. PARKER: Objection; form, foundation. Go ahead.
BY THE WITNESS:
A. I'm sorry. You're asking me -- one more time, please.
MR. CURLEY: Sure. Could you read that back, please Ms. Reporter.
(Record read back as requested.)
BY THE WITNESS:
A. No. All I can testify is what the letter -- what I'm reading in front of me. So if it's not in the letter, then I can't assume that she was informed of that or not informed of something.
Q. Was Maureen told in this letter that she would be rated based on whether the panel believed she was best suited for a clerical or office position?

Page 268

A. No --
MR. PARKER: Objection; form, foundation.
BY THE WITNESS:
A. That's obviously not in the letter.
MR. CURLEY: Thank you. No further questions at this time.
MR. PARKER: I -- I just have a few, quick follow-up.
EXAMINATION
BY MR. PARKER:
Q. Mr. Jones, counsel just recently showed you a series of certificates of attendance what I believed you called speaker series certificates, and other certificates for Maureen Bresnahan; do you recall that?
A. Yes.
Q. And I believe your testimony was that you did not review those prior to or at any time during this selection process for the bomb tech in 2015; correct?
A. Yes, I have no recollection of that.
Q. Right. And after you've -- you've reviewed them here for your deposition, do you believe that if you had reviewed any of those certificates, it would have -- would have changed, in any way, your -- your opinion and decision, with respect to Maureen Bresnahan, on not

Page 269

recommending her for the final eligibility list?
MR. CURLEY: I'll object as no foundation and requiring speculation.
MR. PARKER: You can answer.
BY THE WITNESS:
A. No.
MR. PARKER: That's all I have. Sorry. Did you have any follow-up, Phil?
MR. CURLEY: No, but I -- I will note that you said there would be no cross-examination. No, I have no further questions.
MR. PARKER: It's not -- it's not cross-examination. I get a chance to ask him questions. It doesn't have to be cross-examination.
Okay. We'll reserve signature. Thank you very much. Thank you, Mr. Jones, for taking the time.
THE VIDEOGRAPHER: Going off the record a 5:00 p.m. This concludes the deposition of Roland Jones.
* * * * *



MAGNA LEGAL SERVICES

Confidential



STATE OF ILLINOIS)
) ss:
COUNTY OF C O O K)

The within and foregoing deposition of the aforementioned witness was taken before MARCIE A. HAW, C.S.R., at the place, date and time aforementioned.

There were present during the taking of the deposition the previously named counsel.

The said witness was first duly sworn and was then examined remotely upon oral interrogatories; the questions and answers were taken down in shorthand by the undersigned, acting as stenographer; and the within and foregoing is a true, accurate and complete record of all of the questions asked of and answers made by the aforementioned witness, at the time and place hereinabove referred to.

The signature of the witness was not waived, and the deposition was submitted, pursuant to Rules 30 (e) and 32 (d) of the Rules of Civil Procedure for the United States District Court, to the deponent per copy of the attached letter.



Witness my official signature in and for Cook County Illinois on this 8th day of September, A.D. 2021.

____________________________
MARCIE A. HAW, C.S.R.
License No. 084-004463



MAUREEN BRESNAHAN, )
Plaintiff, )
)
-vs- ) No. 18 CV 1972
)
CITY OF CHICAGO, et al., )
Defendants. )

I, ROLAND JONES, being first duly sworn, on oath say that I am the deponent in the aforesaid deposition taken on 08-24-21, that I have read the foregoing transcript of my deposition, consisting of pages 1 through 269 inclusive, and affix my signature to same.

____________________________
Roland Jones

Subscribed and sworn to
before me this ________ day
of ______________, 2021.

____________________________
Notary Public
HAW



CASE: MAUREEN BRESNAHAN vs. CITY OF CHICAGO, et al.
DATE TAKEN: August 24th, 2021
DEPONENT: Roland Jones
PAGE LINE ERRATA SHEET

____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________
____ ____ CHANGE: ______________________
____ ____ REASON: ______________________

(signed) ____________________ DATE__________
Reporter: MARCIE A. HAW



MAGNA LEGAL SERVICES

# Tab C

# Deposition Designations

# Linda Raufer

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Linda Raufer**

Witness: Linda Raufer; Deposition Date October 7, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| The City objects to all deposition testimony designated for Linda Raufer because it is irrelevant, prejudicial, confusing, and subject to the City's pending Motion in Limine No. 1. The City further objects that Plaintiff has not demonstrated the deponent is unavailable under Rule 32. | | | | |
| Tr. 5:8-6:3 | | | | |
| Tr. 6:7-11 | | | | |
| Tr. 6:17-8:3 | | | | |
| Tr. 8:8-9:22 | | | | |
| Tr. 10:12-13 | Hearsay (exhibit) | | | |
| Tr. 11:11-13:12 | Exhibit (testimony and exhibit) | | | |
| Tr. 14:11-15:9 | | | | |
| Tr. 15:25-16:5 | Hearsay<br>Foundation 15:5-7 | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Linda Raufer**

Witness: Linda Raufer; Deposition Date October 7, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 16:18-17:15 | Hearsay<br>17:12-15 calls for legal conclusion | | | |
| Tr. 17:18-18:3 | Foundation | | | |
| Tr. 18:7-14 | | | | |
| Tr. 19:24-20:4 | Hearsay | | | |
| Tr. 20:17-21 | Hearsay (exhibit) | | | |
| Tr. 21:19-21 | | | | |
| Tr. 23:10-11 | Foundation | | | |
| Tr. 24:2-18 | Hearsay; foundation | | | |
| Tr.28:11-24 | Hearsay | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Linda Raufer**

Witness: Linda Raufer; Deposition Date October 7, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 29:1-16 | Foundation | | | |
| Tr. 31:23-32:7 | | | | |
| Tr. 37:23-38:2 | | 38:3-5 | | |
| Tr. 48:17-25 | Hearsay | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAUREEN BRESNAHAN, )
Plaintiff, )
vs. ) Case No. 18-cv-1974
CITY OF CHICAGO, et al, ) Judge Thomas M. Durkin
Defendants. ) Mag. Judge Maria Valdez
)

VIDEO DEPOSITION OF LINDA RAUFER
TAKEN ON BEHALF OF THE PLAINTIFF
OCTOBER 7, 2021

I N D E X


| QUESTIONS BY: | PAGE |
|---|---|
| MR. CURLEY | 6 |
| MR. PARKER | 38 |
| MR. CURLEY | 48 |


E X H I B I T S


| EXHIBIT | | PAGE |
|---|---|---|
| Plaintiff's Ex. 104 | Interview | 25 |
| Plaintiff's Ex. 407 | Emails | 10 |
| Plaintiff's Ex. 408 | Application | 14 |
| Plaintiff's Ex. 409 | Waiver Letter | 17 |
| Plaintiff's Ex. 410 | Notification | 20 |
| Plaintiff's Ex. 412 | Fact Sheet | 23 |
| Plaintiff's Ex. 413 | Application | 32 |
| Plaintiff's Ex. 414 | Emails | 36 |


Exhibits were retained by the parties.



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAUREEN BRESNAHAN, )
Plaintiff, )
vs. ) Case No. 18-cv-1974
CITY OF CHICAGO, et al, ) Judge Thomas M. Durkin
Defendants. )
)

VIDEO DEPOSITION OF LINDA RAUFER, produced, sworn and examined on October 7, 2021, between the hours of 11:04 a.m. and 11:59 a.m. of that day, at the offices of Alaris Litigation Services, 15 S. Old State Capitol Plaza, Springfield, IL, before Jennifer L. Crowe, a Certified Shorthand Reporter (IL).



A P P E A R A N C E S

For the Plaintiff:
C. Philip Curley
Robinson Curley, PC
300 S. Wacker Drive
Suite 1700
Chicago, IL 60606
312-663-3100
pcurley@robinsoncurley.com

For the Defendants:
Christopher R. Parker
Michael Best & Friedrich, LLP
444 W. Lake Street
Suite 3200
Chicago, IL 60606
312-222-0800
crparker@michaelbest.com

Court Reporter:
Jennifer L. Crowe, CSR
Illinois CSR #084-003786



IS HEREBY STIPULATED AND AGREED by and between counsel for the Plaintiff and counsel for the Defendants that this video deposition may be taken in shorthand by Jennifer L. Crowe, CSR, Certified Shorthand Reporter, and afterwards transcribed into typewriting.

* * * * *

VIDEOGRAPHER: We are on the record. Today's date is 10-7-21. The time is approximately 11:04 a.m. This is the video-recorded deposition of Linda Raufer in the matter of Bresnahan v City of Chicago, no. 18-cv-1974. This deposition is being held in Springfield, Illinois. The reporter's name is Jennifer Crowe. My name is Wayne Rutherford. We are with Alaris Litigation Services.

Attorneys, please introduce themselves.

MR. CURLEY: Good morning. My name is Philip Curley. I represent the plaintiff, Maureen Bresnahan.

MR. PARKER: Good morning. My name is Christopher Parker. I represent the defendants City of Chicago as well as Sergeant Egan.

VIDEOGRAPHER: Would the court reporter please swear in the witness.



MAGNA LEGAL SERVICES

LINDA RAUFER,
of lawful age, produced, sworn and examined on behalf of the Plaintiff, deposes and says:
(Starting time of the deposition: 11:04 a.m.)
EXAMINATION
QUESTIONS BY MR. CURLEY:
Q. Can you start by telling us your full name and spell your last name for the court reporter?
A. Linda C. Raufer, R-A-U-F as in Frank E-R.
Q. Is it okay with you if I call you Linda today?
A. Oh, yeah.
Q. You can call me Phil.
A. Okay.
Q. Can you tell us where you live, please?
A. My address?
Q. Yes.
A. 627 East Wood Avenue, Springfield.
Q. What is the zip code there?
A. 62702.
Q. Just so the jury can get a little bit of an idea of your background, can you tell us or describe for us your educational background



starting from maybe the high school you graduated from and then any sort of formal education before that?
A. I went to, graduated from Quincy Senior High School, went on to do some classes at Lincoln Land but other than that really didn't do much after that.
Q. Okay. And I'm going to be asking you some questions today, Mr. Parker might as well, about a lawsuit that my client has brought, Maureen Bresnahan, against the City of Chicago and James Egan, and it is going -- my questions are going to focus on your time at the Illinois Department of Natural Resources.
So can you tell us when you first started working at that department and take us through your career there until you retired?
A. I started there in January of 2001 I believe it was and retired at the end of the December of last year.
Q. What was the position or positions that you held while you were at the department?
A. My title was an AA2, but I was in the Blasting and Explosives Unit and issued explosive licenses to individuals.



Q. Did you do that for the entire 20 years that you were with the department?
A. Uh-huh, yes.
Q. The reporter can only take down verbal. So if you can try and remember that, that would be great.
A. Okay.
Q. Can you tell us a little bit about the Illinois Department of Natural Resources and what it does?
A. The part that I was in, we were called Mines and Minerals. So we oversaw the mining part of it, storage certificates and things like that for explosives and the blasting licenses for -- that was a different thing. I didn't do the blasting licenses. Those were different. I did the explosive licenses. But I did, you know, clerical stuff, too, for the department or for the division.
Q. And what are these explosive licenses that you mentioned?
A. What are they?
Q. Yes?
A. An explosive license is a license that's issued to an individual who handles or uses



explosives. A regular layperson goes through a background check and they go through a class, a background check, and then when I left they were $100. You pay $100 and they are good for three years, and they have to be renewed every three years.
Law enforcement, they get issued the license with a waiver letter from their supervisors, and it has a restriction -- on the forms that people pay for it just says restrictions none. If it is law enforcement, it will say City of Chicago Police Department, Quincy Police Department or wherever they are using it.
Q. And is any individual in the State of Illinois that uses or handles explosives required to be licensed?
A. Yes.
Q. Is that a statutory requirement?
A. Yes.
Q. I want to ask you, first of all, if you know or remember Maureen Bresnahan?
A. I remember talking to her.
Q. Okay. Have you ever met her?
A. No, I never met her face-to-face, no.
Q. So all your communications were either



MAGNA LEGAL SERVICES

over the phone or by email?
A. Right.
Q. Can you tell us when you first talked with Maureen either over the phone or had an email conversation with her?
A. If you could tell me what year she was first issued, do you know that? Like I said, I couldn't get a hold of the files.
Q. Right. Well, let me --
A. There. I thought -- that will help right there.
Q. Yeah. Let me show you first what I will ask the reporter to mark as Ex. 407.
(Ex. 407 marked for identification.)
Q. That is numbered on the bottom BRES0247 and 248. Linda, this is a series of emails between you and Maureen. Maybe you can just take a moment and read through those. I don't think it will take very long. Perhaps that will refresh your recollection as to when you first had contact with Maureen. And of course, it starts -- it is in reverse order, so the first email is on the second page.
A. She just, she went ahead did the



background check, and she didn't need to do it for the first license that I issued her.
Q. Okay.
A. Then Sergeant Egan called me. I worked with him a lot, too. He called me and said that she was not --she didn't need the license, but they issued the waiver letter for her. So that's what I didn't understand. So we snapped up the license with the restriction on it and issued a license that she paid for with no restrictions.
Q. Okay. If we can look on Ex. 407 on the second page, the first email is dated May 5th, 2015, from Maureen to you. Do you see that?
A. Uh-huh.
Q. And there is a series of emails back and forth between you and Maureen.
Did you read each of these emails on or about the time that you received them, and did you write the emails and send them as indicated on here?
A. Oh, yeah.
Q. Okay. And Maureen told you on May 5th, quote, hello, I'm interested in attending the blasting and explosives training on 3 June, 2015 in Ottawa, Illinois. Please let me know how to



register. Thank you, Maureen Bresnahan. Do you see that?
A. Yes, yep.
Q. Is that the first time that you recall have any contact with Maureen?
A. Yep, that would have been.
Q. And then there is a series of emails back and forth after that of certain dates, then if you look on the first page of this exhibit in the middle, there's an email from Linda to you -- I am sorry, there's an email from Maureen to you June 2, 2015, and you wrote her first, you didn't need to go through a background check if it is for your line-of-duty work. Do you see that?
A. Yes.
Q. That's what you referred to a moment ago that a law enforcement officer did not have to do a background check?
A. Right, if they got the waiver letter from their supervisor.
Q. Right. And then in response to that email right below that, Maureen wrote LOL, which I think is shorthand for lots of laugh, LOL, it is - I'm applying for bomb tech but at least now we both know that I am cleared. Do you see that?



A. Yes.
Q. So you knew when you read this email from Maureen that she was applying for the bomb tech position for the bomb squad in Chicago, right?
A. I guess. I mean, it's been a long time ago so -- but yeah, I guess I did.
Q. You -- it was practice to read emails?
A. Oh, yeah.
Q. Okay. And Maureen specifically told you that she was applying for the bomb tech position here, correct?
A. Right.
Q. Okay. And then further at the top of the exhibit on the first page you wrote again to Maureen on June 2 a little bit later that day, June 2, you don't need to pay either, just get the waiver letter from your supervisor for the waiver of lien?
A. Fees.
Q. Fees -- I'm sorry. Let me know if they need me to send them the form. Do you see that?
A. Yes.
Q. And that is a reference to what you have already told us about that if she got a waiver from her supervisor, she did not have to pay the



MAGNA LEGAL SERVICES

$100 --
A. Right. I was thinking that Egan did send one, but he may not have. I don't know.
Q. Okay.
A. Like I say, it's been a long time. At that time we were trying to license every law enforcement person in the state. We were doing classes with 60, 70 people in them up north, here in Springfield, down south. So, I mean, I was doing probably 40, 45 licenses a week.
Q. And then let me show you, then, what I will ask the reporter to mark as Ex. 408.
(Ex. 408 marked for identification.)
Q. Which is a single page exhibit numbered in the bottom IDNR00279. And just so you know, that IDNR designation at the bottom means it was produced by the Illinois Department of Natural Resources out of their files.
A. Right.
Q. Are you familiar at least with the form of this document?
A. Oh, yeah.
Q. Can you tell the jury what it is?
A. It just gives all of their personal



information, what they are going to do with the license, you know, where they work.
Q. So is this a license application form?
A. Yes.
Q. And this particular one was filled out by Maureen Bresnahan; is that correct?
A. Yes.
Q. This is not the license itself, is it?
A. No, no, no.
Q. And when did Maureen fill this out?
MR. PARKER: Object to foundation. Go ahead.
Q. If you can tell from the document?
A. It would have been first part of June she probably went to the class. We had the classes -- where she took them we had classes the first Thursday of every month. So -- and this was issued on 6-15-18 -- I mean 6-15. The license is good for three years. So it was issued middle of June of '15.
Q. Okay. Was it the typical practice for people applying for licenses to submit the application when they attended the class?
A. Oh, yeah.
Q. So if you look back at Ex. 407, do you



recall that Maureen told you that she was going to attend the blasting and explosives training on 3, June of 2015 in Ottawa, Illinois?
A. Right. That's when she signed the application.
Q. Okay. So to the best of your knowledge based on your review of the document, she signed this application on June 3, 2015, at the class in Ottawa?
A. Uh-huh, and it took about a week for the license or the applications to come to me in Springfield, then they go, they go to another person because there is checks -- if there are checks in there, there is another person that has to handle them. So it probably was a week at least before I got this and issued the license. I tried to get the licenses out as quickly as I could.
Q. Sure. Did you review this application?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And did you find anything improper or incorrect or wrong with the license --
A. No.
Q. -- application?



A. I didn't have any reason to question it.
Q. Okay. And as you saw from Ex. 407 again, Maureen had told you before June 3 that she was applying for the bomb technician position, correct?
A. Right.
Q. When you reviewed this application, did you think or determine that anything on it was fraudulent in any way?
A. No.
Q. At any time after your first review of the application did you come to believe anything about the application was fraudulent?
A. No.
MR. PARKER: Objection, calls for a legal conclusion. Go ahead.
Q. Now let me show you what's been marked as Plaintiff's Ex. 409.
(Plaintiff's Ex. 409 marked for identification.)
Q. Now, this is a single-page exhibit marked at the bottom as BRES0280, and I realize that this is a letter that's not directed to you, but can you take a moment and read it to yourself



MAGNA LEGAL SERVICES

and --
A. It is just a typical waiver letter requesting waiver of fees for that person.
Q. And --
A. I thought -- I did think back then it was Egan that signed it, but I guess it wasn't.
Q. Did you review this waiver letter on or about June 5 when it was received by the department?
A. Mr. Falter would have.
Q. But not necessarily you?
A. Well, I mean, I put it in the file, but I didn't -- as long as he signs off on it, I didn't need to do anything with it.
Q. Okay. When you -- well, did you have any discussions with Mr. Falter about this waiver letter?
A. No, not until the issue was brought up that she -- Egan did not want her to have the license with their restrictions on it. So that's when she paid the money. Like I said, Mike just said well, if that's what she wants to do, she can do it.
Q. Did you have any discussion with Mr. Falter on or about June 5 which is the date



this waiver letter was received by the Department of Natural Resources?
A. No, because we didn't know anything was going on at that time.
Q. Okay. Did Mr. Falter tell you that he believed that this waiver letter was fraudulent or improper in any way?
A. No.
MR. PARKER: I object. I am sorry.
A. He didn't know anything about -- I mean, he didn't know anything about the situation with Maureen and Egan until I told him. So this wouldn't have brought anything up.
MR. PARKER: And I will just object to form on foundation. And I apologize. Every once in awhile, and vice versa when I ask questions, we get a chance to object, and so we have got to be careful about talking over each other. I will try to get it in as quickly as possible before you answer, but just FYI. But you will be able to answer the question after I object.
A. Okay.
MR. PARKER: Thank you.
Q. And focusing on just this date on or around June 5, my question simply is at that time



did Mr. Falter tell you that he believed that anything fraudulent or wrong or improper about this waiver letter?
A. Not at all.
Q. Now if we can go back just for a moment to Ex. 408, that's the license application for Maureen?
A. Okay.
Q. You had already made reference to the box in the upper left that reads official use only.
Can you tell us what that box represents and the different items in the box?
A. The license type, the O is original, first-time license. If she was renewing it, there would be an R there. Expiration date of the license, and then the number of the license.
Q. Okay. Let me show you what has been marked as Plaintiff's Ex. 410.
(Plaintiff's Ex. 410 marked for identification.)
Q. This is a three-page document Bates numbered BRES0265 through 267. Can you identify this document for us?
A. This is a letter that is sent out to the individual that's getting the license. It is



sent to the FBI, and it is sent to ATF.
Q. And is this the actual notification to the candidate, in this case --
A. Yes.
Q. -- Maureen that the license had been --
A. Right, this was the one --
Q. -- granted?
A. This license was the one with the restriction with the Chicago Police Department, if you can see on the license where it says restriction.
Q. Right. You are looking at the third page?
A. Yes.
Q. And what in particular are you referring to restriction? Oh, yeah, sort of over the stamp, but it says Chicago Police Department?
A. Right.
Q. Got ya. So pages 2 and 3 are the actual license that was sent to Maureen.
A. Right.
Q. So in the bottom left on the first page of the letter it says carbon copy law authority.
Who is the law authority, if you know, that this was sent to?



MAGNA LEGAL SERVICES

Page 22

A. It would have been sent to their local police department, and it was sent to the FBI, and it was sent to ATF, I believe.
Q. And did you personally send notification to the local police department?
A. Yes.
Q. Who did you direct that notice to?
A. I just put the, put the address for the police department or the ATF or whatever and then whoever gets it gets it. There was never any individual that I sent it to.
Q. Okay.
A. If you notice in this letter, too, it says since your agency requested and received a fee waiver, the use of this license is restricted to official use only.
Q. Correct.
A. Right there, so --
Q. That's the restriction referred to on the license itself?
A. Right.
Q. What is the next thing that you recall about Maureen's explosive license after it was issued on June 15 of 2015?
A. I just remember Egan calling me and

Page 23

telling me that she shouldn't have had it with their restriction, with -- associated with the police department. That's when she sent in the $100 and filled out a new application.
Q. All right. Are you aware that sergeant Eagle -- Egan filed a complaint against Maureen with the Chicago Police Department in connection with the license?
A. I heard that, yes.
Q. Let me show you what's been marked as Plaintiff's Ex. 412.
(Plaintiff's Ex. 412 marked for identification.)
MR. PARKER: I will object to this. Because it is a confidential document issued by the Chicago Police Department, we would suggest that anything be kept confidential pursuant to the protective order entered between these parties. I would actually object showing this witness as I don't think she would have ever seen an internal document but --
A. Do you not want me to look at it?
MR. PARKER: That's all right for purposes of the deposition.
MR. CURLEY: Yeah. The witnesses are

Page 24

allowed to look at the documents.
Q. This is Bates numbered BRES-DEF003005 through 3006, and this is a fact sheet, as Chris says, from the Chicago Police Department files relating to the complaint that Sergeant Egan filed against Maureen, and do you see near the, near the middle on the right side there is a description of the allegations made by Sergeant Egan, quote, the reporting party -- that's Sergeant Egan -- alleged the accused obtained an explosive license by falsely indicating she was an explosives technician? Do you see that?
A. I see that.
Q. Yeah. And, in fact, Maureen as we saw from the email she sent you on June 2, had specifically told you that she was applying for that position, correct?
A. Right.
Q. So that allegation was unfounded to the best of your knowledge, correct?
MR. PARKER: Objection, form, foundation. Go ahead. I am sorry, you can answer.
Q. So that allegation of Sergeant Egan was unfounded so far as you knew, correct?
A. Right. I mean, I had no way of knowing

Page 25

what she was doing.
Q. Well, you knew that she told you she was applying for the bomb tech position?
A. Right, right.
Q. She didn't tell you in her email that is included in Plaintiff's Ex. 407 she was already a technician, did she?
A. No. I probably just assumed she needed to get the license to get the, get that job.
Q. Right. In fact, hadn't other Chicago police officers applied for the same type of explosive license in order to obtain the position of bomb technician?
A. That very well could be. I mean, like I said, you have no idea how many licenses I issued. I have no way of knowing or remembering.
Q. Okay. Do you recall having a interview over the phone with a member of the Chicago Police Department In -- Internal Affairs -- I keep saying infernal -- Internal Affairs Division about the complaint against Maureen?
A. I do not remember that.
Q. Okay. Let me try to refresh your recollection. I will ask you to look at Plaintiff's Ex. 104.



MAGNA LEGAL SERVICES

Page 26

A. Was this an in-person interview?
Q. No, I believe it was telephone.
MR. PARKER: Same objection. This is a confidential internal document from the City of Chicago. We would object to using this exhibit for this witness, and we would request that it be kept confidential pursuant to the protective parties (sic) entered into between the parties in this case. Go ahead, sorry.
MR. CURLEY: Right, which is what the document says, subject to the protective order. So the protective order applies but does not prohibit showing the document to witnesses.
MR. PARKER: We can talk about that.
Q. Okay. Linda, this is a copy of the Chicago Police Department Bureau of Internal Affairs summary report digest for the complaint Sergeant Egan filed against Maureen and --
A. I would think I would remember this, and I know Mike Falter would have required somebody from our legal department to be there. I don't remember, I don't remember doing this.
Q. All right. So let's look at page 441. Is that the page that you are on? At the bottom.
A. Okay.

Page 27

Q. And about two-thirds of the way down it says on 22 July, the reporting sergeant, and in this situation that refers to the Internal Affairs sergeant, in furtherance of this investigation made contact with circumstantial witness Linda Raufer, and then it goes on. You can just read to yourself over to the middle of the next page setting out the conversation that he had with you. If you can just read that to yourself first, I, I am going to ask some questions about that.
A. I don't remember any of this. I'm sorry, I don't.
Q. So reading this does not refresh your recollection --
A. No, not at all.
Q. -- about this phone call?
Do you have any reason to deny that the phone call of the conversation took place?
A. I don't remember it.
Q. Do you have any reason to believe --
A. I mean, I talked to Jim a couple of times but --
Q. Jim?
A. Egan.
Q. So this is with another fellow. This

Page 28

would be with Sergeant Terrance Cochran who wrote this report and his reporting sergeant.
Do you have any reason to believe that he fabricated this conversation with you?
A. I don't know why he would, but like I said, I don't remember. I'm sorry, I just don't remember this.
Q. Okay. You don't remember one way or the other?
A. Huh-uh.
Q. Okay. Now, did you tell Sergeant Egan when you spoke with him that the actions by Maureen did not rise to the level to be considered a false application?
A. I didn't think it was.
Q. You didn't think it was a false application?
A No.
Q. And did Sergeant Egan nonetheless request that you or the department revoke her license?
A. Uh-huh. Yes, he did.
Q. And did you and the department refuse to revoke or demand return of that license?
MR. PARKER: Object to form. Go ahead.

Page 29

A. I don't remember. I know that she got a new license without the restrictions on them, so -- but that was her choice to do that.
Q. Right. Well, if her license had been -- if her original license had been revoked or withdrawn by the department would there be some record of that?
MR. PARKER: Object to foundation. Go ahead.
A. It would be in her file at the building.
Q. Okay. And so if there is no record in the file that this license that was issued on June 15th was revoked, would it be fair to say that it was not revoked?
A. I don't think it was revoked.
Q. Okay.
A. I just remember talking to her, and she said she was going to go do the background check and pay for the license.
Q. After Sergeant Egan raised his complaint?
A. Right.
Q. Yes. Okay.
MR. PARKER: I will object. I think that



MAGNA LEGAL SERVICES

mischaracterizes her testimony due to the background check she did prior to.
A. It sounds like in an email she did the background check before she even took the class.
MR. PARKER: Right. Exactly. Thank you.
Q. Right. But at some point later after Sergeant Egan's complaint, Maureen was issued another license without restrictions, correct?
A. Right.
Q. For that she paid the $100?
A. Yeah.
Q. Okay.
A. But she wouldn't have been able to use that for work.
Q. When was -- you told us that Sergeant Egan called you after he received notice of the license, the first license.
Can you tell us what you recall about that conversation, what you said, what Mr. Egan or Sergeant Egan said?
A. He just told me, he asked me why I issued the license, and I said because I had a waiver letter from the Chicago Police Department, and, I mean, I don't write the letters. I got it, so I thought that was all legitimate. That's --



she took the class, she passed the class, and there was no issue, I didn't think.
Q. And did he ask you at that time to withdraw the license?
A. I believe he wanted to, but I don't think he had any right to do that. That would be something that you would have to ask Mike Falter. That would be in her file as well, I'm sure, because he, Mike would have written a letter, I'm sure, to Egan and to Maureen.
Q. If the license had been revoked?
A. Right.
Q. Okay. What else do you recall about that first conversation between you and Sergeant Egan?
A. Just that he didn't want her to have the license for the Chicago Police Department.
Q. Okay.
A. Like I said, I had worked with him several times before and, you know, seemed like an okay guy to me. I just -- it is not my place to tell him what to do with his employees.
Q. Had Sergeant Egan ever asked you on any other occasion not to issue a license to a Chicago police officer?



A. No.
Q. Had he ever on any other occasion asked you to revoke a license?
A. No. I don't recall -- in the 20 years I did this, I don't remember revoking anybody's license. I wouldn't do it anyway. That would go up to legal, and they would do that.
Q. Have you told us everything that you remember about that first conversation with Sergeant Egan?
A. Yeah, I told you everything that I can remember.
Q. Okay.
A. I mean --
Q. Was there another or second conversation between you and Sergeant Egan?
A. I can't remember. I don't know.
Q. Okay. Let me show you what has been marked as Plaintiff's Exhibit 413.
(Plaintiff's Ex. 413 marked for identification.)
A. We issued her the same number.
Q. Just for the record, let me say that this Ex. 413 is numbered at the bottom IDNR280, again, indicating it came out of the Department of



Natural Resources files.
Can you identify this for me?
A. That's another application that she filled out.
Q. And is this the application without restrictions --
A. Right.
Q. -- you referred to before?
A. Right.
Q. And to get this particular license, Maureen agreed to pay the $100 fee herself, correct?
A. Yes.
Q. Okay. Did you have any conversation with Maureen about this second license?
A. Just that what she would have to do to get the license, you know, without the restriction on it.
Q. So did she contact you and ask you how to do that?
A. She had everything done already. She had the background check done, and she sent the money in. We issued the license.
Q. Okay. So did you have any conversation with her at all about this second license or



MAGNA LEGAL SERVICES

Page 34

just --
A. No, she just --
Q. Or did the application just show up on your desk?
A. Oh, yeah, she called and told me what she was going to do.
Q. Okay. All right.
A. She did, I remember that.
Q. Okay.
A. But it just was not that big of a deal.
Q. And did she tell you why she was submitting this second license?
A. She just wanted to have the license to show if she ever came -- if something ever came up, that she, you know, could use it, but I told her, I said if you do get the license and you get a job handling explosives, then you are going to have a new license with the restrictions on it.
Q. Uh-huh.
A. Can't have both. You can't have it both ways.
Q. Right. And item no. 1 here on this application, indicate what this application is for, new explosive license is checked, correct?
A. Uh-huh. Yes.

Page 35

Q. So this was a whole new procedure, right?
A. Right.
Q. Then magazine keeper is also checked. What is magazine keeper?
A. A magazine keeper is someone that keeps track of the explosives and things in a magazine that the department has.
Q. Okay. Have you told us everything that you recall about this second explosive license that Maureen obtained?
A. Yes.
Q. Did you have any discussions with Mr. Falter or anyone else at the Illinois Department of Natural Resources about this?
A. No, he signed off on it. He signs -- I process the license, make the license, I give the folder and everything to Mike, he checks it, signs it. If he doesn't sign it, then it is not going to go through. And I got it back from him with no question.
But it was -- you know, she got -- the first license expired June. So it took a couple of months for her to, you know, get the other license, the nonrestriction license.

Page 36

Q. Right.
A. Because the expiration date, as you can see, is 8-25-18 and the other one was 6-15-18.
Q. Right. That's reflected on the different --
A. Up in the left-hand corner.
Q. That's the expiration of the license, but the date the application was filed is next to the signature on the bottom left, correct, on each application?
A. Right. The original one came in, in June of 2015, and I got the other one August 9th of 2015.
Q. Okay. Did you have any -- do you recall any other conversations with Sergeant Egan about Maureen Bresnahan later on in the year 2015?
A. No. I mean, I may have talked to him, but I talked to him about other officers and things like that. I don't remember ever specifically talking to him again about Maureen.
Q. Okay. Let me show you what has been marked as Plaintiff's Ex. 414.
(Plaintiff's Ex. 414 marked for identification.)
Q. This is a one-page document Bates

Page 37

numbered BRES0325, and although you aren't the recipient of either of these emails, the first email in the chain, the bottom email from Maureen to a Kristoff (phonetic) Pettis, P-E-T-T-I-S, says Sergeant Egan contacted Linda Raufer (from the Illinois explosives office again) October 2, 2015 to the best of my knowledge making more comments about me.
Does that refresh your recollection about any other phone call with Sergeant Egan?
A. It sure doesn't. He never made any -- he never made any negative comments, he just said we need to follow the rules, and she is not on the bomb squad. She is not, so we can't have her have this license. But I don't remember making comments about her because I was cordial with her and I was cordial with Jim, so --
Q. No, this is a reference of Sergeant Egan making comments about Maureen to you?
A. I don't recall that.
Q. Okay.
A. I don't recall that.
Q. Okay. Did Sergeant Egan ever tell you in later phone calls with you that the complaint that he had filed against Maureen had been found by



MAGNA LEGAL SERVICES

the Internal Affairs Division to be unfounded?
A. No, I don't remember that at all.
Q. Okay.
A. It is just the kind of information they wouldn't have to share with me.
Q. Right. But he could have shared it with you if he wanted to, couldn't he?
MR. PARKER: Objection, foundation, form.
A. I don't think he would have.
Q. Okay. Did you ever ask him how that complaint was resolved?
A. No.
Q. Okay. Have you told us everything that you can recall about the explosive license applications for Maureen Bresnahan?
A. Yes.
Q. Is there anything further that would refresh your recollection on the subject at all?
A. No, not at all.
MR. CURLEY: Okay. Then I have no further questions at this time.

EXAMINATION

QUESTIONS BY MR. PARKER:
Q. Okay. Well, thank you and, again, thanks for taking the time. I just have a few



follow-up questions about this, the same topics that we are already talking about.
If you could, sorry, counsel put a number of exhibits in front of you. If you could find Ex. 413?
A. Okay.
Q. Which was the second application that Maureen completed?
A. I got it right here.
Q. Do you see that? Now, I know that she signed it on August 9th, 2015, or at least that's what this indicates, correct?
A. Uh-huh, yes.
Q. What is -- the stamp there, it says received Department of Natural Resources August 17th, 2015. What does that indicate to you?
A. That's when the actual application came into our office.
Q. So I believe you previously said that you would have seen this on August 9, but if I understand you correctly, actually now that you have reviewed it --
A. Right.
Q. -- you actually wouldn't have seen it until August 17, correct?



A. Right, right, uh-huh.
Q. Okay. Thank you. Now, up on the top right hand or, I am sorry, top left-hand corner of this same document, I know there is this little box there that says official use only. Now, you said the number, what does that indicate up in that box? There is a line that says number?
A. Each individual is issued a license number.
Q. Okay. And if I can, it looks like this is the same number?
A. Yes.
Q. Okay. And why would it be the same number?
A. There was not any reason to change the number.
Q. Okay. And that's because the previous license -- strike that.
Would this license, then, have, you know, superseded the previous issued license because it is under the same number?
A. Right.
Q. Okay. So Maureen, as of the issuance of the second license, would have had only one license that was currently in effect; is that



correct?
A. Right, right.
Q. And you can track that at IDNR --
A. Yes.
Q. -- by looking up her number, correct?
A. Yes.
Q. All right.
A. In hindsight she probably should have been issued a new number but --
Q. Well, why is that?
A. Just because of the question you just asked, it probably would have been better, but I don't know why I didn't.
Q. Okay.
A. So --
Q. Now, we have mentioned Mr. Falter previously. First of all, who is Mr. Falter?
A. He is head of the blasting and explosives unit.
Q. Okay. Was he your supervisor?
A. Yes.
Q. Okay.
A. When it came to this.
Q. Correct. Okay. Did you have another --



MAGNA LEGAL SERVICES

A. I had several other duties.
Q. But during this relevant period Mr. Falter would have been your supervisor?
A. Right, uh-huh.
Q. Now, I believe counsel previously showed you another exhibit, Ex. 409. If you could just quickly look at that.
A. What was it?
Q. Yeah. Sorry, this is a letter from the police department.
A. Here it is. This is -- that came in on June 5th, 2015.
Q. Okay.
A. And this was the -- from Lieutenant Steven Sesso requesting the waiver of fees.
Q. Okay. And was a waiver of fees actually issued?
A. Yes.
Q. Okay. And that was pursuant to this letter, correct?
A. Yes.
Q. Do you know -- sorry, did you ever talk to Lieutenant Steven Sesso --
A. No.
Q. -- about this letter?



A. No.
Q. Do you know if Michael Falter ever talked to Steven Sesso about this letter?
A. I don't believe so.
Q. Okay. Had you ever seen or heard of the name Lieutenant Steven Sesso prior to this letter?
A. No, I hadn't.
Q. Okay. Do you know one way or the other whether Mr., sorry, Lieutenant Sesso was with the bomb or explosive division at CPD or was with another division?
MR. CURLEY: Objection, no foundation.
A. It just says education and training division, so --
Q. Okay. And I believe you previously testified when you got or at least -- sorry, this letter would have come to Mr. Falter, correct?
A. Right.
Q. It is addressed to Mr. Falter, correct?
A. Yes.
Q. And you only saw it to put it in the file, correct?
A. I mean, there is a form letter that we send out when they apply for the licenses, and this



is just the way it is. Then they fill it in with their pertinent information.
Q. Do you recall ever looking at this letter, sorry, prior to issuing the first license to Maureen Bresnahan?
A. I probably did look at it.
Q. Okay.
A. And put it in her file.
Q. Okay. Did you -- at that time that you looked at that time, did you note who had written the waiver --
A. No.
Q. -- request form? Okay.
A. No. There would have been no reason to.
Q. Okay. As far as you were concerned, as long as somebody in the Chicago Police Department had signed the waiver letter, that was good enough for the department?
A. Right. It was on their letterhead.
Q. So no reason for you to question it, correct?
A. No.
Q. And would that be the same in any police department throughout the state?



A. Oh, yeah, yes.
Q. In your conversations with Maureen do you ever remember her informing you that she was an actual member of the bomb squad?
A. I don't remember.
Q. Okay.
A. I just assumed she was because that's what she had on her first application.
Q. Correct. When you issued -- sorry, when you send the license -- sorry, let me look at Ex. 410. This is the June 15th, 2015, letter from Michael Falter to Maureen Bresnahan issuing the license?
A. Uh-huh.
Q. The first license?
A. Yes.
Q. Do you know how this letter is sent?
A. Just regular US mail.
Q. Okay. So it is dated June 15th, but that means it would not have been received by -- strike that.
As far as you know, it wouldn't have been -- it would have been sent by regular mail, correct?
A. Right.



MAGNA LEGAL SERVICES

Q. So whatever time it takes regular mail?
A. It was sent out of our mail room.
Q. Okay. Then you also, I am sorry, you also send it to the FBI?
A. FBI.
Q. Then you send it to the police department?
A. Mm-hmm, yes.
Q. All right. And that would have been by regular mail as well?
A. Yes.
Q. And you did not -- strike that.
Did Maureen, in your conversations with Maureen -- and you may have testified to this earlier but did she ever tell you why she wanted a second license?
A. She just wanted to have the license as some kind of credentials.
Q. Okay. Anything else that you recall from that conversation?
A. No. I explained to her, you know, she wouldn't be able to use it for work.
Q. Did she issue a waiver form for the second license as far as you know?
A. No, just a check.



Q. And she paid that check by herself, correct?
A. Yes.
Q. Does that indicate to you one way or the other whether she could use the prior license?
A. No, she was informed to cut it up.
MR. CURLEY: Object to form.
Q. Okay. Who would have informed her of that?
A. I believe I was told to tell her to cut it up by Mr. Falter.
Q. The previous license?
A. The one with the restriction on it.
Q. Okay. Thank you. So you did tell her that she would not be able to use that license --
A. Right, right.
Q. -- correct?
A. I mean, she knew that. That's why she got the other license.
Q. Thank you.
A. Did she renew her license, do you know?
Q. I don't know.
MR. PARKER: I don't have any further questions. Thank you very much for your time.



EXAMINATION
QUESTIONS BY MR. CURLEY:
Q. If you go back for just a moment to Ex. 408 and 409, that's the June 3 application and waiver letter?
A. Okay. Uh-huh.
Q. Those are both stamped received by the Department of Natural Resources Explosives and Aggregate Division?
A. Right.
Q. Are you the person that would have put that "received" stamp on there?
A. No.
Q. Okay. When you saw it, when you saw these, had that stamp already been placed on there?
A. Yes.
Q. And I just want to be sure in connection with Plaintiff's Ex. 407, that's the very first one that I showed you, and I had drawn your attention to the emails back and forth between you and Maureen on June 2 in the middle of that chain of emails. Maureen did tell you at that time that she was applying for the bomb tech position, correct?
A. Right.



MR. PARKER: Objection, asked and answered.
Q. She did not tell you that she was a bomb technician, did she?
A. No, because I wouldn't have known that because I didn't have the application yet.
Q. Right. But she told you that she was applying for the bomb tech?
A. Right, right.
MR. CURLEY: Thank you.
MR. PARKER: All done?
MR. CURLEY: Sorry. Done.
MR. PARKER: No further questions.
VIDEOGRAPHER: Okay. The deposition is concluded. The time is 11:59. We are off the record.

CERTIFICATE OF REPORTER

I, JENNIFER L. CROWE, a Certified Shorthand Reporter within and for the State of Illinois, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

____________________________
License No. 084.003786



MAGNA LEGAL SERVICES

# Tab D

# Deposition Designations

# Todd Schmitt

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| The City objects to all deposition testimony designated for Todd Schmitt because Plaintiff has not demonstrated the deponent is unavailable under Rule 32. | | | | |
| Tr. 4:9-20 | | | | |
| Tr. 5:5-9 | | | | |
| Tr. 5:12-17 | | | | |
| Tr. 6:12-16 | | | | |
| Tr. 7:3-22 | | | | |
| Tr. 8:14-9:16 | | | | |
| Tr. 12:17-13:6 | | | | |
| Tr. 14:20-15:13 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 17:13-18:10 | | | | |
| Tr. 19:3-7 | | | | |
| Tr. 20:6-13 | | | | |
| Tr. 21:2-22:10 | | | | |
| Tr. 23:1-4 | | | | |
| Tr. 24:6-9 | | | | |
| Tr. 24:18-25:9 | | | | |
| Tr. 26:18-23 | | | | |
| Tr. 27:3-19 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 28:4-29:5 | | | | |
| Tr. 30:22-33:19 | | | | |
| Tr. 34:5-36:3 | | | | |
| Tr. 36:9-24 | | | | |
| Tr. 37:21-38:3 | | | | |
| Tr. 38:17-39:4 | | | | |
| Tr. 39:8-18 | | | | |
| Tr. 39:23-41:15 | | | | |
| Tr. 43:18-19 | Foundation. Witness testified he did not remember what meeting he attended. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 44:1-13 | Foundation. Witness testified he did not remember what meeting he attended. | | | |
| Tr. 45:2-9 | | | | |
| Tr. 45:13-46:2 | Form, compound. | | | |
| Tr. 46:6 | Form, compound. | | | |
| Tr. 46:8-21 | Misleading | 46:8-47:19 | | |
| Tr. 47:20-48:4 | | | | |
| Tr. 48:7-10 | Form, leading, calls for speculation. Foundation. | | | |
| Tr. 48:14-16 | Form, leading, calls for speculation. Foundation. | | | |
| Tr. 49:4-24 | Form, vague and ambiguous; Foundation. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 50:3-15 | Form, vague and ambiguous, Foundation. | | | |
| Tr. 50:20-51:14 | | | | |
| Tr. 52:23-53:17 | Form, vague and confusing 53:14-17 | | | |
| Tr. 54:1-55:5 | Form, vague and confusing. Foundation. 55:4-5. | | | |
| Tr: 55:8 | Foundation | | | |
| Tr. 55:10-11 | Foundation | | | |
| Tr. 55:14 | Foundation | | | |
| Tr. 55:16-56:6 | Foundation | | | |
| Tr. 56:12-15 | Foundation. Form, leading, calls for speculation. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 56:19 | Foundation. Form, leading, calls for speculation. | | | |
| Tr. 56:21-57:10 | Form, vague or ambiguous, calls for speculation. Foundation. | | | |
| Tr. 57:13-24 | Form, vague or ambiguous, calls for speculation. Foundation. | | | |
| Tr. 58:16-21 | | | | |
| Tr.59:3-61:2 | | | | |
| Tr. 63:8-22 | Foundation | | | |
| Tr. 64:2-3 | Foundation | | | |
| Tr. 64:5-7 | Foundation | | | |
| Tr. 64:10 | Foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 64:12-19 | Foundation | | | |
| Tr. 64:22-24 | Foundation | | | |
| Tr. 65:20-66:19 | | | | |
| Tr. 66:23-67:14 | | | | |
| Tr. 67:24-68:17 | | | | |
| Tr. 68:19-69:8 | Foundation | | | |
| Tr. 69:11-71:18 | Foundation | | | |
| Tr. 72:3-6 | Foundation | | | |
| Tr. 72:11-73:22 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 74:3-4 | | | | |
| Tr. 74:6-75:7 | | | | |
| Tr. 75:20-76:14 | | | | |
| Tr. 80:5-17 | | | | |
| Tr. 80:20-81:20 | | | | |
| Tr. 82:15-17 | | | | |
| Tr. 83:4-84:2 | | | | |
| Tr. 84:13-85:6 | Form, compound, vague and ambiguous, leading. Foundation. | | | |
| Tr. 85:9 | Form, compound, vague and ambiguous, leading. Foundation. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 85:11-16 | Form, compound, vague and ambiguous, leading. Foundation. | | | |
| Tr. 85:19-21 | Form, compound, vague and ambiguous, leading. Foundation. | | | |
| Tr. 85:23-87:2 | Form, vague and ambiguous, leading. Foundation. 87:1-2 | | | |
| Tr. 87:6-12 | Form, vague and ambiguous, leading. Foundation. | | | |
| Tr. 87:14-88:13 | Foundation. 88:13 | | | |
| Tr. 88:16-17 | Foundation | | | |
| Tr. 88:19-89:5 | Foundation | | | |
| Tr. 89:8-9 | Foundation | | | |
| Tr.89:11-12 | Form, calls for speculation. Foundation. | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 89:15 | Form, calls for speculation. Foundation. | | | |
| Tr. 89:17-90:4 | | | | |
| Tr. 93:3-94:8 | | | | |
| Tr. 95:2-17 | | | | |
| Tr. 96:5-6 | Form, vague and ambiguous | | | |
| Tr. 96:9 | Form, vague and ambiguous | | | |
| Tr. 96:23-97:8 | Form, compound, vague and ambiguous. Foundation. | | | |
| Tr. 97:12-14 | Form, compound, vague and ambiguous. Foundation. | | | |
| Tr. 102:9-104:4 | Form, vague and ambiguous. 104:1-4 | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 104:7-9 | Form, compound, vague and ambiguous. | | | |
| Tr. 104:12-13 | Form, compound, vague and ambiguous. | | | |
| Tr. 105:9-10 | Form, compound, vague and ambiguous. | | | |
| Tr. 105:13-107:19 | Form, compound, vague and ambiguous. | | | |
| Tr. 109:23-24 | Foundation. 107:116-19 | | | |
| Tr. 110:6-9 | Foundation | | | |
| Tr. 110:11-16 | | | | |
| Tr. 113:8-13 | | | | |
| Tr. 113:24-115:24 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 116:6-13 | Foundation | | | |
| Tr. 116:18-117:13 | Foundation | | | |
| Tr. 117:16-118:10 | Form, vague and ambiguous, calls for speculation. 118:8-10 | | | |
| Tr. 118:13-16 | F, vague and ambiguous, calls for speculation. 118:8-10 | | | |
| Tr. 118:24-120:11 | | | | |
| Tr. 121:5-6 | Form, vague and ambiguous. | | | |
| Tr.121:11-15 | Foundation, form, speculation | | | |
| Tr.121:18 | Foundation, form, speculation | | | |
| Tr.121:20-24 | Foundation, form, speculation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 122:5-21 | Foundation, speculation | | | |
| Tr. 123:3 | Foundation, speculation | | | |
| Tr. 123:10-124:5 | Foundation, speculation. 124:3-5 | | | |
| Tr. 124:8 | Foundation, speculation | | | |
| Tr. 124:10-17 | Foundation, form, speculation | | | |
| Tr. 124:20 | Foundation, form, speculation | | | |
| Tr. 124:22-125:13 | | | | |
| Tr. 128:8-131:12 | | | | |
| Tr. 134:13-20 | Foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 135:1-19 | | | | |
| Tr. 135:23-136:8 | | | | |
| Tr. 136:18-137:2 | | | | |
| Tr. 138:12-22 | Form, asked and answered. 138:19-22 | | | |
| Tr. 138:24 | Form, asked and answered. | | | |
| Tr. 139:2-22 | | | | |
| Tr. 141:6-13 | | | | |
| Tr. 142:6-13 | Form, speculation | | | |
| Tr. 142:16-20 | Form, speculation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 142:22-143:3 | Foundation, speculation | | | |
| Tr. 143:23-144:9 | Foundation, speculation | | | |
| Tr. 144:16-19 | Foundation, speculation | | | |
| Tr.146:3-147:7 | Foundation | | | |
| Tr. 147:10-13 | Foundation, speculation | | | |
| Tr. 147:16 | Foundation, speculation | | | |
| Tr.147:18-148:5 | | | | |
| Tr. 148:9-19 | Foundation, speculation | | | |
| Tr. 148:24-149:15 | Foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 149:19-150:4 | Foundation | | | |
| Tr. 150:7-8 | Foundation | | | |
| Tr. 150:10-151:4 | | | | |
| Tr. 152:11-12 | Foundation, mischaracterizes testimony | | | |
| Tr. 152:16-18 | Foundation, mischaracterizes testimony | | | |
| Tr. 154:5-18 | | | | |
| Tr.155:9-15 | | | | |
| Tr. 155:18-20 | Foundation | | | |
| Tr. 155:24 | Foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972
**Deposition Designation Chart – Todd Schmitt**
Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 156:16:157:8 | | | | |
| Tr. 157:15-158:20 | | | | |
| Tr. 159:10-19 | Form, vague and ambiguous | | | |
| Tr. 159:22 | Form, vague and ambiguous | | | |
| Tr. 159:24-160:7 | | | | |
| Tr. 162:19-164:4 | | | | |
| Tr. 166:3-5 | Form, vague and confusion, foundation | | | |
| Tr. 166:14-167:5 | Form, vague and confusion, foundation | | | |
| Tr. 167:9 | Form, vague and confusion, foundation | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 168:22-169:18 | | | | |
| Tr. 170:6-13 | | | | |
| Tr. 171:5-172:6 | | | | |
| Tr. 173 14-174:18 | | | | |
| Tr. 176:24-177:6 | | | | |
| Tr. 177:12-178:8 | | | | |
| Tr. 178:11-19 | Foundation | | | |
| Tr. 179:9-13 | | | | |
| Tr. 179:22-180:3 | | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr. 183:5-9 | Foundation | | | |
| Tr. 183:13-184:5 | Foundation | | | |
| Tr. 184:8-9 | Foundation | | | |
| Tr. 184:14-15 | Foundation, asked and answered | | | |
| Tr. 184:19 | Foundation, asked and answered | | | |
| Tr. 184:24-185:23 | Asked and answered, witness is repeatedly telling counsel he does not recall | | | |
| Tr. 186:14-18 | Foundation | | | |
| Tr. 186:21-189:6 | Foundation, relevance | | | |
| Tr. 189:14-16 | Relevance | | | |

Maureen Bresnahan v. City of Chicago – No. 18CV1972

**Deposition Designation Chart – Todd Schmitt**

Witness: Todd Schmitt; Deposition Date August 24, 2021

| Designation | Objection/ Concise Basis | Counter-Designation if Objection Overruled | Counter-Designation | Objection to Counter-Designation/Concise Basis |
|---|---|---|---|---|
| Tr.189:21-24 | | | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MAUREEN BRESNAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 18-CV-1974 |
| | ) | |
| CITY OF CHICAGO, et al, | ) | |
| | ) | |
| Defendants. | ) | |

The videoconference discovery deposition of TODD SCHMITT, taken pursuant to the provisions of the Code of Civil Procedure and the Supreme Court Rules of the State of Illinois pertaining to the taking of depositions for the purpose of discovery, taken before DEANNA L. TUFANO, Certified Shorthand Reporter of the State of Illinois, wherein all present attended remotely, on July 20, 2021, at 9:30 a.m.

Reported for:
MAGNA LEGAL SERVICES
(866) 624-6221
www.magnals.com, by:
Deanna L. Tufano, C.S.R.

APPEARANCES: VIA VIDEOCONFERENCE

ROBINSON CURLEY, P.C.
MR. C. PHILIP CURLEY
MS. CYNTHIA H. HYNDMAN
300 South Wacker Drive, Suite 1700
Chicago, IL 60606
(312) 663-3100
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
on behalf of the Plaintiff;

MICHAEL BEST & FRIEDRICH, LLP
MR. CHRISTOPHER R. PARKER
444 West Lake Street, Suite 3200
Chicago, IL 60606
(312) 222-0800
crparker@michaelbest.com
on behalf of the City of Chicago;
U.S. ATTORNEY'S OFFICE
MR. ALEX HARTZLER
219 South Dearborn Street
Chicago, IL 60604
(312) 886-1390
alex.hartzler@usdoj.gov

and

FBI OFFICE OF COUNSEL
MR. DAVID HABICH
2111 West Roosevelt Road, Chicago, IL 60608
(312) 829-3095
mdhabich@fbi.gov

on behalf of the Todd Schmitt;

Reported BY: DEANNA L. TUFANO, CSR
LICENSE NO. 084-003819
Videographer: Bob Behrens



INDEX


| WITNESS | PAGE |
|---|---|
| TODD SCHMITT | |
| Examination by Mr. Curley | 5 |


EXHIBITS


| Exhibit | Page |
|---|---|
| Exhibit No. 36 | 40 |
| Exhibit No. 47 | 40 |
| Exhibit No. 78 | 44 |
| Exhibit No. 43 | 58 |
| Exhibit No. 33 | 65 |
| Exhibit No. 103 | 108 |
| Exhibit No. 78 | 113 |
| Exhibit No. 41 | 139 |
| Exhibit No. 85 | 142 |
| Exhibit No. 102 | 147 |
| Exhibit No. 48 | 156 |
| Exhibit No. 135 | 166 |
| Exhibit No. 136 | 169 |
| Exhibit No. 71 | 172 |
| Exhibit No. 138 | 172 |
| Exhibit No. 137 | 173 |
| Exhibit No. 141 | 178 |
| Exhibit No. 101 | 181 |
| Exhibit No. 148 | 183 |
| Exhibit No. 145 | 186 |
| Exhibit No. 146 | 187 |




THE VIDEOGRAPHER: Good morning. We are now on the record. Today's date is Tuesday, July 20, 2021, and the time is now approximately 9:30 a.m. central time. This begins the videotape deposition of Todd Schmitt in the matter of Maureen Bresnahan versus the City of Chicago, et al.
Will counsel please identify yourselves for the record.
MR. CURLEY: Good morning. My name is Philip Curley. I represent the Plaintiff, Maureen Bresnahan.
MS. HYNDMAN: Good morning. My name is Cynthia Hyndman. I also represent the Plaintiff, Maureen Bresnahan.
MR. PARKER: Good morning. My name is Chris Parker. I represent the Defendants in this matter, the City of Chicago as well as Sergeant Jim Egan.
MR. HARTZLER: Good morning. This is Alex Hartzler from the U.S. Attorney's office representing the witness, and I believe we've also got on the line David Habich, H-A-B-I-C-H from the FBI Office of Counsel.
THE VIDEOGRAPHER: Will the court reporter please swear in the witness.
THE COURT REPORTER: Before I do that, will you guys agree individually that you will -- that I can swear in



the witness remotely.
MR. CURLEY: Yes.
MR. PARKER: Defendants agree.
MR. HARTZLER: No problem from the witness's counsel.
(Witness sworn.)
TODD SCHMITT,
called as a witness herein on behalf of the Plaintiff having been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. CURLEY:
Q Good morning. Could you please tell us your name and spell your last name for the reporter?
A It's Todd, middle name is Troosten, T-R-O-O-S-T-E-N. Last name is Schmitt, S-C-H-M-I-T-T.
Q Thank you. Where do you live, Mr. Schmitt?
A I live in Schererville, Indiana.
Q Can you give us your street address there?
MR. HARTZLER: Hold on. I apologize. Can we go off the record for just one second.
THE VIDEOGRAPHER: This ends media unit number one in the deposition of Todd Schmitt. The time is 9:32 a.m. We're going off the record.
(Off the record.)



MAGNA LEGAL SERVICES

THE VIDEOGRAPHER: This begins media unit number two in the deposition of Todd Schmitt. The time is 9:33 a.m. We're back on the record.
MR. HARTZLER: This is Alex Hartzler. We just had a discussion off the record and I think everyone's in agreement that the FBI and the U.S. Attorney's Office will facilitate, you know, getting a trial subpoena or whatever needs to happen down the line to the witness should that be necessary in the future.
MR. CURLEY: Thank you. I appreciate that.
BY MR. CURLEY:
Q Could you tell us then, Mr. Schmitt, your work address?
A Yes. It's the FBI, Federal Bureau of Investigation, 2111 West Roosevelt, Chicago, Illinois, 60608.
Q Are you married, sir?
A Yes.
Q Are you not hearing my questions?
A I answered yes.
Q How long have you been married, sir?
A 26 years.
Q Do you have any children?
A Yes, three sons.



Q What are their ages?
A 23, 21, and 17.
Q Could you please tell us the year that you graduated from high school and the high school from which you graduated?
A 1986 and Jasper High School in Jasper, Indiana.
Q What was your first full-time employment after high school?
A The Bloomington, Indiana Police Department.
Q Did you attend Indiana University, sir?
A Yes.
Q When did you graduate from there?
A 1991.
Q Did you also serve as an Indiana University Police Officer while at the school?
A Yes, sir, on a part-time basis, yes.
Q Did you first apply for admission to Indiana University, and then join the Indiana University Police Officer Squad?
A Yes, yes.
Q What was your major at Indiana?
A Criminal justice.
Q Can you describe in general the courses you took as a criminal justice major?



A Just basic law classes and investigative and social interaction type of courses involving law enforcement. It's, you know, several years ago. I don't remember all the courses, but it's the general -- it was a bachelor's of art from Indiana University.
Q What department was criminal justice in?
A It's own department.
Q Did you have any minors while you were at Indiana?
A No, sir.
Q Did you take any science courses?
A I'm sure I did. Whatever the required courses to graduate, I don't recall.
Q Did you have any bomb-related classes or instruction as either an Indiana University undergraduate or as a police officer at the university?
A No.
Q Were you personally involved in any bomb-related incidents while serving as an Indiana University Police Officer?
A No.
Q Did you attend the -- any sort of academy for or prior to your service as an Indiana University Police Officer?



A The Indiana University Police Academy, which is certified through the State of Indiana Law Enforcement Training Board.
Q How many were in your class?
A 40, 50, I don't recall.
Q Do you know where you ranked in that class?
A No.
Q You mentioned the Indiana -- or the Bloomington, Indiana Police Department. Did you join that department after you graduated from Indiana University?
A I joined the police department prior to graduating. I had two classes to go for my degree, so I completed that while working in Bloomington.
Q When did you start at the Bloomington Police Department then?
A October of '90, 1990.
Q And did you start in a full-time position?
A Yes.
Q Did you begin your work at the Bloomington Police Department as a patrol officer?
A Yes.
Q Is that an entry level position?
A Yes.
Q Was there some sort of an application process for

the Bloomington Police Department?
A Yes.
Q Was there a written examination?
A I believe so, but I don't recall. I think so.
Q Was there an oral interview?
A Yes.
Q Can you describe any other parts of the application process other than written examination and oral interview?
A I mean, it's similar to any other department. There was a physical agility test. I don't think -- I don't remember if they had polygraph or if they had the voice -- it's similar to the polygraph. It's a voice analyzer test. I forget which one Bloomington used, and then the background check.
Q Did you attend the police academy?
A The Indiana University one is a state certifying academy, so I did not have to attend another one to start my employment with Bloomington.
Q What were your duties and responsibilities as a patrol officer?
A Working the assigned shift, answering calls through service that would come up during the time. I'm also was a member of the Bloomington SWAT Team and a



member of the Bloomington Scuba Dive Team.
Q Did you have to take any special training to become a member of the SWAT Team?
A Yeah. We attended a SWAT basic course up in Marion County up in Indianapolis, Indiana and just the training.
Q Who ran that SWAT training?
A Marion County Sheriff's Department.
Q Any other special training before you became a member of the SWAT Team?
A No.
Q How long did you remain a patrol officer with Bloomington?
A Probably two, three years, and then I was assigned to narcotics for about a year to two years.
Q Did you apply -- did you become a narcotic's detective?
A No. I was a narcotic's officer, I wasn't promoted to a detective. We were just assigned -- narcotics in Bloomington, they would assign officers over there on a temporary or -- you know a revolving couple year assignment you'd go over there. But I still was classified as patrolman and officer, not a detective.
Q Were you ever a detective with the Bloomington



Police Department?
A No.
Q Did you apply for the position on the Narcotic Squad at Bloomington?
A Yes.
Q Can you describe for us that application procedure?
A It was -- if I remember correctly, it was more as a canvas for an opening, guys who were interested applied, or you know submitted that they were interested in and department made a selection. I am not sure -- I don't remember any other details to the process.
Q Did you have any additional training before you were assigned to the Narcotics Division?
A Just some in-services we attended, and you know, more on-the-job training.
Q Did you have any bomb-related classes or instructions while employed by the Bloomington, Indiana Police Department?
A No.
Q Did you personally respond as a Bomb Technician to any bomb-related incidents while at the Bloomington, Indiana Police Department?
A No. I was not a Bomb Tech at the Indiana Police



Department, no.
Q What was your next employment after Bloomington?
A The United States Drug Enforcement Administration, DEA as a Special Agent.
Q When did you work for the DEA?
A '96 to 2000.
Q Can you describe for us the application process you went through to become a Special Agent at the DEA?
A Submitted an application, I believe there was some type of written test, then some type of interview, and then the -- similar to Bloomington, the agility test, PT test, polygraph, background check, et cetera.
Q Is there a DEA Academy or similar DEA training?
A Yes, in Virginia. It's at the same compound as the FBI Academy in Quantico, Virginia. We're both Department of Justice.
Q And did you attend that DEA Academy?
A Yes.
Q When was that?
A In I want to stay I started in June of '96 and graduated October of '96, I think. I may be getting my academies confused. But '96 is when I started.
Q How many were in your DEA Academy class?
A Just to clarify. I graduated in June of '96 and



MAGNA LEGAL SERVICES

Page 14

would have started earlier than that, I believe. I don't know -- my start date with the Federal Government is June of '96, so I would have started the academy then. I'm sorry what was your question?
Q Sure. How many were in your class at the DEA Academy?
A Approximately 50. They try -- most academies that I've attended try to about a 50 man-- 50 man/woman/person class.
Q Did they rank the class when the training was completed?
A They didn't -- no rank. There were some awards that they gave to top academic, top physical fitness person, top shooting person, so...
Q Did you receive any of those awards?
A I was the top -- they call it a top gun, top marksman for my DEA and for the FBI class, both classes.
Q Any other awards?
A No.
Q Did you receive any bomb-related classes or instruction while employed by the DEA?
A No.
Q Did you remain a Special Agent the entire time you were at the DEA?

Page 15

A Yes, yes. That's the only -- yes.
Q You didn't have any other titles or jobs there?
A No. I worked at Narcotics Investigations, and I also was a member of the Clandestine Lab Team that we would go in and process clandestine lab scenes, chemicals and stuff and dismantle those.
Q Did you personally respond to any bomb-related incidents while at the DEA?
A No.
Q What was your next employment?
A Federal Bureau of Investigation.
Q When did you start there?
A January of 2000.
Q Why did you decide to switch from the DEA to the FBI?
A I didn't want to work drugs for the rest of my career, you know. It's a tasking job, and you know, just wanted -- FBI provided more broad different investigation, different things you could get involved, work and different things. So I applied and decided to accept the position when it was offered to me.
Q Can you describe for us the application process you went through for the FBI?
A The written test, and if you passed the written

Page 16

test or was competitive, you were -- you had a panel interview, and then after that, if you passed or were ranked competitive after the interview, you were -- started the conditional offer and we would background and physical fitness test again and polygraph, and that's basically just a background and polygraph were the big things.
Q And then if you passed all of those, you attended the FBI academy; is that right?
A Yes, sir.
Q What was the nature of the written examination? In other words, was it an intelligence test or did it measure aptitude of some kind, or was it some other kind of test?
A I don't recall, sir. I know there was some -- yeah. I think it was basic -- I remember there was some math and there and different things, but I don't recall. It's been so long.
Q And you mentioned that that test was competitive, what did you mean by that?
A You were -- if I remember correctly, you either passed or failed. You passed it -- it was either passed or fail. You were, I guess, put in a group that you passed the exam, and then whoever looks at your overall

Page 17

application itself and if you're competitive candidate, you were asked to do an interview.
Q So you were competing with the other candidates, that's what you meant?
A Sure, yeah.
Q How many people served on the interview panel?
A Maybe three, four.
Q Were they all FBI employees?
A All FBI agents if I remember correctly, yes.
Q How were they chosen?
A I don't know. It's a process the FBI does to do that I'm not sure.
Q What was your first assignment with the FBI?
A I was assigned to the Chicago office and assigned to a Drug Squad for drug investigations.
Q So you were a Special Agent with the Drug Squad; is that correct?
A Yes.
Q When did you serve in that capacity, how long?
A When I got to Chicago in maybe May of 2000 until 9/11/2001.
Q Did you have any bomb-related classes or instruction while assigned to the FBI Drug Squad?
A No.



MAGNA LEGAL SERVICES

Page 18

Q Did you personally respond to any bomb-related incidents while assigned to the FBI Drug Squad?
A No.
Q What was your next assignment at the FBI?
A After 9/11/2001, as you know, a lot of the FBI's resources investigations returned to counter-terrorism, so I was -- we were building up our Counter-Terrorism Squad, so I volunteered to go to a Counter-Terrorism Squad and worked down there and worked Al-Qaeda related incidents.
Q When you said down there, what did you mean?
A Well, at the time, we were at the federal 20 -- federal building is where the FBI office was. I believe we were on the 7th, 8th, and 9th floor, or something like that, and the Drug Squads were on the top floor of our three floors and the CT Squads were on the bottom floors. So when I say down there, that's what I'm referring to.
Q Just down to a lower floor?
A Yeah, that's it so.
Q Was that on the -- or did you join the Joint Terrorism Task Force, is that what it was called?
A At the time I don't think it was called that, sir, but that's what it is now.
Q Okay. And whatever it was called, you began with

Page 19

that Task Force in 2001, correct?
A Yes.
Q And how long did you remain a member of that Task Force?
A Until today, I'm still -- all of the terrorism squads are part of the Joint Terrorism Task Force, so I'm still technically under that umbrella today.
Q I think you mentioned if I heard it correctly in your answer a moment ago, all of the terrorist squads are assigned to that Task Force, did I hear that correctly?
A Basically yes, yes.
Q What are the Terrorist Squads?
A What are they.
Q Yes, sir.
A I don't understand. What's your question, sir? We have different squads that assign counter-terrorism investigations, International Terrorism Squads, Domestic Terrorism Squads and such.
Q And which Terrorism Squad are you assigned to?
A I'm assigned to what's called Counter-Terrorism Squad 8, which are w -- Weapons of Mass Destruction people are on there. Our Bomb techs are on there. Special event people are on there. Crisis Response Team people are on there. Kind of more of a specialty squad.

Page 20

Q Are your responsibilities in that regard national or were they limited to Chicago?
A Global. We -- the FBI -- we have the agents assigned all over the world, and we will -- if needed, we will shift resources around when needed.
Q Are your own particular responsibilities focused more in the Chicago area?
A I'm primarily assigned to the Chicago office, and we have a -- Chicago office has a region that we cover, and that's our primary area of responsibility. But if, for example, Springfield needs something, we would send resources down there and, you know, if Milwaukee needs something, we'll go up there and such, so...
Q Was there any application process prior to your joining the Joint Terrorism Task Force, or did you just volunteer?
A Yeah. I mean, at the time like you said, the FBI was increasing Counter-Terrorism Squads and if I remember at the time, every squad had to give up two bodies to go down there, and I volunteered to go.
Q Was there any special training required to become a member of the Task Force?
A Just different in-services over the years that we go to learn, you know, specialty stuff for the type of

Page 21

work we do.
Q But at the time in 2001, was any special training required for you to become a member of the Task Force?
A No, no. We just -- every FBI agent is able to work any violation. I mean, you may have -- you may not have the specialty to know the thing, but basically an investigation is an investigation. We investigate violations of the federal statute, so any agent can do that.
Q But you don't recall any special training before you started as a member of the Task Force, correct?
A No, no. We were kind of all hands-on based on what was going on in the world.
Q Did you at sometime become a Special Agent Bomb Technician?
A Yes.
Q When was that?
A Maybe 2006 -- 2005 or 6, that time frame approximately.
Q Did you attend any bomb-related classes or instruction while assigned to the Task Force before 2006?
A I don't believe so.
Q Was 2006 the first time in your career that you served in an official bomb-related capacity?



MAGNA LEGAL SERVICES

A Yes. In 2000 -- at that time frame, I don't recall. I'm trying to remember the date when I went down there, but it was that general time frame.
Q And that was the first time you had served on a bomb squad of any kind, correct?
A Yes.
Q So that was about 15 or 16 years after you began your law enforcement career as a police officer with the Bloomington Police Department, right?
A Yes.
Q Were you required to first serve five years as an FBI Special Agent before you could even apply for the Bomb Tech Position?
A I don't think so, no. I don't know what the FB -- I don't remember what the -- at the time the FBI's requirements were.
Q Have you ever served in the military?
A No, sir.
Q Were you eligible to serve in the military but chose not to?
A Yes.
Q In other words, you didn't have any medical deferment or anything like that?
A No.



Q Did you personally respond to any bomb-related incidents while at the FBI before that 2005, 2006 time period?
A No, I don't believe so. Well, I mean, no, no.
Q Can you tell us any special training that you had before you became, I'm going to call it, refer to it as an SABT, Special Agent Bomb Technician, is that the acronym you folks use?
A Yes.
Q Can you describe for us any special training before you became an SABT?
A Related to -- I was on the -- prior to that, I was and still am a member of the FBI SWAT Team, so I went to our basic SWAT school, our WMD SWAT school, you wear the mask and the different things to operate in a hazard environment. I had to -- I was a sniper for the SWAT Team. I was a Firearm's Instructor for the FBI, Defensive Tactic Instructor for the FBI, a number of different in-services related to tactics and different investigations. I know there is -- we all had to go to a counter-terrorism investigative conference or in-service. Prior to going to bomb school, every candidate has to go to a hazmat, become a Hazmat Tech, similar to what you would think as a fire department wear the tanks and the



mask and they work in the hazardous environment. I went down to Anniston, Alabama, and I believe before I went, I think I attended a Post Blast School in Chicago. Everybody has to do that, but I'm not sure when I did that.
Q Before you became an FBI Bomb Technician, were you required to attend and complete the training at the Hazardous Device School?
A Yes.
Q And that was and is run by the FBI, correct?
A It is now. When I went through, it was a joint partnership, if you want to call, it between the Army, the United States Army, and the FBI. Probably several years ago, maybe 8, 9 years ago, the Army got out of it and the FBI took over 100 percent. So it's funded and ran by the FBI for our state and local partners and our federal agencies that have bomb squads.
Q Did you have to undergo any special bomb-related training other than the FBI Hazardous Device School before becoming a Bomb Technician?
A Just to become a Hazmat Tech that everybody has to do that. So that's at Anniston, Alabama training.
Q Anything else other than the hazmat and the HDS?
A No.



Q Local and state police bomb squads across the country send their bomb squad candidates to the FBI HDS program, correct?
A All certified bomb squads in the United States, local police departments, sheriff's departments, state, and some fire departments all certify through the state will send them there. Yeah, I think there's 400 and some odd certified squads across the United States, I believe that's -- 400 something, something like that.
Q Does the FBI impose any requirements of it's own on those state and local candidates before they are excepted into the HDS program?
A There are requirements and through us and what's called the National Bomb Squad Commanders, NBSCAB, the group that they kind of set the national guideline for what requirements are.
Q Do those include medical and physical requirements?
A Yes.
Q Any other requirements?
A You know, they require -- I think there's the height and weight one and required to be able to function in the bomb suit. Some people -- before getting down there, some people don't know but they are



MAGNA LEGAL SERVICES

Page 26

claustrophobic, and they want you to run through in a bomb suit, make sure you can perform in a bomb suit.
Q Anything other than height and weight and physical agility?
A I'd have to look at the guidelines. I don't remember. Those are the basic once.
Q The state and local police bomb squads decide in the first instance who they want to send to the FBI HDS program?
A Can you repeat that. I don't understand the question, sir.
Q Sure. Do the state and local bomb squads decide in the first instance who they want to send to the FBI Hazardous Device School program?
A The first instance, I don't know what --
Q I'll try and rephrase it. I'll try and rephrase it.
Does the FBI propose to state and local bomb squads who should go to its HDS school?
A Do we, no.
Q So the state and local bomb squads decide who they want to send to the HDS school, correct?
A Yeah. They submit candidates to us, yes.
Q And then the candidates have to comply with those

Page 27

requirements you've described, correct?
A Yes.
Q And once the candidates successfully complete the HDS program, do they become FBI Certified bomb technicians?
A Yes.
Q Does the FBI have any other requirements for candidates becoming a certified Bomb Technician other than completing the HDS program?
A No. I don't belief so, no.
Q Do you also serve as an FBI Special Agent Bomb Technician Coordinator?
A Yes. I am assigned as a Bomb Tech Coordinator for the Chicago Division at the FBI, yes.
Q When were you first assigned as coordinator?
A Maybe '09, 2010, something like that.
Q Did you have to undergo any additional training to become a coordinator?
A No.
Q As a coordinator, did you take on any administrative duties you had not had before?
A Other bomb techs in the FBI, we share administrative stuff, but I'm responsible for making sure they're done and our budges and coverage and such, and

Page 28

I'm kind of the -- I am the liaison between our management and the bomb program stuff. So yes, more responsibilities and admin stuff, yes.
Q Have you pursued any formal postgraduate education since you graduated Indiana University?
A No.
Q Can you tell us any professional certifications you currently hold?
A No. Just different incerpts just through the FBI and stuff. No, not special certifications, no. Not that I can think of offhand.
Q You're an FBI certified Bomb Technician, correct?
A Yes.
Q And that requires recertification every three years, correct?
A Yes.
Q Are you certified as a Bomb Technician by any other group or association?
A No.
Q Are you also certified in Hazardous Materials Technology?
A No. Hazard technician not -- yeah. There's OSHA requirements to keep us -- that we can maintain the work in a hazardous material -- hazardous environment.

Page 29

Q But are you certified as a -- in connection with hazardous materials at all by any professional organization or group?
A No. Just to -- we -- through the FBI keep us, you know, training up.
Q If you're certified by the FBI in connection with hazardous materials, do you get some sort of certificate or what's the record of that?
A Just to keep our, you know, monthly training up and different things. You know, it's not really a certificate, no.
Q Other than perhaps through the FBI, are you -- have you been certified by any other association or organization in connection with your work?
A Other trainings that I've been to, but the certifications it's all co-sponsored with the FBI, so it would be basically in-service trainings approved by the FBI and maybe some other vendors or such as doing.
Q Are you a certified SWAT Team member?
A Yes.
Q And are you certified by the FBI in that regard?
A Yes.
Q And is there an actual physical certificate?
A I may have got one, yeah. We may have got one 18


MAGNA LEGAL SERVICES

Page 30

years ago. I wouldn't know where it is though. We had to complete a SWAT school that is mandated by the FBI for our people.
Q And you mentioned also you were WMD certified, do you recall that?
A I went through a couple WMD related in-services. We have a WMD coordinator program that I am not -- I have not completed those classes. I went to a couple basic once, but I'm not, you know, certified through that program.
Q Are you certified by the FBI in any program other than Bomb Technician?
A No, just bomb-related specialties and stuff. I'm a -- we used to call it Police Instructor when I went through the program. It's like an FBI Instructor, I forget when they call it now, course to teach different FBI approved courses. Everybody has a general instruction course. I've been through that. But all of the rest of them are -- you're certified through -- or through the SWAT program or through the bomb program related topics.
Q You belong to any professional law enforcement associations?
A What's it called, the International Bomb

Page 31

Association or bomb -- International Bomb Technician Investigator's Association or something.
Q And what do they do?
A Just -- we'll put out like a conference in training documents and stuff like that. It's kind of a -- they send out a magazine with some topics and stuff like that just kind of a group, yeah. So I pay my dues and get the magazine, that's about all I do with it.
Q It that a networking organization more or less?
A Yes. It can be, yes.
Q Any other professional law enforcement associations which you belong to?
A No. I can't think of any. You know, we have the FBI Agent Association.
Q Is that also a networking group?
A Networking and they do -- they work with Congress to pass, you know, different laws that are, you know, help, you know, for the agency, and you know, different things. And I'm also a member of the Illinois Federal Law Enforcement Association. Kind of the same thing. They work with on topics that are of interest to Federal employees, Federal law enforcement and such, and kind of a networking thing if you want to say that.
Q And does the FLEA also do lobbying like the FBI

Page 32

Agent Association?
A I think they do, yeah.
Q Any other professional enforcement associations you belong to?
A Not that I can think of, no.
Q Have you received any professional law enforcement awards or citations during your career?
A No, I can't think of any.
Q Do you know Jim Egan at the Chicago Police Department?
A Yes.
Q Do you have a work relationship with Mr. Egan?
A Yes.
Q How long have you had a work relationship with him?
A Since he started with the bomb squad.
Q When was that about?
A I don't recall, he was -- maybe probably 10 years.
Q How would you characterize that relationship with Mr. Egan, excellent, poor, or somewhere in between?
A Between him and I?
Q Yes, sir.
A You know, I -- you know, we work well together.

Page 33

Q So you would you characterize your relationship with him as excellent; is that correct?
A Yes.
Q Can you give us a description of the nature and extent of your work relationship with Mr. Egan?
A Well, we talk and meet on a regular basis to talk about things that are going on in the city, special events that are coming up. What we need to do -- resources we help them with, any calls or investigations that we assist them on a, you know, daily basis. I don't talk to him on a daily basis, but when things come up, we will, you know, meet and discuss those things and get in Chicago and help wherever we can.
Q Approximately how many times a year do you think you see Mr. Egan in the course of your relationship with him?
A I don't know, we -- you know, it's hit or miss, but we, you know, maybe every couple weeks we'll meet for coffee or breakfast and talk about things.
Q And can you give us an idea of how many times a year you might talk to Mr. Egan in the course of your relationship with him?
A I -- it would be a guess. I don't know. I mean, there's a Chicago -- our FBI Chicago area has nine bomb


MAGNA LEGAL SERVICES

Page 34

squads, and you know, I communicate and talk to all of the commanders, you know, through my course of my responsibilities. So I couldn't give you a guess of how many times I meet with them.

Q My question was actually about talking to him on the phone. But would it be fair to say that you either meet with Mr. Egan or talk with him on the phone several times a month?

A Yes.

Q Do you consider with Mr. Egan to be a personal friend as well?

A Yeah.

Q And do you from time to time get together with Mr. Egan socially for lunch, dinner, sporting events, things of that sort?

A No, I wouldn't say that. We get together, like I said, for breakfast every -- on a semi-regular basis and discuss things that are going on or work thing. Socially, a handful of times, we got together a several years ago for -- I picked out a Christmas party thing together and that was a social thing, and then maybe some retirement parties. But I don't -- we don't meet or go out on a social -- on a regular basis. It's always with some event or so.

Page 35

Q Do you know Roland Jones who used to work with the Chicago Police Department?

A Yes.

Q Did you have a work relationship with Mr. Jones while he was at the department?

A Yes.

Q And how long did you have that work relationship with Mr. Jones?

A You know, Roland and I probably became Bomb Techs in the same time frame. So ever since he was a Bomb Tech.

Q So about 2005 or 6?

A Yeah, probably, yeah. I think he came on right around the same time I did.

Q How would you characterize your relationship with Mr. Jones as excellent --

A Yeah --

Q -- poor, or something in between?

A Yeah. Good, excellent, yeah. I have no issues with him. He works for us now.

Q Can you describe the nature and extent of your work relationship with Mr. Jones?

A He was, you know, a Bomb Tech that we would, you know, see on regular basis for calls and different events

Page 36

we would work with, and he was a part of -- him and Egan were both part of a joint team that we have with the FBI for some specialty investigations and stuff or incidents.

Q Can you tell us about that joint team?

A It's basically for a -- I can't really get into too much of it for classification, but basically we have a team of FBI and our state and local partners that would -- would be -- participate in a WMD type of a device.

Q Is it fair to say that you also met or spoke to Mr. Jones several times a month while he was at the police department?

A Yes.

Q Do you consider Mr. Jones to be a personal friend?

A Yeah, sure.

Q And you mentioned that Mr. Jones is now working for the FBI, correct?

A Yes.

Q Did you counsel or assist Mr. Jones in any way in connection with his obtaining that employment?

A I don't know. He may have put me down as a reference, but I wouldn't say assisted. You know, he put me down as a reference, I'm sure, and stuff, but that would be it.

Page 37

Q Did anyone at the FBI contact you as a reference for Mr. Jones?

A They may have. He applied for a job with us in Quantico, Virginia for a WMD related team, national team that we have. And most of the people out there knew him first -- knew him already about from working with our team out here. So they, you know, they knew him already. So I'm sure somebody called and made sure that there wasn't any issue with it, but -- or issue with him and asked me, but I can't recall for sure.

Q Would you have given Mr. Jones a positive reference if you had been contacted?

A Yes.

Q Would you advise Mr. Jones to pursue that position with the FBI?

A I don't recall. It may have been -- I may have told the different bomb techs in our division here that there were openings out there and anyone interested apply. But I don't remember going to Mr. Jones directly and telling him to apply.

Q Did you and Mr. Jones discuss the position before he applied?

A I'm sure we did, you know.

Q Do you remember what you said and what he said?



MAGNA LEGAL SERVICES

A No. I mean, he may have asked me about it, but I would have told him what the job -- what I knew what the job would entail.
Q What did you do to prepare for today's deposition?
A Just talk to our attorney and the attorney from the U.S. Attorney's Office.
Q And did you speak with Mr. Parker or any of the other counsel for the Defendants in this case?
A No.
Q Did your lawyer speak with Mr. Parker or any other attorneys for the Defendants in this case?
A I don't know who they talked to.
Q Did you look at any documents to prepare for your deposition?
A No.
Q Did you participate in the 2015 hiring process for the Explosive's Technician 1 position on the Chicago Police Department Bomb Squad?
A Yeah. I didn't remember when it was, but 2015 sounds correct, yes.
Q What was your role?
A I was on -- I forget what the city called it -- on the interview team that interviewed the candidates.



Q And you served in that role with Mr. Egan and Mr. Jones; is that correct?
A Yes. And then somebody from the Human Resources Department was present too, a couple different ladies.
Q They were present -- we'll get to that in a moment.
But you and Mr. Jones and Mr. Egan were the panel members, correct?
A If that's -- yeah, yeah. I'm not sure if that's the term that they use in the process, but yes.
Q I'm going to refer to it on some of my questions as the interview panel because that's a term I seen. When I say that, I mean you and Mr. Jones and Mr. Egan?
A Yes.
Q Thank you. Did you attend an interview and consensus meeting training session in advance of the hiring process?
A Yes.
Q Did you hear my question?
A I'm sorry. Yes, I did.
Q I guess I didn't hear your answer, sorry.
A Yes, yes, yes, I did.
Q Were you required to follow the hiring procedures discussed during that training?



A Yes.
Q I'm going to share the screen with an exhibit. It's Plaintiff's Exhibit No. 36.
A Okay.
Q Can you identify this exhibit as the training materials for the 2015 interviews and consensus meeting that you attended?
A I don't recall. I mean, it could be. I don't know.
Q Was there a PowerPoint presentation at that meeting?
A Again, I don't remember. There may have been. I don't recall.
Q But you do recall attending that training session, correct?
A Yes, yes.
Q And I'm going to ask or going to share the screen with Plaintiff's Exhibit No. 47, which is a document that was produced by Defendants in this case, and it reports to show sort of the middle of that page, this is Bates number BRES-DEF3949. It shows -- it reports to show that you attended the interview and consensus training on April 28, 2015. Does that seem right to you?
A Yes.



Q Was this the first interview and consensus training session you had ever attended?
A Yes.
Q Have you attended any other since then?
A No.
Q Why not?
A I haven't had the need to.
Q You haven't been asked to?
A I'm sorry?
Q You have not been asked to attend?
A Yes.
Q Were you given any other training documents or materials on the required hiring procedures for the Bomb Tech position?
A I don't think so. I don't recall.
Q I want to go back to Plaintiff's Exhibit 36, and on the second page. We're going to share the screen with that in a second.
A Okay.
Q On Page 2 there's a list of objectives. And looking at the first bullet point it says, understand the interview process from intake session to consensus meeting. Do you or did you understand the interview process from the intake session to the consensus

meetings?
A Did I understand their process?
Q Yes.
A To the best of my ability, yes.
Q Did you attend the intake meeting for the 2015 Bomb Technician hiring process?
A I'm not sure what you're referring to.
Q Do you know what an intake meeting is?
A Is that their testing that they did.
Q It's a meeting prior to the oral interviews?
A That our panel did? I --
Q That's my question. Let me rephrase the question.
Did you attend any meeting prior to the interviews?
A I don't recall.
Q You don't recall one way or the other?
A I don't recall if I -- yeah. I don't know if I did or not. I don't know -- I'm not really sure what you're referring to.
Q Do you know what happens at an intake meeting?
(Whereupon, an objection was made.)
THE COURT REPORTER: I'm sorry for interrupting. I



can't see anybody on the screen right now. Can you tell me who -- can you state your objection and state your name. I apologize. I didn't know who said that.
MR. PARKER: Sorry. This was Chris Parker. Object to foundation. You can answer.
THE COURT REPORTER: Thank you.
MR. CURLEY: Can you read the question back, please.
THE COURT REPORTER: Sure.
(Question read.)
BY THE WITNESS:
A I'm not really sure what the definition of an intake meeting is. I could have been there. I don't know. I am not grasping the term right now with what you're referring to. So I could have been at one, but I just don't know -- I'm just not recalling what that terminology means.
BY MR. CURLEY:
Q What was the first meeting that you attended in connection with the Bomb Technician hiring?
MR. HARTZLER: This is Alex Hartzler. I guess I'm going to object to foundation because I think he said he didn't remember what meeting he attended. But you can go ahead and answer if you understand.
BY THE WITNESS:



A Yeah, I don't recall -- I went to the training, and then I don't recall if there was like a instructional meeting before we started the interviews or we did it the morning we started interviews. I don't recall. I just remember we did interviews for the week. I don't remember if there was something I went to prior to that or not.
Q And then you attended the consensus meeting, correct?
A Afterward, yes.
Q As you sit here today, do you recall attending any other meetings during the hiring process?
A No. No, I do not.
Q I'm going to share the screen with Plaintiff's Exhibit 78.
MR. PARKER: You know -- sorry this is Chris Parker. While we have a little bit of a gap here, I just want to state for the record that we are asserting that, you know, any documents shown to this witness that are marked confidential are subject to protective order and attorneys eyes only. We considered that for the purposes of this deposition as is allowed for under the protective order between the parties in this matter.
MR. CURLEY: Certainly.



BY MR. CURLEY:
Q This is an email chain and the top email is an email from Jim Egan to you and Roland Jones dated May 22, 2015. And attached to the email is a blank Candidate Assessment Form. That starts on Page 3 of the exhibit, if we could share that with the screen. Did you have any role in drafting or preparing the Candidate Assessment Form?
A No.
Q Did you have any drafting or preparing any of the questions on the Candidate Assessment Form?
A No.
Q Did you review the Candidate Assessment Form when Mr. Egan sent it to you?
A Yes. I'm sure I -- I'm sure I did.
Q Was that the first time you had seen it?
A Yes.
Q Why did you review the form?
A Because I was asked to by Sergeant Egan.
Q The Bomb Tech interviews started just a few days later on May 27th of 2015. Do you remember that?
A I didn't know the date, but yes.
Q That's a matter of record, I suppose. Did you prepare for the Bomb Tech hiring in any way other than



MAGNA LEGAL SERVICES

attending the interview and consensus meeting training session and reviewing the Candidate Assessment Form?
MR. PARKER: I will just object to form. Sorry. Go ahead.
BY THE WITNESS:
A No, I did not. Go ahead.
BY MR. CURLEY:
Q The Candidate Assessment Form begins again on the third page of the exhibit. And if you go to the next page, Pages 2 thru 6 of the form itself, those pages give the interviewer the option of checking one of three boxes at the bottom, correct? Either candidate does not demonstrate competency, candidate demonstrates some of the competency, or candidate clearly demonstrates competency. Do you see that?
A Yes.
Q What was your understanding of competency as that word is used here in the Candidate Assessment Form?
A That would -- that would be able to work as a Bomb Tech for the City of Chicago. Just actually be able to work as a candidate.
Q What was your understanding of what candidate does not demonstrate competency meant?
MR. HARTZLER: Can I just interject. I think it's



been misquoted twice. I don't know that it matters or not, but it looks to me like it says, candidate does not demonstrate the competency, which may or not be different than candidate does not demonstrate competency.
MR. CURLEY: Thank you. If I left that word out, it was by mistake.
BY MR. CURLEY:
Q So let me rephrase the question.
What was your understanding of what candidate does not demonstrate the competency meant?
A I thought I just answered that. Was that a different question I answered prior?
Q Well, I had asked before what you understood competency to mean. Now I'm asking you what your understanding of candidate does not demonstrate the competency to mean. If it's the same, that's fine.
A Yeah. The option that the person -- candidate may struggle in being able to perform as a -- essentially perform as a Bomb Tech for the City of Chicago.
Q Did the fact that a candidate might not demonstrate the competency in one area necessarily mean the candidate was unqualified for the Bomb Tech position?
A In one area -- it would be a collective assessment of all the areas of that candidates.



Q So a candidate with the proper training, motivation, and enthusiasm could acquire whatever competency might be needed, correct?
A I suppose so, yes.
Q Did everyone who made the Bomb Tech eligibility list -- Strike that. Let me rephrase that.
Everyone who made the Bomb Tech eligibility list was still required to complete the FBI training program at the Hazardous Device School before they could become a certified Bomb Technician, correct?
MR. PARKER: I'll object to form and foundation. This is Chris Parker. You can answer.
BY THE WITNESS:
A To be -- yeah. Everybody has to complete the FBI Hazardous Device School basic certification course to be a certified Bomb Tech in the United States, so yes.
BY MR. CURLEY:
Q Can a person lacking or candidate lacking street experience still complete the FBI HDS training and become a certified Bomb Technician if they were intelligent enough?
MR. PARKER: I'll object to form. Foundation. This is Chris Parker.
BY MR. CURLEY:



Q Would you like the question read back?
A I don't know. I can't say what a person would be able to do.
Q Well, did the FBI require prior bomb-related experience of candidates before they attended the HDS training?
A No.
Q Did the FBI require any sort of prior street experience prior to a candidate attending the HDS training?
A Street experience, I am not sure what you're referring to on street experience, sir. You have to be a public safety -- full-time public safety either police officer, deputy firefighter and stuff. But there may be a two-year limit or two-year requirement before you can go, but I'm not sure what you're talking about street experience.
Q Is that a term you've ever used, street experience?
A In what -- are you referring to the working patrol type of thing?
Q Well, is that a term you've used in connection with the 2015 Bomb Tech hiring?
A I don't --



MAGNA LEGAL SERVICES

MR. PARKER: Object to form. Foundation. Go ahead.
BY MR. CURLEY:
Q Was your answer you don't recall?
A Yeah. I may have. I know what my definition is. I'm not sure what your definition is, sir.
Q Did the FBI require -- Well, strike that.
Other than the service requirements you just mentioned, did the FBI require any other experience of a candidate prior to attending the HDS training?
A No.
Q Did the interview and consensus meetings training that you attended include any training on how you should rate the candidates on the bottom of Pages 2 thru 6 of the Candidate Assessment Form, those three options?
A Yeah, I don't recall.
Q You don't recall there being any training?
A I recall going through the training. I. Don't recall the topics. I'm sure they discuss stuff and that, but I don't recall.
Q Was there any training at all on how you should rate the candidates?
A I'm sure there was, sir, but I don't recall what it was.
Q Did you discuss in general how to rate the



candidates with Mr. Egan?
A No, I don't believe so.
Q Did you discuss in general how to rate the candidates with Mr. Jones?
A No, I don't believe so.
Q Were the interviewers free to decide on their own how to rate the candidates?
A Yes.
Q Were there any numeric or other objective standards to guide the interviews?
A I'm sorry, sir. Can you repeat that, please.
Q Sure. Were there any numeric or other objective standards to guide the interviewers?
A Not that I recall.
Q Now, if you can turn to Page 7 of the Candidate Assessment Form, the page titled overall candidate rating, there is a different set of three options there. Do not recommend for hire, recommend with some reservations, and recommend candidate for hire. Do you see those?
A Yes.
Q Was there a required number of boxes that had to be checked on the prior pages as either candidate demonstrates some of the competency, or candidate clearly



demonstrates competency for you to rate a candidate recommended for hire?
A Not that I recall. You know, I don't recall.
Q Did the interview an consensus meetings training include any training on how you should rate the candidates on the overall candidate rating?
A Again, I don't recall, sir.
Q Was there any training at all on how you should rate the candidates?
A Again, sir, I don't recall.
Q Did you discuss with Mr. Egan how to rate the candidates on the overall candidate rating?
A During the interview, no, sir.
Q Did you discuss in general with Mr. Egan, in other words, not with regard to a specific candidate, but did you discuss in general with him how candidates should be rated on the overall candidate rating?
MR. PARKER: I'll object to asked and answered. You can answer. This is Chris Parker.
BY THE WITNESS:
A No, I don't recall any conversations about how to rate, sir.
BY MR. CURLEY:
Q Did you have any such discussions with Mr. Jones



on how to rate the candidate on the overall candidate rating?
A No -- this is prior to the consensus section, correct?
Q Yes. And prior to the interviews, yes?
A Oh yeah, no, sir.
Q The interviewers were free to decide on their own how to rate the candidates on the overall candidate rating, correct?
A Yes.
Q Were there any numeric or other objective standards to guide the interviewers?
A Not that I recall, no, sir.
Q Were the interviewers free to decide on their own after the interview whether to recommend a candidate for hire regardless of how they rated a candidate on the individual questions?
A One more time, sir.
MR. CURLEY: Would you read that back, please, Ms. Reporter.
(Question read.)
MR. PARKER: I'll object to form. This is Chris Parker. Go ahead.
BY THE WITNESS:



MAGNA LEGAL SERVICES

Page 54

A Yeah, yeah. I was -- are you asking was I able to make a decision on how -- on to recommend a person or not based on how I rated them?
BY MR. CURLEY:
Q Yes, sir. Without regard to how you rated them on the individual questions.
A Yes.
Q So the fact that one interviewer chose the option do not recommend candidate for hire after the interview did not mean the candidate could no longer be considered by the panel, did it?
A During the consensus part?
Q Yes.
A Yeah. I mean, if I felt someone was recommended for hire and Sergeant Egan didn't, we could -- during that consensus being we were able to talk about the different candidate and make a decision as the, you know, consensus board.
Q So even if you chose do not recommend for hire for a candidate after they interview, that candidate could still be considered at the consensus meeting, correct?
A Yeah -- yes.
Q The fact that an interviewer chose the option do

Page 55

not recommend candidate for hire after the interview did not mean that the candidate was unqualified, did it?
A No, no.
Q Mr. Egan was the hiring manager for the Bomb Technician position, correct?
MR. PARKER: I'll object to foundation. Go ahead.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q As hiring manager, Mr. Egan was responsible for the hiring process, correct?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A I -- Yes, I assume -- yes.
BY MR. CURLEY:
Q Did he tell you that?
A There was some -- there was some -- I really -- during that training, there was some reference to hiring manager. I don't recall what his responsibilities or that person's responsibilities are, but the manager -- as a hiring manager that he has some, you know, responsibility for the process.
Q Well, let's go back to Plaintiff's 36 if we can and share the screen with that exhibit. In particular

Page 56

Page 2304, which is the third page of the exhibit. Do you see there that reference to hiring manager?
A Yes.
Q And according to these training materials, the hiring manager was responsible for hiring process, correct?
A Yes --
MR. PARKER: Objection. Foundation. Go ahead.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q And that was your understanding, correct?
A Yes.
Q And the hiring manager was also the ultimate decision maker; is that right?
MR. PARKER: Objection. Foundation. Form. Go ahead.
BY THE WITNESS:
A Yes. According to this document.
BY MR. CURLEY:
Q And that was your understanding as well, correct?
A Yes.
Q Now as long as you're here on this exhibit, let's turn to Page 2308. This is a schematic of the hiring

Page 57

procedures from intake prep to consensus, but I want to focus on the entry in the middle. It says, interview. Do you see that?
A Yes, sir.
Q And to the right, do you see the entry, quote, individually evaluate candidate against hiring criteria only, with the word only in all capital letters?
A Yes.
Q Was it a violation of the hiring procedures to evaluate candidates outside the hiring criteria?
MR. PARKER: Object to form. Foundation. Go ahead.
BY THE WITNESS:
A I don't know if I -- yeah, I mean we were considering what was in the hiring thing here. I'm not sure what the city -- what was as far as violation, I'm not really sure what you're talking there, but we were to evaluate what was in front of us.
BY MR. CURLEY:
Q It was your understanding that you were required to evaluate candidates based on the hiring criteria, is that fair to say?
A Yes.
Q And the hiring criteria only, right?
A Yes.



MAGNA LEGAL SERVICES

Q What were the hiring criteria for the 2015 Bomb Technician hiring?
A From my understanding they were what they call a general -- or their canvas that they put out that listed what the job consists of and our interview questions.
Q Can we share the screen with Plaintiff's Exhibit No. 43, please. And we can scroll through this and any other exhibit, of course, if you'd like, but does this appear to you to be the -- I think you referred to it as the department canvas in a moment ago?
A Yeah, that's what -- yes. I don't know if that's a term they use, but yes.
Q I think they use the term directive, does that ring a bell with you at all?
A It could be, yes.
Q And if you turn to page Bates Page 2875, under Item H2, it says candidate will be rated in the areas of, and there's items A through E. Was it your understanding that those were the hiring criteria for the Bomb Tech position?
A I don't know, sir.
Q As you sit here today, can you remember the hiring criteria for the Bomb Tech position?
A These rating areas were -- they looked familiar



that they were related to the questions they asked for the process, the interview.
Q What were the qualities you look for when considering a candidate for an Explosives Technician position?
A What do I look for?
Q Yes, sir.
A Someone that could work under pressure, and you know have some, you know, maybe some electronic or some type of technical background, science or something that could relate to the job. Someone who mostly can work alone. The bottom line with a Bomb Tech, unlike any other thing I've ever been experienced with SWAT and different arrests and even when I worked as a patrol officer, generally you go to a stressful situation, you've got a number of different officers with you. And a squad we go in with a small army and different things. As a Bomb Tech, you're going down by yourself, you're working by yourself, and it is -- because we're not going to send unless we need to have a Bomb Tech work is required more than one person, that Bomb Tech is down there working by himself in case something goes wrong that we're not losing two to three people, we're losing unfortunately maybe one person. So that is -- you got to



be able to work in a -- by yourself and in a stressful situation. So that's what I kind of looked for something that a person could perform in.
Q Is intelligence something you look for a Bomb Technician candidate?
A I mean, a degree of intelligence, more. Yeah, I mean, yeah you got to be able to, you know, to grasp the -- of what you need to do.
Q Is electrical and mechanical aptitude something you look for?
A Those are all help in what the job we do.
Q Is quick decision making something you look for?
A Yes.
Q Anything else?
A Well, just, you know, just overall how people would be able to perform in a stressful situation.
Q Are you part of any current Chicago Police Department Bomb Tech hiring process?
A No.
Q Have you been told why you have not been asked to participate in any current Bomb Tech hiring process?
A No.
Q Was there any particular experience outside at the Chicago Police Department required for the Bomb Tech



position?
A Not that I'm aware of, no.
Q Was there any particular experience within the Chicago Police Department required for the Bomb Tech position other than three years of continuous service?
A As far as the FBI is concerned, just what I stated earlier. I'm not sure if the Chicago Police Department -- I don't recall if they had different internal requirements or such, no. There's one that we recommend -- and there's one that the FBI recommends that people have five years left before they can retire because the training is expensive and it's -- the slots are hard to come by. If a bomb squad gives me an application now for a new candidate and I process it, right now the school is running probably a year to 18 months to get that person certified. So it is a -- it is a long list down there, so we want to make sure that before we train, the people have sometime left in their career, so -- but besides those things that the FBI recommends, I'm not sure of any other Chicago requirements.
Q And in the five years left that you mentioned, that's referred to as retainability?
A Yeah.



MAGNA LEGAL SERVICES

Page 62

Q So other than the continuous service requirement and perhaps a retainability requirement was any particular experience within the Chicago Police Department required for bomb technicians?
MR. PARKER: Object --
THE COURT REPORTER: I'm sorry. Excuse me. I'm sorry, Mr. Schmitt. I didn't hear your objection. I'm sorry.
MR. PARKER: Object to foundation.
MR. CURLEY: Ms. Reporter, did you get Mr. Schmitt's answer?
THE COURT REPORTER: I did not. I did not.
BY THE WITNESS:
A Not that I know of.
BY MR. CURLEY:
Q Do you believe that a broader and more diverse set of skills and experience among members of a bomb squad is a good thing?
A Compared to what?
Q Compared to a less diverse set of skills and experience.
A I don't -- can you give me an example of what you're referring to, sir?
Q Well, for instance, candidates may have different

Page 63

experiences within the police department, correct?
A Yes.
Q Do you consider it better that candidates have a more diverse set of experience, different types of experience?
A I don't what you're -- I don't know, sir. I don't know.
Q Okay. Does Plaintiff's Exhibit 43, if we can put that back up on the screen, does that list the duties of a Bomb Technician? I think you're right on the page there, the first page under duties. Do you see that?
A Yes, sir.
Q Looking at Item B under Roman numeral 2, one duty of the Bomb Tech was to have the ability to perform all field functions. Do you see that?
A Yes.
Q What are field functions?
A I assume that refers to anything that a Bomb Tech is required to do, you know, special events, responding to calls, training, you know, and such.
Q Does that include the operational duties of the Bomb Tech?
MR. PARKER: Object to foundation. This is Chris Parker. Go ahead.

Page 64

BY THE WITNESS:
A Yeah. Those are the things I listed I would consider as operational requirements, yes.
BY MR. CURLEY:
Q Was whether or not a candidate held a good current position with the Chicago Police Department part of the hiring criteria?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A That held a what, sir?
BY MR. CURLEY:
Q That held a good current position with the police department, was that part of the hiring criteria?
A When you say good position, do you mean like in good standing not under investigation -- what are you --
Q That their current assignment in the department was a good current position, was that a part of the hiring criteria?
A I don't --
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Sir, I'm sorry. I don't work for the Chicago Police. I don't know what would be considered a good and bad assignment. I'm sorry. So I don't know.

Page 65

BY MR. CURLEY:
Q I see your water is almost empty and I'm at a breaking point before we move onto another exhibit. Do you want to take a 10 minute break, everyone?
MR. PARKER: That works for me.
MR. CURLEY: So we'll come back at 11:25.
THE WITNESS: Okay. Do we stay logged on, is that the easiest?
MR. CURLEY: I'm just going to disable my mute and my video, but I am sure we will stay on. We'll just go off the record as the videographer will soon announce.
THE VIDEOGRAPHER: This ends media unit number two in the deposition of Todd Schmitt. The time is 11:13 a.m. We're going off the record.
(Short recess.)
THE VIDEOGRAPHER: This begins media unit number three in the deposition of Todd Schmitt. The time is 11:25 a.m. We're back on the record.
BY MR. CURLEY:
Q Mr. Schmitt, we put up on the screen Plaintiff's Exhibit 33, which are the Candidate Assessment Forms for Maureen Bresnahan completed by you, Mr. Jones, and Mr. Egan and produced to us by the Defendant's attorneys. Perhaps we can just scroll through them quickly for you.


MAGNA LEGAL SERVICES

And your own Candidate Assessment Form begins on Page 228, I believe. If we can turn to that. It ends on Page 435. Can you first confirm that that is your Candidate Assessment Form for Maureen?
A Yes, it appears to be.
Q Is this the entire Candidate Assessment Form you completed for Maureen Bresnahan?
A I assume so, yes.
Q Does anything appear to you to be missing?
A I don't think so, no.
Q Have you seen Mr. Jones' and Mr. Egan's Candidate Assessment Forms for Maureen prior to today?
A No.
Q Did you take any other notes during Maureen's interview other than on your Candidate Assessment Form?
A No, I did not.
Q Were the oral interviews videotaped, recorded, or transcribed to your knowledge?
A No, I don't believe so.
Q Does the FBI do that when it interviews candidates for a Special Agent Bomb Tech position?
A No.
Q Now again, focusing our attention on Page 428, other than that the candidate name in the upper left,



which is Maureen Bresnahan, is all of the handwriting on that page, yours?
A Yes.
Q And scrolling through Pages 429 through 425 that follow, other than the name Maureen Bresnahan in the upper left, is all the handwriting on those pages also yours?
A Appears to be, yes.
Q Did Maureen say during her interview that she was unwilling, unable, or uninterested in performing any of the field functions of the Bomb Tech position?
A I don't recall. I don't think -- no.
Q You don't recall her saying that?
A No.
Q According to your notes, did Maureen say during her interview that she was unwilling, unable, or uninterested in performing any of the field functions of the Bomb Tech position?
A If you can go a little slower, if I can look at them. I haven't seen them since I've written them. Okay. I got that one (indicating). Okay. Okay. Okay. Okay. Okay. Okay. Okay.
Q All right. Let me ask the question again.
According to your notes, did Maureen



say during her interview that she was unwilling, unable, or uninterested in performing any of the duties of the Bomb Tech position?
A No.
Q According to your notes, did Maureen say during her interview that she was unwilling, unable, or uninterested in performing any of the field functions of the Bomb Tech position?
A I don't understand what the difference between questions you just asked me. But those questions weren't asked of her, but she didn't indicate anything that she wasn't willing to do it. I'm not sure what the difference between the two questions are.
Q One focused on field functions, and the other focused on operational duties. Do you consider those to be basically the same thing?
A Yes.
Q Okay. I'll move on then.
According to your notes, did Maureen say during your interview that she was more interested in administrative duties and not the operational duties of a Bomb Technician?
A All her answers were basic towards the administrative side of why she wanted to be a Bomb Tech



was to keep records, keep inventory for explosives, to keep training and inventories and stuff, so it was to conduct training. So basically everything she answered why she wanted to be a Bomb Tech was based on the administrative duties.
Q But did she say during her interview that she was more interested in administrative duties and not the operational duties of a Bomb Tech?
MR. PARKER: Objection. Foundation. Go ahead.
BY THE WITNESS:
A My recollection of her answers when asked why you wanted to be a Bomb Tech, she stated those administrative duties that she was interested in. And that's why I indicated on the form that she sound like she was within a good position where she was her current position in the academy?
Q So let's look at the question that pertains to why she wanted to be on the Bomb Squad, which I believe is on 430. First of all, can you read into the record what you wrote in interviewer notes in response to that question?
A Better protection to public, follow investigation, render safe, R, I don't know what I meant there. Coolest job, researcher, training background, and



MAGNA LEGAL SERVICES

database management.
Q Do your notes reflect that Maureen said in response to this question that she was more interested in administrative duties and not the operational duties of a Bomb Tech?
A Again, I didn't state that, sir, and I didn't write it down.
Q Better protection to public is a duty of the Bomb Tech, correct?
A It's a duty for any police officer, yes.
Q And that's not an administrative duty, is it?
A It's combined for the whole -- it would be a duty as a police officer for anything, yes.
Q Well, providing better protection to the public is an operational duty of a police officer, right?
A It's an operational, and it can be administrative. It's a duty of the police officer to -- better protection. I could be going out and actually physically protecting or could be just making the department a better ran organization also.
Q So that would include operational duties, correct?
A And administrative, yes.
Q Following an investigation is also an operational



duty, correct?
A It can be, yes.
Q And render safe, do you have any recollection of what you meant by that?
A No. Render safe is a term that we use to, you know, render an item of, you know, safe to be around. So I don't recall what her -- why I wrote that down, what her answer to that would have been.
Q Well, render safe is a term of art used to refer to making a hazardous device safe or rendering it safe, correct?
A Correct.
Q In other words, disabling it or disarming it; is that right?
A Yes.
Q And that's an operational duty of a Bomb Tech certainly, right?
A Yes.
Q And then as you noted, you have the letter R. Is there some reason you didn't complete that note?
A I have no clue what (inaudible)
THE COURT REPORTER: I'm sorry, can you please state your answer again?
THE WITNESS: I have no clue what that in reference



to, no.
BY MR. CURLEY:
Q And what do you recall about Maureen's comment being a member of the Bomb Squad was the coolest job, if anything?
A I don't know.
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Yeah, I don't know why -- what she said on that.
BY MR. CURLEY:
Q Why did you write that down as a note?
A I assume she said it, but I don't know. I don't recall.
Q Do you assume that she said everything that you wrote down in your notes?
A That's what notes are for, yes that they were said somewhere in that content. So I don't know if she said it was a coolest job or she said it was a neat job and I wrote cool. I don't know if she actually said that or not. But I would assume since I wrote it down, it had to be something to that affect.
Q Do you recall what Maureen said about the note you wrote, researcher?
A Again, I assume that it was something she said



that she wanted to do some type of research or some type of work like that for the Bomb Squad. I don't recall specifically why -- what the reference is referring to.
Q And do you know what specifically the reference to training background refers to?
A No. Just that I recall she wanted to be in charge of the training records and such.
Q And do you recall specifically what the reference was to database, I'm assuming that management, MGT?
A Yeah. She wanted to -- there's a requirement for Bomb Squads to report incidents to the bomb management center, data center, ran by the ATF and something to reference she wanted to manage that program.
Q That was an operational duty of a Bomb Technician of the Bomb Squad, correct?
A It's uploading -- it's more of an administrative function that the Bomb Squad is doing the reports and submitting them to the AFT. So it's not an operational, but it's reporting operational activity.
Q Now, do you agree that in order to report operational activity, the Bomb Tech would have to have knowledge of that activity?
A I'm sorry?
MR. CURLEY: Could you read that back, please.



MAGNA LEGAL SERVICES

(Answer read.)
BY THE WITNESS:
A Yeah, sure, from the investigative reports, yeah -- yes.
BY MR. CURLEY:
Q And that national database you referred to, is it fair to say that it's important to the mission of the FBI and other law enforcement agencies that the -- that that database be accurate and maintained up-to-date?
A Sure, yeah.
Q That's an important duty of a Bomb Tech, correct?
A It's a duty of a Bomb Tech, yes.
Q Did you take your notes on Pages 428, this in response to the individual questions, through 435 during the actual course of Maureen's interview?
A Yes.
Q You made your notes as accurate as possible; is that correct?
A Yes.
Q Is it all --
A Wait. Wait. Let me reclarify. We took the reports or the notes and writing as we were talking. Then before the next person came in, we may have spent a few minutes completing our thoughts or writing additional



down there, so -- but it was done during that time frame for that interview. We did, I think 70 something during the week and we had a schedule, so I may not have wrote everything exactly what they were sitting -- the interviewee was sitting in front of me, but it was a few minutes -- before the next person came in. So that, clear -- you know...
Q Thank you. Thank you.
You said you may have spent a few minutes after the interview was concluded. During those minutes, did you discuss the candidate with Mr. Egan and Mr. Jones?
A Absolutely not.
Q That would have been a violation of the hiring procedures as you understood them, correct?
A Yes.
Q Is it always your practice to make your notes as accurate as possible?
A Yes -- yes.
Q According to your notes, did Maureen say she only wanted to be in charge of something called the bunker?
A Did I -- No, I didn't write that down, no.
Q Have you ever used the term bunker in the context of a Bomb Tech?



A Yes. It's a term that's use -- the storage of explosives are held.
Q According to your notes, did Maureen say she only wanted to be in charge of maintenance of equipment?
A No.
Q According to your notes, did Maureen say she only wanted to be in charge of training?
A No, she didn't say she only wanted to be in charge of any of those. She just used those as reasons why she wanted to be a Bomb Tech, not only to do those jobs.
Q Are those some of the reasons she wanted to be a Bomb Tech, correct, in addition to the others you noted on Page 430?
A Yes.
Q Did you or anyone else ask any follow-up questions of Maureen during the interview?
A No. From my recollection, we only were and only did ask the questions that were listed.
Q So did Mr. Jones and Mr. Egan ask Maureen any follow-up questions?
A No. The only questions that were asked were the ones that were listed. And we -- I asked the same question every time. Don't ask me -- I couldn't tell you



what day I asked, but every candidate we were asked the same question, the same interviewee or interviewer, I guess, asked that question to each person, and I don't remember which ones I asked. But I would have asked the same question to each one of the people being interviewed, and that's the only questions that were asked.
Q Was any candidate ever asked any follow-up questions?
A Again, sir, the only questions that were asked at my recollection were the ones that were written down.
Q I just want to make sure that applied to all the candidates and not just Maureen?
A Yes, all the candidates.
Q If a candidate gave an incomplete answer to a question, were interviewers allowed to ask a follow-up question?
A Again, just the questions that were on the assessment form were asked.
Q Right. But I'm asking if a candidate gave an incomplete answer, were the interviewers allowed to ask follow-up questions?
A Again, sir, the only questions that were asked were the ones that were listed on this.



MAGNA LEGAL SERVICES

Q I understand that. I'm asking whether they -- whether you were allowed to ask follow-up questions or whether you were prohibited?
A We were only -- I don't know. I think that's what the cities -- that program was that we were only allowed to ask, but I'm not 100 percent sure if that was a rule. But I'm telling you that the only questions asked to my recollection were the ones that were written on the forms. I don't know that -- I don't believe -- it's my recollection that I don't believe that other questions were allowed to be asked. I'm almost -- I'm positive they weren't, but I can't say that for -- I don't recall if that is a -- was the rule, but no other questions were asked beside that were on the list of questions on the assessment form to anything.
Q Fair enough. Let's look then at a backup plan to 36, which are the training materials for the interview and consensus meetings. And if you can turn or look at Page 2324, do you see there that interviewers were allowed to ask follow-up questions based on a candidate's answer?
A Okay.
Q Does that refresh your recollection that you were allowed to ask follow-up questions?



A Yeah, I -- yeah, I guess. But I don't believe there were any that were asked, and now that maybe if it was a -- someone said I was -- I worked this assignment, it was a conversation of maybe based on their answer but, you know, what district did you say that was or something like that. But it wasn't any other questions that was geared to get additional or clarifying information. There may have been something like what district was that or what assignment was that. But it wasn't a basic more questions.
Q Did all follow-up questions have to be written down, and if you look at the next Page 2325, I believe it says that. Do you recall if interviews were required to write down any follow-up questions they had?
A Yeah. I mean, I -- it would have been the training. Now that I see, I do recognize that this is their training, but I don't -- like I said, I don't believe -- I don't remember any follow-up questions.
Q But you do remember that if any were asked, they must be written down, correct?
A Now that you show me this, I assume this is their training. I didn't recall that.
Q And then as long as we're here, can you turn to page -- look at Page 2327. That says in the fourth



bullet point, you may want to appoint someone in advance to write down all follow-up questions. Was anyone assigned that task for the interviews that you conducted?
A I don't know. I know I wasn't.
Q Now, do you know Lisa Gariota?
A Is she with Human Resources?
Q Yeah, she was.
A I know there were two ladies, I think there was only two, that sat in on the interview process. I believe Lisa was one and I don't remember what the other lady's name was.
Q I think it was Rebecca Zamora; does that ring a bell?
A It could be. I mean, I don't know them. I just know them from that week the time they sat in there. I don't think I would recognize either one of them if they'd walk in today, so...
MR. CURLEY: We can take that exhibit off the screen. I think we're done with that at least for now.
BY MR. CURLEY:
Q According to the records produced by the Defendants in this case, Lisa Gariota was present at Maureen's interview, what was your understanding of her role at the interview?



A To represent the City and Human Resources and just to ensure that the process is, you know, completed properly and such.
Q Did Ms. Gariota have any substantive involvement in the interviews? In other words, did she ask any questions?
A No. I don't remember if there was some type of -- if she said anything as far as -- I don't believe she did. I don't know if it was some type of preamble thing that, you know, that she put on that she told everybody. I think she just sat there and did her -- whatever she does. I don't think she asked anything, but if it was -- if she did ask, she asked something or said something about the process to everybody, but I don't recall if she did or not. It would be -- it would be like an administrative thing like for the whole process, but I don't believe so.
Q Other than that, Mr. Gariota didn't say anything at the interview, correct?
A Correct.
Q Now, do you know of any notes of Maureen's interview other than the Candidate Assessment Forms that are part of Plaintiff's Exhibit 33?
A I don't know what all is in Exhibit 33, but the



MAGNA LEGAL SERVICES

Page 82

only notes I know personally that I produced were the ones you showed me.
Q Well, in Exhibit 33 includes your Candidate Assessment Form and the form for Mr. Egan and Mr. Schmitt (sic). Other than the notes on those forms, are you aware of any other notes that were taken by anyone at Maureen's interview?
A You said Mr. Schmitt, you mean Mr. Jones?
Q Egan and Jones, yes, I'm sorry.
A Again, I just know I produced -- what I produced. I know they produced the same thing. I don't know of any other notes that were taken.
Q When during the interview did you take -- Strike that.
When during the interview did you complete the ratings that were at the bottom of Pages 429 thru 431 -- I'm sorry, thru 433?
MR. PARKER: And I'll just object to the use of the term ratings, so I'll object to form. Go ahead.
BY MR. CURLEY:
Q Well, do you see over on the bottom left of 429, it says rating, so that's why --
MR. PARKER: I'm going to withdraw my objection. Fair enough.

Page 83

BY MR. CURLEY:
Q Do you have the question in mind, Mr. Schmitt, or should I have it read back?
A No, no. As I said earlier, sir, that all of these notes and all of these forms were completed before the next interviewee was conducted. We completed them, completed it, and then we turned them into, I believe, to Human Resources, she collected them and we moved onto the next person. So it would have been, after the interview was completed, we -- a few minutes I talked about earlier, we completed the form. We marked all the bottom assessments, and then we moved onto the next candidate.
Q And you did that both with respect to the notes and the ratings, correct?
A And this is the rating during the interview -- I don't remember if we did something else during the consensus part, but we completed these forms right after the interview was done.
Q If you can turn to Page 434. Do you see at the bottom three options, and you checked the option that says, do not recommend candidate for hire, correct?
A Yes.
Q By the way, are you familiar with the document titled the City of Chicago Police Department Hiring Plan

Page 84

for Sworn Titles; does that ring a bell at all?
A No.
Q Do you know whether the 2015 Bomb Technician hiring was in compliance with the City of Chicago Police Department Hiring Plan for Sworn Titles?
MR. PARKER: Objection. Foundation. To the extent, it calls for a legal conclusion. Go ahead.
BY THE WITNESS:
A I would have to say no since I don't know what that document is, so I don't know what -- if they were in compliant or not.
BY MR. CURLEY:
Q On Page 434, your first note, the first line says very pleasant; do you see that?
A Yes.
Q Was that a positive factor in favor of Maureen?
A Yes.
Q And then you go onto write down friendly, was that also a positive factor in favor of Maureen?
A They're all positive statements towards her, yes.
Q So outgoing is also a positive factor in favor of Maureen, correct?
A They're all positive factors in who's -- yeah. I'm not saying they're positive factors in if she would

Page 85

be a good Bomb Tech or not. They're positive factors in that she was a very pleasant and outgoing individual, so that's positive to her personality.
Q And those traits pleasant, friendly, and outgoing all indicate the ability to work as part of a team; is that correct?
MR. PARKER: Object to form. Foundation. Go ahead.
BY THE WITNESS:
A That makes a team work better, I assume.
BY MR. CURLEY:
Q Well, being unpleasant is not a good trait for a team member, is it?
A Yeah. I mean, it makes a team run smoother, I agree with that.
Q And pleasant, friendly, and outgoing also speak to Maureen's communication skills, correct?
MR. PARKER: Object to form. Foundation. Go ahead.
BY THE WITNESS:
A Yeah. I mean she was very pleasant to talk to and friendly and stuff, so I -- yes, she communicated very well.
BY MR. CURLEY:
Q Do you agree that good communications skills and teamwork are important qualities for a Boom Squad member?


MAGNA LEGAL SERVICES

A Again, they're a good quality to have for a team member. But as I stated earlier, a Bomb Tech generally down range is working by himself, so he would have to pleasant to himself, I guess, or him -- herself. But as a unit, you want everybody to get along.
Q You noted in your next entry on Page 434, very I-N-T-E-L, I assume that means intelligent?
A Yeah.
Q That was also a positive factor for Maureen; is that right?
A Yes.
Q You wrote next that you wrote very interested in databases, and is that learning?
A Learning lessons.
Q Was that also a positive factor for Maureen?
A These notes were -- this was in reference to what we talked about earlier about her interest in doing the administrative work for the Bomb Squad. Developing lesson plans and databases and conducting database, you know, incidents and databases, and doing that administrative work.
Q Right. There are administrative duties of a Bomb Technician, correct?
A Of course, yeah.



Q And so Maureen's interest in those was a positive factor, correct?
MR. PARKER: Objection. Form. Foundation. Go ahead.
BY THE WITNESS:
A They were a factor that I used in the overall assessment to recommend yes or no on all of the candidates. I took everything into consideration and stuff. So I would consider this would be a -- for the overall factors of what a Bomb Tech should do, this would be a lesser quality that we would -- that I would be looking for.
BY MR. CURLEY:
Q You next noted lacks street EXP, does that refer to experience?
A Yes.
Q What did you mean by that?
A I think I saw earlier in one of the forms that she said that she's only have been on work like in patrol for couple years. I think I wrote two and a half years. I'd have to look at it again. And then, you know, she had worked other administrative jobs with the city. So yeah, like I said, we talked to over 70 people. I'm making reference and notes of how I can, you know,



remember what people said and who they are down the line when we talked about it later on.
Q You're not saying here that Maureen had no street experience, are you?
A It lacks -- I'm saying that she had less experience than other people that we were talking to.
Q And so let's go back, since you referred to it, to that page where that's discussed, which I believe is 429. And you noted here that Maureen did have two and a half years experience as a patrol officer; is that correct? Is that what PO is?
A Yes. I assume, yes, yeah.
Q So that's street experience, correct?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Okay. Yes. I see, yes. I assume she was in a patrol district and stuff, 24th District.
BY MR. CURLEY:
Q Do you know where the 24th District is in Chicago?
A No. I mean, I can't -- I get them all mixed up.
Q Were you aware at the time of the interviews that 24th District was in the Rogers Park neighborhood?
A No.



Q Did you know anything about the 24th District in 2015?
A No.
Q Were you aware that Rogers Park is one of the most ethnically diverse neighborhoods in Chicago?
MR. PARKER: Object to form. Foundation. Go ahead.
BY THE WITNESS:
A Yeah. I know generally where it is. I don't know what the makeup is.
BY MR. CURLEY:
Q Do you know whether the 24th District had among the highest number of bomb threats in the city?
MR. PARKER: Object to form. Foundation. Go ahead?
BY THE WITNESS:
A Do I know, no, I don't know that.
BY MR. CURLEY:
Q Did Maureen tell you during the interview that while assigned to the 24th District, she had responded to a bomb threat and assisted in the evacuation of a residential building?
A I don't recall that, but she may have, I don't know.
Q Do you consider that to be street experience as you've used that term?



MAGNA LEGAL SERVICES

A I mean, as I said earlier, according to what she told me, she worked as a patrol officer for two and a half years. So I don't know what that course of her assignments were.
Q Do you consider responding to a bomb threat and assisted in the evacuation of a residential building to be street experience, as you use that term?
A Sir, there are bomb threats that come in on a daily basis. And so it's not -- if you assist in a threat until people get out, that is part of the job, you know. It's not any better or worse than what people do everyday. So I mean, it's answering the call as a police officer, but it's not going beyond of what their requirement jobs are.
Q Did you consider the fact that a candidate had bomb-related street experience a positive factor in the Bomb Tech selection process?
A It would. I don't recall anybody having bomb -- no one was a -- for example, there was no one that was a military explosive ordinance exposal Bomb Tech for the military. There's no -- there was no former Bomb Techs that were in there, so no one had Bomb Tech experience. But if there was a candidate, they would have -- that would have been a positive factor if we had a former



military EOD Tech or former -- another department transferring in that was a Bomb Tech, that would be a positive factor. But there was no one that met that background.
Q Did you tell Maureen during the interview that, in your opinion, she lacks street experience?
A No.
Q Did you say anything to Maureen during the interview than perhaps ask her the questions, one or more of the questions on the Candidate Assessment Form?
A No, just a greeting, a thank you, or something like that that we did everybody.
Q Do you agree that a person lacking street experience can still complete the FBI Hazardous Device School of Training and become a certified Bomb Tech if they are intelligent enough?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A Yeah, I assume as long as they could do the required -- what's the word I'm looking for -- the functions that you perform at a bomb scene, you go down range and go through logic tree of doing a render safe. But we were asked to interview 75 people and rank those candidates to who would be the best candidates for the



Chicago Police Department. As I said, the slots are very rare. It's a small unit, and it's just something that we were asked to get the best people to fill those spots and who would be, you know, a good candidate to do that. I can't say, you know, if people that we did not recommend to do it or not, but through the interview and through the process, you determine some people may be better candidates, and that's how we ranked them.
MR. CURLEY: All right. I will move for the record to strike that as answer is nonresponsive. And let me try and ask it a different way.
BY MR. CURLEY:
Q Are there candidates -- have there in the past been candidates who lacked street experience nonetheless completed the FBI HDS training and became certified Bomb Technicians?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A I have no idea, sir. We send -- you know, there's thousands of certified Bomb Techs in the United States. I don't know what all their backgrounds were.
BY MR. CURLEY:
Q Well, I didn't really ask you if you knew all of their backgrounds, I just asked if you knew of anyone in



particular that fit that question, either yes or no?
A No.
Q Okay. Last on Page 434, if we go back to that. You wrote Maureen seems to be and you underline be, B-E, in a good current position. What did you mean by that?
A Okay. I don't know if I intentionally underlined be, I don't know if that was just a -- I was going to add something else or whatever. Whatever, but basically she discussed being at the academy doing the lessen plans and stuff, and she had an -- if I recall, I think I saw it earlier that she had an education background. I don't remember if she was a teacher, but she worked at a library and talked about working at the library and maintaining records and stuff, so it seemed like that the Chicago Police Department had her in a position where she would do well and do good for the city by -- they would be in a position that she is through her background is able to positively contribute to the city and so that's why I made that comment.
Q Was that your own personal opinion?
A Yeah, all of these on here are my -- either what you said or in my personal opinion, yes. I didn't talk to anyone about it.
Q Was it part of the hiring criteria whether or not



MAGNA LEGAL SERVICES

a candidate seems to be in a good current position?
A No.
Q Taking your note at -- Well, strike that.
Did you believe after your interview with Maureen that she was unqualified for the Bomb Tech position?
A I wouldn't say unqualified. I would say wasn't competitive compared to the other people we interviewed.
Q But not unqualified, correct?
A Again, she was not competitive compared to the other people we were interviewing.
Q Well, if you can answer yes or no, I'd appreciate it. Did you believe after her interview that Maureen was unqualified for the Bomb Tech position?
MR. PARKER: Objection. Asked and answered. Go ahead.
BY THE WITNESS:
A The term unqualified may have met the qualification, but she was not competitive with the other people we interviewed. So that's why I marked her not -- I got to get my classes on to see what it says -- not recommend candidate for hire. So that's in term unqualified in this, then it would be yes. But I mean, she did not compare with the other people that were



better qualified or better candidates.
Q Did you write on your Candidate Assessment Form that Maureen was unqualified to serve as a Bomb Technician?
A No. I just marked her do not recommend candidate for hire.
Q Maureen's then current position was as an instructor at the police academy. I think you referred to that before. Do you remember that?
A I -- yeah, she worked at the academy I don't recall what she did. I know she did something with e-learning. I'm not sure if she did the lesson plans I wrote, but I'm not sure if she was actually an instructor and if she was, what she instructed. I just remember she said something about -- I wrote it down -- but doing the lesson plans and such for the -- it may be the same thing. I don't know how the academy works over there.
Q Looking at the first page of Exhibit 33, that's some of Mr. Jones' notes. He wrote daily-develop lesson plans/and/or teach in classroom. Does that refresh your recollection that she was an instructor at the police academy?
MR. PARKER: Objection to form. Foundation. Sorry, go ahead.



BY THE WITNESS:
A Yeah, I don't know -- again, I don't recall. She may have said it that she instructed. I don't recall.
BY MR. CURLEY:
Q Did you consider her current position at the police academy to be clerical or office?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A I don't know, I don't know what I thought.
BY MR. CURLEY:
Q Can you character this -- can you characterize -- start over.
Can you characterize for us today what you understood her position to be at the police academy?
A I don't recall. Just what I had in my notes here that she worked over there and did something with developing lesson plans and such. I don't remember what else she said about her tasking over there.
Q Is there anything that would refresh your recollection?
A I just don't recall, sir, I'm sorry.
Q Did Maureen tell you at her interview that the curricula she developed while assigned to the academy



incorporated materials from the Bomb Squad and hazmat materials from Illinois State Police?
A She may have. I don't recall that. I didn't write it down, so I don't recall it.
Q Did you consider the fact that a candidate had experience with the Bomb Squad materials and hazmat materials a positive factor in the Bomb Tech selection process?
MR. PARKER: Objection. Foundation. Form. Go ahead.
BY THE WITNESS:
A I don't know what material that would serve, so I can't evaluate if it would be helpful or not.
BY MR. CURLEY:
Q Did you know when you considered Maureen for the Bomb Tech position that she had been valedictorian of her police academy class?
A Did I -- no. Sir, out of 75 people, I don't know anybody from the City of Chicago Police Department. I may have seen people here or there, but I don't know any of them. Your client, I wouldn't know her if she walked in the door. I don't know any of these people. I don't know anything about their background accept what they said during the interview.



MAGNA LEGAL SERVICES

Q And I'm just asking you, sir, did you know when you interviewed Maureen that she had been valedictorian of her police academy class?

A No. Unless she said it during the interview, I didn't write it down. I don't recall if she said that, and so the answer would be no, I don't think I knew it, unless she said it. But I don't recall if she did or not.

Q Well, if we can turn to Page 413 again Mr. Jones' notes near the bottom he wrote -- are we there, yes -- 24th District-valedictorian. Does that refresh your recollection that Maureen had been the valedictorian of her police academy class?

A No --

MR. PARKER: Object to foundation. Go ahead.

BY THE WITNESS:

A Again, sir, I don't recall it, and he wrote it down -- I don't know. She may have said it, I'm not disputing that, but I just don't recall if she said it or not.

BY MR. CURLEY:

Q Why didn't you write that down in your notes?

MR. PARKER: Objection. Form. Foundation. Go ahead.



BY THE WITNESS:

A I don't -- I just didn't. I don't know.

BY MR. CURLEY:

Q Do you consider instructors at the FBI Academy to be in clerical (inaudible)

THE COURT REPORTER: Excuse me, Mr. Schmitt. Mr. Curley, you broke off for a second. So I just have, do you consider instructors at the FBI Academy to be in clerical. I didn't hear the ending of your question.

MR. CURLEY: Let me rephrase it. Thank you.

THE COURT REPORTER: Okay.

BY MR. CURLEY:

Q Do you consider instructors at the FBI Academy to be in clerical or office positions?

MR. PARKER: Object to form. Go ahead.

BY THE WITNESS:

A You know I don't know what your terms of clerical or office thing were, but they were not in a operational assignment. They are in what I would consider and I think the Bureau would consider an administrative assignment. And one example I can give of that the -- as an Operational Special Agent, I'm assigned a vehicle for emergency response. People at our headquarters and our academy are not -- agents are not assigned vehicles



because they are not a response -- in a response assignment. So I would consider that more -- we wouldn't consider an office one, but we would consider an administrative posting.

BY MR. CURLEY:

Q Well, do you consider instructors at the FBI academy to be unqualified for field functions or operational duties?

A No as long as -- no.

Q And in fact, as you just mentioned, you are an instructor at the FBI Hazardous Device School in Huntsville, Alabama, correct?

A I am not.

Q Were you at sometime?

A No.

Q Have you ever been an instructor in any capacity with the FBI?

A I am a -- I instruct different training thing, but that is part of our job in the field. A Firearm Instructor, a Defensive TAC Instructor, teach different bomb-related classes. I've never been assigned to our school at Huntsville, Alabama. And the instruction job that we do in the field is a collateral duty, so I may teach firearms once a month, once every other month for



the day. That's not my full-time assignment. We do have, for example, firearm instructors assigned to Quantico, to the academy and that is their full-time position. And those guys are not in an operational assignment.

Q Have you ever taught a course or done any -- supervise any training at the HDS school?

A Been down there for like help with in-service and stuff, but not as -- never in a basic or re-cert class or anything like that. Just specialty training that we would go down and assist with.

Q By the way, what do you mean by in-service? I think you've used that term a few times today.

A In-service is usually a week or two what we call additional training classes. I don't know what the term comes from, but just basically additional training. I would go to some bomb in-service training. If you're assigned white collar, they would have training that's geared toward assisted in the white collar investigations, you know, kind of terrorism in-services that assist in those agents that are assigned to counter-terrorism matters and such like that. So in-service is just extra training above the certification classes.



MAGNA LEGAL SERVICES

Page 102

Q Does your service as in-service or as an in-service instructor or any of the other instructor positions you have testified about make you unqualified for field functions or operational duties?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A No.
BY MR. CURLEY:
Q If we can go back to Page 434, that's the overall candidate rating that you filled out for Maureen. You recommended -- you rated her as do not recommend candidate for hire, correct?
A Yes.
Q But you had on the prior pages beginning at 429 you had rated Maureen as demonstrates some of the competency twice and as clearly demonstrates competency once. Can we scroll through those so we can confirm that?
A Wait. Go back to one page, sir. Okay. So that one does not, right; is that correct?
Q Let's go back to number one. That does not, correct.
A Okay.
Q Number two, that is demonstrates some, correct?

Page 103

A Yep.
Q Number three this also demonstrates some, correct?
A Uh-huh.
Q And number four is does not demonstrate, correct?
A Yeah. This was her example about the child porn at the library, right.
Q And five is candidate clearly demonstrates competency, correct?
A Yep.
Q You had the discretion when you filled out your overall candidate rating to rate Maureen as either recommend wisdom reservations or recommend candidate for hire, correct?
A Or do not recommend. All three is my choices, yes.
Q So you could have rated Maureen as recommend with some reservations or recommend candidate for hire regardless of how you rated her on the individual questions, right?
A Yes.
Q Now, on 434, the top three handwritten notes are bunched pretty closely together. Do you see that?
A The very pleasant?

Page 104

Q Right. Very pleasant, very intelligent, and very interested, do you see that those are bunched closely together, correct?
A Yeah -- yeah.
MR. PARKER: Object to form. Go ahead.
BY MR. CURLEY:
Q In the context of your notes being either a pro or a con, those top three notes are pros in favor of Maureen, correct?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A I think we talked about this already that they're positive towards her or toward the job.
BY MR. CURLEY:
Q And then you left some space --
A I didn't understand your question. Are you saying that they're positive traits to her or to the position of her being a Bomb Tech.
Q Positive -- well, to both. Positive to --
A I think we talked about this in depth earlier that they're all positives for the person pleasant, but a good Bomb Tech could not have those qualifications and still be a Bomb Tech.
Q Just to make sure I heard you correctly, what

Page 105

you're saying is that a candidate could have those -- Start over.
What you're saying is that a candidate could not have those qualities and still be a Bomb Tech, right?
A Correct.
MR. PARKER: Object to form.
BY MR. CURLEY:
Q All right. Now the bottom two notes on Page 434, are those your cons against Maureen?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A Yeah, I mean. They're -- I mean, I guess they would be considered cons, yeah. I don't think there's any -- I don't think I spaced them in any accordance why they're spaced that way if that's what you talked about earlier about the spacing up top. I don't think I did that anything intentionally, I was just writing down thoughts.
Q Are those bottom two notes the reasons you did not recommend Maureen for hire after her interview?
A That and the whole interview that we did, sir. I mean, we talked about earlier, you know, why she wanted to be a Bomb Tech and her responses to that. We asked


MAGNA LEGAL SERVICES

Page 106

everyone tell us a stressful situation, and they're all Chicago Police Officers and she stated a thing when she was a librarian when a -- someone was looking at child pornography and she seized the computer after the person left until the police got there. That was a stressful situation in her life. We had to compare all 75 and come up with the best people that were -- could do the Bomb Tech job. And nothing against her or anybody else we didn't pick, but we were asked to rank those accordingly to get the best quality for the City of Chicago.

Q Let's look at the interview questions starting on 429 and going thru 433. Let's scroll through those slowly and allow Mr. Schmitt to just read to himself the interview questions. And my question to you is going to be, where does it refer in those interview questions to being in a stressful situation?

A Okay. Go one more. One more. One more. This one here (indicating). How did they handle a situation and make a quick decision based on -- okay. This is one I considered a stressful situation.

Q But would you agree that no question asked the candidate to respond about a stressful situation in those terms?

A They used the word stressful, this is the one I

Page 107

was referring to. It doesn't say stressful, make a quick decision, and the action and how the outcome.

Q Our electrical aptitude and mechanical aptitude qualities for a Bomb Tech?

A They would be positive, yes.

Q Did you have any role in selecting the electrical and mechanical aptitude test given to the Bomb Tech candidates?

A No, sir.

Q Did you have any personal familiarity or experience with the electrical and mechanical aptitude test given the bomb test candidates?

A No, sir.

Q Do you even know what test that was?

A No, sir.

Q Do you know that Maureen had the highest score of all the candidates on the aptitude test, one question away from a perfect score?

A No, sir.

MR. PARKER: Objection. Foundation.

BY MR. CURLEY:

Q Was today the first time you heard that?

A I believe. I don't recall that. I know the candidates took the test, and out of all the people who

Page 108

took it that applied, the certain amount of them that scored well, came to the interview process. But I didn't know how the ranking or how any part of them did in my part as the interviewee that wasn't discussed or disclosed to me.

Q Can we share the screen with Plaintiff's Exhibit 103. This is an email, and sir, you are not referenced as having sent or receiving this email. But attached to it, is a two-page attachment listing the Bomb Tech candidates and the raw score on the aptitude. Test have you ever seen that list before today?

MR. PARKER: Object to foundation.

BY THE WITNESS:

A No, sir.

BY MR. CURLEY:

Q Have you ever seen the information that is on this list and in particular the raw score in any other form or fashion before today?

A I only know -- this is from the testing?

Q Yes, sir.

A Yeah. I don't know anything about it, sir, no.

Q Do you see that Maureen's raw score on the aptitude test was 39 out of 40?

MR. PARKER: Objection. Foundation. Form. Calls

Page 109

for speculation.

BY THE WITNESS:

A Yeah. I can see -- her -- yeah, 39, yeah. I don't know what that means, sir.

BY MR. CURLEY:

Q Well, there were a total of 40 questions on the aptitude test, I'll make that representation to you. I don't think there's any dispute about that. Do you agree that a candidate who scores a 39 or 40 on the aptitude test has a better electrical and mechanical aptitude than a candidate who scores a 32 or 33?

MR. PARKER: Objection. Form. Foundation. Calls for speculation. Go ahead.

BY THE WITNESS:

A Again, sir, I don't know what's on the test. I have no -- I've never seen the test. I know nothing about it, so I can't make a assessment on it if it was good or bad. Again, I don't know what's on it.

Q Do you know why you weren't ask for any input on the particular aptitude test that should be given to the candidates?

A No.

Q Did Mr. Egan share with you that Maureen had the highest score on the aptitude test?



MAGNA LEGAL SERVICES

MR. PARKER: Objection. Foundation. Go ahead.
BY THE WITNESS:
A Didn't we talk about this --
MR. PARKER: Objection. Foundation. Go ahead.
BY THE WITNESS:
A I think we already -- I think I already answered this, sir that I did not know anything about this test. I've never talked anybody about it. I didn't know anything about the score prior to you mentioning it now.
BY MR. CURLEY:
Q Right. And I just want to close the circle and make sure that Mr. Egan never shared that information with you, correct?
A No.
Q He did not?
A Not that I recall, no.
Q Okay. Do you see now on Exhibit 103 that only two other candidates tested as highly as Maureen on the aptitude test, and I'll draw your attention to Jose Estrada (phonetic) who also scored a 39 and James Fumo (phonetic), who also scored a 39.
MR. PARKER: Objection. Foundation.
BY THE WITNESS:
Q Okay?



BY MR. CURLEY:
Q Do you see that?
A Yes.
Q Those two candidates made the eligibility list, correct?
A I don't know --
MR. PARKER: Object to foundation.
BY MR. CURLEY:
Q That would be a matter of record in any event, correct?
A I assume, yes.
Q But you do know that Maureen did not make the eligibility list, correct?
A Yes.
Q Now, are you aware that everyone else on the eligibility list scored lower than Maureen on the aptitude test?
A Sure. It's my understanding on this part of the process that the city did this test and I think they did a bomb suit test, and they had a -- whatever the number was of passing score, those candidates were given the interview. As the interviewee, we were only allowed to look at everybody from the interview. Everybody was coming over as a -- on a even playing field when they got



to the interview. That's why I had no recollection of this list because that wasn't provided to our decision making, it was based on the interview. So I had no recollection about what this consists of, what the testing is, it was not given to me, the ranking, because it was not something that we were used to make our decision.
Q Understood.
Would now be a -- and then move onto another topic. Would now be a good time to take a lunch break for everybody?
MR. HARTZLER: Do you have an estimate, Phil on how long this will continue?
MR. CURLEY: Lunch or the deposition?
MR. HARTZLER: Deposition.
MR. CURLEY: Oh, I think we'll be a few more hours. I'm not going to take the full seven hours, at least I don't think I am that I'm allowed, but I think it will be -- it will go on for a while longer. I propose that we take a short break, come back in about a half hour or so.
MR. HARTZLER: That's fine.
MR. PARKER: That's fine with me.
THE VIDEOGRAPHER: This ends media unit number three in the deposition of Todd Schmitt. The time is 12:43



p.m. We're going off the record.
(Lunch recess.)
THE VIDEOGRAPHER: This begins media unit number four in the deposition of Todd Schmitt. The time is 1:14 p.m. We're back on the record.

BY MR. CURLEY:
Q I'm going to share the screen with Plaintiff's Exhibit 78, which we've seen before. Blank Candidate Assessment Form that Mr. Egan sent to you a few days before the interviews. So I'd ask to share that screen and go in particular to the very -- near the very end, Bates numbered Pages 10010 and 10011.
We're going to Exhibit 78 --
MS. HYNDMAN: That's what I have.
MR. CURLEY: Thank you. And near the end. Keep going.
MS. HYNDMAN: That's the last page. Nope. Nope. Nevermind.
MR. CURLEY: I don't think it is. There we go. Okay.
MS. HYNDMAN: Okay.
MR. CURLEY: Thank you.
BY MR. CURLEY:
Q So we're at Pages 10011 and 10010 and 11. And



MAGNA LEGAL SERVICES

Page 114

those pages, Mr. Schmitt, referred to the scenario that was the subject of one of the interview questions, or actually two scenarios. Do you recall that question?
A Yes, sir.
Q At least in general. And that scenario required candidates to articulate how they would handle a bomb-related incident such as a bomb threat or a suspicious package, correct?
A Yes.
Q And if you can just take a moment, we'll scroll through slowly those two pages starting with the page on the screen. And my question to you is whether these pages describe the details of those two scenarios and the question that each candidate was asked?
A Yes.
Q And the candidates were given just two minutes to respond to one scenario and three minutes to respond to the other scenario. Do you recall that?
A There was a time, and I see the time on the questions here. So yeah, I assume that's correct. I know there was a time limit. I assume that it's the ones indicated on the questions you're showing me.
Q And the interviewers gave numeric scores to each candidate based on their responses, right?

Page 115

A If I remember correctly, there were nine items on here, and I believe these points were given to them in some type of written handout, or it was in the canvas for the Bomb Tech thing. So if a person studied and memorized these points, that's what it was kind of a -- I think that's what the check-offs we were doing was if they could regurgitate the information that they read. So some people were better studiers than others I guess.
Q Well, the scoring worked was that a candidate got one point for each of the items listed on Page 10010, correct?
A I don't recall. I remember we counted how many points that they were able to get, but I don't remember there being a magic number to be recommended or not. I don't remember. Okay. There is something there. Okay. There was. I didn't recall that.
Q Okay. And the candidates were not given a handout at the interview about these scenarios, were they?
A I believe that these were in something where they applied the canvas. I could be wrong, but there was something in a general -- somewhere that these points were listed somewhere that they had assess to prior to coming is my understanding.

Page 116

Q All right. And I guess that would be a matter of record, do you agree?
A I assume so, yes. But I could be wrong. I believe there is something that they were -- that these were listed somewhere prior.
Q Now, let's go back if we could, please, to Exhibit 33, the Candidate Assessment Forms for Maureen. And in particular, a page of your notes, Page 433. And do you agree with the statement near the top of that page to the right of a definition which says that the purpose of the scenario was, quote, to assess the member's ability to articulate department directives into an actual situation?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Who --
BY MR. CURLEY:
Q Was that your understanding of the purpose of the scenario?
A As stated on the definition, yes.
Q Okay. Now, the scenario assessed the candidate's ability to perform the field functions and operational duties of a Bomb Technician, correct?
A The questions were able -- if a person can

Page 117

articulate the department directives in this situation, not doing the job. It's what is your department directives, say a patrolman should do, in one of these scenarios. We weren't tell them to be Bomb Techs. What's the directive say if you're responding to a bomb incident.
Q Right. And those responses constituted the field functions and operational duties, correct, as opposed to administrative?
A Correct.
Q And the scenario was designed to assess an applicant's ability to think critically and react quickly in a matter of just minutes, correct?
MR. PARKER: Object to form. Foundation.
BY THE WITNESS:
A As stated in definition, the purpose was to exercise the person's able to restate the department directives in a situation. So if you're a good memorizer, you did well on it because you were able to remember what you had studied. But it showed no skills what an actual person would do in an actual situation. It's just what does the department say you should do. That is a big difference between what you would do or what you can do. And there's no way we could assess that



MAGNA LEGAL SERVICES

Page 118

in the interview.
Q If there is no way you could access what a candidate would do during the interview, is that what you're saying?
A Would actually do, yeah. This question was to say what the department's directive say you should do in a situation like this.
Q So the best you could do during the interview was to assess whether or not the candidate knew what to do, correct?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A That was one of the basis. If they knew what to do and if they answered in the totality of the interview that they were competitive against the other candidates that we interviewed.
BY MR. CURLEY:
Q Was it important how a candidate would perform in an actual bomb-related situation?
A There wasn't an actual bomb. I can't answer that. There's not a -- there wasn't an actual bomb incident for them to respond to. I don't know how they -- I don't know how to answer that question.
Q So as an interviewer, you had no idea how any

Page 119

candidate would respond in an actual bomb-related situation, correct?
A Correct.
Q And then handwritten notes on Page 433 with the first and then second. Do you see that?
A Yes.
Q And you have numbers under there. We can go back and look certainly, but did those numbers respond or I should say correlate to the items listed in the description of the scenario that we looked at in the exhibit just a moment ago?
A It was, I believe so, yes.
Q And so as the candidate correctly identified those points, you made a note of it, instance point one in the first scenario, point two, and so forth, correct?
A Yes. I believe so, yes.
Q And then the candidate was assigned one point for each item that they responded to correctly and then you totaled them up and came to 19, right?
A Correct.
Q And you rated Maureen in connection with the department procedures and scenario as candidate clearly demonstrates competency, correct?
A Correct.

Page 120

Q So in your judgments, she did a good job with the scenarios; is that fair to say?
A That was the criteria you showed me earlier about the number of points they get. This was not a -- this section was, I think, the only one that wasn't a -- what's the term I'm looking for -- up to me --
Q Objective.
A Objective, correct. It was a number associated on how many correct statements they got and we gave a number, and I think was the only one that dictated what the score would be.
Q Your notes on Page 433 do not reflect any hesitancy on Maureen's part to perform any of the field functions or operational duties involved with the scenarios, do they?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A No. She was reiterating what the department directives said. I mean, it wasn't -- she wasn't asked to perform any of these duties, it was what they were owed to review and was just repeating that.
Q Was it important for a candidate to have knowledge of the Chicago Police Department's directives?
A As a member of the -- as a police officer for --

Page 121

I assume so. I mean it's important for me to know what the FBI directives are. But to know the knowledge and to do the -- to actually do the job may be two different things.
Q Did you consider Maureen's performance on the scenarios to be a positive factor?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q Mr. Egan on page -- let me get the right page number, sorry.
Mr. Egan on Page 425 also rated Maureen as a clearly demonstrates competency on the scenario. Do you see that?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q And Mr. Jones on Page 417 wrote that -- or rated Maureen as candidate demonstrates some of the competency and then also wrote studied and hit many points. Do you see that?
A Yes.



MAGNA LEGAL SERVICES

Page 122

MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q I think you might have already answered this, but bear with me. Were the candidates scored against a numerical scale on their responses to the other four questions?
A No.
Q The other responses were assessed subjectively by each of the interviewers individually, correct?
A During the interview stage, yes.
Q Maureen received one of the highest scores on the scenario, are you aware of that?
A I know -- yeah. I don't know she was the highest. I mean, she did well on it, on the points. I don't know if it was the highest, one of the highest. I don't recall what the other points were.
Q Are you aware that only one candidate who made the eligibility list scored higher than Maureen on the scenario?
MR. PARKER: Object to foundation --
BY THE WITNESS:
A I don't recall --

Page 123

MR. PARKER: Go ahead.
BY THE WITNESS:
A I don't recall that, sir.
BY MR. CURLEY:
Q That would be a matter of record in any event; is that correct?
MR. PARKER: Object to form --
THE WITNESS: I assume so.
BY MR. CURLEY:
Q Now, if you can turn to Page 432, this part of the interview assessed the candidates experience, training, and certifications. Do you see that at the top?
A Yes.
Q You rated Maureen as demonstrates some of the competency for experience, training, and certifications, right?
A Yes.
Q Can we turn to Page 429, please. I think we looked at that a little earlier. This part of the interview asked the candidate about their career path and teamwork. Do you see that at the top?
A Yes.
Q And you rated Maureen as does not demonstrate the

Page 124

competency, correct?
A Yes.
Q Now, on page 400 -- Page 413, Mr. Jones rated Maureen as demonstrates some of the competency for that part of the interview. Do you see that?
MR. PARKER: I'll object to foundation. Go ahead.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q And on Page 421, Mr. Egan also rated Maureen as demonstrates some of the competency for that part of the interview. Do you see that?
A Yes.
Q Do you agree that Mr. Jones and Mr. Egan had a better background in the Chicago Police Department in the various assignments and duties and responsibilities than you did?
MR. PARKER: Objection. Form. Foundation.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q Did you ever explain to Mr. Egan or Mr. Jones why contrary to their ratings, you rated Maureen as does not demonstrate the competency for career path and teamwork?

Page 125

A No.
Q Did they ever tell you why they rated Maureen higher than you did?
A No. We didn't discuss any of the candidates until the next process stage, and I don't recall if she was in that pool or not.
Q The next stage being the consensus meeting?
A Yes.
Q Well, everybody that was interviewed was discussed at the consensus meeting, correct?
A I don't -- I don't recall. I didn't know if we did part of the people only part or I don't recall if all 75 were talking about that or not, I don't remember.
Q Well, there were one or two that withdrew or couldn't make it, but other than that, all of the folks who were interviewed were discussed at the consensus meetings; isn't that right?
A I don't recall. I don't recall if I -- I don't recall.
Q Okay. Did Mr. Egan or Mr. Jones tell you at the consensus meetings why they rated Maureen higher than you did on department experience/teamwork?
A No, I don't -- no.
Q Did you ask them at the consensus meeting --


MAGNA LEGAL SERVICES

Strike that. I think you already asked that question.
Did you ask them at the consensus meeting why they rated Maureen higher than you did on department experience and teamwork?
A No.
Q Why did you rate Maureen as does not demonstrate the competency for career path and teamwork on Page 413 -- I'm sorry. On page -- let's go back to your Page 429. So let me rephrase the question now that we get that page in front of us.
My question is, why did you rate Maureen as does not demonstrate the competency for career path and teamwork?
A Sir. We were asked -- I was asked to participate in selection of the Chicago Police Bomb Squad. We interviewed 70 some people. We had to evaluate everyone comparable and make notes and to select the best people there. Like I said earlier, she was a very nice individual, very pleasant, very intelligent, but I was asked to determine who would make in our, along with the other one, who would make the best candidate to be a Bomb Tech. And I took that very serious because I don't want to sound all dramatic, but I said Bomb Techs are doing very dangerous things by yourself, and I just had -- I



took it very serious of who I thought would make the best people evaluating everybody overall. It just wasn't anything against her or her ability. I was just asked to do that, and I tried to do it as best I could. So I don't know why just her experience compared to the other people just wasn't competitive for the positions.
Q You interviewed Maureen very early on in the interview process, do you recall that?
A I don't remember what her ranking was, but I was evaluating people as they came if they were competitive.
Q Do you -- with respect to Page 429 specifically --
A Is that the page I'm looking at, sir?
Q Yes, it should be.
A I don't see a page number on there, that's why I am asking.
Q Yeah, in the lower-left there.
A In my screen, I don't see it. I see 18 out of 24 on top so that's right.
Q Yes. That's the right page. With regard to that page in particular and that question in particular, do you recall one way or another why you rated Maureen as does not demonstrate the competency for that question?
A No.



Q Your notes on Page 429 make any mention of teamwork?
MR. PARKER: Objection. Form. Foundation. Go ahead.
BY THE WITNESS:
A No.
BY MR. PARKER:
Q Let's move onto page 432 if we could. That's question number four and this part of the interview asked about quick decision making. Do you see that up near the top?
A Yes.
Q According to your notes, Maureen's answer to this question described how she preserved evidence in a child pornography case. Do you recall that?
A Yes.
Q And she specifically referred to child pornography as opposed to an adult reviewing pornography, correct?
A I assume. That's what I wrote down.
Q Do you consider child pornography to be a serious crime?
A Yes, sir.
Q Do you consider preservation of evidence to be a



critical field function of a police officer?
A Yes, sir.
Q Do you consider preservation of evidence to be a critical field function of a Bomb Technician?
A A Bomb Tech is a police officer, yes.
Q You noted that Maureen had made the decision to preserve the evidence quickly, that's in quotes. Do you see that?
A I don't see quotes, but I wrote that down.
Q Right. Thank you. And this part of the interview is described at the very top as quick decision. Do you see that?
A Yes. Sir, we interviewed 70 some Chicago Police Officers. Everybody was talking about, and they didn't have to, but they talked about a violent action as they were working as a Chicago Police Officer. Her example of a quick decision was when she was a librarian, and after the person left, she went over and stood by the computer so no one else took it until the police came. That's being a good citizen. That's not being -- so these are what we based -- I based my decision on.
Q Do you consider child pornography to be a violent crime?
A It could be. I don't know, sir.



MAGNA LEGAL SERVICES

Q In any event, you rated Maureen as does not demonstrate the competency for quick decision, correct?
A Correct.
Q And on Page 416, Mr. Jones rated Maureen as demonstrates some of the competency for quick decision do you see that?
A I -- yes.
Q And on Page 424 if you can scroll to that, Mr. Egan also rated Maureen as demonstrates some of the competency for quick decision, correct?
A Correct. But again, all three of us were individuals and making our own decisions and not consulting with each other on what the marks should be. That was my assessment, and this is their assessment.
Q Did you explain to them at the consensus meeting why contrary to their ratings you rated Maureen as does not demonstrate the competency or quick decision?
A I don't recall.
Q Did they ever tell you why they rated Maureen higher than you did?
A No. I don't even remember talking about her at the consensus meeting. We went over everyone. I didn't -- I don't remember discussing her stuff at all.
Q Do you have any recollection of why you rated



Maureen as does not demonstrate the competency for quick decision?
A I think I already answered that, sir. It was as a librarian, she walked over there and after the person left and I assume stood by the computer so no one else would touch it until the police came. That's not -- which is very good for citizen, she wasn't a police officer then, but it's nothing -- it's not a quick action in my opinion.
Q Anything else you recall about why you rated her does not demonstrate competency?
A No, sir.
Q On Page 430, if we can scroll to that, do you see the reference to department directives in the question about the role of a Bomb Technician?
A Uh-huh.
THE COURT REPORTER: Is that a yes?
THE WITNESS: Yes.
BY MR. CURLEY:
Q And was Plaintiff's Exhibit 43, which hopefully you can see without having to call it up we looked at it earlier, that's the directive for the Bomb Tech position. Is that one of the directives referred to on Page 430?
A I'm sorry, sir. I was thinking some -- now that



I read the interview question and we talked about it earlier, I think my left side is what they said the role of an explosive technician should be. And on the right side, I think I put why they want to become an explosive technician. So when we talked about earlier why she wanted to be, I think I said she must have said better protection, follow-up and stuff. I think that when people are right were saying what their roles were based off the directives was on than the left side of the page and I made a list of why they wanted to be on the right side, if that clarifies my earlier answer.
Q Well, they were asked what the role of an explosive technician was, correct?
A And I wrote things on the left side. I think there was a list of things that they had provided before.
Q Did Maureen say that she did not want to better protect the public?
A I think if I remember, that that was the answer to the question of the role of an explosive technician.
Q But my question was --
A I assume so, sir. She's a Chicago Police Officer. I am an FBI Agent. We all want to protect, that is what police officers do. I am sure she does. But I don't know. She didn't say yes or no. If she did,



I think she was repeating what the role of a explosive tech is and that was written and something directive they gave. I assume that she feels that way, but I don't know.
Q Again, the interview question refers to department directives other than the directive we looked at earlier Plaintiff's Exhibit 43, what are the other department directives there?
A That she wrote down?
Q No, no --
A That I wrote down?
Q I'm sorry, the question says, based on your knowledge of department directives. So what are the department directives that are referred to there?
A I don't know. It's whatever the Chicago Police directives are. I don't know them right now and they're different than ours. I don't know what they have listed on theirs.
Q Did you know the Chicago Police Department directives at the time of the hiring process?
A Yeah. I think there's a list there, there was a thing that referenced, but I don't recall what they are right now, sir.
Q Did you read the Chicago Police Department



MAGNA LEGAL SERVICES

Page 134

directives referred to in this exhibit when you became part of the hiring process?
A I reviewed them, yes, sir.
Q And what were they?
A Again, I don't recall at this time, sir.
Q Did you ask for copies of them?
A I don't know if a got a copy of them or not, I don't recall.
Q And how many directives did you review?
A I don't recall, sir.
Q Was it one or two or half dozen or more?
A Again, I don't recall, sir.
Q The next page 431, you wrote if I read it correctly, DNR dash. I'm assuming that means explosive license. Do you see that?
A Yes.
Q Is that a note that Maureen was in the process of applying for her explosive license through the Illinois Department of Natural Resources --
A Yes.
MR. PARKER: Objection. Foundation. Go ahead.
BY THE WITNESS:
A I believe so, yes.
BY MR. CURLEY:

Page 135

Q And was that a positive factor in favor of Maureen?
A It was a factor that she stated in her interview. It wasn't required for an interview -- a person to have one at the time.
Q Right, but whether or not it was required, was that a positive factor in her favor?
A I don't know positive. It wasn't a negative. It was neutral, I guess, I don't...
Q Did you criticize Maureen at her interview for applying for her explosive license?
A No. Of course not.
Q Did Mr. Egan criticize Maureen at her interview for applying for her explosive license?
A No.
Q Did you attend the consensus meeting on June 5, 2015?
A I don't recall the date, but I attended the consensus meeting if that's the date -- obviously, yes.
Q That's a matter of record --
A Yeah. I'm not debating the date. If that's what the date was, yes, I attended the meeting.
Q Were Mr. Jones and Mr. Egan also there?
A Yes.

Page 136

Q And was there a person by the name of Rebecca Zamora there as well?
A There's one of the ladies from HR, I don't remember who was there, but one of the ladies from HR was there.
Q Were there one or two representatives of HR at the consensus meetings as best you recall?
A I don't recall.
Q What was the role of the Human Resources representative or representatives at this meetings?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A I don't know what their role their -- you know, ensuring that the process was ran properly, and that, you know, that they're the experts on the hiring process for the city and they were there to fill in that role, I assume.
Q Was Lisa Gariota at the consensus meeting?
A Again, sir, I don't know. One or two of the ladies -- I'm not sure who was there. Someone from HR was there, I don't recall who it was because I don't really know the ladies at all.
Q Did you have discussions with anyone at all after the interviews before the consensus meeting about any

Page 137

candidate for the Bomb Tech position?
A No.
Q Did you personally know any of the Bomb Technician candidates that made it to the interview stage?
A No. I may have seen some of them -- I didn't know any of their names. I didn't know any of them really personally. Some of the canine guy that I'd seen at different events, I didn't know him. Some of the SWAT guys, I've seen at different SWAT arrests, I don't know them by name. I may recognize the faces. There is a FBI Chicago Police Officer Task Force Officer assigned to one of the gang squads. I saw him at the office. I don't know him. I didn't know he was from Chicago until he came there. So personally did I know anybody, no. Did I see some people before and maybe recognize their face, yes, but I didn't know them personally.
Q And can you tell us today who you recognize during the interview process?
A I'm trying to think a couple of the canine guys was -- I think it was Diaz and McNichols (phonetic) that I had seen before but did not know him. Spencer was on SWAT that I had seen at -- but like I said, didn't know him, but just seen him it was some SWAT activity, just



MAGNA LEGAL SERVICES

recognized the face. And then Colvin -- or not Colvin. Colvin or something was the guy that was assigned to our Gang Task Force. Like I said, I didn't know him -- Tyson. Tyson --
Q Colvin?
A Yes. And just recognized him by face, but like I said did not know him, didn't know anything about any of the people prior to the interview.
Q Anyone else that you recognized at the interview that you can recall now?
A No.
Q When did the consensus meeting start?
A I don't recall, sir.
Q How long did it last?
A Again, I don't recall.
Q Was the consensus meeting videotaped, recorded, or transcribed to your knowledge?
A Not -- I don't know.
Q Were each of the Bomb Tech candidates that have been interviewed discussed at the consensus meeting?
MR. PARKER: Objection. Asked and answered. Go ahead.
BY THE WITNESS:
A I don't recall.



BY MR. CURLEY:
Q Can you tell us what was discussed about Maureen Bresnahan at the consensus meeting?
A I think I already answered that, sir. I don't remember discussing her at all.
Q Did you take any notes during the consensus meeting?
A I don't believe so. If I did, the city would have it.
Q Did you see Mr. Jones or Mr. Egan take any notes during the consensus meeting?
A I don't recall.
Q Did you say at the consensus meeting that Maureen was best suited for a clerical or office position?
A I think I wrote that -- did I write something down, I could have.
Q Let's move onto Exhibit 41.
This exhibit is titled Explosives Technician 1 HR consensus meeting worksheet 2015 and was produced to us by the Defendant's attorneys. Have you seen this document or any part of it before today?
A No, sir.
Q Do you recognize the handwriting on Plaintiff's Exhibit 41?



A No, sir.
Q Do you see that on the third page, if we can scroll down to that. It appears to have been signed by an R. Zamora on June 5, 2015?
A I see the name, yeah. I assume that's the signature. Yeah, I don't know anything about the form, sir. I've never seen it.
Q So you can't identify the handwriting on this exhibit as Ms. Zamora's?
A I wouldn't even know her if she came in the room. So no, I'm sorry, I do not.
Q Does this refresh your recollection that Rebecca Zamora was at the consensus meeting?
A Sir, again, I don't -- there were a couple agents there. If she said she was there, and you said, I'm not arguing about that. I just don't know who there. I know there was somebody there from HR, and her name sounds familiar, but I don't know who was there. I assume if she produced that she was there, but I just don't remember, sir.
Q And I'm not trying to argue either, that's what lawyers do if someone says they don't have a recollection, I show them something that might refresh your recollection that's all --



A Yeah, I'm sorry. I'm not arguing about this. Yeah, she could have been there. I just don't -- I just don't know her, and I remember there was a couple there. I remember there was a Lisa and Rebecca, but I don't know which one was there, so I don't recall.
Q On the first page of this exhibit next to Maureen Bresnahan, it says best suited for clerical office. Did you say that about Maureen at the consensus meeting?
A I could have. I may have, but I don't recall.
Q Do you deny saying it?
A I don't deny. I think we -- I think that based on what she said that that would be -- that's how I felt. I may have said it, but I don't know if I did or not.
Q Can you just read to yourself and we'll scroll through these slowly starting with Page 1 the notes made for each of the candidates and just tell me whether you remember who made any of the comments and whether you personally made any of the comments.
MR. PARKER: I'll just object to foundation. Go ahead.
BY MR. CURLEY:
Q Just let us know, sir, when you're done. Ready for the next page.
BY THE WITNESS:

A I don't remember any, sir. I don't even know half the people -- I only know a couple people on the list, recognize the names. I don't know any of the other people.
BY MR. CURLEY:
Q My question is if we can just continue to go through the list is whether now reading these notes you recall making any of the comments on Plaintiff's Exhibit 41?
A No. I don't remember making any of the comments, sir.
Q Do you have any reason to dispute the accuracy of the notes on this exhibit?
MR. PARKER: Object to form. Go ahead.
BY THE WITNESS:
A Again, not knowing the statement that's listed here and the person without looking at all of the other interview notes, I don't think anything is made up, but I don't know where the assessment came from any of these people that I don't recall.
BY MR. CURLEY:
Q Can we please share the screen with Exhibit 85, Plaintiff's Exhibit 85. This is the final eligibility list for the Bomb Technician position. The list itself



is attached to the email on the first page and was produced to us by the Defendant's attorneys, so if we can turn to the actual third page of the exhibit.
And just so you know, this -- there's been testimony that this lists the first and last names of the each of the candidates that made the final eligibility list, and then the columns that have, for instance Egan/Org (phonetic) those are how Mr. Egan rated each candidate for the overall rating after the interview, and it's the same thing for Jones, and same thing for you. And then the columns that have the red R's are how each of the interviewers rated the candidates after the consensus meeting?
MR. PARKER: I'll object to foundation. Go ahead --
BY MR. CURLEY:
Q And then over in the right there's the ranking. And I'd like to draw your attention to candidate James Fumo, it's about two-thirds of the way down. Can you tell us everything you remember about the discussion of James Fumo at the consensus meeting?
A I don't recall him at all. I don't recognize that name.
Q Now according to this exhibit after his interview, James Fumo was rated by Mr. Jones and Mr. Egan



as a recommended with some reservations, and you rated him as do not recommend candidate for hire, do you see that?
A Okay. Yeah.
Q Those were the same overall candidate ratings that Maureen received, correct, reservation -- recommended with some reservations by Mr. Egan or Mr. Jones and do not recommend candidate for hire by you, right?
A The overall --
MR. PARKER: Objection. Foundation --
THE WITNESS: I'm sorry, sir.
MR. PARKER: Sorry. Objection. Foundation. Go ahead. You can answer to the extent you can.
BY THE WITNESS:
A I don't recall what Sergeant Egan and Roland Jones' overall assessment of her were at all. I don't remember seeing that. I could have. I don't remember what they said.
BY MR. CURLEY:
Q In any event, after the consensus meeting, James Fumo was recommended and made the eligibility list, correct?
MR. PARKER: Object to foundation. Go ahead.



BY THE WITNESS:
A Sir, again, I don't know who he is, and I don't know what he was ranked in the overall.
BY MR. CURLEY:
Q Why was James Fumo recommended and put on the eligibility list at the consensus meeting?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A To repeat what my answer, I don't recall who is he or anything about him.
BY MR. CURLEY:
Q So you don't know why James Fumo was recommended and put on the eligibility list; is that correct?
A Correct.
Q Were you talked out of your do not recommend rating for Mr. Fumo by Mr. Jones and Mr. Egan?
A Sir --
MR. PARKER: Object. Foundation. Go ahead.
BY THE WITNESS:
A -- I don't remember who he is, so I can't give you an answer anything about him because I don't remember anything about him, sir.
BY MR. CURLEY:
Q So is it fair to say that --



MAGNA LEGAL SERVICES

A It's fair to say that I didn't know nothing about him, yes.
Q Is it fair to say that you do not recall what they said that caused you to change your rating?
A That's fair to say, yes.
MR. PARKER: Object to foundation.
BY MR. CURLEY:
Q And if we can please put Plaintiff's Exhibit 41 back up on the screen, that's the notes from the consensus meeting. And if we go to the second page, the notes from Mr. Fumo are, quote, lacks experience, but intelligent, and then to the right is REC, which means recommended, do you see that?
A Yes.
Q Does that refresh your recollection at all about the discussion of James Fumo at the consensus meeting?
A No.
Q Now, if we can go back to Plaintiff's Exhibit 85, I am sorry that we're going to jump back and forth a little bit. That's the final eligibility list. And I'm going to ask you focus on Jose Estrada in about two-thirds of the way down. Do you recall that after the consensus meeting Mr. Estrada was recommended and made the eligibility list?



A Yeah. I don't recognize his name either, sir.
Q Do you remember anything about the discussion of Jose Estrada at the consensus meeting?
A No.
Q Do you know why Mr. Estrada was recommended for hire and put on the eligibility list after the consensus meeting?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Again, sir, I don't recall anything about him.
BY MR. CURLEY:
Q Including why he was recommended for hire and put on the eligibility list, correct?
MR. PARKER: Object to foundation --
BY THE WITNESS:
A Correct.
BY MR. CURLEY:
Q Could we please share the screen with Plaintiff's Exhibit 102, and these are the Candidate Assessment Forms for Mr. Estrada. And if we could scroll down to Page 709, that's where your Candidate Assessment Form starts. Can you confirm that?
A Okay.
Q I want to ask you some questions about Mr.



Estrada's position and duties with the Chicago Police Department. And so if we stay on Page 2079, what did you write about that in your notes?
A Community affairs and media unit.
Q And then if you look at Page 12179.
MR. HYNDMAN: Which page, Phil, sorry.
MR. CURLEY: 12179.
BY MR. CURLEY:
Q Mr. Egan wrote down a little bit more. He wrote news affairs, coffee, news clips, and media inquiries. Do you see that?
A Yes.
Q And then to complete the loop on the very first page of the exhibit, Mr. Jones took even more complete notes of Mr. Estrada's current position and job duties. Do you see that?
A Yes.
Q And he wrote down that Mr. Estrada's current unit was the office of news affairs, correct?
MR. PARKER: Object to foundation.
BY MR. CURLEY:
Q Do you see that?
A Yeah. I guess that's what that means.
Q And for Mr. Estrada's typical day at work he



wrote, set coffee/oatmeal, then get to work. Most days busy. Compile news clips. Deal media inquiries, write-up press releases. Set up media availability, press conferences, prep people for conferences with an asterisk. And then going to the next column, a command staff conferences. Do you see that?
A Yes.
Q And your bottom line judgment on Page 2085, if we can flip back to that, which is your overall candidate rating, was that Mr. Estrada had no real related experience, correct?
A Yes.
Q And by that you meant no real related Bomb Tech experience, right?
A Correct.
MR. PARKER: Object to foundation. Go ahead --
THE WITNESS: Sorry.
BY MR. CURLEY:
Q Did you understand Mr. Estrada's duties at the Office of News Affairs to be administrative in nature?
A Yeah. I don't -- like I said, I don't really -- I vaguely remember somebody from there, but yeah, I don't remember much about him.
Q But did you consider his duties as he described



MAGNA LEGAL SERVICES

them to be administrative in nature?
A The current one, yes.
Q Did you consider them -- his current duties to be operational in nature?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A I considered to be -- I just answered. What was your question you asked before?
BY MR. CURLEY:
Q Whether you considered Mr. Estrada's duties to be administrative in nature?
A Yes.
Q So you did not consider them to be operational, correct?
A Correct.
Q Did you consider his duties to be clerical or office in nature?
A Just -- no, I don't -- just admin. I don't know clerical. It would be more of an admin role, administrative role I would assume, I don't know.
Q And at the consensus meeting, if we go back to Plaintiff's Exhibit 41 and look at the notes for Jose Estrada, those notes are very similar to those of Jim Fumo just below him. And Mr. Estrada's notes reads lacks



experience/training, but has the intelligence to learn, then REC meaning recommended, end quote. Do you see that?
A Yes.
Q I think you've told us that you had a concern about Maureen's experience; is that fair to say?
MR. PARKER: Object. Foundation. Mischaracterizes previous testimony. Go ahead.
BY THE WITNESS:
A Yeah, I don't know if I said that, no.
BY MR. CURLEY:
Q Did you have a concern with her experience?
MR. PARKER: Same objections.
BY THE WITNESS:
A Again, sir, I was evaluating overall the candidates and we tried to provide the best candidates for the position. This guy Estrada, I don't know -- what was the other questions that he answered on that we -- I made notes on his past experience, assignments, how he answered. I can't evaluate one person if I can't see everything I wrote about him. I don't recall this person. Like I said, I remember somebody from the media, but like I said, I don't know him, I don't recall anymore about him.



Q But fair enough. My question actually related to Maureen and simply was if you will have concerns about Maureen's experience?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A Yes.
BY MR. CURLEY:
Q And you told us about those earlier today, correct?
A We discussed earlier in my testimony, yes, sir.
Q You also testified earlier today that Maureen was very intelligent; do you recall that?
MR. PARKER: Object to foundation. Mischaracterizes testimony.
BY MR. CURLEY:
Q Do you want to see your note to that affect?
A No. So -- yeah, I wrote down she seemed very intelligent in her interview, yes.
Q Now, it was decided at the consensus meeting that despite their lack of experience, Mr. Fumo and Mr. Estrada would be recommended for hire because of their intelligence. That's on Exhibit 41, correct?
MR. PARKER: Objection. Form. Foundation.
BY THE WITNESS:



A Am I looking at Exhibit 41 now?
BY MR. CURLEY:
Q Yes you are.
A Again, I don't -- this was -- these notes were not our notes. I don't know -- I can't describe -- these are not what we based our decision on these notes here. I'd have to look at my sheets and how we rated and stuff like that. So I don't know if this is accurate description of what that candidate was. I just don't know anything those notes or I can't comment on them.
Q Do you recall why Maureen was treated differently than Fumo and Estrada at the consensus meeting?
MR. PARKER: Objection. Form. Foundation.
BY THE WITNESS:
A I don't know how she was treated differently, sir. I don't understand your question.
BY MR. CURLEY:
Q Do you know why Maureen was not recommended for hire and placed on the eligibility list, despite her lack of experience given that she was very intelligent?
MR. PARKER: Object to form. Foundation.
BY THE WITNESS:
A Again, sir, we rank all of the candidates based on the totality of all the interviews and ranked therein,



MAGNA LEGAL SERVICES

she did not rank high compared to the other people. It wasn't anything against her or lack of, it was based on other people.

BY MR. CURLEY:

Q Do you recall specifically why Mr. Fumo and Mr. Estrada were ranked higher than Maureen?

A Again, I don't remember those two people, so I cannot answer that. No, I do not.

Q Have you told us everything you can recall about the discussion of Maureen Bresnahan at the consensus meeting?

A All that I can recall, yes, sir.

Q Is there anything that would refresh your recollection about that discussion beyond what you've testified to today?

A That I have?

Q Yes.

A No.

Q Have you told us everything you can recall about the discussion of James Fumo at the consensus meeting?

A Yes.

Q Is there anything that could refresh your recollection about that discussion beyond what you have testified to today?



A That I have, no.

Q Have you told us everything you can recall about the discussion of Jose Estrada at the consensus meeting?

A Yes.

Q Is there anything you have that could refresh your recollection about that discussion beyond what you have testified to today?

A No, sir.

Q Now, before we move on from Mr. Estrada, I did want to go back to his Candidate Assessment Forms, Exhibit 102. And Page 2083, that's the quick decision question. Can you read into the record what you wrote on that page?

A Talked about federal lawsuit, made wrong decision, learned from mistake.

Q What else did Mr. Estrada say about -- Strike that.

What did Mr. Estrada say about the federal lawsuit or the wrong decision he had made or how he had learned from the mistake?

A Sir --

MR. PARKER: Objection. Foundation. Go ahead.

BY THE WITNESS:

A Sir, I don't recall that at all.



BY MR. CURLEY:

Q Can you turn to Page 12183. Those are Mr. Egan's notes of the same question, and he wrote quick decision, made poor decision in personal domestic issue, end quote. Does that refresh your recollection at all about the federal lawsuit involving Mr. Estrada?

A No, sir, it does not.

Q And Mr. Egan -- I'm sorry, Mr. Jones on Page 13034, he had more or at least longer notes. He wrote incident with fiance as victim, candidate arrest defendant was sued as result, in hindsight would have reacted in a different direction, learned from incident.

Does that refresh your recollection any further about Mr. Estrada's answer to the question?

A No, sir.

Q Going back to Exhibit 41 if we could. And perhaps you saw it before, or we can screen through it again if you want. There are references on this Exhibit to, quote, team player, end quote. Is that a term that you used during the Bomb Tech hiring process?

A I don't recall using that, no.

Q Can we turn to Exhibit No. 48 please which are the candidate Assessment Forms for William Carlson. We can scroll through and we can read as much as you'd like,



of course, but I will direct your attention to start with Page 1989. That's your handwriting on that page, correct?

A Yes.

Q And you wrote as the final note on your overall candidate rating that Mr. Carlson seemed to be a team player. Do you see that?

A Yes.

Q Does that refresh your recollection at all as to whether you used that term during the hiring process and what it meant?

A I used it on this document here, but I don't remember writing why I wrote it down or what he said that made me indicate that.

Q Do you know what you meant by team player when you wrote that down?

A I don't recall. It possibly had something to do with working in a unit or team or something and how his reaction with that. I don't recall why I said that.

Q Okay. And you recommended Mr. Carlson for hire after the interview, correct?

A According to this, this is my sheet, yes. But again, I don't know him. I don't remember him.

Q Do you remember any discussion of Mr. Carlson at



MAGNA LEGAL SERVICES

Page 158

the consensus meeting?
A Again, sir, I don't remember -- I don't recognize the name. I don't remember by seeing this who he was or anything. So no, I do not.
Q Do you recall why Mr. Carlson at the consensus meeting was recommended for hire and made the final eligibility list?
A Again, sir, I do not remember him specifically, so I cannot answer that.
Q Did Mr. Jones or Mr. Egan ever use the term team player in your presence during the Bomb Tech hiring process?
A Not that I recall. They could have, I just don't remember.
Q Did they ever tell you what they meant by team player?
A No.
Q If we can turn to page, still on Exhibit 48, page 1986. That's your handwriting, correct?
A Yes.
Q And you noted that Mr. Carlson did not have any military experience, correct?
A Yes.
Q And of course you've already told us that you

Page 159

don't have any military experience either, correct?
A Do I, no.
Q Does not having military experience disqualify a candidate from being recommended for hire in making the eligibility list?
MR. PARKER: Object to foundation. Go ahead.
BY THE WITNESS:
A No.
BY MR. CURLEY:
Q Now, if we can go back to Page 1989, you also noted on that page that Mr. Carlson seemed nervous and was sweaty. Do you see that?
A Yep.
Q Did you consider those to be a quality -- positive qualities for a Bomb Technician?
A There were notes that if I could remember the individual, I assume.
Q Well, did you consider that to be a positive or a negative quality?
MR. PARKER: Object to form. Go ahead --
BY THE WITNESS:
A Neither.
BY MR. CURLEY:
Q Do you want your fellow Bomb Technicians to be

Page 160

nervous and sweaty on the job?
A Sir, I wrote down things that remind me of who they were, I assume. I mean, it's good to be -- it's good for maybe be a little nervous and little respectful of what we're doing, you don't want to be over confident. So just because a person was nervous in an interview does not mean he would be nervous doing the job.
Q Well, you wrote these notes about Mr. Carlson on your overall Candidate Rating Sheet, correct?
A So I can remember who they were, yes, sir. Because again, we were interviewing 75 people, and after a while, you know, a lot of them had similar backgrounds. You had to make notes so you can distinguish who they were because I personally did not know any of them. So I couldn't -- and I had no relationship, no similarity like, oh, we both worked the 24th District -- I had no knowledge of that. I was making notes so that I can remember the next week of what individual I was talking to.
Q Well, according to the a Candidate Assessment Form, the interview on this page was supposed to provide an overall summary of the candidate based on education, professional qualification, work history, and competencies demonstrated. Do you see that?

Page 161

A Yes.
Q Are your handwritten notes under that your attempt to provide that overall summary?
A And other notes for me to recall who they were when we did our assessment -- or our sentence. Because these are the only notes that we took, sir, is right here.
Q Were you aware in 2015 that women were severely under represented across all units in the Chicago Police Department Special Functions Division?
MR. PARKER: Objection. Objection. Foundation. Form. Go ahead.
BY THE WITNESS:
A Yeah, sir, I know nothing of the Chicago Police Department staffing.
BY MR. CURLEY:
Q Based on your many years of experience working with the Chicago Bomb Squad in 2015, had the Bomb Squad ever had a woman member?
MR. PARKER: Objection. Form. Foundation. Go ahead.
BY THE WITNESS:
A They had I know at least two that I know that I personally knew.


MAGNA LEGAL SERVICES

BY MR. CURLEY:
Q In 2015?
A I don't know when they -- what year they retired. I'm not sure if any of them was working at that time or not.
Q And who do you have in mind?
A Cindy, I can't think of her last name. It started with a Z and Irene Jones. I know Irene Jones had retired. I'm not sure if Cindy was still working at that time or not or was getting ready to retire.
Q And your recollection of it was they were both on the Chicago Police Department Bomb Squad?
A They were, yes.
Q How large is the FBI Bomb Squad here in Chicago, how many members are there?
A We have seven Bomb Techs.
Q And how many are women currently?
A None.
Q Can you tell us what you recall about the ranking of candidates once they replaced on the final eligibility list?
A No.
Q Do you have any recollection of how the candidates were ranked?



A Just by discussion with Sergeant Egan and Mr. Jones.
Q Do you have any recollection of that discussion?
A No. I think we all, you know, ranked them ourselves like the top 10 or whatever we did, and then saw who was in the same list of each other and then worked through the ranking like that.
Q You said you think that's what you did. Do you recall that's what happened?
A I don't recall, sir, it's been so many years ago. It would have been a similar situation there that we would have ranked, took our sheets or whatever and reviewed them and ranked them accordingly.
Q But was there any numerical ranking or scoring that was used for the final ranking of the candidates?
A No, not that I recall.
Q Did Mr. Egan have the final say on how the candidates were ranked on the eligibility list?
A As the manager, I think that was one of his duties, but there was no -- I don't recall any argument or conflict between us what the rankings would be, so it was all consistent between the three of us.
Q Well, is it your understanding that Mr. Egan did have the final say on how the candidates were ranked?



A Well, we discussed that earlier as the manager that was in that procedure, correct?
Q Yes.
A Yeah. So, yes.
MR. CURLEY: Why don't we take a break if that works for about 10 minutes. Moving on into what I think is the final phase of my questions.
THE VIDEOGRAPHER: This ends media unit number four in the deposition of Todd Schmitt. The time is 2:38 p.m. we're going off the record.
MR. CURLEY: Let's come back at 2:50 if that works.
(Short recess.)
THE VIDEOGRAPHER: All right. This begins media unit number five in the deposition of Todd Schmitt. The time is 2:48 p.m. We're back on the record.
BY MR. CURLEY:
Q Mr. Schmitt, I should have asked you whether there were any women on the FBI Chicago Bomb Squad in 2015 as well?
A Like I said, I'm not sure when Cindy retired -- the Chicago PD or Chicago FBI?
Q Chicago FBI. Let me rephrase the question so we're clear.
In 2015, were there any women on the FBI



Chicago Bomb Squad?
A Yeah, our coordinator, Canine Handler Jenny Redick (phonetic), she retired somewhere around that time. I'm not sure if she was still working in 2015 or if she had already retired, but she retired somewhere around that time frame.
Q And I believe you testified that you joined the Chicago FBI Bomb Squad in 2006; is that right?
A Yes.
Q Have there been any other women members of the FBI Chicago Bomb Squad since then?
A Just Jennifer Redick (phonetic). But I also should note that since I've been a Bomb Tech in canvassing, no female agents have applied to be a Bomb Tech in Chicago.
Q Thank you. What did you mean when you said you were canvassing?
A We have an open-ended Bomb Tech, we would -- the FBI would put out, same thing Chicago did, would put out a notice, canvas, that we were taking applications or expressed interest in people who would like to become a Bomb Tech.
Q Got it --
A Through our internal computer system, you know,



MAGNA LEGAL SERVICES

put out and then they would fill out an application and apply back.
Q When was the first time you learned that Mr. Egan was looking to start a new hiring process for the Bomb Tech position?
MR. PARKER: Objection. Form. Foundation. Go ahead.
BY THE WITNESS:
A The process that we're discussing now or the current one --
BY MR. CURLEY:
Q Yes, sir. Yes.
A I don't recall. Sometime in 2015.
Q All right. Let me ask to share the screen with Plaintiff's Exhibit 135. And this is an email chain consisting of a number of emails in which you are the recipient and/or the sender. And the bottom email in this chain, the first email is actually dated February 26th of 2014. That's from you copied to Mr. Egan. And you wrote, looking for some help. Sergeant Egan from CPD is looking to start a new process. Does that refresh your recollection that you first learned about the new process in 2014?
A That they were looking to come up with something,



yeah, and Ed Marshman (phonetic) and Jeff Warren (phonetic) were two agents, they're retired now, and they were assigned to the Hazardous Device School in Alabama.
Q And how did you know in 2014, February, that Sergeant Egan was starting a new process?
MR. PARKER: Objection. Form. Foundation. Go ahead.
BY THE WITNESS:
A I don't recall. I assume he called and asked me.
BY MR. CURLEY:
Q Do you recall anything that Sergeant Egan said about the new process that he was looking to start?
A No, sir.
Q When were you first asked to serve on the interview panel?
A I don't recall, sir.
Q Do you know if it was at or about the time that you first learned of the new process in February of 2014?
A No, I doubt it because they didn't have a process in place then. At that time, they were looking to start this new process.
Q Okay. And we'll look at some other emails in a bit that may help you place a date on that.
Attached to this email chain is an FBI



Bomb Data Center Special Technicians Bulletin 2013-1, titled a Guide for Selecting Bomb Squad Personnel. Are you familiar with that document?
A Yes.
Q Can you tell me its purpose?
A To assist squads, bomb squads to select their personnel, giving them suggestions, and maybe best practices.
Q And on the third page of the exhibit under sources, those are the sources for the information in the guide; is that correct?
A I assume so, yes.
Q And the Chicago Police Department Bomb Squad is listed there. Do you know what contribution the Chicago Police Department Bomb Squad made to this guide --
A No, sir. No, sir.
Q And were you involved in compiling or preparing the guide?
A No, sir.
Q Do you know who did that at the FBI?
A No, sir.
Q Other than in February of 2014, did Mr. Egan approach you for any input on the design of the 2015 Bomb Tech selection?



A Not that I recall, no.
Q So after that initial inquiry and he was sent the guide, what do you remember next happening in connection with your role in the hiring?
A I don't recall. I remember sometime he asked me to sit on the board with him, but I don't remember when that was.
Q I have an email that may help you. If you can share the screen with Exhibit 136. That's an email from Mr. Egan to you on March 18, 2015, and he asks if you are still willing to participate in the selection process. Does this help you at all place the time when you were first asked by Mr. Egan to serve on the panel?
A No. I mean, like I say, I meet with him on a regular basis for coffee to talk about different things. I assume sometime prior to March 18th, he asked me initially, and he was following back up here. So I don't remember when he asked me to sit on it.
Q When he first asked you to sit on the panel, did he tell you what the duties and responsibilities were?
A No. And maybe to help clarify, we've been asked several times over the past to sit on Chicago's process. Other bomb squads, it's kind of a -- it's not a -- it's definitely not a requirement, but it's something that a

Page 170

lot of our squads asked us to participate on. And, you know, I've sat on several other squads interview processes or had one of our guys sit on the process. So it's not a irregular thing for us to sit on selections for the departments.

Q Was this the first time that you served on an interview panel for the Chicago Police Department Bomb Squad?

A Yes, sir.

Q And had you had any over involvement of any kind with Chicago Police Department Bomb Squad hiring prior to 2015?

A I have not personally, no.

Q Do you know if anyone else at the FBI had?

A I know in the past several our Bomb Techs are no longer with us and retired. Jenny Redick, I know she sat through several of them. Some other Bomb Techs, I remember sitting when I first got in the program or before they hadn't set over in interviews, but, you know, we've done it in the past, Special Agent Bomb Techs from the FBI has.

Q Did Mr. Egan tell you whether he was considering asking others to serve on the interview panel?

A I don't recall that.

Page 171

Q Did he tell you whether or not he'd ever ask anyone other than you or were you his first choice as far as you knew?

A I don't recall. I don't know.

Q Were you told by anyone how you were chosen to serve on the interview panel?

A No.

Q Were you told who chose you?

A No.

Q By this time on March 18th of 2015, do you know whether Mr. Jones had already been asked to serve on the interview panel?

A I do not.

Q When did you first learn that Mr. Jones was serving on the same panel?

A I don't recall. I assume there's sometime around when I was asked.

Q Was there any written application or documentation you had to submit to the City of Chicago or the Chicago Police Department in order to participate in the hiring?

A Not that I recall, no.

Q Did you interview with any representatives of the City of Chicago or the Chicago Police Department before

Page 172

you were asked to serve on the panel?

A Just attended the course that we talked about earlier.

Q Prior to that, you hadn't been interviewed by anyone at the city or the police department, correct?

A Correct.

Q Before you agreed to serve on the panel, did you have contact with anyone else from the city or the police department about the hiring process?

A No.

Q Could you share the screen please with Exhibit 71, Plaintiff's 71. This is an email just a couple days later, and you're not indicated as having received or have sent this email, but the top email on the chain does say that Mr. Schmitt as been vetted by DHR, and that's from Lisa Gariota. Do you know in what way you have been vetted by the Department of Human Resources?

MR. PARKER: Object to foundation. Go ahead.

BY THE WITNESS:

A No, sir.

BY MR. CURLEY:

Q The next exhibit would be Plaintiff's Exhibit 138. If you can please share that with Mr. Schmitt on the screen. And this is an email that you sent to the

Page 173

Training and Development Department at the City of Chicago attaching your request to attend that interview and consensus meeting you testified about earlier on April 28th. Do you see that?

A I can't see at the bottom of it what I wrote originally.

Q Okay. And then you got a response from Peg White at the Department of Human Resources. Did you ever have any conversations with Peg White about your participation in the hiring process?

A No, sir.

Q Did you ever meet her at all?

A No.

Q Can you please share the screen with Plaintiff's Exhibit 137 to Mr. Schmitt. This is an email chain and I'll ask that we scroll through it all so we can see all of it, but it's an email chain involving you and Mr. submit and Mr. Jones.

A Okay.

Q And the first email at the very bottom, and I think we're on that now on the screen is thought we can get -- thought we can go over the calendar. What calendar were you referring to there?

A I assumed like I said earlier we talked about



MAGNA LEGAL SERVICES

Page 174

meet with Jimmy to talk about -- Sergeant Egan to talk about things that are coming up. I assume the special events that are coming up, it may have been some schools coming up just of see what we got going on in Chicago that we need to support with him.
Q And do you know why you included Mr. Jones, Ronald (sic) Jones in your email requesting to get together for lunch?
A Roland Jones?
Q Yes.
A Yeah. No. Maybe he's working, I don't know.
Q When you get together with Mr. Egan it was typically just you and Mr. Egan, correct?
A No. If other guys were working, sometimes they come along, whatever.
Q Did Mr. Jones typically meet with you and Mr. Egan together?
A We have in the past, yeah.
Q And it looks like the three of you had lunch at Jason's at 11:30 a.m. on March 31st. Do you recall that?
A Yeah, we would go there. I don't know -- I assume so, yeah.
Q Did you discuss the Bomb Tech hiring at that time?

Page 175

A Not that I recall.
Q What is the reference to secret prison in the second email from the top?
A If you remember back at that time, there was a -- referring to Homan Square where they're offices over there, there was -- I forget what it was -- one of the units, one of the gang units or something was -- it's also held there, and the media was making reference that that was a secret prison that the FBI -- or that the Chicago Police were taking people to question that unmarked facility. So it was a reference that was going around in the media at that time, so it was just a joke, that secret prison.
Q It was an inside joke, right?
A It was -- for us, but it was all over the media that that was the Chicago Police Department's secret prison was over at Homan Square, which is a -- not a secret. I mean, it's a police called all around Homan Square. It's a very public police office, so...
Q Do you recall any of the specifics of this lunch meeting between you and Mr. Jones --
A No, sir --
Q -- or Egan on March 31st?
A No, sir.

Page 176

Q We looked at this before, but I'm going to ask that we share the screen again. That's the email that has attached to it the blank Candidate Assessment Form, but I am actually going to ask you a couple questions about the email itself. Can you scroll down so that Mr. Schmitt can take a look at that. Thank you.
First of all, there's a reference to a Christof M. Bielfeldt, B-I-E-L-F-E-L-D-T. Do you know who that is?
A I know -- yes, sir.
Q Who is that?
A I think if it's the guy I'm thinking of, he was the sergeant or assistant over special function, the deputy chief, he was there. He was a sergeant assigned to special functions. If that's who I'm thinking of.
Q Did you ever have any discussions with Mr. Bielfeldt about the 2015 Bomb Tech hiring process?
A No, sir.
Q Do you know who Rose Sprinkle (phonetic) is?
A No, sir.
Q Did you ever have any discussions with Rose Sprinkle about the 2015 Bomb Tech hiring process?
A No, sir.
Q Now other than the interviews and consensus,

Page 177

meaning training we discussed, which we saw happened on April 28th, had you had any discussions prior to the date of these emails, May 21 and May 22 with anyone at the City of Chicago or the Chicago Police Department about the hiring other than Mr. Egan and Mr. Jones?
A No.
Q And in the email at the top, as we noted, it says please reveal the attached documents --
A Sir, you cut out. All I heard was email and it went blank.
Q Yeah. That's my fault, sorry.
At the top the email says, please review the attached documents prior to Wednesday, and that's the blank Candidate Assessment Form. And then Mr. Egan goes onto say, we will need to print these up for each candidate, and let's try to get there ahead of the first interview to discuss any issues. Did the three of you get together ahead of time before the first interview to discuss the interviews?
A I assume we got together whatever time we were meeting, we got there. And if we discussed anything, it was just to how the procedures we're going to go down and look at how we're going to do it. But we didn't discuss any candidates or scoring or anything like that, and it


MAGNA LEGAL SERVICES

was going over the, I want to say, ground rules of how the interviews we're going to go.
Q Do you have a specific recollection of anything that was said at the meeting?
A No. I'm assume -- no, I do not.
Q Do you have a specific recollection of any issues that were discussed at that meeting?
A No.
Q Could you please pull up Exhibit 141 and scroll down so that Mr. Schmitt can see it. Thank you.
These are a couple emails dated June 5, 2015 between you and Mr. Egan and Mr. Jones, and it refers to Starbucks at 8:30. Do you have any specific recollection of the Starbucks meeting at 8:30 on June 5th?
A No.
Q Was anyone at that meeting there other than you, Mr. Egan, and Mr. Jones?
A I don't recall --
MR. PARKER: (Inaudible.)
Q How long did the meeting last --
MR. PARKER: Object to foundation.
THE COURT REPORTER: I'm sorry. Mr. Parker, did you just object previously too because it got jumbled up?



MR. PARKER: (Inaudible.)
THE COURT REPORTER: I'm sorry, your voice is contorted, distorted. I don't know. I can't hear you.
MR. PARKER: (Inaudible.)
MR. CURLEY: Can you read back the pending question, please.
(Pending question and answer read.)
BY MR. CURLEY:
Q So question -- my follow-up question was how long did that meeting last?
A Again, sir, I don't recall the meeting. And I -- was this the same date as the consensus meeting?
Q Yes, it was.
A Okay. I think we just met there to get a cup of coffee and walked over to the meeting. There was no meeting -- I don't ever remember sitting down at the Starbucks. I think we just went and met and got coffee to go to come back.
Q Okay. And that's all you recall, correct?
A Yeah, I don't recall sitting in the Starbucks over there, no.
Q Did you learn that Mr. Egan filed a complaint register against Maureen Bresnahan?
A In reference to --



Q Well, what I'm thinking of is in reference to her explosives license with the IDNR?
A For the application, I did know that, yes.
Q Okay. Are you aware of any other CR that Mr. Egan filed against Maureen?
A No.
Q And do you recall that on July 6, 2015, Mr. Egan received notification from the IDNR that a explosive license had been issued to Maureen on June 15th?
MR. PARKER: I'll object to foundation.
BY THE WITNESS:
A I didn't know when -- I don't even remember when I became aware of that, no, I don't -- but I did know that.
BY MR. CURLEY:
Q Did Mr. Egan tell you that he was going to be filing the complaint register before he actually filed it?
A I don't recall. I don't believe so.
Q Did Mr. Egan, after he received the notification from the IDNR, call you up to get your opinion as to whether that application was false or fraudulent?
A No --
MR. PARKER: Object to foundation. Go ahead, sorry.



Object to foundation.
BY THE WITNESS:
A I'm sorry. No, he did not ask my opinion.
BY MR. CURLEY:
Q Could you please bring up Exhibit 101. And while we're doing that, let me ask you if you recall anything else that Mr. Egan told you about his complaint register against Maureen?
A No. I don't remember if Sergeant Egan told me or -- because I think this is what went down for their internal affair interview. I think did she file something against Sergeant Egan then? One of them, I was interviewed by their internal affairs. So I got some knowledge from that interview, but I don't know if I learned it from Sergeant Egan or through that course of that investigation.
Q All right. Can you just take a moment then and read through this exhibit, it's pretty short as we scroll it. And my question simply is going to be whether this refreshes your recollection at all any further about Mr. Egan's complaint register against Maureen?
MR. PARKER: You know, I'm going to object. This is a document, this is an internal CR document. You haven't asked him if he's ever even seen it. I'm not going



MAGNA LEGAL SERVICES

to -- so I'm going to object to foundation. Calls for speculation, you know. And again, I'm going to request that this be short leeway on this because this is not something you've established he's ever even seen.
MR. CURLEY: Right. But as you know, I'm entitled to show the witness anything to see if it refreshes his recollection. And that's simply my question, whether this refreshes his recollection any further.
BY THE WITNESS:
A No. I know there was a complaint filed that on the application stated that she was a Bomb Tech for the City of Chicago, and that it was a referral to their internal affairs to investigate it. And I'm not sure -- I don't know anymore about their course of actions with it.
Q All right. Did you ever see Maureen's application to the IDNR?
A No, sir.
Q Do you have an opinion one way or another whether that application, the license was obtained on false pretenses?
A Again, sir, I've never seen this, so I cannot speculate on it.
Q I guess I should ask since Chris mentioned it,



have you ever seen Exhibit 101 prior to today?
A Is that what I'm looking at right now?
Q Yes, it is.
A No, sir. I have not.
Q Can you pull up Exhibit 148, please. These are a couple of emails dated July 8th, which is a couple days after Mr. Egan received the IDNR notification and it refers to you and Mr. Egan stopping by to meet Steve Georgas (phonetic). Do you see that?
A No. There's nothing on my screen.
Q Fair enough. Can you please share 1248. Thank you.
Scroll down to the bottom if you would. Make sure he gets it all. Do you have any recollection of meeting with Mr. Egan and Mr. Georgas on July 8, 2015?
A No, sir.
Q Who is Mr. Georgas?
A He was -- I believe at the time, he was over at Special Functions. I'm not sure if he was a commander or deputy chief at the time, but he was over at Special Functions.
Q Did you meet from time to time with just Mr. Georgas and Mr. Egan?
A Very rarely. I mean, I would see Mr. Georgas at



functions and different activities and stuff, and I knew him, but, you know, I don't recall what this meeting was in reference to.
Q Was the 2015 Bomb Tech hiring process discussed during the meeting?
MR. PARKER: Object to foundation --
BY THE WITNESS:
A Again, sir, I don't recall what the meeting was in reference to.
BY MR. CURLEY:
Q I am allowed to ask him follow-up questions to try and probe your recollection or refresh it?
A Understand.
Q Was the complaint register that Mr. Egan filed against Maureen discussed at the meeting?
MR. PARKER: Objection. Foundation. Asked and answered.
BY THE WITNESS:
A Sir, I don't recall.
BY MR. CURLEY:
Q Did you ever discuss Mr. Egan's complaint register against Maureen with Steve Georgas?
A I don't believe so, no.
Q Have you ever discussed it with Mr. Egan?



A I knew he filed on it -- a complaint. I know she filed a complaint on him afterwards, and we didn't talk in great depth about it, but I knew that the two were filed.
Q Focusing on Mr. Egan's complaint register against Maureen, what do you recall Mr. Egan telling you about that?
A I think I answered this already, sir. But it's that the application stated that she was a Chicago Police Bomb Tech assigned to the bunker when, my understanding, sergeant Egan and his position gets all the applications that are in Chicago or that are in the city. I don't know why -- I don't know why he gets them, but he got notice and happened to look at them. My understanding that he saw her name on there and the application and said, well, she's not a member of the Bomb Squad. And some -- you know, he was told or did or I'm not sure how the complaint was -- there was by the record or his form my understanding was an allegation of possible wrongdoing. That is what their internal affair section is designed to do. So her referral was made to them to look at it and it was looked into, and I'm not 100 percent sure what the outcome was.
Q Do you recall anything else that Mr. Egan ever



MAGNA LEGAL SERVICES

told you about his complaint register against Maureen?
A No.
Q And I think I asked you if you ever saw Maureen's application?
A Right --
Q So this is a different question. Did you ask Mr. Egan to give you a copy of the application?
A No, sir, I did not.
Q Have you ever discussed Mr. Egan's complaint register against Maureen with anyone other than Mr. Egan or representatives of the Department's Internal Affairs Division?
A No, no.
Q Can you please pull up Plaintiff's Exhibit 145. Just a couple short emails. If you can begin to scroll down so Mr. Schmitt can see those. Thank you.
These emails refer to a meeting with you and Mr. Egan and Mr. Jones. Do you see that?
MR. PARKER: Objection. Foundation. Go ahead.
BY THE WITNESS:
A Sir, these are all to the best of my recollection. I wouldn't -- meetings -- a lot of times in the morning, I can call -- if I haven't seen Sergeant Egan for a while, we'd want to just catch up on what's



going on, hey, do you want to get together for coffee. You know, maybe I talked to him on Monday. Hey, let's get together Wednesday morning, I'll be in the. Office and that's what they're more of a get-together to see what's going on in Chicago for the bomb world. They're not official meetings.
Q Do you have any recollection of what was discussed at this meeting on January -- on July 23, 2015 with Mr. Egan and Mr. Jones?
A No, sir. I do not.
Q Was the 2015 Bomb Tech hiring discussed?
A No. I do not recall.
Q Was the CR filed by Mr. Egan against Maureen discussed at the meeting?
A I don't recall what was discussed, sir.
Q Could you please pull up Plaintiff's Exhibit 146.
This is a one-page email that just refers to an attachment, and the attachment is lengthy. It's the complaint filed in Federal Court by Maureen Bresnahan against the City of Chicago. And you're welcome to have us scroll through as much of that complaint as you would like.
A Okay. Can I wait to see what your question is on it?



Q Very reasonable, yes. Did Mr. Egan tell you why he was sending you a copy of this complaint?
A No. Is this the one that I was named in?
Q No.
A Okay.
Q The only defendants are the City of Chicago.
A Okay.
Q Did this just show up unannounced in the email or did Mr. Egan call you and tell you it was coming?
A I don't recall. I assumed he would have called since there's no thing on it or no message with it.
Q Did you discuss Maureen's complaint after you received a copy from Mr. Egan?
A I'm sure we talked about it, yes. I don't recall the specifics though.
Q On how many occasions have you discussed Maureen's complaint with Mr. Egan?
A I mean, numerous in the last couple years. A lot of it just basically what's going on with it, have you heard anything. Because I have not -- I don't -- I'm not in the regular, you know, getting information on it. I just -- once in awhile I may ask Sergeant Egan, hey, what's the status, is there anything going on with it and such. But I can't give you a number.



Q Do you recall the specifics of any discussions you've had with Mr. Egan about Maureen's complaint?
A No. Nothing specific, no.
Q When did you last speak to Mr. Egan about Maureen's complaint?
A I don't recall.
Q Other than your attorney, have you discussed today's deposition with anyone else?
A No.
Q Mr. Egan was deposed in the case a couple weeks ago. Have you had any discussion with him about his deposition?
A No.
Q Have you ever discussed Maureen's complaint, which is attached to Exhibit 146 with Roland Jones?
A Yeah, but -- yeah, just basically same thing with Sergeant Egan, just in general.
Q And have you had discussions with Mr. Egan and Mr. Jones together about Maureen's complaint?
A Not that I recall.
Q Do you recall the specifics of any of the discussions you had with Mr. Jones about Maureen's complaint?
A No.



MAGNA LEGAL SERVICES

Q Have you ever discussed Maureen's complaint with Steve Georgas?
A I don't believe so.
Q Have you ever discussed it with anyone else from the City of Chicago or the Chicago Police Department?
A I --
Q I'm sorry, sir. Other than the Internal Affairs Division?
A No. I don't believe so, no.
MR. CURLEY: Can you take that exhibit off the screen, please.
Alex, I think I'm done. I'd like about maybe 10 minutes to make sure I didn't omit anything. Is that all right?
MR. HARTZLER: Can we take five?
MR. CURLEY: Take five. I knew if I asked for 10, you'd give me five.
THE VIDEOGRAPHER: This ends media unit number FIVE in the deposition of Todd Schmitt. The time is 3:33 p.m. we're going OFF the record.
MR. CURLEY: So, I'll be back at 3:40.
(Short recess.)
THE VIDEOGRAPHER: This begins video number six in the deposition of Todd Schmitt. The time is 3:39 p.m.



We're back on the record.
BY MR. CURLEY:
Q Mr. Schmitt, I don't have any further questions at this time. Thank you for your time and attention.
MR. PARKER: And this is attorney Chris Parker. We don't have any further questions at this time either.
MR. HARTZLER: We'll waive signature.
THE VIDEOGRAPHER: This ends the deposition of Todd Schmitt. The time is 3:40 p.m. We're going off the record.

* * * * * * * *



REPORTER'S CERTIFICATE

The within and foregoing statement of the witness, TODD SCHMITT, was taken before DEANNA L. TUFANO, CSR, and Notary Public, wherein all parties appeared via Zoom at 9:30 a.m. on the 20th of July, A.D., 2021.

The said witness was first duly sworn and was then examined upon oral interrogatories; and the questions and answers were taken down in shorthand by the undersigned, acting as stenographer and Notary Public; and the within and foregoing is a true, correct, and accurate record of all of the questions asked of and answers made by the said witness, TODD SCHMITT, at the time and place hereinabove referred to.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature and seal as Notary Public in and for Cook County, Illinois on 3rd day of August, A.D., 2021.

Deanna L. Tufano

RealLegal Notary for E-Transcript

DEANNA L. TUFANO, CSR
CSR No. 084-003819
MAGNA LEGAL SERVICES
SEVEN PENN CENTER
1635 MARKET STREET, 8TH FLOOR
PHILADELPHIA, PA 19103
(866) 624-6221



MAGNA LEGAL SERVICES